IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

_____

ANDRE JACOBS

Plaintiff

vs.                                Civil Action No. 04-1366

PENNSYLVANIA DEPARTMENT OF
CORRECTIONS, et al

Defendants
_____

PROCEEDINGS (Day 4)

        Transcript of Jury Trial Proceedings, continuing
Thursday, November 6, 2008, United States District Court,
Pittsburgh, Pennsylvania, before Honorable Joy Flowers Conti,
United States District Judge.


APPEARANCES:

For the Plaintiff:        ANDRE JACOBS, Pro Se

For the Defendant:        SCOTT BRADLEY, Esquire
                          ROBERT WILLIG, Esquire



Reported by:              Virginia S. Pease
                          Official Court Reporter
                          619 USPO & Courthouse
                          Pittsburgh, Pennsylvania 15219
                          412.208.7385



Proceedings recorded by mechanical stenography.  Transcript
produced by computer-aided transcription.

1               (Whereupon, court convened.)

2               THE COURT:  Please be seated.  We're still waiting

3     for the defendant.

4               MR.WILLIG:  We have the two Camp Hill inmates on the

5     line now.  They can see us, Matt; we just can't see them.

6               THE COURT:  Mr. Jacobs, as soon as you're ready, if

7     you could just let me know.  Take your time.

8               Which witness do we have here on the screen?

9               MR. BRADLEY:  This is David Smith.

10              THE COURT:  Mr. Smith, okay.

11              STATE OFFICER:  No, it's Edwards.

12              MR. BRADLEY:  My apologies.

13              THE COURT:  Okay.

14              MR. JACOBS:  I'm ready, Your Honor.

15              THE COURT:  Good morning, Mr. Edwards.

16              THE WITNESS:  Good morning.

17              THE COURT:  I am Judge Conti, and this is a civil

18    case that has been brought by Andre Jacobs against various

19    defendants who are employed by the Pennsylvania Department of

20    Corrections.

21              This is a case where we're going to have testimony

22    from you.  You're a witness called by Mr. Jacobs.

23              Mr. Jacobs, is there anything you wish to ask him

24    now, before I bring in the jury?

25              MR. JACOBS:  No.  I think I want to ask him about

1  whether he refused to come to this trial or not, just for the

2  record.

3        THE COURT:  You need to pull, you can pull the base

4  close to you; it moves.

5                        * * * * *

6        MICHAEL EDWARDS, a witness herein, having

7  been first duly sworn, testified as follows:

8        DIRECT EXAMINATION (out of the presence of the jury)

9  BY MR. JACOBS:

10 Q.    Can you hear me, Mr. Edwards?

11 A.    Yes.

12 Q.    I was advised yesterday that you refused to come to

13 participate in this trial.  Is that correct?

14 A.    Yes.

15 Q.    And is there a reason why you refused to participate in

16 this trial?

17 A.    Yes.

18 Q.    What is the reason?

19 A.    It's the -- David Smith was assaulted on his way here,

20 after he left here.  There was no connection, and he was

21 assaulted.

22 Q.    For him trying to come here to participate in the

23 trial?

24 A.    I have no knowledge of why he was assaulted, but he was

25 assaulted after they didn't -- he found out that it wasn't no

1    connection.  So, he said it wasn't no lawyer, so he asked to

2    come back to his cell.  Once he got back on the block he was

3    assaulted.  So, I refused to come out of my cell.

4    Q.      Because you were afraid you might be assaulted, too?

5    A.      Yes.

6    Q.      Has that in any way affected your willingness to

7    participate in the trial at this point?

8    A.      Yes.

9    Q.      In what way?

10   A.      Um, I fear for my safety.

11   Q.      Do you fear for your safety right now?

12   A.      Not around these particular guards here.  I don't know

13   them.  But there's certain guards that work in the unit I'm

14   in.  I fear for my safety.

15          THE COURT:  Okay.  This is Judge Conti.  If there

16   are any problems that you experience, Mr. Edwards, you can let

17   the Court know, and the Court will view any adverse actions

18   taken against you as an attempt to obstruct justice and to

19   intimidate a witness.

20          I'm not going to pre-judge anyone one way or the

21   other.  I'm just letting everyone know that an inmate, just as

22   anyone else, has a right to testify without fear of

23   retribution.

24          So, but you have at this stage, Mr. Edwards, you

25   have not been assaulted; is that correct?

1                THE WITNESS:  No, ma'am, but I have been threatened.

2                THE COURT:  Okay.

3     BY MR. JACOBS:

4     Q.      Who were you threatened by, Mr. Edwards?

5     A.      Um, that information is on its way to the mail; two

6     declarations.

7     Q.      I mean, was it a prisoner or guard?

8     A.      They were correctional officers.  They found your

9     correspondence to me in the cell about this case.

10    Q.      And that was the basis for them threatening you?

11    A.      Yes.

12    Q.      And what was the nature of the threats?

13    A.      Um, I'm not to testify in your behalf.

14               THE COURT:  Okay.  We'll have that matter looked

15    into.

16               But at this stage, Mr. Edwards, are you willing to

17    testify?

18               THE WITNESS:  Yes.

19               THE COURT:  All right.  So, with that, okay.

20               I'm going to order the colloquy that was outside the

21    presence of the jury with the witness, Mr. Edwards, to be

22    transcribed, and I'm going to have that done at the cost of

23    the defendants at this time, and I'll re-assess whether the

24    costs should be allocated differently at an appropriate time.

25               All right.  So, with that, I'm going to ask if the

1  two guards, remember how they were stationed yesterday?  Do

2  these guards know about that?

3          MR.WILLIG:  Randy, can you have the two officers

4  stand off, outside of camera view.

5          THE COURT:  To the side.

6          MR.WILLIG:  To the side.  If he's on a tether.

7          Can you zoom the camera in?  Okay.  There you go.

8  That's good.  Just make sure the CO's stay outside of the

9  camera range.  We're good.  Thank you.

10          THE COURT:  Okay.  Are we ready to go?

11          Mr. Jacobs, you ready for this witness?

12          MR. JACOBS:  Yes, Your Honor.

13          THE COURT:  Okay.  Please rise for the jury.

14          MR. BRADLEY:  Excuse me, Your Honor, before the jury

15  comes in, I would ask that, because whatever happened at Camp

16  Hill --

17          THE COURT:  That's not going to be the subject of

18  any of the questioning.

19          MR. BRADLEY:  I just wanted that for the record.

20          THE COURT:  Yes.  I said I will have it looked into.

21          MR. BRADLEY:  Thank you, Your Honor.

22          THE COURT:  Okay.

23          (Jury is seated.)

24          THE COURT:  Please be seated.

25          Members of the jury, you'll recall yesterday I

1   mentioned that we would take witnesses out of turn.  The

2   defendant had not finished putting on his evidence.

3           We're now going to go back and interrupt the

4   questioning of the witness from the defense that we had on

5   yesterday.  She'll be returning later in the trial to finish

6   up the cross examination and the rest of her testimony.  But

7   today we have one of Mr. Jacobs' witnesses.

8           I'm going to ask that the witness please be sworn

9   in.

10                          * * * * *

11           MICHAEL EDWARDS, a witness herein, having

12   been first duly sworn, testified as follows:

13                     DIRECT EXAMINATION

14   BY MR. JACOBS:

15   Q.    State your name for the record.

16   A.    Michael Edwards.

17   Q.    And you're currently incarcerated?

18   A.    At SCI Camp Hill, SMU.

19   Q.    Was there ever a time you were at SCI Pittsburgh?

20   A.    Yes.

21   Q.    At what time were you at SCI Pittsburgh?

22   A.    Two separate times.  From 1984 to '91, and from 1998

23   'til 2003.

24   Q.    Was there ever a time while you were at SCI Pittsburgh

25   in the second term that you were housed in a restricted

1    housing unit?

2    A.      Yes.  I was housed in A-1 and A-2 from 1998 to 2003.  I

3    was housed in the RHU.

4    Q.      Did you ever use the grievance procedure when you were

5    at SCI Pittsburgh?

6    A.      Yes, sir.

7    Q.      To what extent did you use that procedure?

8    A.      Excuse me?

9    Q.      To what extent did you use the grievance procedure?

10   A.      Total exhaustion, from the grievance to Camp Hill.

11   Q.      On how many occasions?

12   A.      Numerous.

13   Q.      Could you give an estimate?

14   A.      Ah, I have a document here -- if you would like to

15   copy, or the Attorney General would like to copy -- of

16   documents actually stolen out of my cell from 1998 to 2000 on

17   a grievance.

18   Q.      Okay.  There are officers' names.  You have any names

19   in regards to what officers participated in these type of

20   taking of documents?

21   A.      Yes.

22   Q.      Was there ever occasion when -- do you know an officer

23   by the name of Giddens?

24   A.      Yes.

25   Q.      Who is he?

1    A.       Lieutenant Giddens.

2    Q.       How do you know him?

3    A.       I filed a grievance on him pertaining to an incident

4    where an inmate committed suicide, and within an hour of him

5    committing suicide, he was assaulted by officers in A-1 of the

6    RHU at SCI Pittsburgh.

7    Q.       Okay.

8    A.       He placed me on restrictive movement.  I couldn't take

9    showers, I couldn't take -- I couldn't go to law library.   I

10   couldn't have yard.   I was barred from trays, showers, due to

11   me giving a statement to the Pennsylvania State troopers

12   concerning that incident.

13   Q.       So, you were retaliated against for giving a statement?

14   A.       Oh, definitely.   I was placed in a cell with no

15   clothing and four-point restraints, face down on the concrete

16   floor for nine days.

17   Q.       Did you file a grievance, did you file a grievance

18   about this?

19   A.       No, I couldn't, because you have a time period of 15

20   days.   They kept me in this cell, four-point restraint, face

21   down for nine days.   I didn't get my property back until two

22   and a half months later.

23   Q.       So your property was taken?

24   A.       Excuse me?

25   Q.       Your property was taken from you?

1   A.      I have that in writing, black and white, from this

2   Institution, from SCI Pittsburgh, to SCI Fayette, to where I'm

3   at now.   There is approximately six boxes of legal documents.

4   The majority of the documents pertain to me being retaliated

5   against, others being retaliated against at SCI Pittsburgh,

6   RHU A-1, A-2 and A-3 units.

7   Q.      And how do you know that other prisoners were being

8   retaliated against?

9   A.      I was moved from one unit to another.   I was

10   specifically told by Lieutenant Giddens, retract the statement

11   that I gave to the State troopers.   And I also wrote a

12   declaration to the mental health unit, which they used at a

13   suicide hearing to determine the death of Mr. Solomon, Howard

14   Solomon.   That was his name.   He was a lifer, and I witnessed

15   him being physically assaulted.

16        I filed a grievance and a complaint with the

17   Pennsylvania State troopers about what I witnessed, and

18   Lieutenant Giddens was a witness while the State troopers was

19   processing the crime scene, or the scene of the suicide.   He

20   told me to stop talking to the State troopers.   And when I

21   hollered out my cell, I was placed on -- well, the restriction

22   was this, I couldn't come out my cell for nothing.   And I was

23   moved from the cell I was in, placed in the corner cell in

24   another part of the RHU, and was told through other

25   correctional officers, as well as Giddens, all I had to do was

1   withdraw the grievance and the statements that I gave to the

2   State troopers and he would put me back on regular status,

3   like every other inmate.  So, I was denied basically

4   everything.

5   Q.      Meaning probably everything that you were generally

6   permitted to have in your cell?

7   A.      Yes.  And he recently, he recently retaliated against

8   me at SCI Fayette.

9           MR. BRADLEY:  Your Honor, excuse me.

10          THE COURT:  Excuse me, just one moment.

11          MR. BRADLEY:  I understand anything that happened

12  after September, 2000 isn't relevant -- September, 2003, isn't

13  relevant to what Mr. Jacobs claims are; specifically, what

14  happened in another Institution with regard to this inmate.

15          THE COURT:  We need to keep focused on the relevant

16  time table.  So, that objection is sustained.

17  BY MR. BRADLEY:

18  Q.      Did you hear that, Mr. Edwards?

19  A.      Yes.

20  Q.      And the relevant years are what, 2001, 2003, and before

21  that time frame.

22  A.      Okay.

23  Q.      2003 and before.

24  A.      Okay.

25  Q.      How were your grievances addressed?  I mean, did you

1    get resolution for your grievances, grievances that you filed

2    throughout your time, your years of using the grievance

3    process?

4    A.      I got no relief.  I was told, as long as I filed

5    grievances, help other inmates --

6                MR. BRADLEY:  Your Honor, excuse me.

7                THE COURT:  Okay.  Just a second.  He has to say

8    who, if there were any, of the defendants that were involved

9    in that type of conduct.  It can't be hearsay from other third

10   person.

11   BY MR. BRADLEY:

12   Q.      Did you hear that?

13   A.      Yes.

14           Who are the defendants?  The only defendant I know of

15   is Giddens, that you explained that I heard his name, Giddens.

16   Q.      Okay.  What I'm going to do, I'm going to tell you all

17   the defendants who are in this case, and I want you to

18   identify which ones may have participated in retaliating

19   against you, conspiring against you, or obstructing your

20   grievances, destroying your property, anything dealing with

21   those specific issues from 2003 and beforehand.

22               THE COURT:  Right.  You need to focus.  The inquiry

23   should be directed towards taking of the legal property, and

24   the grievances relating to that.  Okay.

25               MR. JACOBS:  Retaliation as well.

1            THE COURT:  Yes.

2            MR. JACOBS:  Okay.

3   BY MR. JACOBS:

4   Q.     Can you hear me?

5   A.     Yes.

6   Q.     The defendants in the case are Jeffrey Beard, Thomas

7   McConnell, Carol Scire -- but it's pronounced Scire.

8   A.     Yes.

9   Q.     Gregory Giddens, Allen Lynch, Robert Bittner, Captain

10  Simpson, Kristin P. Reisinger, Michael Ferson, Shelly Mankey,

11  William Stickman, Frank Chirico, David McCoy.

12            Do you recognize -- do you recognize any of those

13  names?

14  A.     Just about everybody but three.

15  Q.     Which ones were they?

16  A.     Um, after you spoke about the executive staff at Camp

17  Hill, from, well, McConnell --

18            THE COURT:  Why don't you go through each name?  I

19  think that might be easier, since he doesn't have any paper in

20  front of him.

21            MR. JACOBS:  Okay.

22  BY MR. JACOBS:

23  Q.     Do you know Jeffrey Beard?

24  A.     Yes.  I talked to him personally.

25  Q.     Do you know Thomas McConnell?

```
 1  A.      Yes.

 2  Q.      Do you know Carol Scire?

 3  A.      Yes.

 4  Q.      Do you know Gregory Giddens?

 5  A.      Yes.

 6  Q.      Do you know Allen Lynch?

 7  A.      Is he a correctional officer?

 8  Q.      He is a correctional officer?

 9  A.      I only know one Lynch.  That was at SCI Pittsburgh.  I

10  don't know if his first name is Allen but I do know a CO

11  Lynch.

12  Q.      And where did you know him from?

13  A.      A-1, RHU.  He was involved in.

14  Q.      Wait.  Just tell me where.

15  A.      He was involved in this particular incident.

16  Q.      During what time frame, what year; do you remember?

17  A.      2000, 2001.

18  Q.      Okay.  Do you know Robert Bittner?

19  A.      Bittner?

20  Q.      Yeah.

21  A.      I only know one Bittner, and he was, if I'm not

22  mistaken, records room officer at SCI Fayette -- I mean, SCI

23  Pittsburgh.  That's the only Bittner I know.  I appealed some

24  paperwork to him.

25  Q.      Paperwork in regards to what?
```

1    A.      Ah, records.

2    Q.      You say that was SCI?

3    A.      SCI Pittsburgh.

4    Q.      Do you know Kristin P. Reisinger, Ressing, or

5    Reisinger?

6    A.      Who?  Repeat that name.

7    Q.      Reisinger ask, Reisinger.  Kristin P. Reisinger.

8    A.      No.

9    Q.      Do you know Michael Ferson?

10   A.      Yes.

11   Q.      Do you know Shelly Mankey?

12   A.      Yes.

13   Q.      Do you know William Stickman?

14   A.      Yes.

15   Q.      Do you know Frank Chirico?

16   A.      No.

17   Q.      Do you know David McCoy?

18   A.      Is this gentleman a captain?

19   Q.      I'm not certain myself.

20   A.      Because if he is, that's who took my statement about

21   the incident with the State troopers.

22   Q.      What year?

23   A.      2000, 2001, late 2001.  Filed several complaints with

24   the Pennsylvania State troopers.  He handled one from 1998 to

25   2001.

1   Q.      Have any of these defendants who you just identified,

2   you do know retaliated against you in any way during the

3   relevant time frame?

4   A.      Yes.

5   Q.      In what way have you been retaliated against by the

6   specific defendant?

7           MR. BRADLEY:  Your Honor, I think that's a little

8   too broad.

9           THE COURT:  How would you suggest it?

10          MR. BRADLEY:  In terms of the areas that the Court

11  has permitted evidence, regarding interference with legal

12  property, things of that nature.

13          MR. JACOBS:  I informed him of what area.

14          THE COURT:  Okay, fine.  Well, then, why don't you

15  focus your inquiry; why don't you rephrase your question?

16          MR. JACOBS:  Okay.

17  BY MR. JACOBS:

18  Q.      Jeffrey Beard -- can you hear me?

19  A.      Yes.

20  Q.      In what way has Jeffrey Beard ever retaliated against

21  you?

22          THE COURT:  Okay.  Could you keep it within the time

23  frame.

24          MR. JACOBS:  I informed him to focus on a specific

25  time.

1   BY MR. JACOBS:

2   Q.      Are you aware that we're talking about the specific

3   time frame from 2003 beforehand?

4   A.      Okay.  From, from what year?

5   Q.      No later than 2003.

6   A.      Oh.  That's when I left.

7   Q.      That's when you left?

8   A.      That's when I left, February -- yeah, February, 2003.

9   Q.      Okay.

10  A.      I came in 1998 and left February of 2003, and at that

11  time I personally talked to State representatives in the

12  presence in the RHU law library with Jeffrey Beard, and as a

13  result of that conversation about the conditions of

14  confinement, my legal property being stolen, my legal mail

15  being tampered with, me being physically assaulted, he turned

16  to, if I'm not mistaken, it was Superintendent Price at that

17  time, and he told him, in front of State representative Deana

18  Washington, look into this matter.

19          And instead of the retaliation, and harassment and

20  intimidation ceasing, it was turned up.

21  Q.      By "turned up", you mean?

22  A.      Let's say, immediately after I had this conversation

23  with Jeffrey Beard face-to-face, and State representative

24  Deana Washington, some of her aides in the law library in the

25  RHU, in the 2002, exactly, the month was October, I was sent

1    down state by that extent I was sent downstairs to A-1 and

2    after that I was placed in a hard cell with no furniture,

3    four-point restraints, after I filed a grievance.

4    Q.    How frequent -- how frequent is it that adverse actions

5    are taken against you by prison officials for filing a

6    grievance?

7            MR. BRADLEY:  Excuse me, Your Honor, "by prison

8    officials" doesn't confine it to this case.

9            THE COURT:  He needs to focus on his time at SCI,

10   just phrase your questions with respect to his time at FCI

11   Pittsburgh, and if he can frame in his response the period of

12   time that was involved, and if he has an identification of any

13   of the prison officials.

14   BY MR. JACOBS:

15   Q.    Do you remember what prison officials were involved in

16   you exhausting the grievance procedure --

17   A.    Yes.

18   Q.    -- during the relevant time frame?  During the relevant

19   time frame.

20   A.    From, from 1998 to 2003, the defendant, Carol Scire,

21   she had several positions at this time; notary, grievance

22   coordinator, and I was sending notarized documentation to a

23   Federal Judge and a judiciary chairman by the name of John

24   Connors, Jr. in Washington DC.  She told me she was informed

25   by the Defendant Stickman that she cannot no longer notarize

1   documents to Court officials, because the majority of my

2   documentation was notarized.  And for some reason, one day in

3   2002, she said, I can no longer notarize your documents to

4   Court officials, on the orders of Defendant Stickman.

5   Q.     And Miss Scire's capacity as grievance coordinator, do

6   you remember having any interactions with her trying to file

7   grievances, and appeal grievances, things of that nature?

8   A.     I had Defendant Carol Scire personally come to my cell

9   and tell me that I just need to stop filing grievances; this

10  is frivolous.

11  Q.     Well, how -- as grievance coordinator, she processed

12  the grievances; correct?

13  A.     Yes.

14  Q.     Did you ever have any difficulty with her processing

15  the grievances?

16  A.     Yes.  I've had her bring my grievance back to my cell,

17  throw it in my cell.

18          MR. BRADLEY:  Your Honor --

19          THE COURT:  Just one moment.  There's an objection.

20          MR. BRADLEY:  There's no claim in this case that

21  Mr. Jacobs had his grievance process interfered with.

22          MR. JACOBS:  Yes, I did.  Yes, there is, Your Honor.

23          THE COURT:  Okay.  You can continue, and I'll direct

24  the jurors to disregard it if it's -- if that's not part of

25  the retaliation.

1   BY MR. JACOBS:

2   Q.      You can continue, Mr. Edwards.

3   A.      Yes.  She personally stuck my grievance with a

4   rejection note on it, stating, "rejected".  If I was sleeping,

5   sometime she would wake me up and tell me, I'm not processing

6   this.  These are some of the documents that were taken out of

7   my cell, which I have a grievance right here in front of me

8   on.

9              MR. BRADLEY:  Your Honor --

10  A.      From 1998 to 2000, these grievances, grievance

11  response, some requests, request of staff to her, Defendant

12  Stickman, were taken out of my cell.  I have a copy of the

13  grievance that I filed on this situation right in front of me.

14  Q.      I want to draw your attention to experiences with the

15  misconduct system.  Are you familiar with the misconduct

16  system in the Department of Corrections?

17  A.      Yes.

18  Q.      At SCI Pittsburgh?

19  A.      Yes.

20  Q.      During the relevant time frame?

21  A.      Yes.

22             MR. BRADLEY:  Excuse me, Your Honor.

23  A.      I refuse to participate --

24             THE COURT:  Excuse me, we have an objection.

25             MR. BRADLEY:  This is beyond the scope of what this

1   witness was offered for.

2          THE COURT:  Okay.  Why don't we take a brief recess.

3   We'll excuse the jury.

4          (Whereupon, jury retired.)

5          THE COURT:  Please be seated.

6          When we have a more extended discussion, we need to

7   excuse the jury.  Ordinarily, I would do it at sidebar, but

8   because of the circumstances where the counsel and the

9   plaintiff are sitting at the tables, we can't do that.

10          MR. BRADLEY:  My understanding of the proffer of

11   this witness is that he was going to testify as to, in order

12   to establish supervisor liability, prior incidents involving

13   the matters outlined by the Court that occurred at SCI

14   Pittsburgh involving these defendants in the relevant time

15   frame.

16          THE COURT:  So, let's ask Mr. Jacobs, how would this

17   conduct tie in with that; okay?

18          MR. JACOBS:  Just yesterday, Your Honor, you said I

19   could offer testimony, direct testimony from witnesses who had

20   experiences with the 801, 801 misconduct procedure, to show a

21   connection between the supervisory officials and --

22          THE COURT:  The question is whether the misconducts

23   relate to legal materials being taken, or retaliation in

24   connection with the actions of inmates trying to exercise

25   their First Amendment rights.

1          MR. JACOBS:  I'm going to ask Mr. Edwards, has he

2    ever been retaliated against through the misconduct system.

3          THE COURT:  You have to tie it in with that.

4          MR. JACOBS:  It will be, Your Honor.

5          THE COURT:  Okay.  See, a misconduct, he receives a

6    misconduct for exercising their First Amendment rights, and

7    other defendants have participated in that, or goes up the

8    chain, and they have learned about it in the system, then,

9    that is the type of evidence that I did say could be

10   introduced.

11         You'll have fair opportunity to cross examine, and

12   your witnesses will be able to testify about any of these

13   matters.

14         Okay.  Please rise for the jury.

15         Before the jury comes in, just so you know, we can't

16   go off in collateral matters without getting confusion to the

17   jury.  So, try to focus your questions to the issues that are

18   in this case.

19         MR. JACOBS:  Okay.

20         (Jury is seated.)

21         THE COURT:  Please be seated.

22                    DIRECT EXAMINATION CONTINUES

23   BY MR. JACOBS:

24   Q.   Mr. Edwards --

25   A.   Yes.

1   Q.      -- has the misconduct system ever been used as a

2   retaliatory tool?

3   A.      Yes.

4   Q.      For your exercising a right?

5   A.      Yes.

6   Q.      In what way?

7   A.      I was denied to bring documentation, evidence into the

8   hearing examiner.  The hearing examiner, I believe, was

9   Michael Ferson.  The defendant, Michael Ferson, would direct

10  the correctional officers escorting you that if you was in the

11  RHU, one, you couldn't call a witness from the RHU who

12  witnessed an event; 2, you couldn't bring any legal

13  documentation.  So, basically you couldn't even put up a

14  defense.

15  Q.      Did you ever challenge the actions of Mr. Ferson for

16  denying you witnesses?

17          MR. BRADLEY:  Excuse me, Your Honor.  Whether or not

18  this individual challenged these actions is not relevant to

19  the matters.

20          THE COURT:  I'll permit the question as to whether

21  he challenged it.

22  BY MR. JACOBS:

23  A.      Yes.

24  Q.      How did you challenge it?

25  A.      Through the grievance system.  And I was told you

1    cannot file a grievance pertaining to a misconduct.  When in

2    fact, I wasn't grieving the misconduct, I was grieving the

3    proceedings of the misconduct hearing.

4         Once he gave me his what they call rationale for

5    finding me guilty, I couldn't understand the handwriting, so I

6    grieved that.

7              THE COURT:  I think you need to focus on who the

8    individuals were involved.

9              MR. JACOBS:  He said the hearing examiner was

10   Ferson, Defendant Ferson.

11   BY MR. JACOBS:

12   Q.   Did you ever appeal a misconduct?

13   A.   Yes.

14   Q.   Who did you appeal it to?

15   A.   Superintendent.

16   Q.   Did you ever appeal a misconduct to the PRC?

17   A.   Yes.

18   Q.   Did you ever get any type of relief?

19   A.   None.

20   Q.   Do you remember any of the individuals who were

21   involved in the appeal process of misconduct at SCI

22   Pittsburgh?

23   A.   Yes.  Defendant Stickman.

24   Q.   At SCI Pittsburgh?

25   A.   Yes.  He's on the documents that was taken out of my

1    cell.  Request to staff, to the executive staff.  I would like

2    to get this on record, if the Court would allow it.

3                    MR. BRADLEY:  Excuse me, Your Honor.

4                    THE COURT:  He just has to answer the questions.

5                    THE WITNESS:  I said, questions I'm being asked,

6    Your Honor, can be verified through documentation.

7                    THE COURT:  Well, just answer the question.

8                    THE WITNESS:  Yes, sir.

9                    THE COURT:  The issues with respect to this witness

10   are not on trial today, so those documents are not here today.

11   They are not direct -- they are not evidence in this case.

12                    So, he needs to answer the questions, and his

13   answers are the evidence that can be considered.

14                    THE WITNESS:  I said, yes.

15   BY MR. JACOBS:

16   Q.      Okay.  She said, just focus -- your answers are the

17   evidence, you know, so --

18   A.      Okay.  And I said, yes, to your question.

19                    MR. JACOBS:  No further questions at this time.

20                             CROSS EXAMINATION

21   BY MR. BRADLEY:

22   Q.      Mr. Edwards, my name is Scott Bradley.  I don't know if

23   you can see me.  I just raised my hand.

24   A.      I can see you.

25   Q.      I'm representing the defendants in this case, and I

1    just have a few quick questions for you.

2         You indicated that in SCI Pittsburgh you were in A-100

3    and A-200?

4    A.    Yes.  From 1998 to February 3rd.  I came October, '98.

5    Q.    Were you ever on the same unit as Mr. Jacobs?

6    A.    I have no idea.

7    Q.    Were you ever on A-300?

8    A.    Yes, but not at the time period you're talking about.

9    Q.    Okay.  Did you witness -- do you know what Mr. Jacobs

10   is claiming in this case?

11   A.    Yes.

12   Q.    Did you witness any of those events?

13   A.    Yes.  I, I suffering myself from them.

14   Q.    Excuse me?

15   A.    I suffer it myself from them.

16   Q.    Did you witness any of the actions that were taken

17   against Mr. Jacobs in this case?

18   A.    Pertaining to the theft of his legal property or

19   whatever?

20   Q.    Yes.

21   A.    No, sir.  I -- from this picture that I'm looking at

22   now of Mr. Jacobs, if he was in the RHU at the relevant times,

23   from '98 to 2003, you know, we talking about, we talking about

24   ten years ago.

25   Q.    Mr. Jacobs is claiming in September of 2000, while he

1  was on A-300, that some property of his was taken.  Did you

2  witness that?

3  A.     A-300?

4  Q.     A-300.

5  A.     Or A-2 -- or A-200?

6  Q.     A-300.

7  A.     A-300 is, that's the old death row, the old SMU.  I was

8  on A-1 and A-200.

9  Q.     Okay.  So, you did not witness any of the events that

10  Mr. Jacobs is complaining about in this trial; is that

11  correct?

12  A.     About him having anything taken from him personally;

13  personally, no.

14  Q.     No, you did not witness those things?

15  A.     No.

16  Q.     Thank you.

17         MR. BRADLEY:  That's all I have, Your Honor.

18         MR. JACOBS:  No redirect.

19         THE COURT:  Okay.  We're going to take another brief

20  recess, then.  Please rise; excuse the jury.

21         (Whereupon, court recessed at 10:30 a.m.)

22         THE COURT:  Okay.  This witness can be excused.  I'm

23  going to say, in the future -- somebody keeps walking back and

24  forth, one of the guards.  I don't know if there's a need for

25  that, or why that person keeps doing it, but for the next

1  witnesses, if they could just stay where they are, that would

2  be appropriate.

3            MR.WILLIG:  Okay, Your Honor.

4            Randy, are you there?  This witness is done.

5            Can you bring in the next witness?  I think it's

6  David Smith.  And if possible, can the CO's not walk across

7  the screen?  If they could just stay where they are, if

8  possible.  Thanks.

9            THE COURT:  You can all be seated while we're

10 waiting.

11           Could the defendants' counsel please come back in.

12           MR. BRADLEY:  Your Honor, one of the defendants have

13 brought a concern to my attention.  Apparently Mr. Grote, who

14 was called as a potential witness by Mr. Jacobs, when he walks

15 past the defendants, he's making certain remarks to them that

16 they are finding very offensive.

17           THE COURT:  I'll address him when he comes back in.

18           MR. BRADLEY:  Thank you.

19           THE COURT:  That's inappropriate, if he's doing

20 that.

21           Okay.  I'm going to order the colloquy that was

22 outside the presence of the jury with the witness,

23 Mr. Edwards, to be transcribed, and I'm going to have that

24 done at the cost of the defendants at this time, and I'll

25 re-assess whether the costs should be allocated differently at

1   an appropriate time.

2          MR. BRADLEY:  Your Honor, with respect to this

3   witness, he was never at SCI Pittsburgh.

4          THE COURT:  Why don't we ask him his name.  Could

5   the witness -- this is Judge Conti.

6          THE WITNESS:  Hello, ma'am.

7          THE COURT:  Hi.  What is your name, sir?

8          THE WITNESS:  Mr. David Smith.

9          THE COURT:  David Smith?

10          THE WITNESS:  Yes ma'am.

11          THE COURT:  Okay.  Were you ever at FCI Pittsburgh?

12          THE WITNESS:  No, ma'am, I wasn't.

13          THE COURT:  Okay.  Mr. Jacobs --

14          THE WITNESS:  No, ma'am, I haven't.  I've never been

15   to SCI Pittsburgh.

16          THE COURT:  Okay.

17                          * * * * *

18          DAVID SMITH, a witness herein, having been

19   first duly sworn, testified as follows:

20          DIRECT EXAMINATION (out of the presence of the jury)

21   BY MR. JACOBS:

22   Q.    Have you ever had any type of dealings or interactions

23   with any of the following persons:  Jeffrey Beard; do you know

24   that name?

25   A.    Ah, yes, I do.  Pertaining to my situations, as far as

1  for me being assaulted previously at the prior Institution

2  where I was transferred from SCI Huntingdon.  I had spoken

3  upon good faith to Mr. Jeffrey Beard on multiple occasions,

4  twice, and in 2008 of January 7th pertaining to my being

5  physically abused by the corrections officers at --

6            THE COURT:  Just a minute.

7            Mr. Grote, you're returning here to the courtroom.

8  You were previously offered as a witness.

9            The Court has been advised you're making

10 inappropriate comments in the courtroom to the defendants.

11 So, if you are -- and I have seen you personally making faces,

12 and you know, during testimony.  If you're here, you know --

13 and I would direct this to anyone else in the courtroom as

14 well, you need to maintain the appropriate decorum when you're

15 here.

16           MR. GROTE:  Understood.

17           THE COURT:  We don't want any disruptions.

18           THE WITNESS:  The reason why I'm --

19           THE COURT:  Have we lost the feed?

20 Q.    Did you hear me?

21 A.    Yes.  I want to apologize.  The reason why I'm making

22 faces --

23           THE COURT:  I wasn't talking to you.  I was not

24 talking to you.

25           THE WITNESS:  I humbly apologize.

1          THE COURT:  No, it was someone else in the

2    courtroom.  It has nothing to do with you.

3          THE WITNESS:  I apologize, Judge.

4          THE COURT:  I just wanted to know the time frame you

5    were speaking with Mr. Beard.  Did I hear you correctly, was

6    that 2007?

7          THE WITNESS:  It was 2007 of January 4th, which was

8    a Friday, at approximately 9:15 a.m., while he was making a

9    particular round.

10   BY MR. JACOBS:

11   Q.    That was the second time you talked to him?

12   A.    No, sir.  That was the first time.  That was the

13   initial, the first and initial time I had verbally and

14   informally spoken to Mr. Beard.

15   Q.    Have you ever written to Mr. Beard prior to that time?

16   A.    I wrote to Mr. Beard, but I don't know whether the mail

17   had actually got to his destination, because they were

18   actually stealing mail off -- the mail was being pocketed

19   about the grievances, and mail and grievances never making

20   their destination pertaining to inside the department as far

21   as towards the griever and coordinator, or to the streets

22   civilian wise.

23         I did write, I did write upon good faith, but I never

24   received a response.

25   Q.    And with, what time frame are you talking about?

1   A.      I had wrote him pertaining to a situation before I had

2   actually spoke to him physically pertaining to an assault that

3   occurred 3 assaults that occurred in 2006 which was on

4   May 12th, 2006, which was on a Friday, at approximately

5   2:50 p.m. I wrote him pertaining to an October 8th incident

6   and also and October 11th incident also.

7   Q.      Of what year?

8   A.      2006.

9   Q.      How long have you been incarcerated?

10  A.      Unfortunately, I've been incarcerated now going on five

11  years.  Since 2004, February 28th, 2004.

12  Q.      So, you were never in the Department of Corrections

13  prior to 2004?

14  A.      Prior to 2004?  This is my second State correctional

15  confinement.  I was incarcerated 2000 -- I mean, excuse me,

16  1997.  From 1997 up until 2002.  2000, I maxed out, and then,

17  in 2004, unfortunately, I was re-arrested.

18  Q.      From 1997 to 2000, you were in the Department of

19  Corrections?

20  A.      Yes, I was.

21  Q.      At what prison?

22  A.      SCI Mahanoy, Frackville.

23  Q.      And in that time frame, had you ever interacted with

24  defendant, excuse me, Jeffrey Beard?  From the first, from the

25  first State time; you did?

```
 1   A.      No, I haven't.
 2   Q.      I'm going to give you a list of names.  I want you to
 3   tell me if you recognize any of these names.
 4           Thomas McConnell, Carol Scire.
 5   A.      No, sir.
 6   Q.      Gregory Giddens?
 7   A.      No, sir.
 8   Q.      Allen Lynch?
 9   A.      No, sir.
10   Q.      Kristin P. Reisinger?
11   A.      No, sir.
12   Q.      Michael Ferson?
13   A.      No, sir.
14   Q.      Shelly Mankey?
15   A.      No, sir.
16   Q.      William Stickman?
17   A.      No, sir.
18   Q.      Frank Chirico?
19   A.      No, sir.
20   Q.      David McCoy?
21   A.      No, sir.
22   Q.      Okay.
23           THE COURT:  Okay.  Was Mr. Smith one of the ones
24   that refused to leave his cell?
25           MR. JACOBS:  Yes, Your Honor.
```

1          THE COURT:  Why don't we just ask him about that,

2   please.

3   BY MR. JACOBS:

4   Q.      Yesterday, we were advised that you refused to

5   participate in this trial.  Is that true?

6   A.      That's not true, as far as pertaining to me refusing.

7   I asked -- when I received the notification per the Courts

8   that we were going to come over for a video conference, the

9   date that was stated officially on the document was

10  October 11th.

11         Now, pertaining to my environment as far as here at the

12  SMU, SCI Camp Hill SMU, I was trans -- like I said before, I

13  was transferred here.  I was assaulted on multiple occasions.

14  I actually witnessed assaults, and actually witnessed

15  individuals being starved to death, you know, if I can say

16  that myself, by not getting trays.

17         Since I've been here I've been dealing with these

18  injuries, as far as dealing with my shoulders, Your Honor.  I

19  have torn ligaments in my fingers from during the cell I in

20  evidence referred whether he I got offer think I stated

21  respectfully if lawyers wasn't present I was never notified

22  that I would like to be taken back to my cell because the date

23  on the documents stated the 11 and it was 5 days prior I

24  didn't know what was going on but I never tell lie rebelled

25  against coming over to testify within the realm of being on

1   notice that it was for the 11 of November.

2   Q.      So, you did come over to the conference room?

3   A.      I came over to the conference room an upon me being

4   escorted back from the conference room I was assaulted.  By an

5   offers CO huh beer as I was walking back being escorted back

6   and also on the compound an also in my cell.

7   Q.      What reasons?

8           THE COURT:  Excuse me, just get the date.  Was that

9   yesterday?

10  BY MR. JACOBS:

11  Q.      Was that yesterday?

12  A.      Yes, ma'am.  I was assaulted yesterday on my way back

13  from this particular room here, this particular area.

14  Q.      In regards to this case?  I mean -- well, in regards to

15  you coming to the conference room for this case.

16  A.      I would say it, it amounts to that.  I would say that.

17  Because all I had asked, respectfully, was to take me back to

18  my cell.  I didn't know what was going on, and the date and

19  the time was November 11th, and the time was 13:30, which was

20  1:30 p.m., and here I am, 9:30.  I didn't know what was going

21  on.  But they were actually telling me I would have to stay in

22  front of the Judge.  I didn't know who the Judge was.

23          Like I said, upon me being escorted back, I was

24  assaulted, which multiple witnesses had seen this particular

25  individual officer assault me.  So, I'm sitting up here, now

1   with re-agitated injuries and also injuries on my head where

2   he pushed my head into the wall.

3         But I never refused to come over.  I was already over

4   here.  But I didn't know, gentleman, ma'am, what was going on,

5   or what was about to occur.  So I'm still waiting to see

6   medical now for the injuries, sustained injuries.

7               THE COURT:  You have any questions?

8               MR. BRADLEY:  No, Your Honor.

9               THE COURT:  Okay.  Mr. Smith, this case involves

10   incidents happening at FCI Pittsburgh in the year 2003, and

11   your -- you don't have any knowledge about any of the

12   individual defendants in this case, and your communications

13   with Jeffrey Beard are later than that.  And so, we're not

14   going to need your testimony for this case.  But we have a

15   record of everything you have said here today.  So, thank you

16   for coming.  But you will be excused at this time.

17               THE WITNESS:  Thank you very much.

18               THE COURT:  Okay.  Thank you.

19               MR.WILLIG:  Randy this is rob.  Is that it for Camp

20   Hill; right?  That's it for you guys.  Thanks a lot.  I

21   appreciate it.

22               OFFICER:  Thank you.

23               THE COURT:  Okay.  Who will be the next witness.  Do

24   we have anyone else from a remote site at this time, or should

25   we take back up with the defendant that was testifying

1   yesterday?  We have about 15 minutes.

2           MR. BRADLEY:  The next video witness is Gary Banks,

3   and I believe he's set for 1:30.

4           So, we can pick up with Miss Mankey.

5           MR.WILLIG:  Between 1:00 and 3:00, he's available.

6           THE COURT:  Okay.  We won't be back here until 1:30.

7   So, we'll try to start right around that time.  Okay.  If the

8   witness, if you could come and retake the witness stand.  And

9   I'm going to direct that that last testimony from Mr. Smith,

10  also that transcript is going to be ordered at the cost of the

11  defendants.

12          MR. BRADLEY:  Understood, Your Honor.

13          THE COURT:  Okay.  Please rise for the jury.

14          (Jury is seated.)

15          THE COURT:  Please be seated.  The witness is

16  instructed that you remain under oath.

17          THE WITNESS:  Yes, ma'am.

18          THE COURT:  Okay.  When we left off yesterday,

19  remember, this is one of the defense witnesses.  It's a

20  defendant.

21          And Mr. Jacobs, you were questioning on cross

22  examination.

23

24

25

1                          * * * * *

2                     SHELLY MANKEY, a witness herein, having

3       been previously duly sworn, testified further as follows:

4                       CROSS EXAMINATION CONTINUES

5       BY MR. JACOBS:

6       Q.      If I recall correctly, Miss Mankey, we were discussing

7       the factors that you consider in making a decision denying my

8       appeal.

9               You remember that testimony?

10      A.      Yes.

11      Q.      Your review at the PRC, at the PRC level is to ensure

12      that -- to review whether or not the procedures at the

13      misconduct hearing were in accordance with the law?

14      A.      We review whether the -- whether there were any

15      procedural errors of, um, the, like, um, say whether the

16      misconduct was heard in a timely manner, things like that.

17              We do not re-hear the misconduct or re-investigate the

18      misconduct.

19      Q.      So, if you look at Section C, where it says, the

20      evidence was insufficient to support the decision?

21      A.      Yes, sir.

22      Q.      Do you see that?

23      A.      Um-hum.

24      Q.      How do you determine whether a person received a fair

25      hearing, if you don't review the evidence?

1  A.      It's not up to us to review the evidence; it's up to

2  the hearing examiner to do that.

3  Q.      But as a ground for appeal, a prisoner can raise that

4  the evidence was insufficient.  So at that stage a prisoner

5  can identify why he feels that the grounds were insufficient,

6  the evidence was insufficient to support being sanctioned;

7  correct?

8  A.      He can ask that.

9  Q.      Excuse me?

10  A.      Yeah, correct.

11  Q.      Is that correct?

12  A.      He can ask, yes.

13  Q.      And so, you're saying that even though a prisoner can

14  ask that a prisoner can allege that the evidence was

15  insufficient, you're not really even reviewing whether or not

16  the evidence was insufficient?

17  A.      We review whether the hearing examiner found it

18  sufficient or not.

19  Q.      Without reviewing the evidence?

20  A.      The hearing examiner reviews the evidence.

21  Q.      Okay.  The hearing examiner reviews the evidence;

22  right?

23  A.      That's his job.  We do not re-hear the hearing.

24  Q.      Okay.  And I'm -- and a prisoner appeals, challenging

25  his review of that evidence, and he appeals to the PRC and

1   says, well, the hearing examiner didn't properly review this

2   evidence, and he then comes to you, as the PRC member, and

3   says, well, the evidence was insufficient, the evidence is not

4   what it appears to be, and I would like further review of this

5   particular evidence.

6          At that point you're saying that you don't review the

7   evidence?

8   A.     It's not the job of the hearing --

9   Q.     Yes, or, no.

10  A.     It's not the job -- no.

11         MR. BRADLEY:  Your Honor, can she be allowed to

12  answer the questions?

13         MR. JACOBS:  It's a, yes, or, no, question, Your

14  Honor.

15         THE COURT:  Just a second.

16         She can answer, yes, or, no.  If there's a short

17  addition, you can do it; otherwise, it's up to you on redirect

18  to have her fully explain her answer.

19  BY MR. JACOBS:

20  Q.     You also stated yesterday that a prisoner is entitled

21  to -- as part of the review, a prisoner is entitled to the

22  reason why you feel as though that he doesn't qualify for the

23  ground that he alleged in his appeal.

24         So, if I say that the evidence was insufficient, you

25  respond that the evidence was not insufficient, that I'm

1  entitled to a reason why you feel that the evidence was not,

2  was not insufficient?

3  A.    I believe I stated that we answer the three things that

4  are on the top of the appeals thing; A, B and C.

5  Q.    Okay.  But as part of that, do you give a reason why

6  you feel that the prisoner has no grounds for appeal?

7  A.    Usually within the answers of A, B and C.

8  Q.    Within them.  So, is your answer confined to A, B and

9  C, or do you tailor your answer to a specific circumstance?

10  A.    Within A, B and C, those are the only things we can

11  answer.  As PRC Appeals Committee, the only things we can

12  answer are within those things, or within specifically those

13  things.

14  Q.    Okay.  I'm trying to get to, when you say, "within".

15  If I raise a claim relating to A, in addition to, in addition

16  to you responding that I don't qualify for A, do you say, you

17  don't qualify for A because blah, blah, blah, blah, blah, as

18  it relates to this specific misconduct?

19  A.    It may state, we may state, for example, there was no

20  procedural error found per ADMIN DC-801.

21  Q.    And that's it?

22  A.    And we may, depending on what you put as -- what the

23  inmate stated as the procedural error he thinks was the

24  problem, we probably would state, you stated this procedural

25  error.  We did not find that that procedural error is found in

1   this.

2   Q.      But it doesn't -- the document, the decision form does

3   not reflect what you consider, or why you believe that there

4   was no procedural error; there was insufficient evidence, or

5   so forth or so on?

6   A.      Is there a question in that?  I didn't, I don't --

7   Q.      It's not on the form.

8           THE WITNESS:  Is there a --

9           THE COURT:  If you don't understand the question,

10  just say you don't understand it.

11  BY MR. JACOBS:

12  A.      I don't understand the question.

13  Q.      The things that you consider in making this decision --

14  A.      Um-hum.

15  Q.      -- is not written on the appeal decision form?

16  A.      (Nods.)

17  Q.      Outside of A, B and C?

18  A.      The only things we're permitted to consider by the

19  Appeals Committee, PRC Appeals Committee, the only things that

20  we're permitted to consider are A, B and C.

21  Q.      Okay.  I understand that.  The things that you consider

22  in making a decision is not written on that decision form?

23  A.      Um-hum.

24  Q.      Is that correct?

25  A.      We --

```
 1   Q.      Yes, or, no?

 2   A.      That form is used; yes.

 3   Q.      Thank you.

 4           It also states that the procedures were, the procedure

 5   in Part A, the procedures employed were contrary to law.

 6           You see that?

 7   A.      Yes.

 8   Q.      So, if a prisoner makes an appeal and says that what

 9   was done was illegal, you don't review that either?

10   A.      That's law of Administrative Directive 801.

11   Q.      But it says, the procedures employed were contrary to

12   law, comma, Administrative Directive 801, comma, or the ICU

13   consent decree.

14           Do you see that; do you see that?

15   A.      Yes.

16   Q.      And it says, "or". So, it gives a line of areas that

17   are to be considered?

18   A.      Yes.

19   Q.      Thank you.

20           Miss Mankey, I'm showing you what's going to be tagged

21   as Plaintiff's Exhibit No. 16.

22           Do you recognize that form?

23   A.      It looks like a witness statement.

24   Q.      Is this one of the statements that you review as part

25   of the grievance -- I mean, misconduct appeal?
```

1  A.      It might have been with the misconduct, it might not

2  have.   I don't remember.

3  Q.      I'm saying that, you see that misconduct number right

4  over here in the right-hand corner?

5  A.      Yes, I see it.

6  Q.      Does that misconduct number correspond with the

7  misconduct in question?

8  A.      Yes, it does.

9  Q.      And you also stated yesterday that you, you review

10  misconduct-related documents; correct?

11  A.      I said we review the misconduct.

12  Q.      Just the misconduct?

13  A.      Yes.

14  Q.      You don't review the witness lists?

15  A.      It's not necessarily -- this statement wouldn't

16  necessarily be with it.

17  Q.      Would the witness form?

18  A.      Yes, the witness form is usually with it, if there is a

19  witness form.

20  Q.      But would you agree with me that this is a

21  misconduct-related document?

22  A.      Ah, yes.

23  Q.      And that this misconduct-related document was related

24  to the specific misconduct in question?

25  A.      Looks like the same number.

1  Q.     You, you want to check to make sure?

2  A.     Yes.

3       MR. BRADLEY:  Your Honor, we'll stipulate that it's

4  the same number.

5       THE COURT:  Okay.  Thank you.

6  BY MR. JACOBS:

7  Q.     Do you see anywhere within that document where I allege

8  that my constitutional rights were being violated?

9  A.     Yeah.

10      MR. BRADLEY:  Your Honor, I'll stipulate that's what

11 the document says.

12 BY MR. JACOBS:

13 A.     I do believe that's what it says.

14 Q.     Do you agree with me that prisoners are allowed to have

15 legal documents?

16 A.     They are allowed to have their own legal documents.

17      THE COURT:  Okay.  It's now 11:00, and I mentioned,

18 we have an extended recess today from 11:00 to 1:30.

19      MR. JACOBS:  I'm almost done.

20      THE COURT:  Are you almost done; you want to ask one

21 more question?

22      MR. JACOBS:  Just a couple; not more than three,

23 four minutes.

24      THE COURT:  Okay.

25 BY MR. JACOBS:

1  Q.      You stated yesterday that you normally put on a

2  misconduct, on a rationale form why the appeal is being

3  denied.

4  A.      Again, we answer A, B and C.

5  Q.      Did you testify yesterday that you normally put on the

6  form why the appeal is being denied?

7  A.      Yes.

8  Q.      Okay.  And do you recognize that form?

9  A.      Yes.  It's a witness form.

10  Q.     And this is going to be marked as Plaintiff's Exhibit

11  No. 17.

12         Do you agree with me, that this witness form --

13  A.      Yes.

14  Q.      -- corresponds with --

15  A.      Yes.

16  Q.      -- the misconduct in question?

17  A.      (Nods.)

18  Q.      And this witness form, I requested that Mr. Banks be

19  produced at the misconduct hearing?

20  A.      Yes.

21  Q.      To verify that the documents were not his?

22  A.      Yes.

23  Q.      And that they belonged to me?

24  A.      Yes, that's what you requested.

25  Q.      And do you think that if this testimony would have been

1   admitted to disclaim ownership, and me claiming ownership,

2   would that have raised a question as to whether the 801 was

3   violated, or whether a law was being violated?

4   A.      That's up to the hearing examiner to decide.   He

5   investigates.

6   Q.      I'm asking you, do you think that's relevant?

7   A.      I don't determine that.  I can't determine that.  It's

8   up to the hearing examiner to investigate when he investigates

9   the misconduct, not the PRC.

10  Q.      You don't review -- even if he's violating law, you

11  don't review that?

12  A.      No.  The hearing examiner doesn't --

13  Q.      Answer the question, please.

14  A.      No.

15  Q.      You don't -- even if he violates the law, you don't

16  review that?

17  A.      No, we do not review that.

18  Q.      If he violates policy, you review that?

19  A.      Procedural errors according to the DC ADMIN 801, we

20  review stuff like that.

21  Q.      Under the DC-801, prisoners can call witnesses in

22  support in their defense at a misconduct; yes, or, no?

23  A.      Yes.

24  Q.      Thank you.

25          And you sustained a decision against me as part of a

1   practice; didn't you?

2   A.      Not as part of a practice, no.

3   Q.      You did not review any type of evidence that I raised,

4   any witnesses I tried to produce, or anything that I tried to

5   show that I was, I was being singled out; did you?

6   A.      We reviewed --

7   Q.      Yes, or, no.

8   A.      -- the misconduct.

9   Q.      Yes, or, no.

10  A.      We reviewed the misconduct.

11  Q.      Yes, or, no.

12  A.      Yes, we reviewed it.

13  Q.      You did review the evidence?

14  A.      We reviewed the misconduct as the PRC Appeals

15  Committee, as we were supposed to do, yes.

16  Q.      Listen to the question.  I'm going re-state the

17  question.

18          You did not review any of the evidence, you did not

19  review my request for the witness, and you did not review my

20  claim that I was being singled out and my constitutional

21  rights were being violated; correct?

22  A.      Those are several questions, and I would answer

23  differently to different parts of that question.

24  Q.      Okay.  Did you review me not being able to have a

25  witness?

1    A.    Yes, we reviewed the witness -- the denial of the

2    witnesses.

3    Q.    And did you review what effect the denial of that

4    witness had on the hearing?

5    A.    We reviewed you not having a witness.  I don't --

6    Q.    Did you review --

7    A.    No, we didn't review that fact.

8    Q.    Did you review my claim that my constitutional rights

9    were being violated?

10   A.    No.

11   Q.    Did you review my claim that the evidence was

12   insufficient?

13   A.    Yes.

14   Q.    And earlier you testified that you don't review that;

15   you said you don't review that?

16   A.    We review whether the hearing examiner had sufficient

17   evidence to find for guilt, yes.

18          THE COURT:  Mr. Jacobs, it's now been five minutes,

19   and I told you that we have to take this extended recess.

20          Do you have any more questions?

21          MR. JACOBS:  No further questions, Your Honor.

22          THE COURT:  Okay.  When we come back, then, we will

23   have another plaintiff witness, and then, this witness can be

24   recalled for redirect.

25          Please rise for the jury.

```
 1              (Whereupon, jury retired.)

 2              THE COURT:  We'll be in recess until 1:30.

 3              (Whereupon, court recessed at 11:05 a.m.)

 4                         * * * * *

 5              (Whereupon, court reconvened.)

 6              THE COURT:  Please be seated.

 7              We're going back to the defendant's -- excuse me,

 8    the plaintiff's case now, and this next witness is one of the

 9    plaintiff's witnesses.

10              Would the clerk please swear in the witness.

11              MR.  BRADLEY:  Yes.

12                         * * * * *

13                  GARY BANKS, a witness herein, having been

14    first duly sworn, testified as follows:

15                         DIRECT EXAMINATION

16    BY MR. JACOBS:

17    Q.    Good morning, Mr. Banks.  Can you hear me?

18    A.    Yes, sir, I can hear you.

19    Q.    Could YOU state your name for the record.

20    A.    Name is Gary Banks.

21    Q.    Are you currently incarcerated?

22    A.    Yes, sir.

23    Q.    Where are you currently incarcerated at?

24    A.    Graterford SSMU.

25    Q.    Was there a time when you were incarcerated at
```

1   SCI Pittsburgh?

2   A.      Yes, in the LTSU.

3   Q.      From what time period were you incarcerated at

4   SCI Pittsburgh?

5   A.      From November 30th to, um, June 20th, 2004.

6   Q.      From November of what year?

7   A.      November of 2000.

8   Q.      I'm going to read a list of names off to you.  I want

9   you to tell me if you recognize any of these names; okay?

10  A.      Yes.

11  Q.      Jeffrey Beard.

12  A.      I know Jeffrey Beard, yes.

13  Q.      Thomas McConnell.

14  A.      Thomas McConnell?

15  Q.      Yeah.

16  A.      I don't know him by that name, no.

17  Q.      Carol Scire.

18  A.      Yeah.  That's the grievance coordinator.

19  Q.      Gregory Giddens.

20  A.      Yeah.  That's the Lieutenant.

21  Q.      Allen Lynch.

22  A.      Yeah.  He was a sergeant up there.

23  Q.      Robert Bittner.

24  A.      Robert Bittner?

25  Q.      Yes.  Yes, sir.

1   A.      Yeah.  That's Chief Hearing Examiner.

2   Q.      Captain Simpson.

3   A.      Captain Simpson; don't recognize him.

4   Q.      Kristin Reisinger, or Reisinger.

5   A.      Never heard that name.

6   Q.      Michael Ferson.

7   A.      Yeah, I know Michael Ferson; Hearing Examiner.

8   Q.      Shelly Mankey.

9   A.      Nah.  No, I don't recognize that name.

10  Q.      William Stickman.

11  A.      I know Stickman, yeah.

12  Q.      Frank Chirico.

13  A.      Yeah.  I know Frank Chirico, yeah.

14  Q.      David McCoy.

15  A.      David McCoy?

16  Q.      David McCoy.

17  A.      No.

18  Q.      You would have what, been at SCU Pittsburgh on

19  September 16th, 2003; correct?

20  A.      Correct.  That's correct.

21  Q.      Do you recall having any interactions with Gregory

22  Giddens on that day?

23  A.      Yes.  Gregory Giddens came do my cell and told me,

24  didn't I tell you, go mind your own business.  I asked him

25  what he was talking about.  He said he confiscated Andre

1   Jacobs' property and found declarations with my signatures on

2   them.   And I better learn to mind my business, or he will get

3   the guards to assault me again.   And stop helping prisoners

4   out in their legal matters.

5   Q.      He told you to stop helping prisoners with their legal

6   matters?

7   A.      Their legal matters; right.

8   Q.      In reference to the declaration, what -- did you have

9   any idea what he was talking about?

10  A.      Well, when he said he confiscated declarations with my

11  signature on them, I knew right then what he was talking

12  about.

13  Q.      What is a declaration?

14  A.      A declaration is just like an affidavit; more details.

15  Sworn statements under oath.

16  Q.      In regards to -- what would be the contents of a

17  declaration?

18  A.      Well, for instance, if something happened on the pod

19  and I seen it, if I did, I file a grievance, along with a

20  declaration, saying I saw it, witnessed it and what details

21  happened.

22  Q.      So, it was basically a statement about something that

23  you witnessed take place?

24  A.      Exactly.

25  Q.      And that would be in regards to, you said, something on

1  the unit in regards to who?

2  A.     Andre Jacobs.

3  Q.     And I mean generally, if you fill out a declaration

4  stating that you witnessed something, you filled out a

5  declaration saying that you witnessed what?

6  A.     Witnessed Giddens and them took his property, along

7  with somebody else's property.

8  Q.     I mean, not just in regards to me, but just filling out

9  a declaration in general.

10  A.     Filling out declaration, yeah, sure.  Whatever I seen,

11  I put it down.

12  Q.     Okay.  Is that something that prisoners typically do?

13  A.     Not all prisoners.  Some prisoners just let what happen

14  happen, and that's it.  They don't have -- no matter what they

15  do to me.  They don't care.  I do care about prisoners and

16  what happen around me.

17  Q.     What was Mr. Giddens' demeanor when he made these

18  statements to you?

19  A.     Well, when he made the statements, it was more like a

20  threat to me.  Made like intimidation, threat.  You all know

21  what happens.  And that's when he had Officer Chirico and

22  numerous other officers beat me up in the hallway.  More like

23  what happened again.  So, it was like prisoner intimidation

24  and any -- at the time, time it made me angry, where I was

25  scared to come out of my cell.

1    Q.      Where were you at when this took place?

2    A.      The cell I was in, I was in A-200, 4 cell.

3    Q.      A-200?

4    A.      A-300, up on the third floor, but it goes A-200, and

5    A-100 and A-300.   I was believed to be in 200, 200, 1024 cell.

6    Q.      Was that on the same, same pod area as I was?

7    A.      That's Andre Jacobs.   Yeah, you was in 1 cell; I was in

8    4 cell.

9    Q.      You stated that if you witnessed something, you would

10   file a grievance.

11   A.      If I seen something, I would file a grievance on 001,

12   if it had something to do with assault, the allegations.   That

13   way, the grievance coordinator would have to have somebody

14   investigate that.

15   Q.      What were your interactions like with Carol Scire;

16   Carol Scire?

17   A.      Well, far as her being the grievance coordinator, she

18   was more, like she used to cover the officers up in LTSU.

19   Whatever they did, she would act like it was merely a

20   disagreement, when it wasn't a disagreement.

21   Q.      She would reject it, reject the grievance?

22   A.      Reject the grievance.

23   Q.      As a result of the grievance being rejected, what would

24   happen to that grievance?

25   A.      You could still file that grievance at Central Office,

1    but once you get to Central Office they would say the same

2    thing, "denied".  They would go along with what she said.  Or,

3    the Superintendent would always go along with her, too.

4    Q.      So, whenever you appeal the rejection of the grievance

5    to the Superintendent, he would go along with whatever Carol

6    Scire said?

7    A.      Right.

8    Q.      Do you remember who the Superintendent was at

9    SCI Pittsburgh?

10   A.      Ah, at that time I think we had Philip -- I think it

11   was Philip, ah -- I'm sorry.  I think -- it was the black

12   dude, Philip.  I think that's his name, Phillips.

13   Q.      And how do you know William Stickman?

14   A.      William Stickman was a deputy at the time working

15   there.

16   Q.      At SCI Pittsburgh?

17   A.      Correct, at Pittsburgh.

18   Q.      What interaction did you have with him?

19   A.      Well, when I went on a hunger strike, numerous times he

20   filled out a complaint; see if they can force me to eat.  But

21   the Judge denied that, because by them not having us having

22   television, radios, and the things we was supposed to have in

23   the hole, he wouldn't let us have it.  So, I went on a hunger

24   strike.

25   Q.      In your time being at SCI Pittsburgh in the LTSU, have

1  you ever witnessed prisoners' property being destroyed,

2  confiscated?

3  　　　　　　MR. BRADLEY:  Excuse me, Your Honor, could we get a

4  clarification on the time frame he would be testifying to?

5  BY MR. JACOBS:

6  Q.　　You said you were at SCI Pittsburgh from what time?

7  A.　　Well --

8  Q.　　When did you first arrive at SCI Pittsburgh?

9  A.　　November 30th of 2000.

10  Q.　　When did you leave SCI Pittsburgh?

11  A.　　24th of 2004, June 24th, 2004.June 24th or 20th, 2004.

12  Q.　　The entire time you were at SCI Pittsburgh, were you in

13  the same housing area?

14  A.　　No.  They normally kept me on A-300.  Because of time,

15  they moved me to A-100 or A-200.  The guards would fabricate

16  assaults on me.  Like they assaulted me, like I assaulted

17  them.  So, they moved me to A-300.  Kept me on the cameras.

18  Q.　　So, what portion of your time was spent on A-300?

19  A.　　Well, A-300.  Mainly the whole time I was there, except

20  for a few months.  They might put me on A-200 for about

21  three-weeks, then, put me on the other side for about a month,

22  then, they bring me right back to A-300.

23  Q.　　Okay.  And then, in your time experienced on A-300 in

24  LTSU, have you ever witnessed --

25  　　　　　　MR. BRADLEY:  Excuse me, Your Honor, the time frame

1   is prior to September of 2003.  I think that needs to be

2   established.

3   BY MR. JACOBS:

4   Q.      In 2003, were you at, were you in the LTSU on A-300

5   throughout the year of 2003?

6   A.      Sure, but not all -- not all the time.  A-300 is

7   upstairs.

8   Q.      We got to get there, starting, when you say "A-300",

9   that's up on the third floor.  Then, you got A-200 up on the

10  floor to 200, A-100.  Then, not the top, A-200 and A-100

11  downstairs, too?  Okay.

12  A.      When you say, A-300, you got to say what you're saying.

13  A-300, 200, A-300, 100.

14  Q.      While you were on A-300 --

15  A.      Right.

16  Q.      -- in the year 2003, or before the year 2003, did you

17  ever witness any of these persons that you identify destroy or

18  confiscate property of yours or of someone else's?

19  A.      Well --

20          THE COURT:  Just one minute.  Are we talking about

21  legal property?

22          MR. JACOBS:  Yes, I'm talking about legal property.

23          THE COURT:  Okay.  Make sure the question is

24  directed to that.

25  BY MR. JACOBS:

```
 1   A.      Yes, sir.  Well, Chirico and Lieutenant Giddens, they

 2   confiscated my property quite a few times, among other

 3   people's property, and when they go and get them, they

 4   assaulted them.

 5   Q.      What type of property?

 6   A.      Legal and personal property.

 7   Q.      Legal and personal property.

 8           On how many occasions has your legal property been

 9   taken by Chirico or Giddens?

10   A.      Well, are -- well, the staff took it, Lieutenant

11   Giddens took it one time, and they gave it back to me right

12   when he was getting ready to leave the jail.

13   Q.      Who is Stafford?

14   A.      That's Frank Stafford.  That was the unit manager up

15   there.  He was a Lieutenant, and then, they shifted to unit

16   manager.

17   Q.      Why was the property taken?

18   A.      Because of the guys filing lawsuits and too many

19   grievances on them.  So they took the whole box of grievances,

20   so they wouldn't have to file no complaints on them.

21   Q.      In response to your filing lawsuits and grievances, all

22   your property was taken?

23   A.      Correct.  So, I wouldn't have to file no complaints.

24   Q.      By Giddens and Chirico?

25   A.      By Giddens, Chirico and Stafford.
```

1  Q.    But that property was eventually returned to you?

2  A.    Sure.  It was returned after I left the jail, the day

3  after I packed up.

4  Q.    And did them withholding your property have any effect

5  on your pursuing --

6        MR. BRADLEY:  Your Honor, that goes beyond the scope

7  of what this testimony is permitted for.

8        THE COURT:  You need to direct whether he was

9  retaliated against for that conduct.

10       MR. JACOBS:  I think we have an issue.  We'll excuse

11  the jury for a moment.

12       (Whereupon, jury retires.)

13       THE COURT:  Be seated.

14       MR. JACOBS:  Mr. Banks testified that whenever he

15  witnessed something that took place, he would report it.  And

16  the core of the retaliation claim is that, one of the elements

17  of the retaliation claim is that a person's ordinary firmness

18  would be deterred from pursuing or asserting our rights.

19       So, in order for a jury to understand the type of

20  effect that the actions other defendants had on me, I believe

21  that examples of the type of effects it had on other persons

22  is also relevant to that inquiry.

23       MR. BRADLEY:  First, I think the question he was

24  about to ask him is, what impact did taking your property have

25  on your legal actions.

1           THE COURT:  That's what I thought.  I thought you

2     were asking him about what happened to the cases those

3     materials related to.

4           MR. JACOBS:  I'm asking, I'm focusing on adverse

5     action, the adverse action.

6           THE COURT:  You need to rephrase the question, then.

7     Because you'll be permitted to ask that question.

8           MR. JACOBS:  Okay.

9           THE COURT:  You can't ask him about his underlying

10    cases that were involved.

11          MR. JACOBS:  I'm not attempting to get into that.

12          THE COURT:  Okay.  Please rise for the jury.

13          (Whereupon, jury is seated.)

14          THE COURT:  Mr. Jacobs, if you could just clarify

15    your question for the witness.

16          Can you hear us now, Mr. Banks?

17          MR.  BRADLEY:  Yes.  Yes, I can hear you.

18          THE COURT:  Okay.  Mr. Jacobs, if you could just

19    please clarify your question.

20    BY MR. JACOBS:

21    Q.    As a result of your property being taken, your legal

22    property being taken and your grievances being held, were you

23    in any way discouraged from pursuing those grievances?

24    A.    Sure.  Because once I filed -- say if I filed a

25    grievance and I got to Carol Scire, I would never be able to

1   respond to the initial response to the Superintendent, or I

2   never get the chance to respond to Central Office.

3   Q.     By have you ever sent complaints to Central Office?

4   A.     Yes, I filed informal complaints to them, and also to

5   State senators.

6   Q.     Have you ever appealed grievances to Central Office?

7   A.     Yes.

8   Q.     Do you remember who reviewed those grievances at

9   Central Office?

10  A.     Ah, she's not working there.  Her name was Karen

11  Carrington, something like that.  I'm not quite sure.

12         Hold it. Sharon Burkes.  Her name was Sharon Burkes.

13  Q.     Sharon Burkes?

14  A.     Right.

15  Q.     Do you remember what her position was?

16  A.     Well, she was the Chief Grievance Coordinator.

17  Q.     And what was -- as a result of her being Chief

18  Grievance Coordinator, what position, what role did she have

19  in the grievance process?

20  A.     Well, her role was after she examined the grievance, to

21  see whether it would be denied or sent back for further

22  hearing.  Or if they made a mistake, they can correct their

23  mistake.  Or a lot of times, she would go along with them.

24  Q.     When you say, "a lot of times", you mean how often?

25            MR. BRADLEY:  Your Honor, again, I think this is

```
 1   getting beyond the --
 2   BY MR. JACOBS:
 3   A.     99 percent of the times.
 4          THE COURT:  Okay.  I think you just -- I think
 5   you'll need to move on from Miss Burke.  She's not a defendant
 6   in this case.
 7          MR. JACOBS:  She works in the same office, Your
 8   Honor.
 9          THE COURT:  I'll permit this, but then, you need to
10   make sure you're keeping it within the nature of this case.
11          MR. JACOBS:  Okay.
12   BY MR. JACOBS:
13   Q.     You say 99 percent of the time?
14   A.     Correct.
15   Q.     What interaction did you have with Jeffrey Beard?
16   A.     Well, I -- when I, normally when I file complaints.
17   Q.     Let me clarify the question.  I mean, the time frame
18   between 2003 and beforehand.
19   A.     As far as interaction with him, I filed a lot of papers
20   to Central Office for his investigation, but he sent someone
21   else down to investigate it for him, OPR, and far as results I
22   got from them, was mainly they go along with the DOC.
23   Q.     And where does OPR come from?
24          MR. BRADLEY:  Your Honor, I don't know what that has
25   to do with this case.
```

1          THE COURT:  Let him see if he can develop it.  Why

2   don't you explain.

3   BY MR. JACOBS:

4   Q.      Who is OPR?

5   A.      OPR, that's professional responsibility.

6   Q.      And where is OPR located; where are they located at,

7   who are they associated with?

8   A.      Central Office.

9   Q.      Meaning the Department of Corrections; correct?

10  A.      Yeah.  Camp Hill, correct.  That's the headquarters.

11  Q.      And Jeffrey Beard resides at SCI Camp Hill, Central

12  Office?

13  A.      Right.  He's the Secretary.

14  Q.      Has a misconduct ever been used, during the relevant

15  time frame, as a retaliatory tool?

16  A.      Sure, sure.  I had a lot of misconducts.

17          MR. BRADLEY:  Your Honor -- Your Honor, again, can

18  we limit it to the defendants in this case?

19          THE COURT:  I think you'll need to just have him say

20  who issued the misconducts and that type of thing.

21          MR. JACOBS:  Okay.

22  BY MR. JACOBS:

23  Q.      While you were in the LTSU, in your interactions with

24  Allen Lynch, Frank Chirico, Gregory Giddens, has a misconduct

25  ever been used as a retaliatory tool?

```
 1   A.      Yes.  I would get a misconduct for when I ain't even
 2   done nothing.  They give me misconducts for nothing at all;
 3   just for filing paperwork.  That's what they say, as long as
 4   they -- I file paperwork, they say they're going to file
 5   paperwork.
 6   Q.      When you say, "paperwork", you mean what type of
 7   paperwork?
 8   A.      Giving out DC-141, misconducts.  They give me a lot of
 9   CD time.
10   Q.      I mean, the paperwork you were filing.
11   A.      I was filing grievances.
12   Q.      You were filing grievances.
13           THE COURT:  Would you ask who the "they" are.
14   BY MR. JACOBS:
15   Q.      When you say "they", you mean who?
16   A.      Allen Lynch, Giddens and Chirico; Frank Chirico.
17   Q.      Have you received misconducts from Frank Chirico?
18   A.      Sure.
19   Q.      Have you received misconducts from Gregory Giddens?
20   A.      Yes.
21   Q.      Have you received misconducts from Allen Lynch?
22   A.      Yes.
23   Q.      What was your interactions like with Michael Ferson?
24   A.      Well, I went in front of him about twice.  Only he
25   wasn't, to me, my opinion, he wasn't really a hearing
```

1    examiner, really looked into the misconduct.  He just go along

2    with the DOC.  I filed a lawsuit against him about that.

3    Q.      From what year?

4    A.      Well, I filed it in 2003.

5    Q.      Filed a lawsuit against Michael Ferson in 2003?

6    A.      Ferson, Michael Ferson, and Chirico, Giddens and Lynch.

7    Q.      And you said that Ferson basically went along with the

8    DOC?

9    A.      Right.

10   Q.      Did you ever appeal a misconduct?

11   A.      Sure, I always appeal all my misconducts.  Take them to

12   Robert Bittner.

13   Q.      What type of results did you get from Robert Bittner?

14   A.      It be like, sustained.  Whatever the DOC say, he

15   sustained it.

16   Q.      Have you ever had a misconduct that you sent to Robert

17   Bittner that wasn't sustained?

18   A.      No, not -- no, not that I know of.  All the ones I got

19   from him, he sustained them.

20          MR. JACOBS:  No further questions.

21                    CROSS EXAMINATION

22   BY MR. BRADLEY:

23   Q.      Mr. Banks, my name is Scott Bradley.  I'm representing

24   the corrections defendants in this case.  I'll raise my hand

25   so you can see who I am on the screen.

```
1    A.      All right.

2    Q.      Just a few questions.

3            I believe Mr. Jacobs had just asked you what effect

4    these actions had on your, I guess intention to file

5    grievances.  Again, in the time frame you've been discussing,

6    how many grievances do you think you filed with the DOC?

7    A.      About over 300.

8    Q.      How many lawsuits?

9    A.      Two in the LTSU.

10   Q.      You had talked about Chirico and Giddens taking your

11   property, and then, it was returned when you left.

12           Do you recall that?

13   A.      I recall that.

14   Q.      Do you know exactly when that happened?

15   A.      Well, it happened like 2002, right before 2003,

16   somewhere around November.  Along with Stafford, too.  I also

17   mentioned Stafford, but he's not in your lawsuit.

18   Q.      Going back to your testimony about the declarations

19   that you provided to Mr. Jacobs; do you recall that?

20   A.      Sure.

21   Q.      I believe you said at that time you were in A-200?

22   A.      I was in -- you got to realize A-200, A-300, A-100.  I

23   was in A-200, in 4 cell.  I believe in 4 cell.

24   Q.      How did you get the declaration to Mr. Jacobs?

25   A.      Well, the guards allowed to pass them.  Inmates allowed
```

1   to pass, too.

2   Q.      What do you mean by that?

3   A.      If I got some legal work, I can get them over to him.

4   I can tell CO Herb, or another CO that's cool with me, send it

5   over to him, or I can fish it to him.

6   Q.      How do you fish it to him?

7   A.      Take a string from your sheet, make what we call a

8   "car" out of an envelope, and slide it right in his cell.

9   Q.      Is that authorized?

10  A.      It's authorized.  Anything is authorized to get legal

11  work through.  That's the only way to do it.  I do it the best

12  way I can.

13  Q.      That's your opinion.  Is that authorized by DOC policy?

14  A.      That's not -- I didn't get a misconduct for it, so,

15  it's not unauthorized, not unless I get caught.

16  Q.      In the LTSU, did you have -- how would you, what would

17  you write a declaration on?

18  A.      If somebody got assaulted, somebody's property was

19  taken --

20  Q.      Excuse me, I'm talking about physically writing it.

21  What, what would you write it on?  Not what event, but what

22  would you write it on?

23  A.      Write it on anything.  Hey, truthfully, what I got in

24  my cell.  If I got toilet paper, I write on that paper.  If I

25  got writing paper, I write on it.  If I got one sheet of

1  paper, I write on it.  If I have a request slip.  Whatever I

2  got in my cell.

3  Q.      Did you have blank paper in the LTSU?

4  A.      Blank paper, sure; card paper.

5  Q.      Where would you get the blank papers from?

6  A.      Just the fact I'm indigent, I get it from the unit

7  representative.  The grievance coordinator will contact the

8  business manager, and they would send me two packages a month

9  with 50 sheets in it.

10 Q.      And were you able to purchase -- if you had funds in

11 your inmate account, would you be able to purchase these packs

12 of blank paper?

13 A.      You would be able to purchase, but I wouldn't, because

14 it costs too much.

15 Q.      But you indicated that every month you would get two

16 packs, with 50 sheets in each pack?

17 A.      Sure.  But like I said, I do a lot of legal work

18 myself, too.

19 Q.      Now, with regard to the misconducts Mr. Jacobs asked

20 you about, you said you appeared in front of Mr. Ferson on two

21 occasions?

22 A.      I didn't say how many occasions.  I said I seen him a

23 couple, three occasions, maybe more than that.  I didn't tell

24 him how many occasions.

25 Q.      I think you said two.

1   A.      I've seen Mr. Ferson over 50 times.   You asked me.

2   Check with Miss Scire.

3   Q.      You appeal all those misconducts?

4   A.      Misconducts always get -- I appeal them to Central

5   Office.

6   Q.      They are always sustained?

7   A.      Always sustained, or you can say, "denied".   Never win

8   nothing.

9   Q.      You were not successful in challenging them; is that

10  correct?

11  A.      Excuse me?

12  Q.      What you're saying is you were never successful in

13  challenging your misconducts?

14  A.      Nobody in LTSU was.   You, anybody in LTSU file

15  misconducts with Ferson, or even Robert Bittner, nobody was;

16  only DOC.

17  Q.      Were you ever actually guilty of any of those

18  misconducts you received?

19  A.      Everybody who receives a misconduct gets found guilty.

20  That's my whole point.

21  Q.      I'm asking you, did you actually ever do what was --

22  you were accused of doing in the misconduct?

23  A.      Well, I don't think I was found guilty of everything I

24  was accused of, even if I did it or not.

25  Q.      That's what I'm asking.   Did you do some of the things

1   you were alleged to have done?

2   A.      Some things I done; some things I didn't.

3   Q.      Do you know what ratio that was?

4   A.      50/50, 75/25.

5           Like I said, 99 percent of my time with Robert Bittner

6   and Ferson, I was sustained or denied.

7                   MR. BRADLEY:  That's all Your Honor, thank you.

8                   THE COURT:  Any further questions, Mr. Jacobs?

9                   MR. JACOBS:  No, Your Honor.

10                  THE COURT:  Okay.  Thank you.  We're going to take a

11  brief recess.

12          Please rise for the jury.

13                  MR. WILLIG:  Your Honor, we're done with Mr. Banks?

14                  THE COURT:  Yes we, are.

15                  MR. WILLIG:  We're done with Mr. Banks.  Thanks a

16  lot.

17                  MR.  BRADLEY:  Thank you, sir.

18                  THE COURT:  Mr. Jacobs, do you have any other

19  witnesses you're going to be calling?

20                  MR. JACOBS:  No, Your Honor.

21                  THE COURT:  Okay.  Please rise for the jury.

22          (Whereupon, jury retires.)

23                  MR. BRADLEY:  Your Honor, I would like to make a

24  motion.

25                  THE COURT:  Well, is he going to rest?  I don't

1   know.

2           Are you resting?

3           MR. JACOBS:  I may have a rebuttal witness.

4           THE COURT:  That would come after the defendants'

5   case.

6           MR. JACOBS:  Yes.

7           THE COURT:  But your case in chief, you'll be

8   resting?

9           MR. JACOBS:  I don't have no more witnesses.

10          THE COURT:  Okay.  What is your motion?

11          MR.  BRADLEY:  The plaintiff rests?

12          THE COURT:  He's going to be resting.  Yes, he

13  rests.  Then, I'll have him repeat that in front of the jury.

14          MR. BRADLEY:  Initially, with respect to the

15  retaliation claim, there's been no evidence that the following

16  defendants were aware that plaintiff had filed grievances or

17  lawsuits.  That would apply to Defendant Bittner,

18  Defendant Mankey, Defendant --

19          THE COURT:  Just a second.  You're going too fast.

20          MR. BRADLEY:  Sorry.  Bittner, Mankey, Simpson,

21  McCoy, Beard, Ferson and McConnell.

22          Under the standard outlined in Mitchell versus Horn

23  318 F3d, 523, Third Circuit case in 2003, quoting Rauser

24  versus Horn, 241 f3d, 330, at 333, another Third Circuit case

25  from 2001, there has to be a causal link between the exercise

1   of the Constitutional right and the adverse action taken

2   against the inmate.   In Booth versus King, 228 Fed. Appendix,

3   167, at 172, a Third Circuit case from 2007, where the inmate

4   fails to provide any evidence that the parties responsible for

5   the asserted adverse actions had any knowledge of the

6   grievances filed with the prison administrators, there's no

7   causal connection between the protected activity and the

8   adverse action.

9           In this case, with respect to Mankey, Simpson and

10  McCoy, the adverse action is their review of his misconduct

11  appeal.   There was no evidence presented in Mr. Jacobs' case

12  that either of these members of the PRC were aware that

13  Mr. Jacobs had filed grievances or lawsuits.

14          Similarly, with respect to Michael Ferson, who was

15  the hearing examiner who ruled on Mr. Jacobs' misconduct, and

16  Mr. Bitner, who ruled on the final appeal of Mr. Jacobs'

17  misconduct, which is the asserted adverse action, there's been

18  no evidence presented by Mr. Jacobs that they were aware that

19  he filed the grievance, filed grievances, or filed any

20  lawsuits.

21          Defendant Beard is, of course, the Secretary of the

22  Department of Corrections.   He's in on a claim of supervisor

23  liability.   But to the extent there's any retaliation claim

24  against him, there's been no evidence that he was aware that

25  Mr. Jacobs had file grievances or lawsuits at the time that

1   his property was taken.

2          Mr. McConnell was the, the Security Captain at

3   SCI Pittsburgh at the relevant time.  I think the challenged

4   claim with respect to him is that he didn't return the

5   property.  But there's been no evidence, or evidence to show

6   that Mr. McConnell was aware Mr. Jacobs had been filing

7   gravenesses or had filed lawsuits.

8          I have additional argument on other claims.  Do you

9   want me to proceed with that, or just go claim by claim?

10          THE COURT:  I think what we will do is, I need to

11  make the most use of the jury's time.  So, I'm going to take

12  your motion under consideration.  I'll be reserving judgment

13  on it, a decision on it until after the verdict is returned.

14          So, we will, at the end of the day I'll let you make

15  the other arguments you have, and I'll hear back from the

16  plaintiff at that time.  But I think right now, rather than

17  take up another hour of time -- these matters, by the way,

18  could have all been raised in motion for summary judgment.

19  So, we have them here now, and I need to make the most use of

20  the jurors' time while they are here.

21          So with that, would everyone please rise for the

22  jury.

23          (Whereupon, jury is seated.)

24          THE COURT:  Be seated.

25          Mr. Jacobs, are you, as the plaintiff, resting your

1   case?

2              MR. JACOBS:  Yes, ma'am.

3              THE COURT:  Okay.  Thank you.

4              MR. BRADLEY:  Defendants recall Shelly Mankey for

5   the continuation of her redirect.

6              THE COURT:  You may continue.

7                            * * * * *

8                     SHELLY MANKEY, a witness herein, having

9   been previously duly sworn, testified further as follows:

10                      REDIRECT EXAMINATION

11  BY MR. BRADLEY:

12  Q.    Miss Mankey, when Mr. Jacobs was cross examining you,

13  he had asked you about when you were handling his misconduct

14  appeal on the PRC back in, I believe it was 2003, whether you

15  were affected by any outside influence.

16         I would like to ask you again, when you wrote the

17  grievance, or the misconduct response to Mr. Jacobs' appeal,

18  were you affected by any outside influence?

19  A.    No, I was not.

20  Q.    At that time --

21             MR. BRADLEY:  Excuse me, could we have the exhibit?

22  I believe it's Plaintiff's C.

23             Can you pull that up, so the bottom of the page

24  shows?  That's good.

25  BY MR. BRADLEY:

```
 1   Q.     Again, identifying for the record exhibit, Plaintiff's

 2   Exhibit C is the appeal response that was submitted in

 3   response to Mr. Jacobs' appeal in his misconduct; is that

 4   correct?

 5   A.     Yes, it is.

 6   Q.     Your signature appears on that?

 7   A.     Yes, it does.

 8   Q.     And is that dated October 1st, 2003?

 9   A.     Yes, it is.

10   Q.     I believe you had already testified that as of that

11   date you were not aware of who Andre Jacobs was; is that

12   correct?

13   A.     No, I was not.

14   Q.     At that time, October 1st, 2003, were you aware

15   Mr. Jacobs had file grievances while in prison?

16   A.     No, I was not.

17   Q.     Were you aware that he filed any lawsuits against DOC

18   personnel?

19   A.     No, I was not.

20           MR. BRADLEY:  Thank you.  That's all I have.

21           THE COURT:  Mr. Jacobs, do you have any recross?

22           MR. JACOBS:  Yes, Your Honor.

23                    RECROSS EXAMINATION

24   BY MR. JACOBS:

25   Q.     Are you familiar with the Department of Corrections
```

1  Code of Ethics?

2  A.      Yes, I am.

3  Q.      Are you aware of a provision within the Code of Ethics

4  which states that any decision by a superior officer, anyone

5  under that superior, must defer to their judgment, even if

6  they disagree with it?

7  A.      I couldn't testify to that, what it states completely.

8  Q.      You never read it?

9  A.      I have read it, but I don't know that that's exactly

10 what it states.

11 Q.      Okay.  Do you see Paragraph 9?

12 A.      Yes.

13 Q.      Are you familiar with that paragraph?

14         Now, does that refresh your recollection?

15 A.      It's been a long time since I read the Code of Ethics,

16 but I see it on the, the page.

17 Q.      Does its refresh your recollection now?

18 A.      I can see it on the page.

19 Q.      Would you have been aware of the provisions within the

20 Code of Ethics at the time in question?

21 A.      When we were doing the PRC appeals?  Yes.

22 Q.      You would have read the Code of Ethics with reference

23 to that?

24 A.      That would have applied at that time?  Not to the PRC

25 appeals process.

1    Q.      Well, so you're saying that the Code of Ethics never

2    directly --

3    A.      It had nothing to do with the appeal we were looking

4    at.

5    Q.      Do you agree with me that the Code of Ethics deals with

6    how you were to conduct yourself during the entirety of your

7    employment with the Department of Corrections?

8    A.      Yes.

9    Q.      At all times?

10   A.      Yes.

11   Q.      Do you see Paragraph 9?

12         MR. BRADLEY:  Your Honor, I don't believe that's the

13   complete paragraph.

14         THE WITNESS:  Yeah.  I believe there's another page.

15         MR. BRADLEY:  So, if that could be shown as well.  I

16   believe there's a Page 6.

17   BY MR. JACOBS:

18   Q.      Did you familiarize yourself with what's on there now?

19   A.      Could you put them both on there at the same time?

20         MR. BRADLEY:  He's working on it.

21   A.      Yes.

22   Q.      Does that refresh your recollection?

23   A.      Like I said, I remember reading the Code of Ethics at a

24   time prior to 2003, yes.

25   Q.      Do you generally defer to your superiors?

1    A.      Yes, when they give me an order.

2    Q.      Officer superior says to you not to do something, you

3    would not do it, or you would do it?

4    A.      If it was unethical, I would not do it.

5    Q.      Okay.  In your experience, have you ever witnessed

6    anything unethical by another DOC employee?

7    A.      No.

8    Q.      How long have you been with the DOC?

9    A.      11 years.

10   Q.      11 years?  In 11 years, how much interaction --

11           MR. BRADLEY:  Excuse me.  Excuse me, Your Honor.

12           THE COURT:  Yes.

13           MR. BRADLEY:  I don't think this is appropriate

14   cross examination.

15           THE COURT:  I'll see you -- we'll excuse the jury.

16           Please rise for the jury.

17           (Whereupon, jury retires.)

18           THE COURT:  Please be seated.

19           Could you state your reasons, Mr. Bradley.

20           MR.  BRADLEY:  Initially, it's beyond the scope of

21   my redirect.  But beyond that, the claim against Miss Mankey

22   is that she, in the process of sustaining the hearing

23   examiner's findings, violated his rights.

24           The fact that she did or didn't see other ethical or

25   unethical behavior, didn't report it or did report it, or

1  never saw any unethical behavior in the part of the prison she

2  worked is just not relevant to what's going on here.

3      MR. JACOBS:  First of all, Your Honor, within the

4  complaint, I alleged not just --

5      THE COURT:  Let's focus on, first of all, it does

6  appear to the Court this line of questioning is beyond the

7  nature and kind of questions that were asked in the redirect.

8      MR. JACOBS:  He questioned outside influence.  I'm

9  centering in on outside influence, and it's the policy, and it

10  is within the complaint.  It is a policy of DOC employees to

11  act in collusion with other DOC employees, to sabotage

12  grievances, sabotage appeals, so forth and so on.

13      He brought the issue up, "outside influence".  I'm

14  addressing the issue, outside influence.

15      MR. BRADLEY:  If he wants to ask that question, he

16  can ask that question, if he's asking about whether she's

17  witnessed ethical, or whether she has ever witnessed unethical

18  behavior in her 11 years in the DOC.

19      THE COURT:  That's --

20      MR. JACOBS:  That goes to her credibility, Your

21  Honor.  If she is saying that -- she just testified that if

22  she did, if she did receive an order from a superior, that

23  she -- that was lawful, but if it wasn't unethical, then, she,

24  she would, if it wasn't ethical, she would report it.

25      I'm testing her credibility.  And this goes to

1   conspiracy.  This goes to drawing the link.  This goes to the

2   fact that when other defendants testify that they did talk to

3   other people.  And you -- this is an issue of conspiracy, Your

4   Honor.

5        THE COURT:  Well, the conspiracy has to do with

6   whether or not there was a conspiracy with respect to you and

7   the taking of your legal property.  That's what the conspiracy

8   goes to.

9        MR. JACOBS:  Okay.

10       THE COURT:  So, you know, I don't see the link

11  between what areas you're trying to get into to your case.

12       MR. JACOBS:  I'm going to the issue of outside

13  influence.

14       THE COURT:  You need to direct the outside influence

15  to her.

16       MR. JACOBS:  Well, this is direct to her.  If --

17  Your Honor, if the DOC has a policy of, unwritten policy of

18  supporting misconduct of other DOC officials, that is

19  influence.  That is influence.  That is something that will

20  weigh on her ability to make an impartial decision with

21  respect to me.

22       THE COURT:  Well, you have to link it to her, her

23  role at the PRC.

24  Q.    If she saw misconducts that were improper and she

25  didn't do anything about them, and just, you know, rubber

1   stamped them, then, you can probe into that.  But I don't know

2   what your asking her here that's related to that.  You have to

3   keep it related to your case.

4        MR. JACOBS:  I believe her credibility is related,

5   you know, the issue of her credibility here, saying, if she

6   did witness something unethical that she will report it.

7        And I'm saying that something unethical was going

8   on, and that something unethical did take place in my case in

9   regards to this appeal, and that she would not report it, and

10  that she did not report it.  And the fact that she never

11  reports anything in regards to what a DOC official does, does

12  add weight to my suggestion that even if something unethical

13  did take place, she would not testify to that.

14        THE COURT:  I think you need to ask if she has seen

15  things that were unethical in this conduct process and the

16  appeals that she was reviewing.

17        MR. JACOBS:  I think that is also relevant to her,

18  this exhibit, as the DOC official and the Code of Ethics.  If

19  she witnessed unethical -- I mean, why would she report it in

20  my case if she never reported it before?

21        THE COURT:  Well, you can ask her that.

22        MR. JACOBS:  That's what I mean.

23        THE COURT:  In the misconducts.  I mean, I have no

24  idea what the scope is of what you're asking, quite frankly.

25        MR. JACOBS:  Your Honor --

1              THE COURT:  I'm trying to give you a fair

2    opportunity to questions, but you have to keep your questions

3    related to this case, and the time frame.

4              MR. JACOBS:  It is related.

5              THE COURT:  And you are suggesting here, with

6    respect to her role as a reviewer, as someone that was in the

7    review process.  So, if she's seen misconducts that in her

8    review process she turned a blind eye to, you can ask her

9    that.  I mean, I don't know about what other kinds of

10   unethical conduct might be going on, you know, out in a yard

11   or somewhere else that may or may not have gotten reported,

12   and how serious those would be.

13             So I mean, we're going to be in a whole side

14   collateral issue here, and that's confusing.  And so, you need

15   to keep it with respect to your claims.

16             MR. JACOBS:  Okay.  Let me ask you this, Your Honor.

17   Is it okay for me to ask her on her own observation, in her

18   own experiences, in her own interactions with guards, in her

19   time as Department of Corrections staff, has she ever

20   witnessed or reported unethical behavior.  That, I mean, that

21   goes to her credibility.

22             MR. BRADLEY:  That has nothing to do with this case.

23             MR. JACOBS:  It has to do with her credibility.  It

24   has to do with whether or not she's truthful, and if she would

25   report this in my case.  It's relevant.

1          THE COURT:  How does it go to truthfulness?

2          MR. JACOBS:  It contradicts what she just said; if

3    she did witness unethical behavior, that she would report it.

4          My allegation against her is that there was

5    unethical behavior in my case that she did take part in, and

6    that's not reporting it, and that she's hiding it right now.

7          THE COURT:  I'm not going to have this case go into

8    becoming what other kind of ethical behavior is going on over

9    three years or four years in the prison system.  We need to

10   focus on your claims.

11         MR. JACOBS:  I'm not --

12         THE COURT:  And this witness is here because she was

13   in the review panel.

14         MR. JACOBS:  Your Honor, I'm not going to ask her

15   what type of unethical behavior, she may have witnessed it,

16   how many times she may have witnessed it or anything of that

17   nature.

18         I'm going to ask these few questions, and that's it.

19   And I believe this goes directly to outside influence.  The

20   matter which he raised on direct, and it's the only issue that

21   I'm addressing, "outside influence."

22         MR. BRADLEY:  If he wants to ask about outside

23   influence, he needs to ask her, were you influenced by any

24   outside factors.

25         MR. JACOBS:  He already asked that question.

1              MR.  BRADLEY:  I think that's the question.

2              THE COURT:  How does this go to outside influence?

3              MR. JACOBS:  The policy, the policy of supporting --

4    the policy of supporting DOC staff when they commit a

5    violation against a prisoner is the influence.  That is the

6    influence.  That is the motivation for her to rubber stamp my

7    appeal, and then, go along with the guards.  That is the

8    influence.

9              MR. BRADLEY:  He needs to ask her if she's aware of

10   that policy, if it exists, if that's where he's headed with

11   this.

12             THE COURT:  You can ask her if there's a policy

13   along those lines, and that if there is, what's the effect to

14   her decision here.

15             MR. JACOBS:  Okay.

16             THE COURT:  Okay?

17             MR. JACOBS:  Okay.

18             THE COURT:  Please rise for the jury.

19             (Whereupon, jury is seated.)

20             THE COURT:  Please be seated.

21                  RECROSS EXAMINATION CONTINUES

22   BY MR. JACOBS:

23   Q.    You basically rubber stamp any, any adverse action

24   taken against a prisoner; correct?

25   A.    No.

1  Q.      Anything, anything a guard said that a prisoner did,

2  you would agree with whatever the guard said?

3  A.      No.

4  Q.      Were you also aware of a policy at the time in question

5  of prison staff, DOC staff supporting any allegations by a

6  guard against a prisoner?

7  A.      I am aware of no such policy.

8  Q.      And at the time you rendered your decision on my

9  appeal, you were acting pursuant to that policy; weren't you?

10  A.      I'm aware of no such policy.

11          MR. JACOBS:  No further questions, Your Honor.

12          MR. BRADLEY:  Nothing further, Your Honor.

13          THE COURT:  I'm just going to excuse the jury for a

14  moment.

15          (Whereupon, jury retires.)

16          THE COURT:  Please be seated.

17          I just want to put on the record that I believe the

18  last objection was based on Rule 608 of the Federal Rules of

19  Evidence, evidence of character and conduct of witnesses.

20          And that will be 608(b):  Specific instances of the

21  conduct of a witness for the purpose of attacking or

22  supporting a witness' character for truthfulness, other than

23  conviction of crime, as provided in Rule 609, may not be

24  proved by extrinsic evidence.

25          They may, however, in the discretion of the Court,

1  if probative of truthfulness or untruthfulness being inquired

2  into on cross examination of the witness, one, concern the

3  witness' character for truthfulness or untruthfulness, or two,

4  concerning the character for truthfulness or untruthfulness of

5  another witness as to which character the witness being cross

6  examined has testified.

7         So, that's really -- and we're directed here as well

8  by Rule 404(b) with respect to the, with respect to this, with

9  respect to this issue.

10         And so, the Court was looking at this as to whether

11  it proves truthfulness or untruthfulness, and the broad and

12  breadth of the question relating to.

13         Whatever kind of ethical or unethical kind of

14  conduct may or may not have been observed was not specific

15  enough, and it would have created potential confusion and

16  collateral matters that would unduly delay the trial, and it

17  was not sufficiently related to truthfulness or untruthfulness

18  in this context.

19         Okay.  Ready with your next witness?

20         MR. BRADLEY:  Yes, Your Honor.

21         THE COURT:  Please rise for the jury.

22         (Whereupon, jury is seated.)

23         THE COURT:  Please be seated.

24         Call your next witness.

25         MR. BRADLEY:  Yes, Your Honor.  Defendants call

1   Charles Simpson.

2           THE COURT:  Witness could please come forward, stand

3   in front of the court reporter, and be sworn.

4           Please take the witness stand.

5                        * * * * *

6           CHARLES SIMPSON, a witness herein, having

7   been first duly sworn, testified as follows:

8                   DIRECT EXAMINATION

9   BY MR. BRADLEY:

10  Q.     Good afternoon.  Could you please state your name to

11  the jury, please.

12  A.     Charles Simpson.

13  Q.     And are you currently employed?

14  A.     Yes, I am.

15  Q.     By whom?

16  A.     Pennsylvania Department of Corrections.

17  Q.     How long have you been employed by the Department of

18  Corrections?

19  A.     28 years.

20  Q.     What is your current position with the Department?

21  A.     I'm a shift captain.

22  Q.     At what institution?

23  A.     SCIP.

24  Q.     Pittsburgh.  As a shift captain, are you a uniformed

25  officer?

1   A.      Yes, I am.

2   Q.      In your career with the Department of Corrections, have

3   you always been a uniformed officer?

4   A.      Yes, I have.

5   Q.      And what was your first position with the Department of

6   Corrections?

7   A.      I was Correctional Officer 1.

8   Q.      And you advanced from Correctional Officer 1 all the

9   way up to Captain?

10  A.      Yes, I did.

11  Q.      Back in September of 2003, where were you assigned?

12  A.      SCI Pittsburgh.

13  Q.      And what was your assignment?

14  A.      I was a 6:00 to 2:00 shift captain.

15  Q.      Can you tell the jury briefly what your

16  responsibilities as the 6:00 to 2:00 shift captain were?

17  A.      I oversee the running of the shift that starts at

18  6:00 o'clock in the morning, finishes up at 2:00 o'clock in

19  the afternoon.

20          I have subordinate lieutenants who work under my

21  command, who supervise sergeants, as well as other officers.

22  Q.      Do you know the plaintiff in this matter, Andre Jacobs?

23  A.      No, not really.

24  Q.      Prior to being named as a defendant in this lawsuit,

25  did you know Mr. Jacobs?

1   A.      Other than just whenever I sat in on the PRC hearing.

2   That's the only time I had any dealings involving him.

3   Q.      Did you ever personally interact with him?

4   A.      No.

5   Q.      You had indicated that you sat on the PRC.  I believe

6   the jury has heard some testimony on what the PRC does, but

7   could you briefly explain your understanding of the role of

8   the PRC?

9   A.      Yeah.  There is an area where the inmate will appeal

10  the findings from the hearing examiner to the Program Review

11  Committee, and we look over what took place at the hearing.

12  What narrow parameters, whether there was a violation of

13  procedures, or if the punishment was excessive or witnesses

14  were improperly denied.  We ensure that the hearing examiner

15  performs his job as required.

16  Q.      Plaintiff's Exhibit C, which has been previously marked

17  as the PRC response to Mr. Jacobs' appeal after misconduct

18  back in September, October of 2003; have you seen that

19  document before?

20  A.      Yes.

21  Q.      Your name and signature appear on this document?

22  A.      Yes, it does.

23  Q.      Is that at the line that says, Charles J. Simpson,

24  Captain?

25  A.      Yes, it is.

1    Q.      Appears to be dated 10/1/'03.

2    A.      Yes.

3    Q.      Looking at that document today, do you have any

4    independent recollection of signing that document?

5    A.      Yes, I do.   That's my signature.

6    Q.      I understand that's your signature, but do you have,

7    sitting here today in the courtroom, do you have any

8    independent recollection of having signed that back in 2003?

9    A.      Not really.

10   Q.      In October of 2003 when you sat on the PRC that

11   reviewed Mr. Jacobs' misconduct appeal, were you aware at that

12   time that Mr. Jacobs had filed grievances while in prison?

13   A.      No.

14   Q.      Were you aware that he filed a lawsuit against other

15   DOC personnel?

16   A.      No.

17   Q.      If you can recall, do you know if anybody from outside

18   the PRC attempted to direct the decision of the PRC in that

19   case?

20   A.      Nobody did.

21   Q.      Did you ever work in the LTSU when you were assigned at

22   SCI Pittsburgh?

23   A.      No.

24           MR. BRADLEY:   That's all the questions I have, sir.

25   Thank you.

```
 1                          CROSS EXAMINATION

 2    BY MR. JACOBS:

 3    Q.      Good afternoon, Mr. Simpson.

 4    A.      Afternoon.

 5    Q.      You said that you worked for the DOC approximately

 6    28 years?

 7    A.      Yes.  Started on November 6th, 1980.

 8    Q.      And what portion of that time was spent serving as a

 9    member of the PRC?

10    A.      I don't recall the exact dates, but it was

11    approximately, I would say, late '90's, up until the SCIP

12    closed in 2005.

13    Q.      Approximately five years?

14    A.      At least.

15    Q.      In that five years, how many appeals would you estimate

16    you reviewed in that capacity?

17    A.      Very -- numerous.  None I could recall a specific

18    number, but on average, we had anywhere from sometimes three a

19    week, to sometimes 20 a week.  So I never really kept count.

20    Q.      In total, do you think it would be more than 50?

21    A.      Yes.

22    Q.      More than 100?

23    A.      At least.

24    Q.      More than 200?

25    A.      Probably, yes.
```

1    Q.      Okay.  Isn't it true that whenever a prisoner appeals,

2    the committee that you sat on, PRC, usually denied the appeal?

3    A.      Not always.

4    Q.      Not always, but usually?

5    A.      My answer is, not always.

6    Q.      Before we get to that --

7            MR. BRADLEY:  Your Honor --

8            THE COURT:  You have an objection?

9            MR.  BRADLEY:  I don't necessarily object.  I just

10   don't know if this is the proper time to do this.

11           THE COURT:  We'll take a brief recess.  Please rise

12   for the jury.

13           (Whereupon, jury retires.)

14           THE COURT:  Please be seated.

15           MR. BRADLEY:  He's put up our response to request

16   for admissions, and it indicates in there that this witness

17   previously used to work, usually when talking about the extent

18   to which they affirmed the hearing examination decision.  I

19   don't have a problem with the admissibility of that.  I just

20   don't know that confronting him with this is the appropriate

21   thing to do, or is this something that should come in in

22   rebuttal in his subsequent portion of the case.

23           THE COURT:  Well, if it's -- if it's inconsistent,

24   he can ask him if he's ever said that he usually did

25   something.

1          MR. BRADLEY:  But again, he can confront him, and he

2    can affirm or deny it.  But then, to actually impeach him, I

3    don't know that this is the right time to do it.  That would

4    come during his rebuttal.

5          THE COURT:  I think he can show it to him.  This is

6    something that's admissible in evidence.  He can use it right

7    now, if he wants to.

8          MR. BRADLEY:  Okay, that's fine.  I apologize.  Like

9    I said, I didn't object to what it was; I just was concerned

10   about the process.

11         THE COURT:  Okay.  Please rise for the jury.

12         (Whereupon, jury is seated.)

13         THE COURT:  Okay.  Please be seated.

14         Please be seated.

15         Is that clear on the screen?  Can the jurors read

16   that?

17         THE JURORS:  No.

18         THE COURT:  Can you make it clearer?

19                  CROSS EXAMINATION CONTINUES

20   BY MR. JACOBS:

21   Q.     During the relevant time frame, Mr. Simpson, did

22   Miss Mankey ever -- did she usually participate as a PRC

23   member, along with you?

24   A.     Yes, she did.

25   Q.     Prior to 2003 as well?

1   A.      I would think so, yes.

2   Q.      Do you recognize this document?

3   A.      It looks vaguely familiar.

4   Q.      If you look to the caption of the case, is that the

5   case that we're here on today?

6   A.      I believe so.

7   Q.      You want to make sure?

8           THE COURT:  Will you stipulate to that, Mr. Bradley?

9           MR.  BRADLEY:  I'm sorry, Your Honor.  Of course,

10  yes.  I apologize.

11          THE COURT:  Okay.

12  BY MR. JACOBS:

13  Q.      And this document asks you to admit or deny facts

14  pertaining to this case; correct?

15  A.      Correct.

16          THE COURT:  Which question do you want him to look

17  at?

18          MR. JACOBS:  I told him.

19          THE COURT:  Okay.

20  BY MR. JACOBS:

21  Q.      Do you see No. 13?

22  A.      Yes.

23  Q.      Can you read it?

24  A.      The PRC that you sat on routinely sustained the hearing

25  examiners refusal to let a prisoner call a witness at prison

1   disciplinary hearings?

2          Defendants' response:  And then, there's a blank,

3   "admitted", and a blank and, "denied".

4   Q.     Okay.

5          MR. BRADLEY:  Your Honor, just for the record,

6   that's not the question that he asked him.  To start this

7   process, that's not the question he asked him.

8          THE COURT:  That's okay.  Was there another

9   question, Mr. Jacobs?

10         MR. JACOBS:  I think it's two similar questions in

11  the same area.

12         THE COURT:  You want to go back in the questions?

13  BY MR. JACOBS:

14  Q.     I'm sorry.  You see No. 11?

15  A.     Yes.

16  Q.     Could you read that?

17  A.     The PRC's that you sat on, as a member on, almost

18  always sustain the decision of the hearing examiner?

19  Defendant's response: --

20         MR. JACOBS:  You want to turn to the response page,

21  please.

22  BY MR. JACOBS:

23  Q.     What was your response?

24  A.     The No. 11?

25  Q.     Yes.

1    A.      The statement is admitted to, that usually occurs.

2            It is denied, if it is implying that this is routine,

3    as this is determined at the hearing.

4    Q.      So, you admitted, then, that it usually did occur?

5    A.      On that statement, yes.

6    Q.      That you usually denied a prisoner's appeal?

7    A.      On that statement, yes.

8    Q.      Okay.  And the reason you usually deny a prisoner's

9    appeal is because you don't feel as though prisoners should

10   have rights; correct?

11   A.      Could you repeat that question again?

12   Q.      The reason that you usually deny the prisoner's appeal

13   while you was a PRC member is because you don't want prisoners

14   to have rights; you don't feel as though prisoners should have

15   rights?

16   A.      That is not the case.

17   Q.      You do not feel as though that prisoners should have

18   their rights protected at a disciplinary hearing?

19   A.      Could you repeat that question one more time?

20   Q.      You don't care, you don't care about prisoners having

21   rights at a prison disciplinary hearing?

22   A.      Is that a statement, or is that a question?

23   Q.      I'm asking you.

24   A.      If you form it in a question.

25   Q.      You review misconduct hearings, you review the decision

1   of the hearing examiner; correct?

2   A.      That is correct.

3   Q.      And when that appeal comes to you, when a prisoner

4   appeal comes to you, you're not concerned with whether or not

5   the prisoner's rights was violated at the disciplinary

6   hearing; are you?

7   A.      My job at the hearing, at the Program Review Committee

8   hearing is to review the actions of the hearing examiner and

9   what took place at the misconduct hearing.

10  Q.      Yes, or, no?  Are you concerned with whether or not the

11  prisoner's right was violated at the disciplinary hearing?

12  A.      It's not in my scope.

13  Q.      Are you concerned with it; yes, or, no?

14  A.      I'm not quite sure I understand your question.

15  Q.      When a prisoner appeals a disciplinary decision to the

16  PRC, are you or are you not concerned with whether his

17  constitutional rights were violated at that particular

18  disciplinary hearing?

19  A.      Well, concerns over constitutional rights are beyond my

20  scope.

21  Q.      Yes, or, no?

22  A.      If it had to be an answer, it would be, no.

23  Q.      So, you're also not concerned with whether or not the

24  misconduct could have been, could have been used as a

25  retaliatory tool?

1   A.      Could you repeat that question again?

2   Q.      You're also not concerned with whether or not the

3   particular misconduct may have been used as a retaliatory

4   tool?

5          In other words, if a guard used a misconduct to

6   retaliate against a prisoner, you're not concerned with that

7   either; are you?

8   A.      It would appear to be in a hypothetical situation, or

9   are you talking about your situation?

10  Q.      I'm talking about any situation.  I'm talking about

11  your review, the scope of your review.

12         If a, if a prisoner made a claim that a guard used

13  misconduct as retaliatory tool, is that something that you're

14  concerned with when you render your decision?

15  A.      It's not part of the decision-making process of a PRC

16  member.

17  Q.      Okay.  Are you concerned with -- you said that you're

18  not concerned with the constitutional rights of the prisoner;

19  correct?

20  A.      As a member of the PRC?

21  Q.      As a DOC employee.

22  A.      In a very broad, general sense, yes.

23  Q.      And one of the grounds for appeal that a prisoner could

24  use is a violation of the law; that correct?

25  A.      Yes.

1   Q.      And even though it might be a violation of law, you

2   still don't review whether or not there was a violation of

3   law; correct?

4   A.      It's beyond -- as far as, law violations are beyond our

5   scope.

6   Q.      But yet, it's on the form that that's one of the

7   grounds that a prisoner could challenge; correct?

8   A.      Correct.

9   Q.      So, even though the form said that a prisoner could

10  challenge a violation of law, you're not in position to

11  actually correct any violations of the law?

12  A.      We're not the law enforcement.

13  Q.      So, basically you rubber stamp the appeal?

14  A.      That is not correct.

15  Q.      And you basically don't condone anything the guards

16  write against a prisoner?

17          MR. BRADLEY:   I don't believe I understood that

18  question, Your Honor.   Could he rephrase that.

19  BY MR. JACOBS:

20  Q.      Any time a guard writes a misconduct against a

21  prisoner, and it's appealed up to you, you don't care what the

22  guard did, why he did it, and whether it's valid or not?

23  A.      That's not true.

24  Q.      As long as there's no procedural error, as you stated

25  earlier, you're not going to overturn the decision; correct?

1    A.      As long as there is none of those three parameters that

2    we have available to review, that's what we concern ourselves

3    with; the procedures, the witnesses, as well as the sanctions.

4    Q.      Okay.  Well, the witnesses, if a prisoner calls a

5    witness at a disciplinary hearing, attempts to call a witness

6    at a disciplinary hearing, and the witness is not called, what

7    is the scope of your review; what are you deciding?

8    A.      To ensure that the hearing examiner properly excluded

9    the witness or included the witness, as the case may be.

10   Q.      Based on what criteria?

11   A.      The relevancy of the witness.

12   Q.      And the DC-801 procedures, too?

13   A.      Correct.

14   Q.      Correct?

15   A.      Correct.

16   Q.      And under the DC ADMIN 801 procedures, a prisoner is

17   allowed to call a witness at a disciplinary hearing?

18   A.      As long as he's allowed by the hearing examiner;

19   correct.

20   Q.      And are you familiar with that section of allowing

21   prisoners to, to call witnesses at a disciplinary hearing?

22   A.      Very familiar with it.

23   Q.      What is the criteria for calling the witness at the

24   disciplinary hearing?

25   A.      To, if it's determined by the hearing examiner, if he

1    would be able to help to add to the, the misconduct hearing,

2    as far as being relevant, as far as they would help him, to

3    whether it's necessary or needed testimony in the case at hand

4    or not.

5    Q.    Do you think that in this particular case, where a

6    prison guard labels a declaration contraband, that a witness'

7    testimony will be relevant to what the document was and

8    whether or not the document belonged to him?

9    A.    In your case in particular?

10   Q.    No.  Yes, in this particular case.

11   A.    We found as part of the member of PRC that the hearing

12   examiner properly excluded any witnesses you wished to call.

13   Q.    I understand that.

14        What I'm asking you now is, did you think that

15   Mr. Bank's testimony as a witness at the disciplinary hearing

16   that the documents did not belong to him, and the nature of

17   the documents being legal, was relevant to whether or not I

18   was guilty of contraband, and whether or not I loaned and

19   borrowed someone else's property?  Do you think his testimony

20   is relevant to that question?

21   A.    No, because we, basically, we believe that the

22   exclusion by the hearing examiner was proper.

23   Q.    Regardless of whether it was proper or not?

24   A.    As I said before, the hearing examiner's determination

25   of whether the witness was needed or not was what we

1   determined.

2   Q.      So, that's what rules.  Because the hearing examiner

3   said it wasn't relevant, you said that it wasn't relevant;

4   correct?

5           MR. BRADLEY:  Your Honor, I'm not sure that the

6   document reflects that the hearing examiner said he was

7   excluded because it was not relevant.

8           MR. JACOBS:  Well, he said that --

9           THE COURT:  Would you like to re-ask the question?

10  BY MR. JACOBS:

11  Q.      Did you conduct an independent review of the misconduct

12  hearing?

13  A.      As a member of the PRC, we reviewed --

14  Q.      Just answer that question first.

15          Did you conduct an independent review of what took

16  place at the misconduct hearing, as a member of PRC?

17  A.      By, by "independent", we reviewed what took place as

18  far as the notations from the hearing examiner.

19  Q.      So, did you review the actual documents in question?

20  A.      The misconduct?

21  Q.      No, the actual -- the declarations, the documents that

22  were taken that were alleged to be contraband.

23  A.      No, they weren't.  As part of our review, PRC --

24  Q.      But they were in the possession of the hearing

25  examiner; correct?

1   A.      I believe they were at -- they were shown at the

2   hearing.  I'm not sure.

3   Q.      And they were used as evidence to sanction me for

4   having those indictment documents; correct?

5   A.      I believe so.

6   Q.      That was also the basis for accusing me of having

7   contraband, and loaning and borrowing, and refusing to obey a

8   direct order; correct?

9   A.      I believe so.

10  Q.      And you don't think that, whether or not I had

11  contraband, you don't think it was necessary to review the

12  actual evidence to determine whether or not it was contraband,

13  whether or not it belonged to Mr. Banks?

14  A.      It wasn't our job to retry the hearing.

15  Q.      I'm asking you, do you think it was relevant?

16  A.      No.

17  Q.      Even if my rights to access to the Courts was involved?

18  A.      That wasn't part of our review.

19  Q.      Yes, or, no?

20  A.      No, it wasn't part of our review.

21          MR. JACOBS:  No further questions.

22                      REDIRECT EXAMINATION

23  BY MR. BRADLEY:

24  Q.      Just a few additional questions, Captain Simpson, and

25  just to clear this up.

1          Mr. Jacobs had asked you some questions about whether

2   you were concerned with prisoner's civil rights.  I want to

3   take you out of the PRC and in your role as Captain of the

4   Department of Corrections.  In that role in the prison, are

5   you concerned with prisoner civil rights?

6   A.     Yes, we are.

7   Q.     Is it the job of the PRC to re-hear the misconduct

8   hearing below?

9   A.     No, it is not.

10  Q.     Mr. Jacobs had asked you some questions about whether

11  the misconduct hearing was contrary to law.

12         Are you an attorney?

13  A.     No, I'm not.

14  Q.     You have any legal training?

15  A.     No, I do not.

16  Q.     When you reviewed the record of the misconduct hearing,

17  are you looking for compliance of the requirements of the

18  DOC's misconduct policy?

19  A.     Yes, we are.

20  Q.     With respect to, specifically, the review of

21  Mr. Jacobs' misconduct back in October of 2003, other than the

22  members of the PRC, did any of the other defendants in this

23  matter approach you and direct you to come to a specific

24  conclusion on his appeal?

25  A.     Nobody contacted me.

1    Q.      Did you have any -- outside of the PRC, did you have

2    any discussions with any of the other defendants in this

3    matter about Mr. Jacobs?

4    A.      No, I did not.

5    Q.      Again, at that time, did you have discussions with any

6    of the other defendants about efforts to retaliate against

7    Mr. Jacobs by sustaining the hearing examiner's finding in his

8    misconduct appeal?

9    A.      No, I did not.

10   Q.      Thank you.  That's all.

11                        RECROSS EXAMINATION

12   BY MR. JACOBS:

13   Q.      You familiar with the Code of Ethics?

14           MR. BRADLEY:  Beyond the scope of redirect, Your

15   Honor.

16           THE COURT:  Overruled.

17   A.      Yes, I am.

18   Q.      And the Code of Ethics dictates what your code of

19   conduct is as an employee of the Department of Corrections;

20   does it not?

21   A.      That is correct.

22   Q.      That's at all times?

23   A.      Yes, it is.

24   Q.      And it also states within the Code of Ethics that if

25   you're aware of any violations of law, any violations of

1    rights, or any type of improper conduct, that you should

2    report that misconduct; isn't that correct?

3    A.      That's a general statement; yes.

4    Q.      Well, you want to go over it, just to make sure?

5    A.      Do you have a specific?  There's several items in the

6    Code of Ethics.  If you -- you talking about a specific one?

7    Q.      Okay.  So, if you became aware of a violation, such as

8    a fabricated misconduct, would it be your duty under the Code

9    of Ethics to report that misconduct?

10   A.      This is a hypothetical situation?

11   Q.      Hypothetical under the Code of Ethics, your

12   interpretation of the Code of Ethics.

13   A.      If I was made aware that there was a fabrication or a

14   lie made up, yes.

15   Q.      Okay.  If you were aware that a violation of law

16   occurred, in your capacity as PRC member, under the Code of

17   Ethics, would you be required to report it?

18   A.      If it's a violation of law, yes.

19   Q.      So, despite you being in a position as a PRC man,

20   you're still required to recognize the law and any type of

21   falsification of misconducts by prison guards; correct?

22   A.      They are corrections officers.  But if I was made aware

23   of anything, yes, I would be required by my Code of Ethics to

24   report it, yeah.

25   Q.      But it's the policy of the DOC to support any

1    misconduct that a guard commits against a prisoner; isn't that

2    correct?

3    A.     No.

4    Q.     You don't care whether or not a guard did something to

5    a prisoner; do you?

6    A.     Yes, I do care.

7    Q.     Even if a guard did do something improper to a

8    prisoner, you're not going to report it; are you?

9    A.     Could you restate that as a question?

10   Q.     Even if a guard did do something to a prisoner, you

11   wouldn't report it; would you?

12          MR. BRADLEY:  Your Honor, that's just -- I object to

13   that question.

14          THE COURT:  Sustained.

15          MR. JACOBS:  No further questions, Your Honor.

16          MR. BRADLEY:  Nothing further, Your Honor.

17          THE COURT:  Okay.  Witness is excused.

18          This will be a good time for our afternoon recess.

19   Please rise for the jury.

20          (Whereupon, the jury retired and court recessed at

21   3:25 p.m.)

22                         * * * * *

23          (Whereupon, court reconvened.)

24          THE COURT:  Please be seated.

25          Do you have your next witness?

1              MR. BRADLEY:  Yes, Your Honor.  Defendants call

2   Michael Ferson.

3              THE COURT:  If the witness could please stand in

4   fronted of the court reporter to be sworn.

5              Thank you.  Please be seated.

6                        *  *  *  *  *

7              MICHAEL FERSON, a witness herein, having

8   been first duly sworn, testified as follows:

9                        DIRECT EXAMINATION

10  BY MR. BRADLEY:

11  Q.     Would you please state your name, and spell it for the

12  record.

13  A.     Michael Ferson, F-E-R-S-O-N.

14  Q.     You currently employed?

15  A.     No, sir, I'm not.  I'm retired.

16  Q.     Retired from what?

17  A.     Pennsylvania Department of Corrections.  I was a

18  hearing examiner when I retired.

19  Q.     How long did you work for the Department of

20  Corrections?

21  A.     About 31 years.

22  Q.     And what position did you hold when you first started

23  with the Department of Corrections?

24  A.     Corrections counselor from 1975 'til 1986.  1986, I was

25  promoted to a hearing examiner at the State Regional

1  Correctional Facility at Mercer, and in 1992 I transferred

2  back to the State Correctional Institution at Pittsburgh.

3  Q.      And what position did you hold at SCI Pittsburgh?

4  A.      I was an -- initially at Pittsburgh, I was a

5  corrections counselor, and when I returned to Pittsburgh, I

6  was the hearing examiner.

7  Q.      And that was in 1992?

8  A.      Yes, that's correct.

9  Q.      Did you retire as a hearing examiner?

10  A.      Yes, sir, I did.

11  Q.      Can you explain to the jury what the duties and

12  responsibilities of the hearing examiner are?

13  A.      Certainly.  The best analogy I can offer to folks that

14  don't have a background in it is when you and I were in junior

15  high school and we did something wrong, we were sent down to

16  the vice principal's office.

17       So, when something happens within one of the

18  correctional facilities, when an inmate is alleged to have

19  done something that violates the code of behavior that they

20  have, they're sent down to the hearing examiner for an

21  adjudication.

22       When inmates come into any correctional facility, they

23  are given an inmate handbook.  Within that handbook is

24  something we call Administrative Directive 801, and that

25  explains the inmate disciplinary process.  In that process,

1   the hearing is conducted by myself, a hearing examiner.  I am

2   not -- I'm not an employee of State Correctional Institution

3   Pittsburgh, or any other State correctional institution.

4        I'm -- I was an employee of the Department of

5   Corrections, but we were supervised by the chief counsel's

6   office.  I am not an attorney.  I have a Bachelor's degree in

7   psychology.  I have a Master's degree in education, with

8   certification as a secondary school guidance counselor.

9        In an inmate misconduct hearing, inmates would have

10  generally the same rights we would at a magistrate level

11  hearing.  In some cases they may have an assistant to help

12  them, not an attorney, but an assistant.

13       If they wish to have a witness, and the hearing

14  examiner decides that that witness is relevant to make a

15  determination for the ultimate instance, they may have those

16  witnesses called.

17       When we conduct the hearing, I conduct it,

18  approximately 200 to 250 misconducts a month, at Pittsburgh.

19  So, this was not a long, drawn out affair; five to ten minutes

20  maybe, and that was the extent of the whole hearing.

21       The inmate is given a copy of something that I believe

22  you've seen before, which we call a misconduct form, which

23  indicates to the inmate what he's being charged with, which

24  has to be a violation of something included in the rule book,

25  in the 801.  Tells him what he is and is not allowed to do.

1    He's given a written copy of that.  At the time he's given a

2    written copy of that, which the copy is approved by a shift

3    commander.  The inmate then gets a copy of it, and it's

4    documented.  We have a time period to hold a hearing.  When

5    he's given his copy, he gets a witness sheet, which on that

6    witness sheet he's allowed to request his witnesses.  He's

7    allowed to request assistance, and he's also given a revision

8    form.  At the end of the hearing he's given a written

9    explanation of what I did and why.

10        If he's found guilty, he is then given an appeal form,

11   which he may submit to the Program Review Committee.

12        THE COURT:  Could you just pull your chair a little

13   closer, and move the mike over, and speak directly into the

14   bulb of the mike.  Thank you.

15   BY MR. JACOBS:

16   Q.    In September of 2003, you were the hearing examiner at

17   SC -- assigned to SCI Pittsburgh?

18   A.    That's correct.

19   Q.    Were there any other hearing examiners assigned to SCI

20   Pittsburgh at that time?

21   A.    No.  If something -- if someone was on vacation, or

22   someone needed to cover, then, another hearing examiner could

23   come in and hold the hearings.  They are conducted the same

24   way in any of the State Correctional Institutions.

25   Q.    Taking you back to September of 2003, at that time did

1   you know the plaintiff, Andre Jacobs?

2   A.      How would we define "know"?

3   Q.      Did you have -- in the course of your duties at

4   SCI Pittsburgh, did you have occasion to come into contact

5   with Mr. Jacobs?

6   A.      Yes, I did.

7   Q.      Specifically, on September 24th, 2003, do you have any

8   independent recollection of holding a misconduct hearing with

9   Mr. Jacobs?

10  A.      I did not have any until I got a copy of the lawsuit,

11  and at that point, then, I was, you know, I remembered having

12  done that, yes, because of my documentation.

13          MR. BRADLEY:  We have an exhibit to mark, Your

14  Honor.  I believe that's Defendant's D.

15          Can you put up -- may I approach the exhibits, Your

16  Honor?

17          THE COURT:  Yes, you may.

18          MR. BRADLEY:  Thank you.

19  BY MR. BRADLEY:

20  Q.      You see an exhibit that's placed on the screen

21  previously marked as Plaintiff's 7-A.  Is that the type of

22  document upon which an inmate would be issued a misconduct?

23  A.      Yes, sir.

24  Q.      And specifically, does that appear to be the

25  misconduct -- a misconduct that was issued to Mr. Jacobs on

1   September 16th, 2003?

2   A.     Yes, sir, it does.

3          MR. BRADLEY:  Thanks.

4   Q.     The document that has been placed on top of

5   Plaintiff's 7-A, do you recognize that document?  And let's

6   start with the form of the document.

7   A.     I'm sorry, sir?

8   Q.     Do you recognize the form of that document?

9   A.     Yes.

10  Q.     What form is that?

11  A.     That's a hearing report.

12  Q.     Is that what you would fill in at the conclusion of the

13  hearing?

14  A.     I would be filling it out during the hearing, yes.

15  That would be a copy of what the inmate is given at the

16  completion of the hearing.

17  Q.     And looking in the upper right corner of what's been

18  marked as Defendant's Exhibit D, does that misconduct number

19  correlate to the misconduct that was issued to Mr. Jacobs on

20  September 16th, 2003?

21  A.     It does.

22         MR. BRADLEY:  Can you put that whole document up

23  now?

24         BRADLEY KITLOWSKI, Law Clerk:  D?

25         MR. BRADLEY:  D, yes.

```
 1   BY MR. BRADLEY:

 2   Q.      Can you identify that document for the jury?

 3   A.      Yes, sir, I can.  That's a hearing report that I

 4   prepared.

 5   Q.      In --

 6   A.      And the writing is a bit unique, that everyone is aware

 7   of.

 8   Q.      Does that indicate that Mr. Jacobs was afforded a

 9   misconduct hearing on misconduct A469506 on September 24th,

10   2003?

11   A.      Yes, it does.

12   Q.      And again, that's your handwriting on there?

13   A.      Absolutely, sir.

14   Q.      Would you mind reading that to the jury?

15   A.      Glad to.  Says, sworn -- sworn in.  Witness sheet

16   properly submitted.  Pleads not guilty.  Submits written

17   version.  Testified Mr. Banks gave him copies of material he

18   submitted to the Courts.  Hearing examiner finds Sergeant

19   Lynch's report more credible, and finds he has presented some

20   evidence to show that while searching Mr. Jacobs' cell he

21   found two pages of legal papers belonging to Inmate G. Banks.

22   The hearing examiner notes from personal observation the

23   documents are unsworn declarations.  Note Mr. Jacobs' own

24   testimony as to how he obtained the documents.  He is found

25   guilty of number 36, No. 44, Class 1 sanction, 30 days DC, to
```

1    be served consecutively.  Revoke contraband.  No. 35DWOP.

2    Q.     Which, DWOP means, the charge is dismissed without

3    prejudice?

4              THE COURT:  You need to speak into the mike.

5    A.     Oh, I'm sorry.  It means, the charge is dismissed

6    without prejudice.

7    Q.     As you sit here today, do you have an independent

8    recollection of having held that hearing with Mr. Jacobs back

9    on September 24th, 2003?

10   A.     An independent, no.  I've been retired for five years,

11   and that part of my life is behind me.

12   Q.     So, what you know about that hearing is what you

13   recorded on this document?

14   A.     Yes, sir.  That's an exact.  What is not recorded on

15   the document is the fact that when I, I saw that there was a

16   question about legal material, I contacted my supervisor.  I

17   looked at the material, took it with me to the phone, and

18   talked to my supervisor, who's the chief hearing examiner, and

19   asked him, is this legal material?  And he said, describe what

20   it was.  Told him what it was.  He said, no, he believes that

21   it's an unsworn declaration, and it's not legal material, and

22   it can be revoked.

23   Q.     And is that the basis upon which you made the decision

24   in this case?

25   A.     Um, partially.

1    Q.      What other aspects went into your decision?

2    A.      The fact Sergeant Lynch found a document signed by

3    another inmate in Mr. Jacobs' cell as part of it, and the fact

4    that Mr. Jacobs testified that he, Mr. Banks gave him the

5    copies.

6    Q.      And based on that, and based on your understanding of

7    the rules and regulations of the Department of Corrections, as

8    set forth in the 801 policy, you concluded that Mr. Jacobs had

9    violated the indicated provisions of that policy?

10   A.      Specifically, the contraband was property of another.

11   Inmates are not permitted to have other people's property.

12   Q.      You indicated that at the time of the hearing, in

13   September of 2003, that you had occasion in the course of your

14   duties to interact with Mr. Jacobs.

15          At that time were you aware that Mr. Jacobs had filed

16   grievances against other correctional staff at SCI Pittsburgh?

17   A.      No, sir, I was not.  My discussions with Mr. Jacobs

18   were limited only to DC Administrative Directive 801 hearings.

19   Q.      Were you aware Mr. Jacobs had filed a lawsuit against

20   DOC personnel from another Institution at that time?

21   A.      No, sir, I'm not.

22   Q.      Did any of the other defendants in this case approach

23   you and indicate that you should find in your misconduct

24   hearing with Mr. Jacobs, that you should find a specific way?

25   A.      Absolutely not.  In 30 years that I was in the -- as

1  long as I was a hearing examiner, since 1986, no one has ever

2  told me how to find at a hearing, no staff member, nobody.

3  That's one of the nice things about being the hearing

4  examiner, is that I do not work for any of the institutions.

5       My boss is Chief Counsel's office, and those are the

6  only people I answer to for making the correct decisions;

7  correct in that they are in compliance with the administrative

8  directions, and based -- my decisions are based on facts.  No

9  one else is able to tell me, no one else is able to tell me

10  what to do, and no one else has ever tried.

11  Q.    Thank you, sir.

12       MR. BRADLEY:  No further questions.

13                  CROSS EXAMINATION

14  BY MR. JACOBS:

15  Q.    You stated that you -- it has never been an occasion in

16  your employment, in your interactions with the Department of

17  Corrections that a staff member has ever came to you in an

18  unethical way?

19  A.    I'm saying, no one has ever told me what to make a

20  decision about, a finding of guilt or innocence at an inmate

21  misconduct hearing.

22  Q.    That would have been unethical; correct?

23  A.    I don't know whether it's unethical or not, sir.  I can

24  tell you what anybody has told me.

25  Q.    You don't know whether or not it would be unethical for

1  a guard to tell you how to find at a misconduct hearing?

2  A.     You can determine whether it's unethical or not.  I'm

3  telling you, it never happened.

4  Q.     I'm asking you, based on the code of conduct that you

5  go by --

6  A.     My code of conduct --

7  Q.     Could I finish the question?

8  A.     Sure.

9  Q.     I'm asking you that, based on the code of conduct that

10  you go by, would it be unethical for a guard to come to you

11  and tell you how to find at a misconduct hearing?

12  A.     For a guard to come to me, would it be unethical?

13  Q.     And tell you how to find at a misconduct hearing?

14  A.     I don't know how you would define "unethical".  I'm

15  telling you, it's never happened.  No one has ever tried to

16  tell me what to do in a misconduct hearing.

17  Q.     Would that be unethical?

18  A.     How do you define unethical?

19  Q.     Well, what code of conduct do you go by?

20  A.     Which one are you asking?

21  Q.     Do you go by --

22  A.     Which one are you asking me?

23  Q.     Do you go by the Department of Corrections Code of

24  Ethics?

25  A.     Certainly, I do.

1    Q.      Are you bound by the Code of Ethics?

2    A.      I think so, since I was an employee.

3    Q.      Under the Code of Ethics, the -- would it be proper for

4    you to ignore a guard telling you how to find at a particular

5    misconduct hearing?

6    A.      No; don't know, because the situation has never arose.

7    Q.      I'm not asking you whether the situation ever arose or

8    not, I'm asking you that's your, your interpretation of the

9    Department of Corrections Code of Ethics, which you admitted

10   that you're bound by?

11   A.      I don't remember what the Code of Ethics says.

12   Q.      You don't know?

13   A.      No.  I don't remember what it says.

14   Q.      You were with the Department of Corrections for 30

15   years, you said?

16   A.      Yes, correct.

17   Q.      And you're not familiar with the Code of Ethics?

18   A.      I've been out of there for five, and I don't remember

19   what it says; absolutely not.

20   Q.      Those 30 years working for the Department of

21   Corrections, how many times have you read the Code of Ethics?

22   A.      Maybe once.

23   Q.      And am I correct that staff generally carry that in

24   their pocket?

25   A.      I, I don't know.

1    Q.      Did you?

2    A.      Absolutely not.

3    Q.      Was it a pocket size?

4    A.      I don't remember.

5    Q.      Okay.  Does that look familiar to you?

6    A.      Appears to be a Department of Pennsylvania, Code of

7    Ethics, yes.

8    Q.      Is that what it is?

9    A.      That's what it says it is.

10   Q.      Do you see No. 14?

11   A.      Yes.

12   Q.      Take a moment to look over that.

13   A.      Okay.

14   Q.      Does that refresh your recollection with respect to

15   your duty to report any type of misconduct of another

16   Department of Corrections staff?

17   A.      That's what it says.

18   Q.      No; does it refresh your recollection?

19   A.      No.

20   Q.      It doesn't refresh your recollection?

21   A.      No.  I told you, I read that document one time.  I had

22   other things to do, other than reading Department of

23   Corrections documents.

24   Q.      So, this is basically your rule book; correct?  These

25   are basically the rules that you have to abide by --

```
 1   A.      Okay.

 2   Q.      -- in your capacity as the hearing examiner; correct?

 3   A.      In the hearing examiner?  No.  I have a different set

 4   of rules.  If -- I follow the Administrative Directive 801

 5   when I conduct misconduct hearings.

 6   Q.      Okay.  What I'm asking, does the Code of Ethics apply

 7   in your capacity as the hearing examiner?

 8   A.      I'm sure.  I'm sure it does.

 9   Q.      Okay.  And you're saying that this doesn't refresh your

10   recollection --

11   A.      No.

12   Q.      -- as to whether or not these particular rules were

13   being applied at that time?

14   A.      I don't understand the question, sir.

15   Q.      Were you, were you governed by the Code of Ethics?

16   A.      I assume that I was.  I assume that I was.

17   Q.      You assume that you were?

18   A.      Yes.

19   Q.      Are the rules that you're supposed to abide by

20   important to you?

21   A.      Absolutely.

22   Q.      Isn't it your duty to know those rules?

23   A.      I suppose so.

24   Q.      Under the Code of Ethics?

25   A.      Do you expect me to remember everything that I was told
```

1  in 30 years?  I can't.  I've been out of there for five years.

2  Even the specifics of the Administrative Directive 801, I

3  don't remember anymore.

4         When I was doing it every day, I knew what was going on

5  about what needed to be done.  Now I'm retired, and I don't

6  care about it anymore.

7  Q.     Did you care about it then?

8  A.     Absolutely.  That was my job.  That was my

9  responsibility, to make sure that I conducted my misconduct

10  hearings fairly and within the requirements.

11  Q.     Could you just answer the question?

12  A.     What's the question?

13  Q.     Did you care about it then?

14  A.     Care about what?

15  Q.     About the Code of Ethics.

16  A.     Sure.

17  Q.     But you don't remember any of the rules?

18  A.     No.

19  Q.     And you also state on direct examination that you're

20  not employed by the Department of Corrections?

21  A.     I did not state that.

22  Q.     What did you?  Refresh my recollection.

23  A.     I said, I'm not an employee of the State Correctional

24  Institution at Pittsburgh.  I am employed by the Chief

25  Counsel's office.  From the time I was --

1   Q.      At the time in question?

2   A.      From the time I became a hearing examiner, I was

3   employed by the Department of Corrections, but the Chief

4   Counsel's office was my supervisor.  So, I was not employed by

5   any State Correctional Institution.  And I explained why we

6   were not employed by them, we are not subject to them.

7   Q.      And where were these misconduct hearings taking place?

8   A.      At SCI's; State correctional institutions.

9   Q.      Within the prisons?

10  A.      Yes.

11  Q.      And who escorted the prisoners to these misconduct

12  hearings?

13  A.      Correctional officers.

14  Q.      And did you interact with the correctional officers?

15  A.      How do you define "interact?"

16  Q.      Speak to them.

17  A.      Certainly.

18  Q.      Eat with them?

19  A.      Sometimes.

20  Q.      Call them on the phone?

21  A.      No.

22  Q.      You --

23  A.      You mean outside of work?

24  Q.      Outside of work.

25  A.      No.

```
 1   Q.      Never developed a friendship with any of the
 2   correctional officers?
 3   A.      How do you define "friendship"?
 4   Q.      A friendship; somebody you talked to, somebody --
 5   A.      Somebody I hang out with?
 6   Q.      Somebody you share with, somebody you hang out with?
 7   A.      No.
 8   Q.      Somebody you call on the phone, depend on?
 9   A.      Not correctional officers; no, sir, I didn't.
10   Q.      Any of the defendants in this case?
11   A.      No, sir.
12   Q.      You haven't developed friendships with any of them?
13   A.      No, sir.
14   Q.      Even with ones that worked at SCI Pittsburgh?
15   A.      No, sir.
16   Q.      For years and years at a time?
17   A.      As you define "friendship", no.
18   Q.      How to you define "friendship"?
19   A.      I'm asking you how you want me to respond to it.
20   Q.      I'm asking you, how do you define "friendship"?
21   A.      Someone that I socialize with outside of work.
22   Q.      Okay.
23   A.      None of the defendants do I socialize with outside of
24   work.
25   Q.      In 30 years?
```

```
 1   A.      In 30 years.

 2   Q.      Okay.

 3   A.      I've never been to any of their houses, and none of

 4   them have ever been to my house.

 5   Q.      Okay.  I hear you.

 6           And you stated that you spoke to your Office of Chief

 7   Counsel.  You mean Robert Bittner?

 8   A.      Yes.

 9   Q.      And you said that he told you that the documents in

10   question, the unsworn declaration is not a legal document?

11   A.      He said that under our policy, those are not legal

12   documents.  They could be confiscated.

13   Q.      They could be confiscated?

14   A.      Yes.

15   Q.      Where are those legal documents at?

16   A.      I don't know.

17   Q.      You don't know?

18   A.      No, sir, I don't.

19   Q.      What did you do with them?

20   A.      I left them there.

21   Q.      You were in position of them; correct?

22   A.      I put them back where I had found them; yes.

23   Q.      Found them?

24   A.      Where they were when I went to look at them.

25   Q.      Where did you get them from?
```

1   A.      I believe they were in the lieutenant's office.

2   Q.      And you used these documents as part of the misconduct.

3   They were evidence in a misconduct hearing; correct?

4   A.      That's correct.

5   Q.      And --

6   A.      Did I bring them?

7   Q.      Do you --

8   A.      Do I routinely bring evidence to hearings?  No.

9   Q.      What do you do with the evidence after the misconduct

10  hearing?

11  A.      I don't do anything with it.

12  Q.      You have to do something with it.  It's in your

13  possession?

14  A.      I left it where it was.

15  Q.      You just leave evidence lying around after the

16  misconduct hearing?

17  A.      Yeah.

18  Q.      And you don't --

19  A.      I left it where I found it.  It was --

20  Q.      Okay.

21  A.      It was in the lieutenant's office.  I left it in the

22  lieutenant's office.

23  Q.      Okay.  You don't know what happened to it after that?

24  A.      Absolutely not.

25  Q.      Then, you don't remember the nature of the documents?

```
 1   A.      They were unsworn affidavits or something.  And they

 2   were signed, I believe they were signed by Mr. Banks.

 3   Q.      But you don't remember what was said in those

 4   documents?

 5   A.      No, sir, I don't.

 6   Q.      You don't care about what was said in those documents?

 7   A.      No, sir.  They weren't notarized.

 8   Q.      You remember that?

 9   A.      Yes, sir.

10   Q.      Specifically?

11   A.      Yes.

12   Q.      How do you remember that?

13   A.      Because that -- Mr. Bittner asked me that question,

14   were they notarized.

15   Q.      How many years ago was this?

16   A.      2003.

17   Q.      You remember that --

18   A.      Yeah, I do.

19   Q.      -- specific conversation?

20   A.      I do.

21   Q.      That they weren't notarized?

22   A.      Right.  Want to know why?  I'll be glad to answer that

23   question, if you want to ask it.

24   Q.      Don't worry.

25   A.      Okay.
```

1  Q.      Is your statement today that under the DOC's policy, an

2  unsworn declaration is contraband?

3  A.      It is property of another.  That document was property

4  of another.  It was revoked.

5  Q.      Yes, or, no?

6  A.      Yes, or, no?

7  Q.      Yes, or, no.  I want you to answer the question.

8          THE COURT:  Answer the question, yes, or, no.

9  BY MR. JACOBS:

10 Q.      Yes, or, no?

11 A.      What's the question?

12 Q.      I'm going to ask you the question.

13 A.      What's the question?

14 Q.      Is it your statement that it is the policy of the

15 Department of Corrections to label unsworn declarations

16 contraband?

17 A.      No it's, not a policy.  It was a decision that was made

18 at that specific instance.

19 Q.      For me?

20 A.      No, for those documents, period.

21 Q.      Pertaining to me?

22 A.      I guess they pertained to you.

23 Q.      I was singled out.

24 A.      You were?  You're not the only person I've conducted

25 misconducts for, Mr. Banks -- Jacobs, excuse me.

1    Q.      Okay.  You said that for this particular occasion those

2    documents were labeled contraband?

3    A.      That case, they were.  Those documents were labeled.

4    Q.      Okay.  You agree that they were contraband?

5    A.      Yes.

6    Q.      For this particular occasion?

7    A.      On that instance, yes.

8    Q.      Because somebody came to you and told you --

9    A.      No, sir.

10   Q.      -- what was going on?

11   A.      Absolutely not.  Absolutely not, sir.

12   Q.      Could you just answer the question, please.

13            THE COURT:  Wait for him to ask the question, and

14   then, answer it.

15   BY MR. JACOBS:

16   Q.      And conducting all these hearings; said you conducted

17   approximately 220, 250 hearings a month or a week; what was

18   that?

19   A.      A month.

20   Q.      A month.  And those hearings were conducted in the

21   prison environment on the -- a lot of them in the RHU;

22   correct?

23   A.      Yes.

24   Q.      And in that time frame, you interacted with the prison

25   guards?

1   A.      Certainly.

2   Q.      And for this particular misconduct, prison guards did

3   come to you and encourage you how to find?

4   A.      Absolutely not.

5   Q.      In this particular misconduct?

6   A.      Absolutely not.

7   Q.      And that is --

8   A.      I resent the implication.

9           THE COURT:  Just answer the questions.

10  Q.      Answer the questions.

11          THE WITNESS:  The answer was, no, ma'am.  I

12  apologize, Your Honor.

13  BY MR. JACOBS:

14  Q.      And that was the reason that you agree that these

15  particular misconducts -- these particular documents were

16  contraband; correct?

17  A.      I believe I answered the question.  The answer is, no.

18  Q.      And on the other document, which was Defendant's

19  Exhibit -- your rationale form -- Defendant's Exhibit D.

20  A.      Okay.

21  Q.      Okay.

22  A.      I can see it.

23  Q.      You stated that -- it states on there that the witness

24  was sworn in?

25  A.      Yes.

```
1    Q.      Meaning me?

2    A.      Yes.

3    Q.      And that I took an oath?

4    A.      Yes.

5    Q.      That what you mean by "sworn in"?

6    A.      Yes.  Do you swear or affirm the information you're

7    about to give me is the truth.

8    Q.      Okay.  And you also state that -- somewhere within that

9    document you state that you still believe the report of

10   Mr. Lynch?

11   A.      Yes.

12   Q.      Do you know Mr. Lynch?

13   A.      Do I know who Mr. Lynch is?

14   Q.      Yes.

15   A.      Today, I do.

16   Q.      Did you know who he was at that time?

17   A.      No.  In fact, when I came into court today, came into

18   court on Monday, he had to identify himself to me.  I didn't

19   know who Sergeant Lynch was.

20   Q.      Okay.  But you still found him to be more credible than

21   me?

22   A.      That is correct.

23   Q.      And you didn't know whether he was a credible person or

24   not?

25   A.      That's correct.  But that was not the only evidence.
```

1   Q.      You just knew --

2   A.      No, sir.

3   Q.      You just knew he was a correctional officer.

4   A.      No, sir.

5   Q.      And you just knew that I was a prisoner; correct?

6   A.      Incorrect.

7   Q.      And you didn't care whether or not what he said was

8   true; did you?

9   A.      Yes, I did.

10  Q.      You didn't care whether or not he was using a

11  misconduct as a retaliatory tool; did you?

12  A.      Yes, I did.

13  Q.      You didn't care if the misconduct was issued to

14  obstruct my access to the Courts; did you?

15  A.      Yes, I did care.

16  Q.      You routinely found prisoners guilty; didn't you?

17  A.      No.

18  Q.      Well, out of 250 hearings you hold in a month,

19  approximately, give my an estimate.

20  A.      I have no idea.  I don't keep track of those.  It's not

21  a score card.  I don't keep score.

22  Q.      One?

23  A.      I don't know.

24  Q.      20?

25  A.      I don't know.

1   Q.      50?

2   A.      Don't know.

3   Q.      Hundred?

4   A.      Don't know.

5   Q.      150?

6   A.      Still don't know.

7   Q.      200?

8   A.      Still don't know.

9   Q.      No idea --

10  A.      No, sir, I don't.

11  Q.      -- how often you found prisoners guilty?

12  A.      No, sir.  I don't keep track of it.

13  Q.      Do you know whether the Department of Corrections gets

14  the definition for what contraband is?

15  A.      No.

16  Q.      So, how is it possible for you to determine whether or

17  not something is contraband, if you're not aware of where the

18  definition comes from?

19  A.      The definition was found in the Administrative

20  Directive 801.  I don' know where that came from, and I don't

21  know how they decided what items were contraband.

22          MR. BRADLEY:  Your Honor, I don't have a problem

23  with Mr. Jacobs exploring this avenue, but the document he's

24  using, he's intending to offer, is not what was in effect at

25  the time of the hearing.

1            THE COURT:  Why don't we show those to the witness.

2    We won't show them to the jury yet.  And he can ask if -- the

3    plaintiff can ask him if the policy had changed, if that was

4    the same one he remembers.  If he doesn't, then, I'll deal

5    with it.

6    BY MR. JACOBS:

7    Q.      Do you recognize that document?

8    A.      Do I know what it says; am I familiar with it?

9    Q.      Do you know what that document is?

10   A.      It says it's the policy statement, DC Administrative

11   Directive, Inmate -- DC Administrative Directive 203, searches

12   of inmate's cells.

13   Q.      And this particular misconduct that was issued to me

14   dealt with the search of my cell; correct?

15   A.      Yes.

16   Q.      And in order for you to determine whether or not the

17   receipt of these documents was proper, it would have to be

18   viewed in the context of searches of inmate's cells; correct?

19   A.      I don't understand the question.

20   Q.      I mean --

21   A.      Are you trying to ask me was the cell search legal; is

22   that what you're trying to ask?

23   Q.      No, that is not what I'm trying to ask.

24   A.      Then, I don't understand the question.

25   Q.      If a prison guard violates a DOC policy, and in

1   conducting a cell search, is that something that you factor

2   into your determination of whether a person is guilty or not?

3   A.      I'm -- you're speaking hypothetically, and I really

4   don't understand what you're asking.

5   Q.      Well, in this particular case did you factor into

6   whether or not Mr. Lynch may have had an improper motive for

7   taking these documents?

8   A.      No, sir.  I had no reason to.  Nor did you raise

9   anything at the hearing.

10  Q.      Do you generally factor that into your determination?

11  A.      Factor what?

12  Q.      Whether a guard may have been improperly motivated?

13  A.      How would I know whether the guard is improperly

14  motivated or not?

15  Q.      I'm not asking you whether you know it.  I'm asking you

16  whether you factor that into your determination.  Do you

17  question it?

18  A.      Not unless I know it, no.  Unless I have a reason not

19  to believe it, I'm going to believe it.

20  Q.      If you look on the second page of that document, where

21  it says, "contraband".

22  A.      Yes.

23  Q.      Are you familiar with the particular title created in

24  the highlighted section?

25  A.      Meaning the 18 PS 5123?

1  Q.     Correct.

2  A.     I have no idea what that is.  It's some legal law, but

3  it's not my area of expertise.

4  Q.     So what you're saying is the Department of

5  Corrections -- first, let me ask you this.  Do you agree with

6  me that that policy governs how guards are supposed to conduct

7  searches of inmates and cells?

8          MR. BRADLEY:  Your Honor, I'm going to object, not

9  so much that it is, but that is the policy, that was in place

10 at the time.

11         THE COURT:  You'll have to lay a foundation for this

12 witness, if this was the same provision.

13 BY MR. JACOBS:

14 Q.     Are you familiar with a policy at the time in question

15 governing searches of inmates and cells?

16 A.     Am I aware that one existed?

17 Q.     That one existed; that one did exist.

18 A.     I assume that one existed.  Can I quote it for you?

19 No, I'm not able to do that.

20 Q.     Okay.  And do you remember -- do you state that it

21 would be under that same title and same DC ADM-203 policy?

22 A.     No, I could not state that.  I don't know.

23 Q.     But I mean, would it still have the same --

24 A.     I don't -- I assume that it would.  I don't know for

25 sure.

1    Q.      Well, for example, the DC ADM-804, hasn't there always

2    been grievance procedures?

3    A.      I believe it has.

4    Q.      Hasn't the DC ADM-801 always dealt with inmate

5    discipline?

6    A.      Yes.

7    Q.      So what I'm asking you, the DC ADM-203, hasn't that

8    always dealt with searches of inmates and cells?

9    A.      The answer is, I don't know.

10   Q.      But --

11   A.      Because I don't deal with that on a daily basis.

12   Q.      You don't deal with grievance procedures --

13   A.      No.

14   Q.      But you just said --

15   A.      804, yes.

16   Q.      You just said it is always dealt with.  The number has

17   not changed?

18   A.      To the best of my recollection, yes.

19   Q.      Okay.  But you never dealt with grievances either?

20   A.      No.

21   Q.      As a hearing examiner?

22   A.      No.

23   Q.      But you just don't remember whether or not that number

24   would change?

25   A.      I don't know.

1    Q.      Okay.  You said, you testified on direct about the

2    inmate handbook.

3    A.      Um-hum.

4    Q.      Which is given to all inmates?

5    A.      Yes.

6    Q.      Isn't that part of the rules that would be given to the

7    inmates?

8    A.      I assume so.  What's in the handbook changes from time

9    to time, but the part that I'm concerned with, and I was

10   sharing with the jury, was the fact that there is a section

11   that deals with discipline, disciplinary procedures.

12   Q.      Okay.

13   A.      And that changes from time to time also.

14   Q.      And contraband specifically, is there any other rule

15   book that defines contraband?

16   A.      Not that I'm aware of.

17   Q.      So, if there's no rule book that defines contraband,

18   how do you determine when something is contraband and when

19   something is not contraband?

20   A.      No.  In the inmate handbook, in the 801, there's a

21   section that deals with contraband, and that's -- it clearly

22   lays out.  If you have that document, I'll be glad to review

23   that document and tell you what the contraband is.

24   Q.      But you don't want to talk about the DC ADM-203?

25   A.      I don't want to talk about 203, because I'm not

 1   familiar with it.  I could read you what it says here.

 2   Q.      30 years for the Department of Corrections.

 3   A.      Yes.

 4           MR. BRADLEY:  Your Honor, I'm going to object,

 5   because -- my objection is based on the date on the policy,

 6   not what the content is.

 7           THE COURT:  I understand.  But it was the Court's

 8   recollection there was a stipulation that these policies were

 9   the same ones that were --

10           MR. BRADLEY:  My understanding is that I provided

11   him with policies that were current as of the time of these

12   events.

13           THE COURT:  Yes.  And isn't this what you provided?

14           MR. BRADLEY:  I don't believe it is.

15           MR. JACOBS:  The only policy they gave me.

16           THE COURT:  Why don't we -- we'll proceed with a

17   line of questioning, and you can look into that and get back

18   to me.

19   BY MR. JACOBS:

20   Q.      You found me guilty of loaning and borrowing?

21   A.      Yes.

22   Q.      Takes two to loan and borrow; correct?

23   A.      Correct.

24   Q.      Correct?

25   A.      Correct.

```
 1   Q.      You need at least two people?

 2   A.      Yes.

 3   Q.      Was it odd to you that I was the only one charged with

 4   loaning and borrowing?

 5   A.      I don't know whether you were charged with it or not.

 6   Q.      Well, you just said you found me guilty.

 7   A.      I said -- I'm sorry.  I don't know whether the other

 8   person was charged with that or not.

 9   Q.      If the other person was charged with it, you would have

10   been the one to be the hearing examiner; correct?

11   A.      Not necessarily.  I was the hearing examiner, but not

12   necessarily.  If that, if that other document, that other

13   misconduct was sent to informal resolution, that would not

14   come to me.

15   Q.      Okay.  So, you wouldn't know about it?

16   A.      Correct.

17   Q.      So, would you disagree with me if I said that Mr. Banks

18   was not given a misconduct?

19   A.      Would I disagree with you?

20   Q.      Yes.

21          MR. BRADLEY:  Your Honor, that's -- he's attempting

22   to establish something that he has no foundation for.

23          MR. JACOBS:  There's been testimony on it.

24          THE COURT:  I think you should direct the question

25   to whether he has any knowledge about whether Mr. Banks ever
```

1    had a misconduct.

2              MR. JACOBS:  Okay.

3    BY MR. JACOBS:

4    Q.    Do you have any recollection as to whether or not

5    Mr. Banks was given a misconduct in relation to this charge of

6    loaning and borrowing?

7    A.    No.

8    Q.    And if me and him received the same charges and the

9    same misconduct on the same date, regarding the same incident,

10   what is the likelihood of his misconduct going to informal

11   resolution and my misconduct coming to you?

12   A.    I don't know that.  You would have to talk to the shift

13   commander about that who made the decision.

14   Q.    I'm asking you.  I'm asking you.

15   A.    You're asking me?

16   Q.    Is that normal; is that normal practice?

17   A.    I don't know.  If it goes to informal resolution, it

18   doesn't come to me.

19   Q.    I understand that.

20   A.    You're asking me to testify about what somebody else

21   did, and I don't know.

22   Q.    I'm asking you to testify about if two prisoners in the

23   same case, with the same charges, same incident, are served a

24   misconduct, is it normal procedure for one misconduct to go

25   somewhere else, and one misconduct to go informal resolution

1   and one misconduct to go to you?

2   A.      I can't answer that question.

3   Q.      You don't know?

4   A.      I don't know.

5   Q.      You don't remember?

6   A.      I don't know.

7   Q.      The section that you referred to in the 801 which you

8   said defines contraband --

9   A.      Um-hum, yes.

10  Q.      -- does that, property of another --

11  A.      Does property of another appear there as a charge?

12  Q.      Correct.

13  A.      Yes.

14  Q.      And is that what you base your decision on?

15  A.      Yes.

16  Q.      Okay.  Just because a person's name is on something,

17  doesn't mean that it belongs to that person; does it?

18  A.      Yes.

19  Q.      So, if a person -- so, if my name and Mr. Bank's name

20  is on a document, who does the document belong to, then?

21  A.      That would depend.

22  Q.      Depend on what?

23  A.      Where it was found and who claimed it.

24  Q.      Well, Mr. Banks was offered as a witness.  Do you

25  remember that?

1   A.      Yes.

2   Q.      And Mr. Banks was willing to testify that the documents

3   did belong to him?

4           MR. BRADLEY:  Objection, Your Honor.  He can't

5   testify as to what Mr. Banks would have testified to at the

6   hearing.

7           MR. JACOBS:  Well, he -- it's in the document.

8           MR. BRADLEY:  He can present the document.

9           THE COURT:  Do you have the document?

10          MR. JACOBS:  It's up there.

11          THE COURT:  Why don't we show that to him.  Could

12  you refer to the document number, the exhibit number?

13  BY MR. JACOBS:

14  Q.      I'm showing to you what is marked as Plaintiff's

15  Exhibit No. 17.

16          THE COURT:  Thank you.

17  Q.      Do you recognize that document?

18  A.      Yes, I do.  Yes, I do.

19  Q.      What is that document?

20  A.      It's a Department of Corrections inmate witness sheet

21  form.

22  Q.      Did you see a section where I requested that Mr. Banks

23  be produced as a witness?

24  A.      Yes, I do.

25  Q.      And can you see the offer of what his testimony would

1    be?

2    A.      Yes, I do see that.

3    Q.      What does it say?

4              THE COURT:  Can you blow it up a little bit, please.

5    A.      Because this inmate will verify that said documents

6    were mine and that he filled them out for me.

7    Q.      So, Mr. Banks would have been disclaiming ownership of

8    those documents; correct?

9    A.      I don't know what he would have told me.  This is what

10   you said he would have told me.

11   Q.      Is that how you interpret my offer?  Do --

12   A.      Believe.

13   Q.      Not whether or not you believe it, but do you interpret

14   my offer of his testimony as that he was disclaiming ownership

15   of those documents?

16   A.      That's what you have written there, yes.

17   Q.      I'm asking you, did you interpret it that way?

18   A.      Interpret it how?

19   Q.      That he was disclaiming ownership of those documents.

20   A.      I can interpret it as that is what you wrote there.

21   Q.      Did Mr. Banks -- if my name is on a document and

22   Mr. Banks' name is on a document, and Mr. Banks is disclaiming

23   ownership of those documents, isn't that relevant to

24   ownership?

25   A.      It depends on the situation.  We're talking about this

1    situation here.

2    Q.      If Mr. Banks disclaims ownership of those documents,

3    does that go to the question of whether I was in possession of

4    property of another?

5    A.      No.

6    Q.      No?

7    A.      It was in your cell.  It had his name on it.  You did

8    not have permission to have it.

9    Q.      So --

10   A.      So, it's contraband.  It's property of another.

11   Q.      So, if something with another prisoner's name on it is

12   found in my cell, it's labeled contraband?

13   A.      Yes.  It can be.

14          THE COURT:  Mr. Jacobs, we just have about two

15   minutes before it's quarter of.  So, if you have another

16   question.  Because we can bring the witness back on Monday.

17          MR. JACOBS:  No, I'm almost done.

18          THE COURT:  Okay.

19   BY MR. JACOBS:

20   Q.      The fact is, isn't it, that you knew that these

21   documents weren't contraband?  Did you?

22   A.      Contraband.

23   Q.      You knew; yes, or, no?

24   A.      Yes.  The items in question are contraband, yes.

25   Q.      You knew that these documents weren't contraband?

```
1    A.      That's incorrect.

2    Q.      You knew that they were legal documents?

3    A.      No, sir, they are not.

4    Q.      You read the documents?

5    A.      I looked at them, yes.

6    Q.      And you saw that Mr. Banks was verifying an incident

7    which he witnessed?

8    A.      I did not read it.  I don't remember.  I saw his name

9    on it.

10   Q.      You did not read it?

11   A.      I looked at it, but did I read it to remember it; no.

12   Q.      And it was your purpose to assist Mr. Lynch in

13   concealing and furthering retaliation?

14   A.      Absolutely not.  No.

15           MR. JACOBS:  No further questions, Your Honor.

16           THE COURT:  Do you have other questions?

17           MR.  BRADLEY:  I do, Your Honor.

18           THE COURT:  Will it be lengthy?

19           MR.  BRADLEY:  It will take probably about five

20   minutes.

21           THE COURT:  Does any juror have to leave?

22           Okay.  We can stay another five minutes.

23                          REDIRECT EXAMINATION

24   BY MR. BRADLEY:

25   Q.      Regarding the request to have Mr. Banks called as a
```

1    witness, you did write a response to that; did you not?

2    A.      Absolutely.

3    Q.      And --

4    A.      I don't have that on my screen here.  It's a

5    different -- where it says, testimony not relevant, not

6    required?

7    Q.      Yes.

8    A.      Yes.  Testimony not required to determine guilt or

9    innocence.  And the reason for that is, if you would go back

10   to the previous document of Mr. Jacobs' written version, where

11   he explains how he became -- how the stuff got to him, that's

12   why I made that decision.

13   Q.      Putting up what's marked Plaintiff's Exhibit 16.

14   A.      That's not what I was referring to, Mr. Bradley.  The

15   hearing report sheet.

16   Q.      The report sheet itself, Plaintiff's Exhibit D.  I

17   don't know what the numbers are.

18   A.      Right.  Mr. Jacobs said to me at the hearing, testified

19   Mr. Banks gave him copies of material he submitted to the

20   Courts.  That's how I determine that it was Mr. Bank's

21   property.

22   Q.      Does it indicate there that Mr. Jacobs told you that

23   this was his property, not the property of Mr. Banks?

24   A.      No, sir, he did not.

25   Q.      Would you have made the same decision in this matter if

1   it had not involved Mr. Jacobs, if the same facts had been

2   presented?

3   A.      Absolutely.

4   Q.      So the fact that Mr. Jacobs was the subject of the

5   misconduct had no bearing on your decision?

6   A.      No, sir.  This was just another basic routine hearing

7   that I did.

8   Q.      Mr. Jacobs' cross examination, I don't know that he

9   used the term "rubber stamp" at this point, but essentially

10  insinuated that you just did whatever the guards wanted, or

11  that you just came to the conclusion that he was guilty just

12  because that was what was done as a regular course.

13          Isn't it true that in this case it gave you pause, to

14  the point that you actually called your supervisor to obtain

15  guidance on what you should do?

16  A.      Absolutely.

17  Q.      And I believe at one point you were about to explain

18  why you remembered a portion of the conversation related to

19  that.

20  A.      Only because of what we were dealing with, with a

21  document here that may come back to haunt me somewhere down

22  the road in proceedings such as this one, I want to make sure

23  I made an informed decision.  That's why I sought guidance

24  from somebody more knowledgeable than I am.

25  Q.      And based on that guidance, you came to the decision

1  you did?

2  A.     Yes.

3  Q.     And again, was that based on the fact that Mr. Jacobs

4  was a subject of the misconduct?

5  A.     Absolutely not.

6  Q.     Was that based on any outside influence from any of the

7  defendants?

8  A.     Absolutely not.

9  Q.     And it was your determination that this, these

10 documents were property of another because they contained the

11 signature of Mr. Banks?

12 A.     That's correct.  And they were in Mr. Jacobs'

13 possession.

14        MR. BRADLEY:  Thank you.  That's all.

15 BY MR. BRADLEY:

16 A.     Can I add one more thing?  Mr. Jacobs is single-celled

17 in that unit, so there was nobody else in his cell who would

18 be in possession of them, other than him.

19        THE COURT:  Mr. Jacobs, do you have a few brief

20 questions?

21        MR. JACOBS:  No, Your Honor.  No.

22        THE COURT:  You don't?  You're done with this

23 witness?

24        MR. JACOBS:  Yes.

25        THE COURT:  Okay.  Members of the jury, we will not

1    be in session tomorrow.

2            I'm going to ask that you return here on Monday at

3    9:15.

4            Remember the instructions I've given you.  You're

5    not to read any newspaper reports about what may be happening

6    here.  You are not to discuss the case among yourselves, at

7    home, at work.  Simply no discussions whatsoever.

8            You're not to do any research or investigation on

9    your own.  And you still need to keep an open mind, because

10   you've not heard all the evidence or the final instructions

11   and the closing arguments.

12           With that, I'm going to ask you to have a nice

13   weekend, and we'll see you Monday.

14           Please rise for the jury.

15           (Whereupon, jury retired.)

16           THE COURT:  Please be seated.  We just have to wait

17   for the jurors to leave.

18           You're excused.  I just need to verify, all the

19   jurors have left?

20           MATTHEW FERGUS, Law Clerk:  Yes.

21           THE COURT:  We have a few matters that we need to

22   deal with.  The first are the three additional claims that the

23   plaintiff is asserting.  We haven't had the argument on that.

24           Did you get a chance, Mr. Jacobs, to review the

25   written submission of the defendants?

1           MR. JACOBS:  Yes, Your Honor.

2           THE COURT:  Have you had a chance to put anything in

3    writing to respond to that?

4           MR. JACOBS:  Um, I haven't had -- I haven't had any

5    type of ability to research, or anything like that.

6           THE COURT:  Okay.  Will you have time tomorrow; will

7    he be --

8           MR. JACOBS:  I have all the time, but they don't

9    give me access to no law library, no law books, or I mean, I

10   don't know how I'm expected to respond.

11          THE COURT:  Where he is located now, is there a law

12   library?

13          MR. BRADLEY:  Is it possible to have him taken to

14   the law library?

15          STATE LIEUTENANT:  Yes.

16          MR. BRADLEY:  Additionally, Your Honor, his property

17   is being brought up from Fayette to SCI Pittsburgh for him to

18   review tomorrow.

19          THE COURT:  Make sure it's all there.

20          MR. JACOBS:  Your Honor, strongly, I object to this.

21          THE COURT:  Well, wait and see if it all comes.

22          MR. JACOBS:  Your Honor, I was in this position

23   before when I was at Allegheny County Jail, as I was trying to

24   explain to you last time, and I also had a statement by the

25   investigator that was sent up to SCI Fayette personally to

1  separate my legal property from my personal property.

2         11 books of legal property was sent to Allegheny

3  County Jail; six of them got lost.  And I mean, I --

4         THE COURT:  I understand.  But we're trying now to

5  make sure you have your documents.  They say they are bringing

6  them up tomorrow.  If there's a problem, you let me know

7  Monday, and I'll take appropriate action.

8         MR. JACOBS:  I mean, in the past they, they have

9  pulled this same move.  And I mean, what I'm getting, Your

10 Honor, is that I should have been notified that I was going to

11 be held at SCI Pittsburgh, rather than being told that I was

12 going to be sent back and forth.  And I believe that this is a

13 tactic being used to obstruct the following case.

14        THE COURT:  Well, is there any way he could be taken

15 back to Fayette?  It would be either tonight or in the

16 morning, so that he can have his materials, and then, bring

17 with him what he needs for Monday?

18        KRISTIN REISINGER:  I can the Institution.

19        MR. WILLIG:  Now we're going to -- the risk we run

20 of -- never mind, Your Honor.

21        MR. BRADLEY:  We can try, Your Honor.

22        And I would note, just in terms of the allegations

23 that this is a tactic --

24        THE COURT:  I'm not, I'm not going -- I'm just

25 trying to avoid future problems.

1           MR. BRADLEY:  I understand.

2           THE COURT:  I mean, if we can avoid having an issue

3   down the road, that's the best thing to do; otherwise, we'll

4   have to have more hearings and more issues, and if there's a

5   way to eliminate any question about whether Mr. Jacobs has all

6   the materials that he had when he was at Fayette, and how they

7   are transported, it's best to try to take that extra step now,

8   rather than having, you know, further litigation over this

9   matter.

10          So, if there's a way to do it, that would be

11  appreciated.

12          MR. BRADLEY:  Understood, Your Honor.

13          THE COURT:  Okay.  So if there's a way for

14  Mr. Jacobs -- I don't know if it's maybe too late tonight, but

15  if he can be taken back either tonight or tomorrow morning and

16  be given access to the law library, either here at FCI

17  Pittsburgh or at FCI Fayette, then, when he comes back here he

18  can have all the materials with him that he will need over the

19  course of the next two weeks, if he's going to be staying

20  here.

21          Okay.  If you could do that, that would be

22  appreciated.

23          Would you appreciate that?

24          MR. JACOBS:  Yes.  Yes, Your Honor, greatly.

25          MR. BRADLEY:  We'll make our best efforts, Your

1   Honor.

2           THE COURT:  That's all we can do, is ask for the

3   best efforts.  If we can't, then, we'll have to deal with, did

4   it all come, didn't it come.  If there's a way to avoid that,

5   I would appreciate it.  I know Mr. Banks would, too.

6           MR. BRADLEY:  Mr. Jacobs.

7           THE COURT:  Mr. Jacobs, I'm sorry.  Mr. Banks was

8   testifying today, and his last documents, those last documents

9   involved him.

10          Okay.  So, that's what we're going to try to do, is

11  make arrangements for you to go back to Fayette, either

12  tonight or tomorrow morning.  And you'll be there over the

13  weekend and be returned here for Monday morning.  Okay.

14          Now, we have to get some time set aside to deal

15  with -- so, then, you should be able to give something, or at

16  least be prepared to argue orally on those three claims on

17  Monday.

18          MR. JACOBS:  Correct.

19          THE COURT:  Okay.  You indicated, Mr. Bradley, that

20  you have a motion for judgment as a matter of law that you

21  wish to assert in this case, and you had started with respect

22  to the retaliation claim, and you said you had -- does it go

23  for the other claims as well, you want to make one?

24          MR. BRADLEY:  Yes, Your Honor.

25          THE COURT:  The best thing, I think, to do, because

1    they are extensive, and there are a number of cases you want

2    to rely on, you want the Court to review and read, if you

3    could put something together tomorrow, and then, have it

4    submitted to the Court on Monday morning, then, I can have the

5    cases pulled, Mr. Jacobs will have a chance to look at them.

6            I mean, that's one of the difficulties when you do

7    have someone that's incarcerated, and he has to have a fair

8    opportunity to respond to the arguments.  So, you'll need to

9    address the, the factual background that you believe supports

10   the position.

11           If you could identify for each claim what the

12   elements of the claim are, and you want -- and why you believe

13   as a matter of law that that particular element has not been

14   met, and the appropriate citations to authorities.  And if you

15   have cases, if it's not too difficult, if any particular cases

16   you would have printed that you're relying on, I think that

17   would be helpful as well for all the parties, just to expedite

18   everything for everyone.

19           MR. BRADLEY:  I will do that, Your Honor.

20           THE COURT:  Okay?  Then, you'll have an opportunity

21   to look at that.  And then, I'll be able to rule on it at the

22   end of the trial.  Okay?

23           MR. BRADLEY:  Very good.

24           MR. JACOBS:  End of the trial, you said?  At the end

25   of the trial, you said?

1              THE COURT:  At the end of the trial, right.  At this

2     stage we already have the jury here.  I need to make sure the

3     evidence phase is done.  If I have to delay for a day or two

4     to do that, then, these jurors are inconvenienced.  I think

5     it's better just to proceed with the trial.  I can reserve the

6     ruling on that motion, on that motion.  And we'll give the

7     parties appropriate time to review it and present their

8     argument.

9              This is -- it's difficult when someone is

10    incarcerated, but we need to have at least a fair opportunity

11    for Mr. Jacobs to review the issues that are raised, and to be

12    able to respond.

13             MR. BRADLEY:  Certainly, Your Honor.

14             THE COURT:  Okay.  So I think those are the

15    remaining matters that we have at this stage.

16             MR. BRADLEY:  Your Honor, I did have one thing I

17    wanted to present.

18             THE COURT:  Okay.

19             MR. BRADLEY:  During the testimony of Mr. Jacobs,

20    Mr. Lyons, Mr. Banks, and Mr. Edwards, there was a lot of talk

21    about what was happening in this unit.  And I believe that

22    Mr. Jacobs, by presenting that testimony, particularly

23    regarding suicides, regarding denial of meal privileges,

24    showers, a number of other things that came in beyond the

25    scope of the Court's ruling, that I should be permitted, as

1  long as supervisor liability is still a, a claim in this case,

2  or a basis for liability, that the Department should be able

3  to offer testimony about the nature of this unit, and why some

4  of those things were occurring, to explain that it was not

5  because those inmates were engaged in grievance activity or

6  litigation activity, but it was because of the nature of their

7  behavior, the nature of their inability to adjust in the

8  prison system.

9          THE COURT:  Mr. Jacobs?

10         MR. JACOBS:  Well --

11         THE COURT:  I mean, I did limit the scope of it to

12  that unit, in terms of the description.  So now, the question

13  is --

14         MR. JACOBS:  They didn't.

15         THE COURT:  -- that your witnesses have opened the

16  door.

17         MR. JACOBS:  Well, as I recall, whenever they did

18  veer off into other issues that weren't relevant, you

19  intervened and stopped them from doing that, and I redirected

20  their attention to what I -- what the issues were in the case.

21  And as I recall, each witness did focus on the time frame, but

22  then, instructed by the Court and instructed by me.

23         THE COURT:  I think it's particularly the one

24  witness who was talking about observing the suicide and --

25         MR. JACOBS:  That didn't even happen in the LTSU,

1   so.  That happened in RHU, so that his grounds for that are

2   frivolous, that it happened in the LTSU.

3          MR. BRADLEY:  Mr. Jacobs himself testified about a

4   suicide, and I came to learn that that actually occurred at

5   Fayette in 2004.

6          MR. JACOBS:  And a retaliation that led up to the

7   suicide began at SCI Pittsburgh.  But what, what value, what

8   relation does the nature of the unit have to do.

9          THE COURT:  This is what I want you to focus on,

10  Mr. Bradley.  You have a proffer.  I want you to put the

11  proffer in writing as to exactly what the nature of the

12  testimony will be.  And then, if it's true that the suicide

13  that Mr. Edwards -- I believe was Mr. Edwards testified about

14  that, that that was on a different unit, if we can have a

15  stipulation that that unit was not the unit that Mr. Banks was

16  on, and that they are to disregard that testimony, then, I

17  can, you know -- maybe that's another way that we don't have

18  to have another, you know, extension of the trial and getting

19  off into the nature of the unit.

20         MR. JACOBS:  As I recall, though, Your Honor, the

21  witness testified -- Mr. Edwards testified that

22  Defendant Giddens intimidated him into not testifying about

23  that particular suicide.  So, you can't tell the jury not to

24  dis -- to disregard that testimony.

25         THE COURT:  I think, see the problem is now, if

1   that's going to be coming in like that, and you're correct,

2   that was -- you reminded me that was the nature of the

3   testimony, then, it's probably fair to have some description

4   of the various units that are at issue.

5           MR. BRADLEY:  Additionally, Your Honor --

6           THE COURT:  So there will be a proffer.  So, you can

7   look at it, and we'll see exactly what the nature of the

8   testimony will be.

9           MR. BRADLEY:  I would also like to offer, I've been

10  informed that not only SCI Pittsburgh, but the entire

11  Department of Corrections has received an accreditation from

12  the American Corrections Association, and that's based on a

13  independent audit of the institutions, and there are various

14  factors that must be met.  And it's a fairly high standard

15  that must be met.  The fact that Secretary Beard is still a

16  defendant in this case, and the allegations --

17          THE COURT:  Is it from the relevant time frame?

18          MR. BRADLEY:  It's from the relevant time frame, and

19  it would go to the issue of whether he was deliberately

20  indifferent to the issues that Mr. Jacobs has brought up.  And

21  I would like to offer that.

22          THE COURT:  Are you aware of that certification,

23  Mr. Jacobs?

24          MR. JACOBS:  No, I'm not, Your Honor.

25          THE COURT:  Can you get him an exhibit that shows

```
 1   what that means, that you would intend to rely on?

 2             MR. BRADLEY:  I'll do that.

 3             That is all I wish to bring up to the Court.

 4             THE COURT:  Okay.  So, he'll get that to you, and

 5   you can look at it.  If there's any way to get it to him prior

 6   to Monday, that would be greatly appreciated.

 7             MR. BRADLEY:  I'll try.  I'll try.

 8             THE COURT:  So then we have as few delays as we can

 9   possibly have.  It's difficult, given the situation with the

10   transportation and the need to have the guards present.

11   Everybody needs to go back; Mr. Jacobs needs to get his meals.

12             Okay.  Anything else, then?

13             One other thing, I do want to also have ordered that

14   portion of the transcript where the Court, outside the

15   presence of the jury, was engaged in a colloquy with the

16   parties regarding the refusal of Mr. Edwards and Mr. Smith to

17   come out of their cells.  So we can have that, because I

18   think, then, that will reflect the appropriate portions.

19             If you feel there's something else, Mr. Bradley,

20   that needs to be included, so that we have, we have the

21   appropriate record of this.

22             MR. BRADLEY:  I understood you were going to do --

23   you had already ordered that.

24             THE COURT:  I had ordered the portions where those

25   witnesses were testifying, but there was a colloquy the day
```

1  before about their refusal to testify.

2           MR. BRADLEY:  I understand.

3           THE COURT:  I want that, too, because I think that

4  shows why the issue came up.  I think it's just necessary, so

5  it puts everything in context.

6           MR. BRADLEY:  Okay.  I misunderstood.

7           THE COURT:  So, if there's something else that's not

8  included you feel, that would be on the record that needs to

9  be included, you need to let the court reporter know, so that

10 that can also be transcribed.

11          MR. BRADLEY:  I can't think of anything elsewhere

12 that was discussed on the record.

13          THE COURT:  Okay.

14          MR. JACOBS:  Just one last issue.  Due to the late

15 nature of the defendant raising an issue concerning the

16 Fourteenth Amendment due process with respect to the seizure

17 of the documents -- you remember that issue?

18          THE COURT:  Yes, I do.

19          MR. JACOBS:  I'm requesting that that ruling be

20 reconsidered, on the grounds that I have discovered that under

21 the DOC policy, I was not permitted to grieve the issue of the

22 misconduct, under the DC ADMIN-804, and that although Your

23 Honor has stated that I will still have the alternative to go

24 into State Court with the claim.

25          THE COURT:  The question was conversion, and you

1    did -- I believe there was a grievance relating to the fact

2    that your property was taken.

3                MR. JACOBS:  From Mr. Banks.

4                THE COURT:  I think it was from Mr. Lyons.

5                MR. JACOBS:  From, I filed a grievance about that.

6                THE COURT:  Yes.

7                MR. JACOBS:  But I didn't file a grievance about the

8    documents relating to Mr. Banks, because it was processed

9    under the DC ADMIN-801, which prohibits a prisoner from

10   grieving matters related to an 801.

11               THE COURT:  That's why I also put on the record, if

12   you felt that was your property, not returned to you, and was

13   taken improperly, that you have filed a State law claim for

14   conversion, and that in and of itself is sufficient to satisfy

15   the due process requirements.

16               MR. JACOBS:  I understand that.  And now, what I'm

17   saying at this point is that had I been informed of this, had

18   the defendants filed a proper motions at the proper time, I

19   could have asserted that claim in a timely manner.  I could

20   have asked this Court to exercise supplemental jurisdiction.

21               Being as though that the claim is so intertwined

22   with the Federal claims, Your Honor does have authority to

23   consider State law claims under the supplemental jurisdiction.

24               THE COURT:  You want to include a claim for

25   conversion at this stage?

1          MR. JACOBS:  I would like to, Your Honor.  I would
2    like you to supplement.  I would like you to exercise your
3    supplemental jurisdiction.
4          THE COURT:  And have the claim for conversion?
5          MR. JACOBS:  Yes, Your Honor.
6          THE COURT:  Okay.  So, you'll need to consider that.
7          MR. BRADLEY:  Just briefly, Your Honor, I would
8    submit, he did have the same due process that he would have
9    been afforded in the grievance process, in the misconduct that
10   he appealed to the same level.  So he basically had the same
11   problem, same due process available.
12         THE COURT:  Because he would have, within the
13   misconduct, been arguing that it was his property and not the
14   other side's property.
15         MR. BRADLEY:  Yes.
16         THE COURT:  Not Mr. Banks property.
17         MR.  BRADLEY:  Yes.
18         MR. JACOBS:  But that, in light of Mr. Ferson's
19   testimony that the evidence was not even preserved, there was
20   no likelihood or even possibility that the document, the
21   property could have been returned to me.
22         MR. BRADLEY:  Mr. Ferson's testimony was, he left it
23   in the Lieutenant's office.
24         MR. JACOBS:  Right.  But there's no documentation,
25   there's no type of evidence that it was preserved; whereas, in

1    the grievance process --

2            THE COURT:  See, the problem with it being your

3    property, if it is, if it is taken from you, then, you're

4    entitled to the value of the property.  And that's another

5    problem here, one which I didn't get into, and that's, that's

6    what's the value of the property?  If it's de minimis, there's

7    some concern about whether there's a viable claim, you know,

8    if something is very de minimis in value, you know, how -- how

9    you know, how would that rise to the level of a, of a

10   Constitutional right for the Fourteenth Amendment.

11           MR. JACOBS:  Okay.

12           THE COURT:  Okay?  I mean, you know, the problem,

13   when you're talking about taking your property without due

14   process, if it's property that's of a de minimis value, paper,

15   you know, that's, that's what we're -- that's the property, is

16   the paper.  I understand that there is a, there's an intrinsic

17   value that you would be arguing with respect to how that would

18   affect your ability to access the Courts.  But that's covered

19   with your access to Court claim.  They took property that was

20   preventing you from litigating your appeal, and then, also

21   prosecuting the case that you were the plaintiff in.  So that

22   that's where that is covered, in terms of the substance and

23   nature.

24           And when you're talking about the due process and

25   taking your property, you know, the Courts have to focus on

1   what is the property.  And that's where the, the issue is.

2   I'm not trying to resolve anything on the record today, but if

3   you're talking about two pieces of property, two pieces of

4   paper, in terms of what the value would be of two pieces of

5   paper, I know there's an issue with respect to access to

6   Courts that's handled in the other claim, but if we're talking

7   about, you should have had -- just because you want those two

8   pieces of paper, what's the intrinsic, what's the actual value

9   of those two pieces of paper, you know.  And then, that's

10  really --

11          MR. JACOBS:  To pursue legal claims.

12          THE COURT:  But that goes to your right to access to

13  Court.

14          MR. JACOBS:  But would it also go to the question of

15  the value of those particular documents?

16          THE COURT:  Well, the value, when you're talking

17  about conversion and that type of thing, you're talking about

18  the real value of the property.

19          You know, I could have something that has a lot of

20  sentimental value to me.  I can say you can't put a price on

21  it, but when your dealing with conversion, you're talking

22  about what the market price for that type of item is.

23          So we'll -- we have to be going all down those

24  issues, and really, the gist of your concern here is the

25  property was taken; that interfered with your ability to

1    access the Courts.  And that's the main thrust of it.  And

2    you, I told you, you have as much opportunity as you want to

3    bring out evidence that it was your property, that they took

4    those pages, and how that affected you.  And when -- we've

5    done that here.

6              But for a claim for two pieces of paper, to describe

7    the Pennsylvania law on conversion, where they have to

8    attribute a market value to that, how are you going to value

9    the two pieces of paper?  And it's the market value, not in an

10   intrinsic value, per se.  So, you may get nominal damages, but

11   you would get -- you can get the same --

12             MR. JACOBS:  I understand, Your Honor.

13             THE COURT:  I think we need -- so just think about

14   that.

15             MR. JACOBS:  Okay.

16             THE COURT:  Okay?  And you can think about it, too,

17   Mr. Bradley, in terms of what he's arguing now, where he

18   essentially wants the Court to recognize his claim for

19   conversion.  And if you have any cases that would support that

20   the misconduct which involves property is similar to the

21   grievance process that would suffice for the procedural due

22   process under the Fourteenth Amendment, I would appreciate

23   seeing those cases.

24             MR. JACOBS:  And just this policy issue.

25             THE COURT:  Right.  See, we had a discussion on that

1   sometime pretrial, where you turned over, the defendants

2   turned over the policies, and I think you didn't have the

3   policies from the exact time frame, but there would be a

4   stipulation that those were the same policies.

5            MR. BRADLEY:  I know I just provided Mr. Jacobs --

6            THE COURT:  We'll have to look at the record of that

7   hearing.  Think about that and see, if you go back and check

8   your records, if -- see what you turn up.  It may well be the

9   date of the policy the plaintiff was using.

10           MR. JACOBS:  And in any event, I will get a policy

11  that was in effect at the time.

12           THE COURT:  Okay.

13           MR. JACOBS:  That will resolve it.

14           THE COURT:  Okay.  You can just double check,

15  though.  See if they are exactly the same.  If they are, we

16  won't need to deal with it any more in front of the jury.

17           MR. JACOBS:  Okay.

18           THE COURT:  Okay?  Okay.  The hearing is adjourned.

19           MR. JACOBS:  Thank you, Your Honor.

20           THE COURT:  We're in recess for the day.

21           MATTHEW FERGUS, Law Clerk:  All rise.

22           (Whereupon, court adjourned at 5:15 p.m.)

23                      *  *  *  *  *

24

25

1                              I N D E X

2   <u>PLAINTIFF</u> <u>WITNESSES</u>           <u>DIRECT</u>  <u>CROSS</u>   <u>REDIRECT</u>   <u>RECROSS</u>

3   Michael Edwards

4        By Mr. Jacobs                 3 (out of presence of jury)
                                       7
5        By Mr. Bradley                      25

6   David Smith

7        By Mr. Jacobs                29 (out of presence of jury)

8   Gary Banks

9        By Mr. Jacobs               50
         By Mr. Bradley                      66
10

11  <u>DEFENDANT</u> <u>WITNESSES</u>           <u>DIRECT</u>  <u>CROSS</u>   <u>REDIRECT</u>   <u>RECROSS</u>

12  Shelly Mankey

13       By Mr. Bradley                              75
         By Mr. Jacobs                      38                   76
14
    Charles Simpson
15
         By Mr. Bradley              88              104
16       By Mr. Jacobs                      92                   106

17  Michael Ferson

18       By Mr. Bradley             109              147
         By Mr. Jacobs                     118
19                                 * * * * *

20                   I certify by my original signature herein

21  that the forgoing is a correct transcript from the record of

22  proceedings in the above-entitled matter.

23

24                             s/Virginia S. Pease
                               Official Court Reporter
25