IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

_____

ANDRE JACOBS

                    Plaintiff

          vs.                    Civil Action No. 04-1366

PENNSYLVANIA DEPARTMENT OF
CORRECTIONS, et al

                    Defendants

_____


PROCEEDINGS (Day 6)

        Transcript of Jury Trial Proceedings, continuing
Thursday, November 13, 2008, United States District Court,
Pittsburgh, Pennsylvania, before Honorable Joy Flowers Conti,
United States District Judge.


APPEARANCES:

For the Plaintiff:      ANDRE JACOBS, Pro Se

For the Defendant:      SCOTT BRADLEY, Esquire
                        ROBERT WILLIG, Esquire



Reported by:            Virginia S. Pease
                        Official Court Reporter
                        619 USPO & Courthouse
                        Pittsburgh, Pennsylvania 15219
                        412.208.7385



Proceedings recorded by mechanical stenography.  Transcript
produced by computer-aided transcription.

 1             (Whereupon, court reconvened at 9:30 a.m.)

 2             THE COURT:  Please be seated.

 3             I believe Lieutenant --

 4             MR. BRADLEY:  -- Giddens, Your Honor.

 5             THE COURT:  If you could please come forward and

 6  retake the witness stand.

 7             The witness is instructed that you remain under

 8  oath.

 9             MR.  BRADLEY:  Yes, ma'am.

10                       * * * * *

11                  GREGORY GIDDENS, a witness herein, having

12  been previously duly sworn, testified further as follows:

13                  CROSS EXAMINATION CONTINUES

14  BY MR. JACOBS:

15  Q.    Good morning, Mr. Giddens.

16  A.    Good morning.

17  Q.    If I recall your testimony the other day correctly, you

18  were testifying about promotions that you received in the

19  course of your DOC employment.

20  A.    Just the progression of my employment, yes.

21  Q.    Are you familiar with your Code of Ethics?

22  A.    I know that it exists.

23  Q.    Are you familiar with it?

24  A.    Ah, not in the whole, no.

25  Q.    How long have you said you worked with the Department

1   of Corrections?

2   A.      18 years.

3   Q.      And over those 18 years, how many times have you

4   reviewed your Code of Ethics?

5   A.      Many, in limited portions.

6   Q.      And it is also your duty as a Department of Corrections

7   employee to know your Code of Ethics; correct?

8   A.      It's my duty as an employee of the Bureau of

9   Corrections to know all policy and procedure.

10  Q.      I'm talking about your Code of Ethics.

11  A.      All policy and procedure.

12  Q.      Specifically, Code of Ethics.

13  A.      Specifically mall policy and procedure.

14  Q.      All right.  Is it your duty as a DOC employee to know

15  the Code of Ethics; yes, or, no?

16  A.      It is my duty to --

17  Q.      Yes, or, no.

18  A.      No.  The Code of Ethics is available for review, when

19  needed.

20            MR. JACOBS:  Your Honor, Your Honor --

21            THE COURT:  You need to answer the question as

22  asked.  You can answer, yes, or, no.

23  BY MR. JACOBS:

24  Q.      Are you familiar with the section of the Code of Ethics

25  which states that you're supposed to avoid situations where

1   bias or prejudice might interfere with your decision-making?

2   A.      I am not.

3   Q.      Are you familiar with the section of the Code of Ethics

4   which states that you are not to enter any type of false or

5   inaccurate information on official documents?

6   A.      I am.

7   Q.      Mr. Giddens, I'm showing to you what's been marked as

8   Plaintiff's Exhibit No. 25.

9   A.      Okay.

10  Q.      Do you recognize this document?

11  A.      I do.

12  Q.      I'm going to draw your attention to No. 7.

13  A.      Okay.

14  Q.      You see your answer?

15  A.      I do.

16  Q.      Did you understand the question?

17  A.      Clearly.

18  Q.      Didn't you testify yesterday that you went, you went

19  through the documents?

20  A.      No, not yesterday.

21  Q.      Well, I mean, the other day.  Did you testify that you

22  went through those documents?

23  A.      I don't recall.  We would have to look at the record.

24  I can't answer, yes, or no.

25  Q.      It was just a few days ago.

1    A.      I don't recall that question.  I can't say.  I reviewed

2    some of the documents for this proceeding, yes, if that's what

3    you're asking.

4    Q.      Did you review the documents that Defendant Chirico

5    took from Mr. Lyons on September 15th, 2003?

6    A.      I did not.

7    Q.      You never looked at them?

8    A.      Back then, yes, I'm sure I looked at them.  Yes.

9    Q.      Okay.  And by looking at them, you became at least

10   familiar with the documents, the nature of the documents?

11   A.      I may have at that time, yes.  That was five years ago,

12   so I can't tell you what those documents were today, and those

13   documents are unavailable for my review today.

14   Q.      Because they were destroyed; right?

15   A.      I have no idea where they are or what happened to them.

16   Q.      You took no steps to secure them?

17   A.      I took the steps that I'm required to take by procedure

18   and policy.

19   Q.      You participated, you participated, at least in some

20   part, in both seizures of documents, September 15th and

21   September 16th?

22   A.      I'd say, yes.

23   Q.      Okay.  I'm showing you what's been marked as

24   Plaintiff's Exhibit No. 2.

25   A.      Okay.

1   Q.      You recognize the document?

2   A.      Yes.

3   Q.      That's the statement that you wrote?

4   A.      That is correct.

5   Q.      Is that an -- is that an accurate statement?

6   A.      I believe I've previously testified that at the time --

7   Q.      I'm asking you, yes, or, no; yes, or, no?

8   A.      At the time I wrote it --

9   Q.      Yes, or, no?  Yes, or, no?

10          THE COURT:  Just a second.

11          Repeat the question.  Repeat the question.  If you

12  can answer the question, yes, or, no, you need to do so.

13          If you want to have a further explanation, your

14  counsel will be able to bring that out on the redirect.

15          THE WITNESS:  Okay.

16          THE COURT:  Okay?  Repeat the question, please.

17  BY MR. JACOBS:

18  Q.      Is that an accurate statement?

19  A.      As of today, no.

20  Q.      You testified that in pursuit of the investigation of

21  this particular grievance number, that you reviewed the only

22  misconduct or document that you could find that related to

23  seizures of documents.  Remember that testimony?

24  A.      Issued to you, yes.

25  Q.      And I'm referring to -- I'm showing you what's been

1    marked as Plaintiff's Exhibit No. 7-A.

2    A.    Okay.

3    Q.    Do you agree with me that nowhere in that document is

4    Mr. Lyons' name mentioned?

5    A.    Okay.

6    Q.    Do you agree with me?

7    A.    Yes.

8    Q.    And that it is impossible that you looked at that

9    document and came out with Mr. Lyons' name?

10   A.    No, I wouldn't agree with that, obviously.

11   Q.    Based on this document right here --

12   A.    No. no, I wouldn't agree with that.  Obviously, I

13   looked at that document in response to the previous exhibit,

14   because that is the genesis of my response, is that document.

15   Q.    But it had nothing to do with a seizure of documents

16   from Mr. Lyons; correct?

17   A.    Then I must have overlooked that particular part of

18   your grievance.

19   Q.    Yes, or, no?

20   A.    I must have overlooked it.

21   Q.    Just looking at this document right here, that has

22   nothing to do with the seizure of documents from Mr. Lyons;

23   correct?

24   A.    No; that is correct.

25   Q.    And that has nothing to do with Defendant Cherico

1    seizing documents at all?

2    A.      That is correct.

3    Q.      Nor does it have anything to do with Mr. Lyons being in

4    the law library?

5    A.      Well, it didn't go into that, so that --

6    Q.      This document reflects a cell search that took place on

7    September 16th in my cell; correct?

8    A.      Correct.  And that's how I responded to the grievance.

9    Q.      Okay.  I'm showing you what's marked as Plaintiff's

10   Exhibit No. 1.

11   A.      Okay.

12   Q.      This document involves the documents that were taken

13   from Mr. Lyons on September 15th, 2003; correct?

14   A.      I concur.

15   Q.      And you testified that there was or there wasn't

16   disposition taken as to these particular documents?

17   A.      I can't tell you.  You would have to check the record.

18   Q.      Well, Mr. Lyons testified that he never had a

19   misconduct hearing.

20   A.      Yes, I do recall that.

21   Q.      And you wrote in response to this grievance that

22   disposition was taken as to these particular documents.

23   A.      No.  In my response, I wrote the disposition was taken

24   on the two documents.

25   Q.      But this grievance don't have nothing to do with two

1  documents; correct?

2  A.      However, that was what my response spoke to.

3  Q.      This grievance doesn't have nothing to do with two

4  documents being taken; is that correct?

5  A.      That's correct.  That's why I said you fabricated the

6  response.

7  Q.      This grievance doesn't have anything to do with a

8  misconduct being issued to me; does it?

9  A.      I would agree.

10  Q.      And this document doesn't have anything to do with two

11  pages of documents being taken from me that belong to

12  Mr. Banks?

13  A.      I would agree.

14  Q.      So, your response is fabricated?

15  A.      Negative.

16  Q.      And basically what you tried to do --

17  A.      Absolutely not.

18  Q.      Okay; absolutely not.

19        Basically what you tried to do was mix one incident up

20  from the day before with the one that happened the day after

21  that?

22  A.      Absolutely not.

23  Q.      And you knew when you responded to that grievance that

24  this grievance didn't have nothing to do with Gary Banks?

25  A.      Absolutely not.

1  Q.     And you knew it didn't have nothing to do with two

2  pages of legal documents taken from Mr. Lyons, that

3  disposition was taken on 9/24, 2003?

4  A.     It's an official document.  Absolutely not.

5  Q.     You knew that no disposition was taken as to these

6  documents?

7  A.     Absolutely not.

8  Q.     Because you had the record.  You had access to those

9  records; didn't you?

10  A.     Absolutely not.

11  Q.     You didn't have access to the records?

12  A.     Obviously not.

13  Q.     You had access to the records as to whether or not

14  disposition was taken; didn't you?

15  A.     Absolutely not; otherwise, I would have found those

16  records.

17  Q.     You're the Lieutenant; correct?

18  A.     Yes.

19  Q.     You don't have access to documents?

20  A.     I obviously didn't at that time.

21  Q.     Who had them?

22  A.     I couldn't tell you.

23  Q.     Did they exist?

24  A.     I couldn't tell you.

25  Q.     Were they destroyed?

1  A.      I couldn't tell you.

2  Q.      Something happened to them.

3  A.      That's your position.

4  Q.      You also testified that informal resolutions are not

5  processed in the same way that normal misconducts are

6  processed.  You remember that testimony.

7  A.      Right.  The difference in the two are formal and

8  informal.  There's a difference in the way they are processed.

9  Q.      Okay.  What is the difference in the process?

10  A.      A formal resolution is processed through a shift

11  commander input and sent before the hearing examiner.

12          And informal resolution, although it is annotated on

13  the main frame system, is not reviewable via DOC.net.

14          In any research of misconducts, I look at DOC.net.  And

15  if there's no record of the misconduct on DOC.net, then, I

16  assume that there's no record of the misconduct.

17          I did not have authorization or access to research

18  misconducts via the main frame.

19  Q.      Okay.  So, how long have you believed that that is the

20  way informal resolutions are handled?

21  A.      I'm not sure I understand your question.

22  Q.      How long has that been the process for processing

23  informal resolutions?

24  A.      As long as I've been aware of informal resolution.

25  Q.      How long is that?

1    A.      Um, I'd say at least nine, ten years, that I'm aware of

2    it.

3    Q.      And the DOC.net you're referring to is the automated

4    misconduct tracking system; correct?

5    A.      Um, I don't know if that's officially what it's called.

6    Q.      Well, that's where the normal misconducts are held, in

7    the automated grievance/misconduct tracking system?

8    A.      I can't speak to that.  I call it DOC.net, under

9    misconduct tracking, yes.  If it's called automated, yes.

10   Q.      Okay.  I'm showing you what's been marked as

11   Plaintiff's Exhibit No. 25 -- oh, 26.  Pardon me.

12           Take a moment to familiarize yourself with the

13   document.

14   A.      Okay.

15   Q.      You know what that document is?

16   A.      I do.

17   Q.      Have you taken the opportunity to look at the document?

18   A.      I have.

19   Q.      And does that document reflect that in the year 2000

20   the manner in which informal resolution policy was amended?

21   A.      It does.

22   Q.      And that informal resolutions were processed in the

23   same manner as regular misconducts?

24   A.      It does.

25   Q.      And --

1   A.      Well, it doesn't -- it just says that the process by

2   which they are processed.  It doesn't say it's the same thing.

3   Q.      And it is in an automated system of misconducts and

4   tracking system?

5   A.      It does.  But again, I stated previously that there's

6   the main frame system and DOC.net.  So, I can't tell you which

7   system they are speaking of.

8   Q.      Okay, okay.  But there is a misconduct -- this is a

9   system that's available to the DOC; correct?

10  A.      Some staff, correct.

11  Q.      Okay.  And based on your testimony, that to the best of

12  your memory, informal resolutions were always processed in the

13  manner in which you described previously; correct?

14  A.      Correct, to the best of my knowledge.

15  Q.      But this document shows that there was a change in the

16  manner in which informal resolutions were processed?

17  A.      No, I wouldn't agree with that.

18  Q.      Well, it was amended?

19  A.      Okay.  But I don't know what the amendment is.

20  Q.      It just says, it tells you what the amendment is.

21  A.      To track informal resolutions; correct.

22  Q.      Okay.  See that?

23  A.      Um-hum.

24  Q.      Okay.  So, at the time in question, you didn't know

25  that informal resolutions could be tracked?

1   A.      No, that's not what I said.

2   Q.      No, I'm asking you.

3   A.      No, that's not correct.

4   Q.      So, you did know that informal resolutions could be

5   tracked?

6   A.      Yes.

7   Q.      But you just testified that they are not processed in

8   the same way as the other misconducts.

9   A.      What I testified to is that there are two systems.

10  Q.      Okay.

11  A.      Both of which are automated.  One is specific to

12  DOC.net and one is the main frame.

13  Q.      You said they're processed differently.

14  A.      Misconduct goes on both of those systems.  So when you

15  speak of an automated tracking system, you could refer to both

16  of those system as such.

17          When you review, at least that I recall, when you

18  review DOC.net, it did not at that time show informal

19  resolution.  That is my testimony.

20  Q.      Okay.  And you thought that, based on the fact that

21  they were not processed the same way, you thought that you was

22  able to bury that informal resolution?

23  A.      No.

24  Q.      Even though it was documented, it wasn't processed?

25  A.      I had nothing to do with the --

1           THE COURT:  Just a second.  You can't talk over each

2     other.  So, if you have an objection, you need to bring it to

3     my attention.

4           And listen to the question, and then, answer it when

5     he's done asking.  Otherwise, the court reporter cannot

6     transcribe the record.

7           THE WITNESS:  Yes, Your Honor.

8     BY MR. JACOBS:

9     Q.    Based on your testimony that these informal and formal

10    were processed in different ways, you believe that you were

11    able to bury the misconduct that was issued to Mr. Lyons?

12    A.    I had nothing to do with --

13    Q.    Yes, or, no.

14    A.    -- with the informal --

15          MR. JACOBS:  Objection, Your Honor.

16          THE COURT:  Just a second.

17          MR. JACOBS:  Objection.

18          THE COURT:  Are you able to answer the question;

19    yes, or, no?

20          THE WITNESS:  No.

21    BY MR. JACOBS:

22    Q.    You're not able to answer the question, yes, or, no?

23    A.    I had nothing to do with burying the misconduct; no,

24    absolutely not.

25    Q.    You had nothing to do with it?

1   A.      Nothing to do with any type of burying of any type of

2   document, for that fact.

3   Q.      I'm showing you what's been marked as Plaintiff's

4   Exhibit No. 27.  Draw your attention to Question No. 1.

5   A.      Okay.

6   Q.      Do you understand that question?

7   A.      Clearly.

8   Q.      Okay.  You see your answer?

9   A.      Correct.  Consistent with my testimony.

10  Q.      That as --

11          MR. JACOBS:  Could you show him the date?

12  Q.      -- as of September 16th, 2006 -- oh, September 14th;

13  you see that?

14  A.      Correct.  Yes, I do.

15  Q.      That was when this response was provided; correct?

16  A.      That is correct.

17  Q.      And as of that date, you had no current knowledge, nor

18  could you locate any seizured documents for that date?

19  A.      That is correct.

20  Q.      Three years later.

21  A.      Three years later.

22  Q.      So, you were still attempting to make it seem like that

23  wasn't part of the official record?

24  A.      How could I attempt that?  If it was part of an

25  official record, how could I make that attempt?

1   Q.      Yes, or, no?

2   A.      No, absolutely not.

3   Q.      You testified that when the prisoners in LTSU go to the

4   law library, their legal property is searched; correct?

5   A.      Their person is searched, to include whatever paperwork

6   they have on their person.

7   Q.      If they take pepper work with them, they are searched?

8   A.      Whatever they have with them, including their person,

9   is searched; correct.

10  Q.      On the day in question, would that have been a policy

11  as well?

12  A.      I would suggest, yes.

13  Q.      So, when Mr. Lyons was taken to the law library on

14  September 15th, 2003, his legal property in his possession

15  was searched?

16  A.      I would say, yes.

17  Q.      And they were returned to him?

18  A.      I would say, yes.

19  Q.      And upon Mr. Lyons being taken from the law library,

20  those same legal materials were searched again?

21  A.      I can't speak to that.  I can't speak to the fact that

22  they were or were not the same materials.

23  Q.      Well, isn't it true that you testified that the unit

24  staff may take measures to make sure that inmates aren't

25  passing briefs, cites, and things like that in the law

1  library?

2  A.       That is correct.

3  Q.       So, the law library is searched prior to the prisoners

4  being placed in the law library; correct?

5  A.       Supposed to be.

6  Q.       To make sure things aren't left there for someone else

7  to come in there and pick up and exchange, like you testified?

8  A.       Yes.

9  Q.       So, documents that Mr. Lyons went in with, there was

10 nothing there for him to go in and pick up?

11 A.       I can't make that assumption?

12 Q.       You don't know if the library was searched?

13 A.       Not with definite assurance, no.

14 Q.       Okay.  So, the law library is not always searched?

15 A.       That's not what I stated.

16 Q.       I'm asking you.

17 A.       It is the policy -- it was the policy of the LTSU at

18 that time, and SCI Pittsburgh, to search the law library prior

19 to and after an inmate used it.

20 Q.       And you're suggesting that on this particular day it's

21 possible that it wasn't searched?

22 A.       No.  I'm suggesting that it's possible that contraband

23 may have been left in the law library that was missed by the

24 searching staff.

25 Q.       You're suggesting that that may have been the

1  contraband that Mr. Lyons was in possession of?

2  A.     I can't know that.

3  Q.     Well, are you suggesting the materials that Mr. Lyons

4  went in the law library with are not the same material that he

5  came out the law library with?

6  A.     I'm suggesting that's a possibility.

7  Q.     Okay.  And when these materials that he had in his

8  possession when he came out of law library were taken, were

9  searched, they were taken?

10  A.     Correct.

11  Q.     In between that time, Defendant Cherico informed you

12  after the initial screening that he seen your name in those

13  documents?

14  A.     Not that I recall, no.

15  Q.     And you instructed him to take those documents?

16  A.     No.

17  Q.     And when he came back in, and when he came to take

18  Mr. Lyons out the law library, that's why the documents were

19  taken?

20  A.     No.

21  Q.     That's why they were initially taken?

22  A.     If they were the same documents going in as they were

23  coming out, why wouldn't he have taken them going in; they had

24  my name on it?  If there was concern with my name being on

25  those documents, why not take them then?

1   Q.      So, after he searched the documents, on initial

2   screening, he seen your name in the documents, he put

3   Mr. Lyons in the law library, and he came and informed you

4   that he seen your name in some legal documents?

5   A.      Never happened.

6   Q.      Okay.  Then you instructed him to take the documents?

7   A.      Never happened.

8   Q.      Then, when he came and took Mr. Lyons out the law

9   library, he took the documents?

10  A.      It never happened.

11  Q.      And that's why the documents were never taken on the

12  initial screening; correct?

13  A.      No.

14  Q.      Mr. Lyons was taken back to his cell and he asked to

15  speak to you?

16  A.      Um, I don't know.  At some point I spoke with him.

17  Q.      Did you speak to him on September 15th, 2003?

18  A.      I can't give you a date.  I probably did, as I made

19  regular rounds on the unit, as you are well aware.

20  Q.      But you did have a conversation with Mr. Lyons

21  concerning those particular documents from September 15th,

22  2003?

23  A.      At some point, I did.

24  Q.      Did you agree to have a misconduct issued to Mr. Lyons?

25  A.      I concurred with the report as written by staff.

1  Q.      Did you consider returning the documents to me?

2  A.      I had no control over the return of the documents to

3  you.

4  Q.      Did you consider it?

5  A.      It never was a thought.  I had no control over it.  So,

6  I guess my answer would be, no.

7  Q.      You spoke to Mr. Lyons.  Mr. Lyons indicated that he

8  was going to pursue the matter?

9  A.      Not that I recall.

10  Q.      And then, you come and you search Mr. Lyons' cell on

11  September 16th, 2003?

12  A.      I can't say, yes, or, no, to that.  If you have a

13  record that says we did so, then, we did so, but I can't say,

14  yes, or, no, to that.

15  Q.      Well, Mr. Lyons' cell was searched on September 13,

16  2003; wasn't it?

17  A.      If you have a record that says that.  The previous

18  testimony states that, yes.

19  Q.      And in that cell search, you, Defendant Cherico and

20  Defendant Lynch attempted to retrieve the document, the

21  misconduct that was issued to Mr. Lyons?

22  A.      No.

23  Q.      Then, when you didn't find it in his cell, you searched

24  my cell?

25  A.      No.

1    Q.      You did search my cell on September 16th, 2003?

2    A.      If I recall, we searched a pod worth of cells on that

3    date.

4    Q.      Just a second ago you said you didn't remember whether

5    or not Mr. Lyons cell was searched.

6    A.      I don't remember you and Mr. Lyons were in the same

7    pod.  When I recall your cell, you were in a cell in Pod 2 on

8    the right side, A, or, B, whatever it was; A, I believe, and

9    you were by the shower.  And I didn't remember Mr. Lyons even

10   being in that pod.  So, all of the testimony about you being

11   in a cell next-door to Mr. Lyons, to me, was, was incorrect

12   testimony.

13   Q.      Well, you all had the records; correct?  Department of

14   Corrections keeps records?

15   A.      Somebody has those records, yes.

16   Q.      If there was any dispute about what cell we were in,

17   the Department of Corrections could find out whether or not

18   that's true; correct?

19   A.      You're asking me my recollection.

20   Q.      I'm not asking you your recollection.  I'm asking you

21   about the Department of Corrections tracking for the cells and

22   prison that those prisoners are in.

23   A.      That's correct.

24   Q.      You all keep records of that?

25   A.      They're recorded on the computer; correct.

1   Q.      Okay.  Now, my cell was searched September 16th,

2   2003; correct?

3   A.      If previous record states that, yes.

4   Q.      Well, you don't recall this particular cell search in

5   question?

6   A.      I recall the search.  I do not recall the date.

7   Q.      Okay.  And in this cell search you attempted to find

8   out if I had a misconduct that was issued to Mr. Lyons?

9   A.      Not that I recall.

10  Q.      In this cell search you permitted Defendant Lynch to go

11  through all of my legal documents, read my legal documents.

12  A.      How could he ascertain if they are legal or not if he

13  doesn't review them?

14  Q.      So, it is the policy of the DOC to read prisoners'

15  legal documents; correct?

16  A.      To review.

17  Q.      Review?

18  A.      Review.  You can't check something if you don't look at

19  it.

20  Q.      Okay.  So, you're reading it; right?

21  A.      No.

22  Q.      Is it the normal policy of the DOC to send legal -- to

23  send contraband material to the Security Department?

24  A.      It was the policy of the LTSU at that time, if there is

25  a question about the legitimacy of any document.

1          MR. JACOBS:  Objection, Your Honor.  I object.

2          THE COURT:  Okay.  Just, if you can answer the

3   question, yes, or, no, do so.  And if you want to have a

4   fuller explanation, your counsel will be able to follow-up

5   with you on redirect.  Thank you.

6   BY MR. JACOBS:

7   Q.     And you agreed to have these materials sent to the

8   Security Department?

9   A.     I'm not sure I understand your question.

10  Q.     The documents that were taken from Mr. Lyons on

11  September 15th, 2003 were sent to the Security Department?

12  A.     Yes.

13  Q.     And you agreed to have those documents sent to the

14  Security Department?

15  A.     It was the policy.

16  Q.     Did you agree?

17  A.     It was the policy.

18  Q.     Did you agree?

19  A.     It was out of my hands.  It was the policy.  It was my

20  responsibility.

21  Q.     Did you participate in it?

22  A.     It was the policy.  That's my response.

23  Q.     Okay.  You testified on direct examination, you stated

24  that after the misconduct that was issued to Mr. Lyons on

25  September 15th, 2003 was issued, it was out of your hands.

1   A.      That's correct.

2   Q.      The entire matter?

3   A.      The, the misconduct goes to the shift commander for

4   review and signature; processing.

5   Q.      Okay.  After that particular point, did you participate

6   in anything having to do with those particular documents after

7   that.

8   A.      Not that I recall.

9   Q.      In the normal course of things, would you?

10   A.      Um, there are times that I may have been asked

11   questions about a particular document, or my opinion on them,

12   and there are times that I weren't.  So, it's a 50/50

13   proposition.

14   Q.      Showing you what's been marked as Plaintiff's

15   Exhibit No. 3.

16   A.      Okay.

17   Q.      You recognize that document?

18   A.      No, not particularly.

19   Q.      You don't know what that document is?

20   A.      It's a request slip.

21   Q.      Okay.  That's a form that's used in the Department of

22   Corrections; correct?

23   A.      I recognize the form, if that's your question.

24   Q.      Okay.

25   A.      Yes.

1   Q.      And you agree with me that this particular request

2   concerns the documents that were taken from Mr. Lyons on

3   September 15th, 2003?

4   A.      I do.

5   Q.      Do you know Defendant McConnell, Thomas McConnell?

6   A.      I do.

7   Q.      Did you know him at the time in question?

8   A.      I did I.

9   Q.      You all friends?

10  A.      We were co-workers.

11  Q.      Were you all friends?

12  A.      No.

13  Q.      Can you see the highlighted portion of his response?

14  A.      I do.

15  Q.      He states that he will review the matter with you?

16  A.      Yes.

17  Q.      This was after the documents were sent to the Security

18  Department?

19  A.      That is correct.

20  Q.      And he stated that if it was appropriate, the documents

21  would be returned?

22  A.      That is correct.

23  Q.      After your input?

24  A.      That's not what he said.

25  Q.      Well, he said --

1    A.     That's not what this document here says.

2    Q.     He says he will review it with you?

3    A.     That's what the document says.

4    Q.     For your input.

5    A.     It doesn't say, for my input.

6    Q.     If he's going to review it with you, wouldn't he want

7    your input?  I mean, I'm just asking you policy.

8    A.     You're adding to what the document says.

9    Q.     Now, I'm asking you about the policy of the DOC.  If

10   your supervisor calls you about a particular incident and he's

11   going to inquire about particular documents, he's going to ask

12   you some questions about your position on the documents;

13   correct?

14   A.     That is correct.

15   Q.     Or on a particular situation?

16   A.     That is correct.

17   Q.     So, he was involving you in the situation, because you

18   knew about the situation and he wanted your input?

19   A.     He questioned me about the document.

20   Q.     Oh, he did question you about the documents?

21   A.     That's what this says, that he will question me about

22   the document.

23   Q.     He did?

24   A.     I don't recall.  I don't recall having a conversation

25   with him.

1  Q.     You can't recall if he ever followed up on this?

2  A.     I do not.

3  Q.     But he did talk to you about the documents; didn't he?

4  A.     I just stated I don't recall a conversation.

5  Q.     And you persuaded Mr. McConnell not to return the

6  documents?

7  A.     No.

8  Q.     Because you didn't like what was in them?

9  A.     No.

10  Q.    And you also persuaded Mr. McConnell to destroy the

11  documents?

12  A.     No.

13  Q.     But the documents no longer exist.  You agree with me

14  about that; right?

15  A.     I do not agree with you.  I don't know what happened to

16  them.

17  Q.     Well, nobody knows where they are at.

18  A.     Okay.

19  Q.     Then, they don't exist?

20  A.     Not necessarily.  They could be in a box somewhere,

21  wherever.

22  Q.     So, if they are in a box, could they be found?

23  A.     If every box that is sitting everywhere within

24  SCI Pittsburgh or SCI Fayette is checked, they possibly could

25  be found.

1   Q.      But my right to access to Courts is not important

2   enough to conduct that search?

3           MR. BRADLEY:  Objection, Your Honor.  That's

4   argumentative.

5           THE COURT:  Just a second.

6           MR. JACOBS:  I'm asking -- I'll rephrase the

7   question.

8           THE COURT:  Rephrase the question.

9   BY MR. JACOBS:

10  Q.      If a prisoner informs you that he needs these documents

11  for pending litigation, is that important to the Department of

12  Corrections?

13  A.      The policy --

14  Q.      Yes, or, no?

15  A.      No.

16  Q.      That's not important?

17  A.      It's not important to me.

18  Q.      Okay.  Important -- in regards to the seizure of

19  documents on September 16th, 2003, did Defendant Lynch show

20  you the documents?

21  A.      I think I was outside the cell, so, I would say, yes.

22  Q.      And you agreed with those documents being taken too;

23  correct?

24  A.      That is correct.

25  Q.      Because your name was in them?

1   A.      Had nothing to do with my name being in them.

2   Q.      But your name was in them?

3   A.      I believe so, I believe we reviewed those documents

4   already during these proceedings.

5   Q.      Okay.  That was why you agreed to have those documents

6   taken?

7   A.      Absolutely not.  They had another inmate's name on

8   them.

9   Q.      And you want to punish me and Mr. Banks for --

10  A.      You punished yourself by your presence in the LTSU.

11  Q.      You want to the punish me and Mr. Banks, because

12  Mr. Banks gave me a written statement against you?

13  A.      No, sir.

14  Q.      And you wanted to discourage me in particular from

15  exercising my rights?

16  A.      You were one of --

17  Q.      Yes, or, no?

18  A.      No, absolutely not.

19  Q.      And that was the practice in the LTSU; correction

20  officers, including yourself, taking documents, destroying

21  documents; correct?

22  A.      My response to that would be, we're here today, so, you

23  found a way.

24  Q.      Wasn't at this time policy and practice of you,

25  Defendant Lynch and Defendant Cherico to read prisoners' legal

1    documents?

2    A.      No.

3    Q.      Search for information that was against your interests?

4    A.      No.

5    Q.      Or against the interests of the Department of

6    Corrections?

7    A.      No.

8    Q.      Take the documents, erroneously label them with

9    "contraband", and destroy them?

10   A.      No, absolutely not.

11           MR. JACOBS:  No further questions.

12                       REDIRECT EXAMINATION

13   BY MR. BRADLEY:

14   Q.      Lieutenant Giddens, just to follow up on that last line

15   of questions, and specifically in regard to the search of

16   Mr. Jacobs' cell on September 16th, 2003.

17           Do you recall there being other legal documents in

18   Mr. Jacobs' cell at the time the two pages were removed?

19   A.      At least one record center storage box full of

20   documents.

21   Q.      And of course, that box was taken, and confiscated, and

22   destroyed, and buried and --

23   A.      The box remained in his cell after we left it.

24   Q.      So, there was an entire other box of legal materials

25   belonging to Mr. Jacobs that were not taken or removed from

1   his cell at that time?

2   A.      Correct.  I would say a box of material.  What was in

3   the box, I couldn't speak to.  A box he identified as legal

4   material.

5   Q.      And all that was taken on September 16th from his

6   cell were the two pages with another inmate's name on it?

7   A.      That is correct.

8   Q.      Mr. Jacobs had asked you about conversations you had

9   with Mr. Lyons after the confiscation of the materials on

10  September 15th, 2003.  And there was also testimony from

11  Mr. Lyons that at some point during those conversations you

12  told him that you would have been a fool to give those

13  materials back to Mr. Jacobs, because you were named in some

14  pending lawsuit or outline of a lawsuit.

15          Did that happen?

16  A.      No, sir; absolutely not.

17  Q.      How can you be sure that didn't happen?

18  A.      I -- first of all, it's already been testified that I

19  had a sit-down conversation with Mr. Lyons in my office.  If I

20  were to engage in some type of malfeasance with Mr. Lyons,

21  certainly that type of conversation wouldn't have happened in

22  that environment.  I have no recollection of having any

23  conversation about being a fool to any inmate; Mr. Lyons or

24  otherwise.

25  Q.      And would it have been your policy or practice at that

1  time to withhold documents from inmates in retaliation for

2  proposed litigation against you?

3  A.     As I've previously testified, it's not who I am and

4  it's not what I do.

5  Q.     Mr. Jacobs had questioned you about the inmate request

6  form that was submitted to and responded by Captain McConnell.

7  And just to be clear, did you ever direct that, to anyone,

8  from Captain McConnell, or anybody else in the Department of

9  Corrections, did you ever direct that the documents taken from

10  Eric Lyons be destroyed because your name was in the papers?

11  A.     No, sir.

12  Q.     With regard to the document that had been up there

13  indicating that as of September 14th, 2003, you couldn't

14  recall what the document -- whether the documents were the

15  same or what the result of those where.

16         Do you recall that testimony regarding that document?

17  A.     Yes, sir.  I believe you're speaking of my grievance

18  response to his grievance filed.

19  Q.     Now, this would have been the written deposition

20  responses?

21  A.     Okay; the interrogatories.

22         MR. BRADLEY:  And for the record, that would have

23  been Plaintiff's Exhibit 27, just so everyone is clear.

24  BY MR. BRADLEY:

25  A.     That would have been my answer to Question 1 on that

1  document.  Yes, I recall.

2  Q.      And September 14th, 2006, where were you assigned?

3  A.      I believe SCI Fayette.

4  Q.      And do you know what the status of SCI Pittsburgh was

5  at that time?

6  A.      It was closed, if I recall correctly.  "Moth-balled"

7  was the official term used.

8  Q.      This has been previously marked as Exhibit 2, and I

9  think we all agree this is the response you provided to

10  Mr. Jacobs in response to his grievance at No. 63417.

11      Is that correct?

12  A.      Yes, sir.

13  Q.      I don't know that the word's expressly been used, but

14  would you agree that what you wrote -- as of today, what you

15  wrote there was a mistake?

16  A.      That is correct.  And I previously testified, I

17  believe, I errored in my response on this document.

18  Q.      When you wrote that document, did you believe you were

19  putting accurate information in that document?

20  A.      Without question.

21  Q.      Were you attempting to falsify that document when you

22  wrote it?

23  A.      I was not.

24  Q.      And that response, was it made as part of an overall

25  conspiracy with any of the other defendants in this case to

1    bury this incident, or hide the fact that materials were taken

2    from Mr. Lyons?

3    A.     No.  And my response to the deposition Question 1 that

4    has previously been asked was consistent with my response on

5    that document.  I was unable to locate any documents that

6    refer to what he was asking in his grievance.  Therefore, I

7    had no option but to believe that he was fabricating the

8    story, and I admonished him for that in my response on this

9    particular document.

10   Q.     And you actually, when you got that grievance to

11   review, and when you prepared your response, isn't it true

12   that you -- actually, you didn't just write "denied" on it;

13   did you?

14   A.     I did an investigation.  I looked for documents.  I

15   reviewed DOC.net.  I reviewed his, what we refer to DC 17-X,

16   which is his block file, which would have possibly any

17   pertinent information that I would be able to find misconduct

18   numbers, too, to use that number to reveal via the computer.

19   There was nothing related in there to the Lyons' incident.  I

20   can't recall if I looked in Lyons' file or not.

21          But again, because there was no final disposition on

22   that informal resolution, that document would not have been in

23   there.  So, I had no recourse but to assume that the document

24   was -- I mean, that his allegations were false.  And I

25   responded in kind to that.

1          MR. BRADLEY:  Thank you, sir.  That's all the

2   questions I have.

3                      RECROSS EXAMINATION

4   BY MR. JACOBS:

5   Q.      I want to draw your attention to the first two

6   sentences of this particular response.  You see that?

7   A.      Okay.

8   Q.      So, at least that portion of my complaint was verified

9   by you; correct?

10  A.      Okay.

11  Q.      Yes?

12  A.      Okay.

13  Q.      Yes, or, no?

14  A.      Yes.

15  Q.      And it states that a search was conducted of

16  Inmate Lyons upon completion of law library time?

17  A.      Okay.

18  Q.      Lyons was found in possession of another inmate's

19  property.

20  A.      Okay.

21  Q.      You said that you did an investigation; correct?

22  A.      Correct.

23  Q.      And you also review documents?

24  A.      Correct.

25  Q.      And you would have had to, have had to review the

1  misconduct report in order to validate that allegation?

2  A.     I would suggest that because it was a day later, I'm

3  assuming that I had some direct recall of the process with

4  Lyons.  That was probably pretty fresh in my mind at that

5  time.

6  Q.     The grievance concerns documents taken from Mr. Lyons;

7  correct?

8  A.     Correct.

9  Q.     And you stated that all the prisoners in the LTSU have

10 a personal file?

11 A.     Every inmate in the Department of Corrections has an

12 inmate file.

13 Q.     Okay.  So, being as though I stated in the complaint

14 that the documents were not taken from me, they were taken

15 from Mr. Lyons.

16 A.     Um-hum?

17 Q.     Wouldn't that be in Mr. Lyons' file?

18 A.     Probably.  That's why I suggested I may have reviewed

19 his file.

20 Q.     Wouldn't that be a part of your investigation?

21 A.     Probably.

22 Q.     And you would have found the document, the misconduct

23 that was issued to Mr. Lyons on September 15th, 2003?

24 A.     Not necessarily.  It was informal resolution.  And I

25 think we've already reviewed that document, and I had showed

1   that there was no disposition on the document.  So, we don't

2   place it in the file until final disposition, because, then,

3   it has a few documents, the process it went through and the

4   final disposition.

5   Q.     So you validated my claim that documents were found in

6   Mr. Lyons' possession?

7   A.     In my response; that is correct.

8   Q.     So, you knew what incident I was talking about?

9   A.     I probably did, yes.

10  Q.     And you knew that that wasn't the same incident that

11  happened from September 16th, 2003; you knew that?

12  A.     What I knew was that the only confiscated documents I

13  could find were the two pages.  So obviously, I confused at

14  that time the Lyons' incident, where we were seizing what has

15  been testified to as 151 pages, with the two pages, the

16  confiscation slip that I could find on the two pages seized

17  from you.  That, I believe, is where my confusion sat.

18  Q.     Okay.  And you state that your claim of 151 pages is an

19  outright fabrication and subject to misconduct for lying.

20  A.     That is correct.  But I don't recall you being issued a

21  misconduct.

22  Q.     Because I wasn't lying; right?

23  A.     In hindsight, you were not.

24  Q.     And as far as SCI Pittsburgh being closed

25  September 14th, 2006, when you provided your response to the

1   interrogatories --

2   A.      Okay.

3   Q.      -- you all don't just leave the documents in the jail;

4   do you?

5   A.      It was moth-balled.  There was a security contingency

6   there.  So, I don't know.

7   Q.      I'm saying, well, you know, security, you agree that

8   the Security Department handles a lot of very sensitive

9   material?

10  A.      Correct.

11  Q.      Things that are held in the Security Department?

12  A.      I would suggest, yes.

13  Q.      Including anything labeled "contraband" that is sent to

14  the Security Department?

15  A.      Not necessarily.  If the contraband is destroyed, it's

16  destroyed.

17  Q.      I mean, the -- if it's labeled "contraband" and sent to

18  the Security Department, there's some type of documentation

19  that --

20  A.      You would have to ask someone that worked in the

21  SCI Pittsburgh Security Office.  I can't speak to that.

22  Q.      Okay.  So, you don't know nothing about --

23  A.      I don't know what kind of record-keeping they

24  maintained at SCI Pittsburgh with reference to the Security

25  Department.

1   Q.      Okay.  You we present for the testimony of Mr. Banks?

2   A.      Yes.

3   Q.      You were present for the testimony of Mr. Lyons?

4   A.      Yes.

5   Q.      And you also were present for the testimony of

6   Mr. Edwards?

7   A.      Yes.

8   Q.      Did you recall the testimony of Mr. Banks that you

9   retaliated against him?

10  A.      I recall when he said he could "fish" and get documents

11  from one inmate to another, and as long as you didn't get

12  caught, it was okay.  Is that what you're referring to?

13  Q.      Do you recall, do you recall his testimony that you

14  took legal property from him before?

15  A.      I remember him saying something like that's what we do,

16  we take all their property and destroy it, if that's what

17  you're referring to.

18  Q.      Do you recall Mr. Lyons' testimony that legal property

19  was taken from prisoners on so many occasions that he couldn't

20  even identify a number?

21  A.      No.

22  Q.      Do you recall the testimony of Mr. Edwards that you

23  retaliated against him for attempting to be a witness?

24  A.      No.

25  Q.      That you intimidated him?

```
 1   A.      No.  I didn't do that, if that's your question.

 2   Q.      You didn't do it?

 3   A.      No.

 4   Q.      I'm saying, do you recall his testimony to that effect?

 5   A.      What's referenced to me, no.  If he's talking about

 6   Department as a whole, yes.  But specifically to me, no, I

 7   don't recall that.

 8   Q.      Isn't it true that any allegation a prisoner makes

 9   against you, you deny it?

10   A.      No.

11   Q.      And you know if you deny it, it's going to be supported

12   all the way up the ladder, through the Department of

13   Corrections?

14   A.      Can I provide you with an example of where that's

15   incorrect?

16   Q.      No.  I just want a, yes, or, no.

17   A.      Then that -- that's incorrect.

18   Q.      You don't care what you put on the document?

19   A.      That's incorrect.

20   Q.      You testified that Mr. Lyons; statement that you told

21   him you would have been a fool to return his legal documents

22   is false?

23   A.      That is correct.

24   Q.      And Mr. Bank's testimony that his property was being

25   taken in the LTSU was that false?
```

1    A.      I don't recall Mr. Banks stating that.  I recall him

2    saying that he went in a restriction when his property was

3    removed, and at some point that property was returned to him,

4    all of it.

5    Q.      You don't recall Mr. Banks' testimony that he's filed

6    over 300 grievances?

7    A.      I do recall that, yes.

8    Q.      Were any of those grievances against you?

9    A.      I would say, yes.

10   Q.      Were any of those grievances reviewed by you?

11   A.      I can't speak to that.  I know I've responded to Banks'

12   grievances, but any that were -- that specifically included

13   me, I don't know.

14   Q.      And you denied it?

15   A.      Denied what?

16   Q.      His grievance.

17   A.      I couldn't tell you.  If you have a copy of a

18   grievance.

19              MR. JACOBS:  No further questions.

20              MR. BRADLEY:  Just one question.

21                      REDIRECT EXAMINATION

22   BY MR. BRADLEY:

23   Q.      You wanted to provide Mr. Jacobs with an example of one

24   of the issues you took with him.

25   A.      Yes.

1    Q.      Can you provide that example, please.

2    A.      I had a specific situation with an inmate in the RHU

3    L-5 unit where a misconduct was issued for destruction of

4    State property.  This would have occurred sometime in 2000,

5    and -- it would have occurred sometime in about '99.  I was

6    still a sergeant.  The inmate was issued a misconduct and

7    sanctioned by the hearing examiner for the misconduct.

8           Subsequently -- the inmate's name was Willie McKenna;

9    long-term RHU inmate.  Subsequently, I became knowledgeable

10   that that inmate had, in fact, not committed that misconduct,

11   and I went through a three- or four-month process to have that

12   misconduct withdrawn from his record, to include a written

13   statement that the misconduct was written erroneously on that

14   inmate, based upon information that we later became

15   knowledgeable that it was false.

16          And it took a long, tedious process, all the way up to

17   Central Office.  But in the end, the misconduct was withdrawn

18   from his record.  You couldn't do anything about the sanction,

19   but because he had years of disciplinary custody time, the

20   sanction was irrelevant any way.  But the misconduct was

21   withdrawn from his record at my behest, because I found out

22   that we were wrong in issuing that misconduct to that inmate.

23              MR. BRADLEY:  No further questions.

24                       RECROSS EXAMINATION

25   BY MR. JACOBS:

1    Q.      What about all the stuff in my file?  I'm making --

2    fabricating allegations.  Did you ever take any steps to have

3    this stuff removed from my record?

4    A.      It's no different than the multiple civil cases you're

5    filling against me.

6            THE COURT:  Do you wish to have that last answer

7    stricken?

8    BY MR. JACOBS:

9    Q.      I'm going to draw your attention to this specific

10   response right here.  Did you take any type of steps to have

11   this removed from my record?

12   A.      At the point which I became aware?

13   Q.      Yes, or, no?

14   A.      No, I have not.

15   Q.      And you know this statement to be false?

16   A.      I do at this time, yes.

17           MR. JACOBS:  No further questions.

18           MR. BRADLEY:  That's all, Your Honor.  Thank you.

19           THE COURT:  Witness is excused.

20           This might be a good time for our morning recess.

21           Would everyone please rise to excuse the jury (.

22           (Whereupon, jury retires.)

23           THE COURT:  We'll be in recess.

24           MR. JACOBS:  I have something to raise.

25           THE COURT:  Okay.

1          MR. JACOBS:  My witness, Alton Brown, is being

2    psychologically tortured at SCI Pittsburgh.  I believe this is

3    being used to intimidate him and his testimony in the upcoming

4    case.

5          THE COURT:  Which case is that; which one?

6          MR. JACOBS:  04-1592.

7          THE COURT:  Okay.

8          MR. JACOBS:  He being held on a psychiatric ward

9    around psychiatric patients, and he's not a psychiatric

10   patient.

11         MR. WILLIG:  The last I heard, Your Honor -- I'll

12   have to look into it -- that we brought his three witnesses in

13   1592, we writted them out.  And we can't keep them all in

14   Pittsburgh, because Pittsburgh isn't a maximum security

15   facility.  So, we kept Mr. Brown, Mr. Jacobs at Pittsburgh,

16   and two others we sent to Fayette, and last I heard, Mr. Brown

17   was going to be housed in the infirmary, because they couldn't

18   put him in anywhere else.  But I don't know that to be a fact.

19   I'll have to check into it.

20         THE COURT:  Okay.  Please check into it, because we

21   may not get to that case, in any event.  That's a matter of

22   timing.  So, if you could look into that, and then, report

23   back to me after the break, I would appreciate it.

24         Anything else?

25         MR. JACOBS:  No, Your Honor.

1          THE COURT:  Okay.  Thank you.

2          (Whereupon, court recessed at 10:55 a.m.)

3                          * * * * *

4          SHARON CONLEY, Deputy Clerk:  All rise.

5          THE COURT:  Please be seated.  Mr. Bradley, do you

6     have your next witness?

7          MR. BRADLEY:  Yes, Your Honor.  The defendants call

8     Officer Frank Chirico.

9          THE COURT:  If the witness would please come

10    forward, and stand an be sworn.

11         SHARON CONLEY, Deputy Clerk:  Please raise your

12    right hand.

13         THE WITNESS:  I do.

14         THE COURT:  Would you please take the witness stand.

15                         * * * * *

16              FRANK CHIRICO, a witness herein, having

17    been first duly sworn, testified as follows:

18                      DIRECT EXAMINATION

19    BY MR. BRADLEY:

20    Q.    Please state your name again, and spell your last name

21    for the record.

22    A.    Frank Chirico, C-H-I-R-I-C-O.

23    Q.    What is your present occupation?

24    A.    Corrections officer.

25    Q.    Where you currently assigned?

1   A.      SCI Pittsburgh.

2   Q.      How long have you been a corrections officer?

3   A.      A little over seven years.

4   Q.      And can you tell the jury how you started your career,

5   what position you started your career with the Department of

6   Corrections?

7   A.      I started in August, 2001 as a corrections officer

8   trainee.  I was a trainee for a year.  I transferred over to

9   Corrections Officer 1 at Pittsburgh.

10  Q.      And have you been at SCI Pittsburgh continuously since

11  you started with the Department?

12  A.      No.

13  Q.      Can you explain to the jury what other assignments

14  you've had?

15  A.      I was transferred to State Corrections Institute in

16  Forest Grove for a while, and then, I returned to Pittsburgh

17  last year.

18  Q.      What was your position where were you assigned in

19  September of 2003?

20  A.      I was in SCI Pittsburgh in the A-300 LTSU.

21  Q.      As of September, 2003, how long had you been assigned

22  to the LTSU?

23  A.      I'm not sure of the exact time.  Probably six, seven,

24  eight months.

25  Q.      What duties and responsibilities did you have as a

1  Corrections Officer 1 in the LTSU in 2003?

2  A.    I was assigned to the 1:00 to 9:00 crew, which we

3  did -- there was two of us.  We did showers Monday, Wednesday

4  and Friday, property Tuesday and Thursday, and we assisted the

5  2:00 to 10:00 crew with feeding, any other medical trips, law

6  library trips.

7  Q.    Do you recall coming into contact with Inmate Eric

8  Lyons on September 15th, 2003?

9  A.    Yes.

10  Q.    Can you explain to the jury how that came about?

11  A.    Yeah.  Mr. Lyons signed up to go to the A-300 law

12  library.  Myself and Officer Wyza made contact with him in his

13  cell.  I opened the inmate's pie slot.  He passed his stuff,

14  his material he was taking.  I passed it off to Officer Wyza

15  to be searched.  I then conducted a strip search of

16  Inmate Lyons, handcuffed him, and had his door cracked.  We

17  escorted him to the law library, put him in the library,

18  secured him, gave him his material.

19  Q.    And at that time did you leave him in the law library

20  for a period of time?

21  A.    Yes.  I think it was two hours.

22  Q.    And at the conclusion of his law library time, would

23  you go back to take him from the law library back to his cell?

24  A.    Yes.

25  Q.    Is that what you did?

1   A.      Yes.

2   Q.      Can you explain to the jury what happened in the course

3   of that process?

4   A.      It was pretty much the same thing.  He passed his

5   material out to be searched.  I searched it.  Officer Wyza

6   handcuffed him, then, we escorted him back to his cell.

7   Q.      During the search, did you discover anything?

8   A.      Yes, I found 151 pages of material belonging to

9   Inmate Jacobs in possession of, you know -- Mr. Lyons had it

10  in a, I think it was a folder.  And I looked through it and I

11  seen Inmate Jacobs' name on it.

12  Q.      Were all 151 pages actual legal documents, or was there

13  anything else amongst the papers?

14  A.      I don't remember at this time.

15  Q.      When you saw the information with Mr. Jacobs' name on

16  it, what did you do; what did you think?

17  A.      I asked Inmate Lyons, what was he doing with this

18  material, and he said he was doing a law -- or legal work for

19  assisting Inmate Jacobs.

20          I also, I advised him he was in possession of

21  contraband, because you're not allowed to possess another

22  inmate's material, and I confiscated it.

23  Q.      Do you recall if Mr. Lyons had other legal materials

24  with him at that time?

25  A.      He had his own, own material.

1   Q.     So, there was his own material, and there was the

2   151 pages you identified as Mr. Jacobs' materials?

3   A.     Yes.

4   Q.     What did you do with Mr. Lyons' materials?

5   A.     He retained it.  He took it back to his cell.

6   Q.     You didn't confiscate those?

7   A.     No.

8   Q.     You indicated that you informed Mr. Lyons he was in

9   possession of contraband.  And just so we're clear, can you

10   explain to the jury why you believed that to be contraband at

11   the time?

12   A.     Well, just because it had Inmate Jacobs' name on it.

13   That's the only reason I thought.

14   Q.     And at that time was that considered to be property of

15   another inmate?

16   A.     Yes.

17   Q.     And was Mr. Lyons authorized to have that property?

18   A.     No.

19   Q.     Showing you what's been marked previously as

20   Plaintiff's Exhibit No. 6.

21          Do you recognize this?

22   A.     Yes.

23   Q.     What is it?

24   A.     It's a misconduct I issued to Inmate Lyons.

25   Q.     Your name and signature appear on this document?

1    A.      Yes, on the bottom, left-hand corner.

2    Q.      That was issued on September 15th, 2003?

3    A.      Yes.

4    Q.      This exhibit contains a second page.  Can you identify

5    that page?

6    A.      Yeah.  It's the confiscation sheet I issued

7    Inmate Lyons.

8    Q.      Does that indicate 151 pages of legal materials

9    belonging to Jacobs was taken?

10   A.      Yes.

11   Q.      And under disposition, what does it say?

12   A.      Sent to security.

13   Q.      Did you physically take it to security, or did you just

14   move that process forward?

15   A.      I don't remember actually walking it over, but I do

16   remember it was sent out.

17   Q.      Would that have been sent out at about that time,

18   September 15th, 2003?

19   A.      It would have been sent out during that shift.

20   Q.      Pardon me?

21   A.      During that shift, it would have been sent out.

22   Q.      When you first took Mr. Lyons out of his cell to take

23   him to the law library, you indicated that you had passed the

24   materials to Officer Wyza?

25   A.      Yes.

1    Q.      Did you search the materials at that time?

2    A.      No.  Not coming out, no.

3    Q.      Did Officer -- did Officer Wyza indicate to you at that

4    time that Mr. Lyons was in possession of legal materials of

5    another inmate?

6    A.      No.

7    Q.      While Mr. Lyons was in the law library, did you go to

8    Lieutenant Giddens and have any conversations with him about

9    seeing legal materials from Andre Jacobs that had specifically

10   Lieutenant Giddens' name on it?

11   A.      No.

12   Q.      Once you issued the misconduct and the confiscation

13   slip, did you have any further contact with those papers?

14   A.      No.

15   Q.      Did you have any conversations with Mr. Lyons or

16   Mr. Jacobs about those materials?

17   A.      No.

18   Q.      Did anybody in the course -- after you took the

19   materials, did anybody tell you to do anything or take any

20   action because Mr. Jacobs was planning on filing a lawsuit

21   against various personnel at SCI Pittsburgh?

22   A.      No.  SCI --

23   Q.      At any point thereafter, on September 15th or

24   September 16th, did you go to Eric Lyons' cell and search

25   for the misconduct you had written?

1   A.      No.

2   Q.      Were you involved in the search of Mr. Jacobs' cell the

3   next day, September 16th, 2003?

4   A.      Yes.

5   Q.      Tell the jury the -- first off, is it unusual that an

6   inmate's cell is searched in the LTSU?

7   A.      No, it's not unusual at all.

8   Q.      Is it a frequent occurrence?

9   A.      Yes.

10  Q.      Prior to searching Mr. Jacobs' cell on

11  September 16th, 2003, did anybody direct you or tell you

12  that the reason we're going to do this is because Mr. Jacobs

13  may be filing a lawsuit against other DOC personnel at SCI

14  Pittsburgh?

15  A.      No.

16  Q.      Did anybody tell you you were to look for the

17  misconduct you had previously written for Mr. Lyons?

18  A.      No.

19  Q.      Would you tell the jury what you remember about the

20  search of Mr. Jacobs' cell on September 16th, 2003?

21  A.      Well, I vaguely remember searching the cell, but as for

22  my part, I didn't find anything.  I just searched half the

23  cell, the area I was assigned to search, and that was it.  I

24  don't remember what was found or anything.

25  Q.      And you, you have no recollection of yourself finding

1  anything that would have required you to bring it to the

2  attention of your superiors?

3  A.      No.

4  Q.      There's been testimony generally from other inmates in

5  the LTSU during this trial.  Have you been present for that?

6  A.      Yes.

7  Q.      Have you ever taken any action with respect to any

8  inmates in the LTSU because they have filed grievances or

9  lawsuits?

10 A.      No.

11 Q.      Did you take any action that we've discussed, or that

12 we haven't discussed, with regard to Mr. Jacobs, based on the

13 fact that Mr. Jacobs had filed grievances?

14 A.      No.

15 Q.      Have you taken any action with respect to Mr. Jacobs

16 based on the fact he filed a lawsuit against other DOC

17 personnel from another institution?

18 A.      No.

19 Q.      Did you tell or encourage anybody to do anything with

20 regard to the property that was taken from Inmate Lyons on

21 September 15th, and from Inmate Jacobs on September 16th,

22 as part of a conspiracy or an agreement to retaliate against

23 Mr. Jacobs?

24 A.      No.

25 Q.      Did you do so as part of a conspiracy or agreement to

1    deprive Mr. Jacobs of his constitutional rights?

2    A.      No.

3    Q.      Inmate Banks had testified specifically that you and

4    Lieutenant Giddens had deprived him of his legal property

5    sometime in 2002, because he had filed grievances and

6    lawsuits.

7            Did you do that?

8    A.      I don't remember ever confiscating anything off of

9    Banks.

10   Q.      Showing you what's been previously marked as

11   Plaintiff's Exhibit 8.

12           Do you recognize that as a DOC inmate grievance form?

13   A.      Yes.

14   Q.      That's from August 4th of 2003?

15   A.      Yes.

16   Q.      Submitted by Andre Jacobs.

17           Do you recall this grievance and the circumstances

18   surrounding it?

19   A.      No, I don't recall that at all.

20   Q.      You don't recall this event?  In it, Mr. Jacobs says

21   that -- I believe that's intended to refer to you --

22   CO Charokoe, C-H-A-R-O-K-O-E, and Lieutenant Giddens ransacked

23   the cell and retrieved a stack of legal documents and left the

24   pod.

25           Did you ever take -- on or about August 4th, 2003, did

1   you ever take legal documents from Mr. Jacobs?

2   A.      No, I don't recall that at all.

3          MR. BRADLEY:  That's all the questions I have.

4   Thank you.

5                      CROSS EXAMINATION

6   BY MR. JACOBS:

7   Q.      You stated you don't remember that incident, or you

8   saying that it didn't happen at all?

9   A.      I'm saying I don't remember it.

10  Q.      Okay.  You also stated you don't remember ever taking

11  property from Mr. Banks; correct?

12  A.      That's correct.

13  Q.      You don't remember taking property from anyone; do you?

14  A.      Ah, not -- if I took property, there was a confiscation

15  sheet with it.

16  Q.      But you don't remember?

17  A.      No, I don't remember.

18  Q.      Okay.  You stated that cell searches in the LTSU were

19  frequent; correct?

20  A.      Correct.

21  Q.      How frequent?

22  A.      They were supposed to be done once a month.

23  Q.      Once a month.

24  A.      If I remember policy correct, once a month.

25  Q.      At least once a month?

1  A.      At least once a month.

2  Q.      Giddens said at least twice a month.

3  A.      That's what Lieutenant Giddens remembers.  I remember

4  it once a month.

5  Q.      Okay.

6  A.      That was five years ago.

7  Q.      Okay.  And you agree with me, that prisoners in the

8  LTSU are always allowed to have legal material and religious

9  material?

10  A.      No.  You can have more property than that.  You have

11  personal stuff you can have, not just legal and religious.

12  Q.      Personal.  When you say "personal", you mean?  I mean,

13  you wasn't allowed to have pictures; correct?

14  A.      I don't remember.  I don't recall.

15  Q.      Weren't allowed to have magazines?

16  A.      I don't know.

17  Q.      Weren't allowed to have a television?

18  A.      No, no television.

19  Q.      You weren't allowed to have a radio?

20  A.      No.

21  Q.      So, when these cell searches were being conducted, the

22  only thing you all are really looking for is legal documents?

23  A.      No.

24  Q.      That's the only thing there to take.

25  A.      We were looking for any contraband.

1    Q.     Any contraband.

2           You stated that policy dictates that a prisoner is not

3    allowed to assist another prisoner with legal matters;

4    correct?

5    A.     Correct.

6    Q.     What policy is that, do you know?

7    A.     I'm not sure.

8    Q.     Well, what policy would address things of that nature?

9    A.     I think it's a DC ADMIN-007.  I'm not familiar with

10   that policy.

11   Q.     Would that be access to provide legal services?

12   A.     I'm not -- I don't know.

13   Q.     I'm showing you what's been marked as Plaintiff's

14   Exhibit No. 28.  Is that the DC-ADMIN 007 you just referred

15   to?

16   A.     Yes.

17   Q.     Are you familiar with that policy?

18   A.     Like I stated, at a glance, I'm not familiar with it.

19   Q.     As a Department of Corrections employee, isn't it a

20   part of your duty to know the policies?

21   A.     I don't know all the policies.

22   Q.     I understand that.  Isn't it part of your duty to

23   familiarize yourself with the policies.

24   A.     Yes, it is.

25   Q.     And this is the policy that you acted on in you taking

1   the documents from Mr. Lyons; correct?

2   A.      I acted on a policy that you're not allowed to possess

3   another inmate's property, which Lyons had your property.

4   Q.      Showing you what's been marked as Plaintiff's Exhibit

5   No. 6.  Do you see in there where you state that, in

6   accordance with DOC policy you cannot possess another inmate's

7   legal work unless recognized as a legal aid?

8   A.      Yes.

9   Q.      And the policy governing legal aids and legal access is

10  this particular policy; isn't it?

11  A.      Yes.

12  Q.      Could you show me in that policy where it states that

13  prisoners are not allowed to assist each other with legal

14  work?

15  A.      I'd have to see the policy.  I can't remember it.

16          What was your question?

17  Q.      I asked you to show me in that policy where it states

18  that a prisoner who is not a legal aide cannot assist another

19  prisoner with legal work.

20  A.      There's a section here for selection of inmates.  Since

21  you pick Inmate Lyons, he doesn't qualify; he's not a

22  qualified legal aid at the time.

23  Q.      Can you show me in that policy where it states that a

24  prisoner cannot assist another prisoner with legal work?

25  A.      No, I don't see nothing.

1   Q.      Were you -- were you present for the testimony of

2   Mr. Beard?

3   A.      Yes.

4   Q.      Do you know who Mr. Beard is?

5   A.      He's the Secretary of Corrections.

6   Q.      You recall his testimony about a prisoner being able to

7   assist another prisoner with legal work?

8   A.      Yes, I do.

9   Q.      So, it isn't the policy that a prisoner cannot assist

10  another prisoner with legal work?

11  A.      An inmate can assist another inmate with legal work, as

12  long as he's qualified.

13  Q.      Well, Mr. Beard --

14  A.      Eric Lyons wasn't.

15  Q.      Mr. Beard didn't say anything about having to be

16  qualified.  Do you remember him saying anything about having

17  to be qualified?

18  A.      No.

19  Q.      Do you agree with me, that it is not the policy that a

20  prisoner cannot assist another prisoner with legal work?

21  A.      Say that again.

22  Q.      It is not the policy that a prisoner cannot assist

23  another prisoner with legal work?

24  A.      No.

25  Q.      It wasn't the policy at the time in question; was it?

1   A.      The policy is right here.

2   Q.      And it's not in there; correct?

3   A.      Right.

4   Q.      So your reference, your reference to the policy of the

5   DOC was incorrect.  Would you agree with me on that?

6   A.      No.  At the time I thought I was going by policy.

7   Q.      And now you see in the policy that that was incorrect?

8   A.      I guess, yes.

9   Q.      And in fact, you made a reference to a DOC policy as a

10  pretext to label that material contraband.

11  A.      Right.

12  Q.      Right?

13  A.      Yes.

14  Q.      And that was based on the fact that you saw

15  Defendant Giddens' name mentioned in the legal documents?

16  A.      No, that's not correct.

17  Q.      And you work with Defendant Giddens?

18  A.      Yes.

19  Q.      And you've known Defendant Giddens for a long time;

20  correct?

21  A.      Yes.

22  Q.      You didn't like the fact that I was preparing a legal

23  action against Defendant Giddens?

24  A.      That's not correct.

25  Q.      You didn't care whether or not he violated my rights or

1   not?

2   A.      Yes, I did care, but I didn't see anybody violating

3   anybody's rights.

4   Q.      But you just wanted to assist him in stopping me from

5   bringing that claim?

6   A.      That's incorrect.

7   Q.      So you took these documents, right?

8   A.      Yes.

9   Q.      You did take the documents?

10  A.      I confiscated them, yes.

11  Q.      And you erroneously labeled them "contraband".

12  A.      No, I didn't.

13  Q.      You incorrectly labeled them "contraband"?

14  A.      No, I didn't.

15  Q.      You used the pretext that inmates are not allowed to

16  assist each other with legal work?

17  A.      Okay.

18  Q.      You did?

19         MR. BRADLEY:  Your Honor, I'm not sure he

20  understands what the word "pretext" means.

21         THE COURT:  Repeat your question.

22  BY MR. JACOBS:

23  Q.      The basis of your taking those documents, according to

24  this document, was that the DOC policy stated that prisoners

25  are not allowed to assist each other with legal work.

1   A.      Correct.

2   Q.      But you agree with me that that wasn't the policy?

3   A.      I said that a qualified inmate could assist you.  I

4   didn't say inmates couldn't help each other with legal work.

5   I didn't feel at the time Inmate Lyons was a qualified legal

6   aide.  That's why I took them.  They were contraband.

7   Q.      But your whole purpose, but your whole purpose was to

8   interfere with those legal documents?

9   A.      No, it wasn't.

10  Q.      And with me pursuing what was in those legal documents?

11  A.      No, it wasn't.

12  Q.      Well, you knew that those legal documents not being

13  returned to me would interfere with my right of access to the

14  Courts?

15  A.      No, I didn't.

16  Q.      You didn't know that?

17  A.      No.

18  Q.      You know that now?

19  A.      Ah, that's what I've heard in testimony.  I didn't know

20  it at the time.  I know nothing about the law, nothing.

21  Q.      But you know about the policies; correct?

22  A.      Correct.

23  Q.      You know that prisoners are allowed to have legal

24  material; correct?

25  A.      Yes.

1    Q.      You stated that -- when did your involvement in receipt

2    of these documents end?

3    A.      What do you mean?

4    Q.      At what point did you disassociate yourself with these

5    documents that were taken on the screen right now, the

6    151 pages?

7    A.      That was that day.

8    Q.      So, you agreed to have those documents sent to the

9    Security Department?

10   A.      Yes.

11   Q.      And you, in fact, put that process in motion?

12   A.      I guess, yes.

13   Q.      You issued the confiscation slip; correct?

14   A.      Yes, I did.

15   Q.      You stated on there that those documents would be sent

16   to the Security Department?

17   A.      Yes.

18   Q.      But then, you also stated that after that no one talked

19   to you about these documents?

20   A.      That's correct.

21   Q.      And you were present for the testimony of

22   Defendant Giddens; right?

23   A.      Yes.

24   Q.      He stated he did an investigation into my grievance.

25           Do you remember that testimony?

1   A.      Yes, I do.

2   Q.      And you were the person identified as taking the

3   documents from Mr. Lyons; right?

4   A.      Right.

5   Q.      But nobody never came and talked to you?

6   A.      I don't recall.  I don't remember.

7   Q.      And you don't recall Defendant Giddens ever coming to

8   talk to you about, inquire about those particular documents;

9   do you?

10  A.      He might have asked me what I took, but that's probably

11  all he asked me.  I cannot remember.

12  Q.      Do you remember him coming to you as part of a

13  grievance investigation?

14  A.      No, I don't recall.

15  Q.      And there wouldn't be any need for him to talk to you

16  about what the documents were, or what was the circumstances

17  of the seizure, because he already knew; didn't he?

18  A.      I don't know what he knew.

19  Q.      Well he, he testified that he participated in the

20  seizure of these documents, not the actual seizure, but the

21  agreement to send them to the Security Department.  So, he was

22  aware that, that the seizure took place; correct?

23  A.      I assume.

24  Q.      And he agreed that this particular misconduct was a

25  proper misconduct, as your supervisor; correct?

1    A.      I assume.

2    Q.      So, he knew about this, then?

3    A.      I assume.

4    Q.      You told him about the incident?

5    A.      I notified him I was writing a misconduct and what I

6    confiscated.  What happened after that, I don't recall.

7    Q.      And he reviewed the misconduct; correct?

8    A.      I don't know.

9    Q.      Isn't that the general practice, with him being your

10   supervisor?

11   A.      I showed it to him.

12   Q.      You showed it to him, so he knew about the incident?

13   A.      What he did after that, I don't know.

14   Q.      Okay.  You stated you didn't go to Mr. Lyons' cell on

15   September 16th, 2003 to search for the misconduct that was

16   issued, this particular misconduct?

17   A.      Right.

18   Q.      But Mr. Lyons' cell was searched; was it not?

19   A.      I don't remember.  I don't recall.

20   Q.      You don't remember?

21   A.      I don't recall.

22   Q.      Do you remember any of the other cells that were

23   searched on September 16th, 2003?

24   A.      I'm pretty sure it was the entire pod.

25   Q.      And if Mr. Lyons --

1   A.      Might have been the whole half of the unit.  I don't

2   remember.

3   Q.      And if Mr. Lyons was on that particular pod, that would

4   include him?

5   A.      Then he would have got searched, too.

6   Q.      Okay.  You heard the testimony of Mr. Banks that on

7   occasion you seized documents, legal documents from him, too;

8   correct?

9   A.      That's what he claims.

10  Q.      And that's not true?

11  A.      I don't recall.

12  Q.      You don't recall?

13  A.      Like I said, if I would have took something, I would

14  have gave him a sheet for it.

15  Q.      You don't recall?

16  A.      Don't recall.

17  Q.      Is there any other occasion you recall taking

18  prisoners' legal documents in the LTSU?

19  A.      Not specifically, no.

20  Q.      Destroying prisoners' legal property in the LTSU?

21  A.      I never destroyed nothing.

22  Q.      You never destroyed?

23  A.      No.

24  Q.      So, you always sent it to the Security Department?

25  A.      That's right.

1   Q.      And at that point, you're involvement with those

2   documents ceases?

3   A.      Yes.

4   Q.      How long did you say you worked in the LTSU?

5   A.      I think about a year.

6   Q.      You first went there in 2003?

7   A.      I think in early 2003.

8   Q.      Could you estimate how many cell searches you

9   participated in in that time frame?

10  A.      What, my entire year?

11  Q.      In the LTSU.

12  A.      A lot.

13  Q.      A lot.  Do you ever remember yourself or another prison

14  guard destroying the property of a LTSU prisoner?

15  A.      No, I don't.

16  Q.      Never happened?

17  A.      No.

18  Q.      Showing you what's been marked as Plaintiff's

19  Exhibit No. 8.  Do you know what that document is?

20  A.      It's an official inmate grievance.

21  Q.      Does that document refresh your recollection?

22  A.      No, it doesn't.  I don't remember.

23  Q.      You still don't remember?

24  A.      I don't remember that at all.

25  Q.      At all?

1    A.      No.

2    Q.      Whose decision was it to process Mr. Lyons' misconduct

3    for informal resolution, rather than formal resolution?

4    A.      That would be up to the shift commander, I assume.

5    Q.      Well, isn't that on the document, the person who writes

6    the document?

7    A.      Which document; on the misconduct?

8    Q.      The misconduct.

9    A.      I don't see the misconduct.

10   Q.      You see up in the top, on the top of the document where

11   it says, misconduct report, other DC-ADM 801 informal

12   resolution?

13   A.      Yeah, I see it.

14   Q.      Wouldn't a person writing a misconduct be the one to

15   identify in which way they want that misconduct to be

16   processed?

17   A.      No.  That was up to the shift commander.

18   Q.      So, the shift commander is the one that checked that

19   spot off?

20   A.      Yes.  I left them blank.

21   Q.      And is there any input from any of the people involved

22   on how the misconduct should be processed?

23   A.      What do you mean, "processed"?

24   Q.      For formal resolution or informal resolution; do you

25   have any input on that?

1   A.      That's not up to me.  I write the misconduct and turn

2   it in.  That's the shift commander's decision, what he does.

3   Q.      Do you have any input in it?

4   A.      I didn't.  My input is on the paper.

5   Q.      And do you have any idea what this determination is

6   based on?

7   A.      No.  No, I don't.

8   Q.      But you got Class 1 charges and you got Class 2

9   charges; correct?

10  A.      That's correct.

11  Q.      Wouldn't the nature of the charges factor into how the

12  misconduct is processed for formal or informal resolution?

13  A.      Yes, they would.

14  Q.      So, certain type of charges don't qualify for informal

15  resolution?

16  A.      That's right.

17  Q.      So, if a person -- if two prisoners receive the same

18  exact misconduct, in the same exact charges, would those

19  misconducts be processed differently?

20  A.      That's up to the shift commander.  I don't sign off on

21  that.

22  Q.      I'm asking you your understanding of the Class 1,

23  Class 2, informal/formal, and your understanding of the policy

24  and the processing the misconduct.

25  A.      I would assume, but that's not my decision.

1   Q.      Showing you what's been marked as Plaintiff's

2   Exhibit No. 7-A.  Do you see any difference between the

3   charges that were given to me and the charges that were given

4   to Mr. Lyons?

5   A.      They are the same, except for one charge.

6   Q.      The exact same charges; correct?

7   A.      They are not the exact same charges.

8   Q.      I mean, the one that you're saying, that's the same?

9   A.      Yes.

10  Q.      And Mr. Lyons had one additional charge?

11  A.      Yes.

12  Q.      So, Mr. Lyons had more charges than I had?

13  A.      Yes.

14  Q.      And my misconduct was processed for formal resolution.

15  You see that?

16  A.      I don't see it.

17  Q.      You see it now?

18  A.      Yes.

19  Q.      And Mr. Lyons' misconduct was processed for informal

20  resolution?

21  A.      Right.

22  Q.      This was based on you and Defendant Giddens'

23  understanding that informal resolutions were not documented in

24  the same way that formal resolutions were documented?

25  A.      I don't know how none of them are documented.  I don't

1   know nothing about that.

2   Q.      You don't know nothing about that?

3   A.      I write the misconduct and give it to the shift

4   commander.  That's the extent of it.

5   Q.      That's what defendant Giddens thought.

6   A.      Okay.

7   Q.      That the misconduct -- that the informal resolution and

8   formal resolution was not processed the same way.

9             MR. BRADLEY:  Your Honor, to the extent he's asking

10  what Lieutenant Giddens thought, I object.

11            THE COURT:  Sustained.

12  BY MR. JACOBS:

13  Q.      Were you present for the testimony of Mr. Giddens;

14  correct?

15  A.      Yes.

16  Q.      You recall his testimony that he believed that --

17            MR. BRADLEY:  Your Honor, his understanding, belief

18  about what Lieutenant Giddens' testified to is not relevant

19  here.

20            MR. JACOBS:  I'm not asking him his belief; I'm

21  asking him --

22            THE COURT:  Let him finish the question, and then,

23  I'll assess it.

24  BY MR. JACOBS:

25  Q.      Do you recall Defendant Giddens' testimony that he

1   believed that the informal resolution process was not the same

2   as the formal resolution process?

3   A.      Yes.

4           MR. BRADLEY:  Again, Your Honor, what he recalls

5   about another witness' testimony is not relevant.  It's the

6   jury's recollection that controls.

7           MR. JACOBS:  I'm moving on.

8           THE COURT:  Move on.  Okay, thank you.

9   BY MR. JACOBS:

10  Q.      So, you were going to process this misconduct in a way

11  you all thought you would be able to bury the misconduct?

12          MR. BRADLEY:  Your Honor, I'm going to object, to

13  the extent he already testified he didn't process this

14  misconduct.  He wrote it and gave it to the shift commander.

15          THE COURT:  Okay.  You need to rephrase your

16  question in a way that would be consistent with the answers,

17  and not to be --

18          MR. JACOBS:  He initiated the process.  He may not

19  have signed --

20          THE COURT:  Well, restate your question.

21  BY MR. JACOBS:

22  Q.      You initiated the processing of this grievance of the

23  misconduct in a way that you thought would be -- you would be

24  able to bury the misconduct?

25  A.      I didn't plan on burying nothing.

1   Q.      But as part of an amendment to the DC-ADM 801,

2   discipline policy, informal resolutions are to be processed

3   the same way as formal resolutions.

4           MR. BRADLEY:  Your Honor, there's no basis for that

5   question for this witness; no foundation.

6           MR. JACOBS:  It's in evidence.

7           THE COURT:  But you have to lay a foundation as to

8   his knowledge about it.

9   BY MR. JACOBS:

10  Q.      Are you familiar with the DC-ADM 801?

11  A.      Somewhat.

12  Q.      Well, that's the policy that gives you the authority to

13  write a misconduct; doesn't it?

14  A.      Yes.

15  Q.      And that is that authority that you processed the

16  misconduct under?

17  A.      I don't understand what you mean, "process".  I wrote

18  the misconduct.

19  Q.      Based on DC-ADM 801?

20  A.      Correct.

21  Q.      Inmate discipline?

22  A.      Yes.

23  Q.      So, you're aware of the existence of the DC-ADM 801?

24  A.      Excuse me?

25  Q.      You're aware of the DC-ADM 801?

1  A.      Yes.

2  Q.      Inmate discipline policy?

3  A.      Yes.

4  Q.      You were aware of it in, at the time in question?

5  A.      Yes.

6  Q.      You were not aware that the informal resolution is

7  supposed to be processed in the same way as the formal

8  resolution?

9  A.      Again, I don't process --

10  Q.      I'm not asking you --

11  A.      -- misconducts.  I might have been aware, but I don't

12  process them.  I hand it to the shift commander, and that's

13  the end of it.

14  Q.      Okay.  But you are not aware at the time in question

15  that the informal resolution was not processed in the same way

16  that the formal resolution is.  You were not aware of that

17  aspect of the policy?

18  A.      Apparently not.

19  Q.      Okay.  No further questions.

20                      REDIRECT EXAMINATION

21  BY MR. BRADLEY:

22  Q.      This is the misconduct you wrote to Eric Lyons on

23  September 15th, 2003; is that correct?

24  A.      Yes.

25  Q.      It's there in black and white?

1   A.      Yes.

2   Q.      And it's written down?

3   A.      Yes.

4   Q.      And you can see it?

5   A.      Yes.

6   Q.      And the jury can see it?

7   A.      Yes.

8   Q.      This misconduct was not buried; was it?

9   A.      No.

10  Q.      On your misconduct that you wrote to Eric Lyons for the

11  record marked as Plaintiff's Exhibit 6, can you identify the

12  shift commander who signed off on that?

13  A.      On which one?

14  Q.      On the one that you wrote.  It would be the one with

15  your signature on it.

16  A.      Captain Claiborne.

17  Q.      Although, your name appears on Plaintiff's

18  Exhibit 7-A -- just move that down to show the top box --

19  you're on there as other inmates or staff involved or

20  witnesses; is that correct?

21  A.      Yes.

22  Q.      All right.  But you didn't write this misconduct; is

23  that correct?

24  A.      No, I didn't write it.

25  Q.      Did you tell Sergeant Lynch to write this misconduct?

1    A.      No, I didn't.

2    Q.      Can you identify who the shift commander that signed

3    off on this misconduct is?

4            THE COURT:  You need to try to speak into the

5    microphone.

6    A.      I can't -- it looks like Forte.  I don't know if it's

7    Lieutenant or Captain Forte.  That's what it looks like.  I'm

8    not sure.

9    Q.      Is that different than Claiborne?

10   A.      Yes.

11   Q.      So, two different people signed off on these inmates?

12   A.      Yes.

13   Q.      Or misconducts.  And again, it's your testimony you

14   have no idea why one was processed for formal resolution and

15   the other was processed for informal resolution?

16   A.      I don't know.  It's not my decision.

17   Q.      You didn't have any discussions about that issue with

18   any of the defendants in this case; did you?

19   A.      No.

20   Q.      And you didn't ask anybody, whether a defendant or not

21   in this case, to process Mr. Lyons' misconduct for informal

22   resolution?

23   A.      No.

24   Q.      Mr. Jacobs had asked you if you could recall any other

25   incident where you confiscated legal material from an inmate.

1   If not for this lawsuit, would you have remembered the

2   incident on September 15th, 2003?

3   A.      No, I wouldn't.

4   Q.      Mr. Jacobs had asked you whether the reference to the

5   legal aide was done as a pretext to issue this misconduct and

6   confiscate the materials.

7           Did you understand what he meant by "pretext"?

8   A.      No.

9   Q.      Do you understand that "pretext" means a false reason?

10  A.      Okay.

11  Q.      When you wrote this misconduct, did you believe what

12  you wrote?

13  A.      Yes, I did.

14  Q.      Did you believe that Mr. Lyons was in violation of DOC

15  policy?

16  A.      Yes, I did.

17  Q.      You make the reference to legal aide, and I believe you

18  were talking about, in your review of Plaintiff's

19  Exhibit No. 28, selection of inmates.  Going to have that --

20  is that the page you were looking at?

21  A.      Yes, it is.

22  Q.      Is there something on that page that would indicate to

23  you that Mr. Lyons was not a recognized legal aide under the

24  policy?

25  A.      Well, there's a few of them.

1   Q.      Would you identify those for the jury?

2   A.      Well for.example. A, he had -- says, two years minimum

3   remaining.  He had a lot of time to do.

4        Not found guilty of a Class 1 misconduct within the

5   preceding nine months, which I believe he was.

6        C.  I don't think he was in the LTSU for six months at

7   the time.  And I don't know, I couldn't find anywhere if he

8   was approved by anybody to be doing that to begin with.

9   Q.      I also refer you to Item J on that list.

10  A.      Yeah.  He was in a Level 5 housing unit.

11  Q.      In fact, all the inmates in the LTSU were Level 5's?

12  A.      Yes.

13  Q.      Just based on that criteria, none of the other inmates

14  in the LTSU could be recognized legal aides under the

15  Department of Corrections policy; is that correct?

16  A.      No.

17  Q.      Mr. Jacobs had also asked you about the fact that these

18  inmates were only allowed to have religious and legal

19  materials, and I believe was suggesting that the only reason

20  you would be searching inmates' cells in the LTSU would be to

21  search for legal materials.

22       Has -- you've indicated that the cells are searched

23  frequently.  Has contraband, property of another inmate been

24  found in the course of cell searches in the LTSU?

25  A.      Yes.

1   Q.      What kind of contraband?

2   A.      Weapons.

3   Q.      Any other type of contraband?

4   A.      There's, ah, I remember an inmate was found in

5   possession of just all kind of personal information about a

6   lot of different people; credit card numbers, stuff.  There

7   was credit card numbers, birth date, Social Security numbers,

8   stuff like that.

9            MR. BRADLEY:  Nothing further.  Thank you.

10                    RECROSS EXAMINATION

11  BY MR. JACOBS:

12  Q.      In reference to the misconduct that was issued to

13  Mr. Lyons, you stated that that misconduct was not buried,

14  because it's documented; correct?

15  A.      Correct.

16  Q.      You attempted to bury that misconduct?

17  A.      No, I didn't.

18  Q.      And you were unable to bury that misconduct, because in

19  the cell search that you conducted, you did not find it?

20  A.      I didn't attempt to bury it at all.  I wrote it.  I

21  don't see why I would attempt to bury it.

22  Q.      You conducted the cell search of Mr. Lyons' cell.  You

23  attempted to find a document; correct?

24  A.      Say that again.

25  Q.      You searched Mr. Lyons' cell on September 16th, 2003.

1          You attempted to retrieve that misconduct and

2   confiscation slip; correct?

3   A.      Negative.

4   Q.      Then, when my cell was searched on September 16th,

5   2003, you attempted to retrieve that misconduct and

6   confiscation items and proceed --

7   A.      Negative.

8   Q.      -- because you figured, if Mr. Lyons didn't have it, I

9   would probably have it?

10  A.      I didn't think that at all.

11  Q.      But when that cell was searched, you did not discover

12  it?

13  A.      No.

14  Q.      But at that time, you were already stuck with the

15  grievance that was filed, as well as the document sent from

16  Mr. McConnell, verifying that you all did, in fact, have these

17  materials?

18  A.      Which paper is that?  I don't know what you're talking

19  about.

20  Q.      For the exhibit marked as Plaintiff's Exhibit No. 23.

21  A.      I don't know what that paper is.  I never seen it

22  before.

23  Q.      Okay.  So, there was documentation, other documentation

24  that these materials did exist?

25  A.      I don't know.  The only thing I know about the paper

1   existing was the confiscation sheet I gave.

2   Q.      You knew if you took that confiscation slip and that

3   misconduct out of the equation, I had no proof that those

4   documents were taken?

5   A.      I didn't attempt to take them.

6   Q.      I'm asking you, if you took that confiscated items

7   receipt and that misconduct that was issued to Mr. Lyons, I

8   would have no proof that those documents were taken?

9   A.      I don't think -- I don't know.

10  Q.      I mean, that's the only proof I was given at that time;

11  wasn't it?

12  A.      To you, yes.

13  Q.      Yes, to Mr. Lyons.

14  A.      Yeah.  There were just confiscation sheets.

15  Q.      And the misconduct.  And that was the only

16  documentation that existed?

17  A.      I assume.

18  Q.      And you and Defendant Giddens knew if you took those

19  two documents, I would have no evidence at all to prove that

20  you did -- that that incident did take place?

21  A.      I didn't think that when I went in for the cell search.

22  Q.      But I mean, you know that, though; don't you?

23  A.      I do now.

24  Q.      And that was why you all attempted to retrieve those

25  documents?

1   A.      I didn't attempt to retrieve any documents.

2   Q.      That was why you all attempted to bury the incident.

3   A.      I didn't attempt to bury nothing.

4   Q.      The reason you all went through with it is because you

5   all found out that Defendant McConnell -- that I had other

6   documentation that those documents did exist?

7   A.      I didn't know nothing about that.

8   Q.      I'm showing you what's been marked as Plaintiff's

9   Exhibit No. 7-A.

10          This misconduct is about -- did you take a moment to

11  review the document?

12  A.      Yes.

13  Q.      And this misconduct is about Defendant Lynch taking

14  documents from me that supposedly belonged to Gary Banks;

15  correct?

16  A.      That's what the misconduct says.

17  Q.      And Defendant Lynch identified you as somebody that was

18  involved in this search?

19  A.      That's right.  I was in the cell.

20  Q.      If you look to where it says, people involved and

21  people witness -- do you see that on the left side he checked,

22  after "I".  That indicates that you were involved; correct?

23  A.      That's what he has marked.

24  Q.      Too, if you look to the other side, it has your name

25  again, and has "I" again?

1    A.      Okay.

2    Q.      Do you agree with me that you weren't just involved;

3    you were also identified, supposed to be identified as a

4    witness?

5    A.      That doesn't have me checked as a witness.

6    Q.      Yeah, but he already identified you as somebody that

7    was involved, right, on the left side?

8    A.      I can't answer that.  I see my name twice.  I can't

9    answer why it's on there twice.

10   Q.      Okay.  So, you were involved, and involved?

11   A.      That's what the misconduct says.  I didn't write that

12   misconduct.

13   Q.      Okay.  So, you were all in this cell.  You were

14   involved in the search?

15   A.      I was involved in the cell search.

16   Q.      You were in a cell; you, Lynch and Orpen.

17   A.      Okay.

18   Q.      You were all in the cell.

19   A.      Yes.

20   Q.      These documents were taken?

21   A.      Apparently.  I didn't take them.

22   Q.      You didn't take them?

23   A.      I didn't confiscate them.  I didn't touch them.  I

24   didn't see them.

25   Q.      You didn't see them?

1   A.      No, I didn't.

2   Q.      You didn't seen them being taken?

3   A.      I seen Sergeant Lynch with something in his hands he

4   took out to the Lieutenant.  I'm assuming, but I don't know

5   the contents of the paperwork.  I don't know.  I didn't look,

6   and I didn't ask.

7   Q.      You stated, when Mr. Bradley showed you the

8   DC-ADMIN 007 policy, that you believed that you were acting in

9   accordance with policy?

10  A.      That's right.

11  Q.      But nowhere from that policy does it say that inmates

12  cannot assist each other with legal work; correct?

13  A.      I, I didn't see nothing.

14  Q.      Okay.  So, you were really basing your belief on the

15  practice, and not the policy?

16  A.      What do you mean, "the practice"?

17  Q.      The practice of how you all interpreted, how you all

18  dealt with prisoners' legal property.

19  A.      I still don't understand you.

20  Q.      Well, when you took those documents from Mr. Lyons, you

21  were acting pursuant to a policy, unwritten policy and

22  practice in the LTSU of interfering with prisoners' rights to

23  access to the Courts.

24  A.      I don't know of any such policy.  That's -- never heard

25  it.

1  Q.      Never heard of it?

2  A.      No.

3  Q.      And you weren't basing your actions on a policy, a

4  written policy?

5  A.      I was basing my actions on an inmate having the

6  property of another inmate, that's all.

7  Q.      Legal property?

8  A.      I assumed it was legal property.  That's what

9  Inmate Lyons told me, it was legal property.

10  Q.      You identified it as legal property?

11  A.      He identified it to me.  I don't know what legal

12  property is.

13  Q.      You identified on the misconduct report as "legal

14  property"?

15  A.      Right.

16  Q.      You identified it on the confiscated items receipt as

17  "legal property"?

18  A.      Right.

19  Q.      And you looked through these materials?

20  A.      Right.

21  Q.      And you know that it was legal property?

22  A.      No, I didn't know it.  Everything was legal property.

23  I saw your names.  I asked Lyons what this was.  He told me,

24  legal work.

25  Q.      My name could have been on anything; right?

1  A.    It was on those papers.  I asked Lyons what it was.  He
2  told me, "legal work".  That's all I know.
3  Q.    So, you're saying it doesn't matter what he has that
4  has my name on it; it's contraband to --
5  A.    To me, at the time, it was.
6  Q.    I'm asking you.  You saying, "at the time".  At the
7  time, anything that Mr. Lyons has in his possession with my
8  name on it is contraband?
9  A.    Yes.
10  Q.    So, if I write an article and you find it in Mr. Lyons'
11  possession, and my name is on it, that it is contraband, too?
12  A.    What do you mean, "an article?"
13  Q.    Any article; a news article.
14  A.    Yes, it is.
15  Q.    It's contraband?
16  A.    Yes, it is.  If your name is on it, it's contraband.
17  If your name is not on it, I don't know that it came from you.
18  Q.    Just because my name is on it, doesn't mean it came
19  from me; does it?
20  A.    That's what I thought at the time.
21  Q.    You thought at the time?
22  A.    Yes, I did.
23  Q.    You just testified, too, that you recall in a cell
24  search that you found some names and numbers, or something
25  like that.

1   A.     Which cell search?

2   Q.     You never really identified the cell search.  You just

3   said that you recall a certain cell search in the LTSU where

4   you found some contraband.  You found people's name and ID

5   numbers.

6   A.     I didn't personally find it, but it has happened in the

7   unit before.

8   Q.     You didn't personally find it?

9   A.     No.

10   Q.     But you remembered that particular cell search?

11   A.     Yes.  I wasn't involved in the cell search, but things

12   were passed on from shift to shift of what was going on.

13   Q.     So, it wasn't even on your shift?

14   A.     I don't remember.

15   Q.     But you remember the things that you found, but you

16   don't remember now of the things that you take?

17   A.     I don't remember what I took off you -- off of Lyons

18   that day.  It's not -- if a confiscation sheet says "legal

19   work", that's what I took.  I'm standing by what I took.

20   Q.     But you identify an incident where you recall something

21   that was supposedly found in an LTSU prisoner cell; correct?

22   A.     What was found?  I don't understand what you mean.

23   Q.     You said that some names and numbers, and things like

24   that --

25   A.     Yes.

```
 1   Q.      -- was found?

 2   A.      Yes.

 3   Q.      And then, didn't even happen on your shift; did it?

 4   A.      No, it --

 5   Q.      Happened on another shift?

 6   A.      It might have.  I don't remember.  I might have been

 7   off that day.  I don't know.

 8   Q.      You said the information is passed on from person to

 9   person, and you heard about it?

10   A.      Probably, yes.

11   Q.      But you didn't participate in it yourself?

12   A.      No.

13   Q.      So again, you remember the things that are found in an

14   LTSU prisoner cell, but you don't remember nothing that's

15   taken?

16   A.      What do you mean, what was taken?

17   Q.      I mean, I asked you before, do you ever remember legal

18   property being taken from prisoners in the LTSU.  You said you

19   don't recall; right?

20   A.      That's right, I don't.

21   Q.      I asked you, did you recall ever taking any legal

22   property from me; correct?

23   A.      Correct.

24   Q.      You says you didn't recall?

25   A.      No, I don't.
```

1    Q.     I showed you this document right here and I asked, did

2    it refresh your recollection as to whether you ever took any

3    legal documents from me, and you said you didn't recall;

4    correct?

5    A.     Correct.

6    Q.     But yet, you recall contraband you're supposed to have

7    found in another prisoner's cell.  Oh, that was found in

8    another prisoner's cell; right?

9    A.     Correct.

10   Q.     But you don't remember the things that you take?

11   A.     That's just something that stuck out in my mind, that's

12   all.

13          MR. JACOBS:  No further questions.

14                    REDIRECT EXAMINATION

15   BY MR. BRADLEY:

16   Q.     Officer Chirico, Mr. Jacobs is indicating, if you had

17   never issued the misconduct, then, he would have had no proof

18   that these materials were taken.

19          You recall that?

20   A.     Yes.

21   Q.     You issued a misconduct, though; didn't you?

22   A.     Yes; to Inmate Lyons, I did.

23          MR. BRADLEY:  Nothing further.

24          THE COURT:  Anything else?

25          MR. JACOBS:  No further questions.

1          THE COURT:  Okay.  The witness will be excused.

2          This might be a good time for our lunch recess,

3   before we begin with another witness.

4          Would everyone please rise and excuse the jury.

5          (Whereupon, jury retires.)

6          THE COURT:  We'll be in recess.

7          (Whereupon, court recessed at 12:25 p.m.)

8                              * * * * *

9          (Whereupon, court reconvened at 1:30 p.m., out of

10  the presence of the jury.)

11         THE COURT:  There was something I said would be

12  entered on the record with respect to 04-1592.

13         MR. WILLIG:  Right, Your Honor.  I made inquiry with

14  SCIF personnel.  Mr. Alton Brown, one of Mr. Jacobs' witnesses

15  on that case, is being housed in the A-100 unit, the regular

16  RHU unit.

17         THE COURT:  Which facility is that?

18         MR. WILLIG:  SCIP, here in Pittsburgh.  He was

19  brought up for the trial.

20         THE COURT:  Now, the other thing I need to talk

21  about about the 04-1592, because this case is taking so long,

22  I'm not sure we're going to finish with all the witnesses

23  today, and we've set aside Monday and Tuesday also for this

24  case.

25         We also have to have a final pretrial conference and

1   resolve all the outstanding legal issues with respect to what

2   claims are going to be presented to the jury.

3           So, you know, I expect it will take Monday and

4   Tuesday of next week.  We won't be in session tomorrow.  I

5   would like to release the jury that we've selected in the 1592

6   case, because the next available day I have will be in

7   January, and then, I have the first week in March for -- we

8   have two trials coming up.

9           We can do one in January and one in March, and we're

10  going to have, right when we're finished today, we're going to

11  get on the phone, the lawyers who are representing the

12  plaintiff in the third case, and I thought, if you don't mind,

13  I would give them the choice, since they are doing this pro

14  bono, as to whether they want the January date or the March

15  date.

16          MR. WILLIG:  Sure.

17          THE COURT:  Are you okay with that?  Are you okay

18  with me letting the jury go?

19          The problem is, if they are going to be out for

20  another month and a half and two months.  It's unreasonable to

21  keep them not reading newspapers and that type of thing, and

22  we'll just pick a new jury.

23          MR. BRADLEY:  Your Honor, do you have a date in

24  March?  Because I'm scheduled with a, probably going to be an

25  extensive trial with Judge Gibson.

1          THE COURT:  It's the first week in March, March 2$^{\text{d}}$.

2          MR. BRADLEY:  That's when I'm scheduled to start

3     with Judge Gibson.  So, I think that's within that time frame.

4     That's the only trial I have scheduled at this point, but it

5     is scheduled with Judge Gibson for March 2d.

6          THE COURT:  Okay.

7          MR.WILLIG:  Maybe, maybe the counsel on this

8     Mr. Jacobs' third case, maybe they can go in January.  That's

9     with the one --

10          THE COURT:  We'll check with them tonight.  So, it

11     may not be a problem, because, then, Mr. Willig has the third

12     case that would be in March.

13          MR.WILLIG:  Yes.

14          THE COURT:  Okay.  I'll give you the dates in

15     January at the end of the day, but we'll release that jury.

16          MR. JACOBS:  Just, did you receive my motions?  I

17     gave some motions.

18          THE COURT:  I have those motions.

19          MR. JACOBS:  Okay.

20          No. 2 is, Mr. Brown was housed on A-100 at one time.

21     He came in Monday, I believe it was, and then, yesterday, that

22     was when he was moved up to A-300.  So, what he said was

23     halfway true.  At one time he was on A-100, and A-300.

24          THE COURT:  They are telling me he's on A-100

25     presently, and he's at no time been on the A-300.

1              Is that correct?

2              MISS SCIRE:  That's correct, ma'am.  I called the

3  Institution.

4              MR.WILLIG:  That's Miss Scire.  She called the

5  Institution.  A-100?

6              MISS SCIRE:  Correct.

7              THE COURT:  Through the whole time?

8              MISS SCIRE:  Correct, ma'am.

9              THE COURT:  Okay.

10              THE COURT:  So, they are making representations to

11  the Court.  If they are not, I'll have to refer this matter

12  also, but you know.

13              MR. JACOBS:  I ` them being moved.  That's how I

14  know he got moved.  I watched him be moved.

15              THE COURT:  But you didn't see where he went.

16              MR. JACOBS:  Well, I see that he left A-100.

17  There's only two sides.  The other side is population side.

18  The other side is the hole, and he left out the unit.  So, and

19  he was told when they moved him from the cell, where am I

20  going?  A-300.  This was yesterday.

21              THE COURT:  Okay.  Well, check again.  Check again

22  and report back to me at the end of the day.

23              Are we ready to continue?

24              Please rise for the jury.

25              (Whereupon, jury was seated.)

1          THE COURT:  Please be seated.

2          MR. BRADLEY:  Your Honor, the defendants now call

3   Allen Lynch.

4          THE COURT:  The witness could please come forward,

5   and stand in front of the court reporter to be sworn.

6          SHARON CONLEY, Deputy Clerk:  Please raise your

7   right hand.

8          THE WITNESS:  I do.

9                          * * * * *

10          ALLEN LYNCH, a witness herein, having been

11   first duly sworn, testified as follows:

12                     DIRECT EXAMINATION

13   BY MR. BRADLEY:

14   Q.     Please state your name for the record, and spell your

15   last name.

16   A.     Allen Lynch, L-Y-N-C-H.

17   Q.     How you currently employed?

18   A.     At SCI Pittsburgh.

19   Q.     What position do you hold?

20   A.     Sergeant, Corrections Officer 2.

21   Q.     How long have you been with the Department of

22   Corrections?

23   A.     January, it will be eight and a half years.

24   Q.     And could you just tell the jury your progression

25   through the Department of Corrections from the time you

1  started?

2  A.      Sure.  I started July 10th of the year 2000, as a

3  corrections officer trainee.  I was a trainee for one year.

4  Then, I was promoted to Corrections Officer 1, until May of

5  2003, where I was promoted to sergeant.

6       In March of 2004, when I transferred to SCI Fayette,

7  you can't transfer as a sergeant, so I had to go back to CO 1,

8  Corrections Officer 1, and then, I was an SCI Fayette until

9  December of 2004, where I transferred to SCI Greene, and I

10  remained there as a Corrections Officer 1 until July of '07,

11  when I came back to Pittsburgh.

12       And then, in January of '08, I got re-promoted back to

13  sergeant again.

14  Q.      You've been present for the testimony in the courtroom

15  this week?

16  A.      Yes.

17  Q.      And the previous week?  Obviously, these events are

18  centered around September of 2003.

19       Can you tell the jury what your assignment was and what

20  your position was in September of 2003?

21  A.      I was assigned to the sergeant position in the LTSU

22  A-300.

23  Q.      How long had you been in the LTSU at that point?

24  A.      That point total, Corrections Officer 1 and sergeant.

25  Probably been there about, about a year.

1    Q.      There's been testimony in this case regarding a search

2    of Inmate Eric Lyons on September 15th as he was coming out

3    of the law library.  Were you involved in that in any way?

4    A.      With Inmate Lyons; no, sir.

5    Q.      So, just so I'm clear, you didn't have any involvement

6    with the decision to confiscate the papers from Mr. Lyons?

7    A.      No, sir.

8    Q.      You were not involved in decision to issue the

9    misconduct?

10   A.      No.

11   Q.      You were not involved in the decision to process that,

12   that misconduct for informal resolution?

13   Q.      No.

14   Q.      Did you ever see the papers involved in that matter?

15   A.      Before this trial, no.

16   Q.      Did you ever see the materials that were taken from

17   Mr. Lyons?

18   A.      Actually, I need to correct that, because I think the

19   misconduct to Inmate Lyons, I think I'm the one that served it

20   to him, but I don't really remember.  I think I'm the one that

21   served it to him, so.

22   Q.      With regard to the materials that were taken from

23   Mr. Lyons, did you ever see those materials?

24   A.      No, sir.

25   Q.      Did, did you have any connection with the disposition

 1   of those materials?

 2   A.     No.

 3   Q.     Are you familiar with the plaintiff in this case, Andre

 4   Jacobs?

 5   A.     Yes, I am.

 6   Q.     And how do you know Mr. Jacobs; how you familiar with

 7   him?

 8   A.     Because he was housed in the LTSU A-300 while I worked

 9   there.

10   Q.     Were you involved in the search of Mr. Jacobs' cell on

11   September 16th, 2003?

12   A.     Yes, I was.

13   Q.     Can you explain to the jury what your role would have

14   been in that search, and why that search was conducted?

15   Q.     Well, the search was conducted.  Um, every, every cell

16   in the LTSU -- and this will clarify something that was said

17   earlier -- every cell had to be searched, yes, at least once a

18   month.  But however, Lieutenant Giddens testified that

19   offficers on 2:00 to 10:00 had to search them twice a month,

20   and 10:00 to 2:00.  And it was twice a month.  That day I was

21   the sergeant on the unit, and I assisted with the cell search.

22   I was in the cell, searching the cell.

23   Q.     And was anything recovered during that search?

24   A.     Yes.  I recovered two pieces of paperwork that belonged

25   to Inmate Gary Banks from Inmate Jacobs' cell.

1   Q.      And why do you say it belonged to Inmate Gary Banks?

2   A.      Because the two pieces of paper I confiscated, I

3   remember picking them up off Inmate Jacobs' desk, and the

4   first paper I looked at clearly stated, Gary Banks versus the

5   Department of Corrections.  So therefore, I assume it is Gary

6   Banks' paperwork.

7   Q.      And at that point you made the determination to

8   confiscate those materials?

9   A.      Yes, I did.

10  Q.      Did you see other legal materials in Mr. Jacobs cell at

11  that time?

12  A.      Yes, sir.

13  Q.      What did you do with those materials?

14  A.      I searched through it, as I'm supposed to do, and found

15  no contraband in that other legal work, and I left it in his

16  cell.

17  Q.      Were you involved -- let me ask it this way.

18          There's been testimony in this case that Mr. Lyons'

19  cell was searched that same day, looking for the misconduct

20  that had been issued the day before.

21          Do you have any knowledge of any discussions, any

22  agreements, any directions from anyone, including the

23  defendants, that there was to be a search of Mr. Lyons' cell

24  in order to retrieve the misconduct that Officer Chirico had

25  written the day before?

1   A.      No, not for the purpose of retrieving any kind of

2   paperwork.

3   Q.      And again, was that ever expressed as the reason you

4   were searching Mr. Jacobs' cell that day, to look for the

5   misconduct that had been issued to Mr. Lyons the day before?

6   A.      No, sir.  It was merely a monthly cell search that we

7   did every month.

8   Q.      And is it your recollection that all of the cells in

9   that search -- all of the cells on that pod were searched at

10  the same time on that same occasion?

11  A.      Yes, sir.  I think it was even Mr. Lyons that testified

12  that every cell in the pod was searched that day.

13  Q.      And that wasn't an unusual occurrence on the LTSU?

14  A.      Not.  I mean, we had 40 cells, and each cell had to be

15  searched once a month.  So usually the way we did it is we

16  take one pod pretty much per week.  We do a pod or a pod and a

17  half per week, so we can get it all accomplished within one

18  month.

19  Q.      And I know the term has come up before, but could you

20  just explain to the jury maybe what the physical set up is,

21  and when you say "pod", what do you mean by that?

22  A.      Sure.  When you walk onto the unit, the entire unit

23  consists of two sides.  We had an A house, which housed the

24  disciplinary custody inmates, and the B side, which housed the

25  administrative custody inmates.

1        On each side, the A and B side, each side had three

2    pods; like Pods 1, 2 and 3.  Each pod, I believe, had eight

3    cells in it.

4    Q.    As a result of discovering the two pieces of paper that

5    you believed to be the property of Mr. Banks, did you -- what

6    did you do?

7    A.    After I confiscated the paperwork?

8    Q.    Yes.

9    A.    I wrote a DC-154A, confiscated items receipt.  I also

10   wrote a DC-141 misconduct report, and I believe I annotated on

11   both that the items that I confiscated was placed -- they were

12   held on the unit for the purpose of the hearings, because due

13   to the types of inmates we had in LTSU, the hearings were held

14   on the unit.  And we had a locker in our armory with a lock on

15   it, and that's where we would put contraband, to hold it for

16   the purpose of the hearing.

17        And then, I annotated on the confiscated items receipt

18   that after the hearing the items will be turned over to the

19   Security Department for disposition.

20   Q.    I have a document indicated and previously marked as

21   Plaintiff's Exhibit 7-A.  Do you recognize that document?

22   A.    Yes.  It's the misconduct that I wrote.

23   Q.    And can you just read what's written there in the

24   "staff member's version"?

25   A.    Sure.  It says, on the above date and time, while

1    performing cell searches on the LTSU, this sergeant came

2    across two pages of legal papers belonging to Inmate Gary

3    Banks, CT-8731, in Inmate Jacobs' cell.  These items will be

4    held on the LTSU until misconduct hearing.  It will then be

5    sent to the Security Office.  DC 154A, No. 419641.

6    Q.    That last number you just read off, is that a reference

7    to another document?

8    A.    Yeah.  It's a reference to the confiscated items

9    receipt.

10   Q.    Plaintiff's 7-B.  This document has previously been

11   marked as Plaintiff's Exhibit 7-B.  Do you recognize this

12   document?

13   A.    Yes, I do.  It's the confiscated items receipt.

14   Q.    That was what was referred to on the misconduct?

15   A.    Yes, sir.

16   Q.    Again, what does this identify?

17   A.    The two pages of legal work that I took from

18   Inmate Jacobs that belonged to Gary Banks.  You want me to

19   read exactly what it says there.

20   Q.    I think that's sufficient.

21   A.    It's also annotated thereon, too, in the comment

22   section, what I did with the property after it was

23   confiscated.

24   Q.    Perhaps you could read that for the jury.

25   A.    Sure.  In the comment section, it says, LTSU cell

1   search.  Held on unit for misconduct hearing, then sent to

2   Security Office.  And there's also reference to misconduct

3   No. A469506.

4              MR. JACOBS:  Put 7-A up again.

5   BY MR. JACOBS:

6   Q.      This issue came up in the testimony of Officer Chirico,

7   under the "other inmates or staff involved or witnesses"

8   section.  Officer Chirico's name appears to appear twice.

9              First, let me ask you this.  Was only one

10  Officer Chirico that works in the LTSU?

11  A.      Yes, there is.  I just probably made a simple mistake

12  of writing the name in twice.

13  Q.      As you sit here today, did you intend to list him as a

14  witness, or list him twice, or would you normally list CO's as

15  involved on one line, and then, as witnesses in the other?

16  A.      No, not on two separate lines like that.  Like I said,

17  it was probably just a mistake I made.

18  Q.      But you did put Officer Chirico's name on the document?

19  A.      As involved, yes.

20  Q.      And to your recollection, he was evolved?

21  A.      With the cell search, yes, sir.  And that's what I

22  mean, every name on there, when you put names on there, as

23  involved.  It's kind of a wide range of what it means to be

24  involved.  I mean, just simply putting Chirico was involved,

25  it means he was involved with the cell search.  It doesn't

1   necessarily always mean he was involved with actually

2   confiscating the material or anything like that.

3   Q.      Once you secured the documents and issued the

4   misconduct, did you have any further involvement with the

5   processing or adjudication of this misconduct?

6   A.      No, sir.

7   Q.      Did you have any discussions with the hearing examiner

8   that adjudicated this misconduct about this misconduct?

9   A.      No, sir.

10  Q.      Did anybody tell you to issue this misconduct because

11  Mr. Jacobs was involved in filing grievances?

12  A.      No, sir.

13  Q.      Did anybody tell you to file this misconduct against

14  Mr. Jacobs because Mr. Jacobs was filing a lawsuit against

15  other DOC personnel?

16  A.      No, sir.

17  Q.      At the time you issued this misconduct, and at the time

18  you confiscated these two pages of materials from his cell,

19  were you aware Mr. Jacobs had filed grievances previously?

20  A.      I was aware that he had filed grievances, yes, but I'm

21  never sure as to -- I'm not a part of the grievance process,

22  so I'm not ever sure as to who he's filing it on, or what he's

23  filing.  It's -- the only way I would know anyone even files a

24  grievance is when we pick up the mail.

25          We pick up the mail, which includes grievances, or any

1   other paperwork they are turning out, and we put it into the

2   mailbox.  But as far as, I'm not aware of who he files them on

3   or what the reason for filing them is.

4   Q.      On that day, September 16th, 2003, were you aware

5   Mr. Jacobs was pursuing litigation against DOC members from

6   SCI Pine Grove?

7   A.      No, sir.

8   Q.      On or before September 16th, or in the days, and

9   weeks, and months that followed through the disposition of

10  these administrative processes, did you have any discussions

11  with any of the other defendants in this case, in terms of

12  attempting to bury misconducts or cover up incidents, because

13  Mr. Jacobs had filed grievances or filed lawsuits?

14  A.      No, sir.

15  Q.      Do you recall having any discussions with any of the

16  defendants about Mr. Jacobs, about his grievance filing or his

17  litigation filing?

18  A.      No, sir.

19  Q.      You indicated that although you were not aware of any

20  particular litigation Mr. Jacobs was involved with, you

21  understood that he had, or you were aware that he did file

22  grievances.

23          Did the fact Mr. Jacobs was filing grievances cause you

24  to take any actions against him, or treat him differently than

25  other inmates?

1   A.      No, sir.

2   Q.      Were you aware of the policy or practice, whether

3   written or unwritten, formal or informal, in the LTSU in 2003

4   whereby inmates who engaged in litigation ans grievance

5   activities would be retaliated against?

6   A.      No, sir.

7   Q.      Did you ever engage in any retaliation against inmates

8   who file grievances or law enforcements?

9   A.      No, sir.

10  Q.      Other than issuing this misconduct to Mr. Jacobs on

11  September 16th, 2003, were you involved in any of the other

12  aspects of Mr. Jacobs' case, as you've heard it in this

13  courtroom?

14  A.      No, I wasn't.

15  Q.      Did you take any action with respect to Mr. Jacobs,

16  based on the fact that he had filed grievances?

17  A.      No.

18  Q.      At any time?

19  A.      No.

20  Q.      Did you take any action at any time with respect to

21  Mr. Jacobs, based on the fact he had filed a lawsuit?

22  A.      No.

23  Q.      Did you direct anyone, including the defendants, to

24  take any retaliatory action against Mr. Jacobs, or any action

25  to deprive his access to Courts?

1   A.      No.

2   Q.      Did you ever have any agreement, whether explicit or

3   implicit, with the other defendants to take any retaliatory

4   action against Mr. Jacobs, or any action to deprive his access

5   to Courts?

6   A.      No, sir.

7   Q.      Thank you.

8           MR. BRADLEY:   No further questions.

9                             CROSS EXAMINATION

10  BY MR. JACOBS:

11  Q.      Good afternoon, Mr. Lynch.

12  A.      Good afternoon.

13  Q.      You stated that the documents, stated the documents

14  that you took on September 16th, 2003 stated on the top of

15  them, Gary Banks versus the Department of Corrections?

16  A.      Yes, I stated that.

17  Q.      How is that -- how is it that you remember that

18  specific language today?

19  A.      Because I tried -- I try to remember things from the

20  unit that happen -- cells that I searched, items that I

21  confiscated -- for purposes like today.

22  Q.      Okay.  Was my name on the document, too?

23  A.      No, it wasn't.

24  Q.      You remember that?

25  A.      It could -- your name could have been in the body of

1    the document somewhere.  I don't know.  I'm not permitted to

2    read your paperwork.  As Lieutenant Giddens testified, we scan

3    through it to see if anything stands out, and what stood out

4    to me right off the bat, as soon as I opened it, was real big,

5    says, Gary Banks versus the Department of Corrections.

6    Q.     Did the word "declaration" stand out?

7    A.     I didn't see the word "declaration", no.

8    Q.     All right.  Showing you what's been marked as

9    Plaintiff's Exhibit No. 24.  Going to draw your attention to

10   No. 7.

11   A.     Okay.

12   Q.     Do you remember the title of the two pages of the

13   documents that were taken?

14   A.     Do I remember the title of the two pages?

15   Q.     Yeah.  The documents that you took on September 16th,

16   2003.

17   A.     I don't remember the title of them, no.

18   Q.     You don't.  Would it have stood out to you?

19   A.     It may have at the time.  I don't know.  I don't

20   remember at this time.  What I remember from it thoroughly was

21   it said, Gary Banks versus the Department of Corrections.

22   Q.     Okay.  You see the answer?

23   A.     Excuse me?

24   Q.     You see the answer?

25   A.     For No. 7?

1    Q.      Yes.

2    A.      Yeah.

3    Q.      How were those documents identified?

4    A.      According to this, it says, the two documents

5    confiscated from Mr. Jacobs were unsworn declarations.

6    Q.      That is the only identification of those documents

7    beyond what was in your misconduct; correct?

8    A.      What do you mean?

9    Q.      The documents, the way you identified the documents in

10   the misconduct was just "property, two pages of legal papers

11   belonging to Inmate Gary Banks"?

12   A.      Yes.

13   Q.      You didn't identify what type of legal paper it was?

14   A.      On my misconduct, no, I didn't.

15   Q.      And throughout the litigation of this case, it was

16   identified what those documents were?

17           MR. BRADLEY:  Your Honor, I don't know that there's

18   a foundation for him to testify to what those documents refer

19   to throughout the litigation.

20           MR. JACOBS:  This is evidence in the case.

21           THE COURT:  Just a second.

22           MR. JACOBS:  It's evidence in the case.

23           THE COURT:  We'll excuse the jury for a minute.

24           (Whereupon, jury retires.)

25           THE COURT:  Please be seated.

1           Since the documents have not been located -- these

2      are the two pages that were taken; is that what we're talking

3      about here?

4           MR. JACOBS:  Yes.

5           THE COURT:  Okay.  Those documents have not been

6      located, is that correct; right?

7           MR. JACOBS:  Correct.

8           THE COURT:  And there was testimony from the

9      plaintiff's witnesses about the nature of those documents.

10     But I think the inquiry here is that while that did come in

11     evidence in your case, the question is whether it's an

12     established fact, and it's --

13          MR. JACOBS:  They admitted to it.  This, in the

14     interrogatory in the case they identified them as the "unsworn

15     declarations" themselves.

16          THE COURT:  Right.  But the question of whether it

17     was in Mr. Banks' case or in your case, this witness is

18     testifying that he viewed them as having a caption from

19     Mr. Banks'.

20          MR. JACOBS:  This was an interrogatory directed to

21     this defendant.

22          THE COURT:  But an unsworn declaration, it doesn't

23     say a declaration as to who or about what.

24          MR. JACOBS:  But when I asked him to identify what

25     the document was, he never identified it as, as a Department

1   of Corrections, Gary Banks versus Department of Corrections.

2           MR. BRADLEY:  The question doesn't ask that.  It

3   asks what the title was.  And again, this is one of those

4   interrogatories that was directed to half a dozen defendants.

5   And so, we just provided responses.  And it's not clear to me

6   at this point specifically which defendant responded to this.

7           Obviously, somebody knew it was an unsworn

8   declaration.  He's testified that that wasn't him.

9           MR. JACOBS:  Well, he's the only defendant that took

10  the documents.  He took them.

11          MR. BRADLEY:  And he's testified he didn't know what

12  the title was.  He testified he knows what is at the top.  He

13  testified he doesn't know what the title was.

14          THE COURT:  He can be asked if he reviewed this

15  answer, and that was his answer at the time.

16          MR.  BRADLEY:  I mean, I don't have a problem with

17  him being questioned on this, but he was asking something

18  about throughout the litigation, the knowledge of this witness

19  throughout the litigation, and I just -- he wouldn't know.

20          THE COURT:  You need to probe his knowledge at the

21  time that the documents were taken.

22          MR. JACOBS:  I can ask him, and this was his answer.

23          THE COURT:  Right.  You can ask him if he had

24  reviewed this and if he agreed with that.

25          MR. JACOBS:  Okay.  I need go to the bathroom.

1          THE COURT:  Oh, okay.  We'll take a break.  We'll

2    recess for five minutes.

3          (Whereupon, court recessed at 2:10 p.m.)

4                         *  *  *  *  *

5          (Whereupon, court reconvened at 2:15 p.m.)

6          THE COURT:  Please rise for the jury.

7          (Jury is seated.)

8          THE COURT:  Please be seated.

9          Mr. Jacobs, would you please rephrase your question.

10   BY MR. JACOBS:

11   Q.    Do you see the writing in the bold print?

12   A.    There's a lot of writing in bold print.  Specifically,

13   which one?

14   Q.    Defendants' response to plaintiff's interrogatories and

15   request for production of documents, directed to Ferson,

16   Simpson, McCoy, Lynch, Bittner and Mankey.

17   A.    Yes, I see it.

18   Q.    "Lynch", that would be referring to you?

19   A.    Yes, sir.

20   Q.    There two reflect your response to my request for

21   interrogatories?

22   A.    This paper here?

23   Q.    Yes.

24   A.    I, I don't know if it does or not.  The only thing I

25   can see on this paper is what you just read to me.

1          THE COURT:  Perhaps you could take the document to

2   the witness.

3          MR. BRADLEY:  Your Honor, for the record, I would

4   stipulate that that was the response prepared in response to

5   Mr. Jacobs' request.

6          THE COURT:  Right.  Just a question of whether he

7   has reviewed it, he had previously reviewed it.

8   BY MR. JACOBS:

9   A.     What was the question?

10          THE COURT:  Have you finished reading it?

11          THE WITNESS:  Yeah.  I looked over it.  I didn't

12   read it.

13          THE COURT:  Ask your question now, Mr. Jacobs.

14   BY MR. JACOBS:

15   Q.     And that will reflect your response to my question of

16   what those documents were?

17   A.     I don't understand what you're asking me.  I mean, my

18   response to what the documents were; I don't know what the

19   documents were.

20   Q.     You don't know what the documents were?

21   A.     I wrote on the confiscation slips it was legal papers

22   containing Gary Banks' name.

23   Q.     You don't know what legal documents were?

24   A.     I'm not a lawyer.  I don't know what they are.  But

25   they clearly said, Gary Banks against the Department of

1  Corrections.

2      THE COURT:  Just listen to the question.  Let him

3  finish the question.

4  BY MR. JACOBS:

5  Q.    Those documents right there in your possession reflect

6  identification by defendants in this case of what those

7  documents were; correct?

8  A.    According to No. 7.

9  Q.    According to No. 7?

10  A.    Yes, that's what it says.

11  Q.    And according to the misconduct which we reviewed

12  earlier, Plaintiff's Exhibit No. 7-A -- remember that

13  document?

14  A.    Misconduct, yes.

15  Q.    The document that you wrote?

16  A.    The misconduct I wrote, yes.

17  Q.    You were the only one that took the documents; correct?

18  A.    I confiscated them from your cell, yes.

19  Q.    And none of the other people that were in the cell took

20  those documents?

21  A.    No.  I, I confiscated the documents.

22  Q.    You confiscated them?

23  A.    Yes.

24  Q.    So you know what they were?

25  A.    I just stated, I don't know what they were.  I wrote

1   what they said.  I wrote down, legal papers belonging to

2   Inmate Gary Banks.

3   Q.     And you based that on the fact that Mr. Banks signed a

4   declaration; correct?

5   A.     No, I did not.  I didn't see no signature on it or

6   anything like that.  What I saw is exactly what this looks

7   like.

8             MR. JACOBS:  Your Honor --

9             THE COURT:  Just a second.  Just listen to the

10  question, and answer the question.  Your counsel will be able

11  to follow-up with you.

12            MR. BRADLEY:  Your Honor, he was providing an answer

13  that wasn't a, yes, or, no, answer.  So, he should be entitled

14  to finish his answer.

15            THE COURT:  Okay.  Finish your question, then.

16            THE WITNESS:  My answer?

17            THE COURT:  Yes.

18  BY MR. JACOBS:

19  A.     What I confiscated, what I noticed on it is almost

20  exactly what this has here, Andre Jacobs, Plaintiff versus PA

21  Department of Corrections.

22         What I confiscated out of your cell said, Gary Banks

23  versus PA Department of Corrections.

24            MR. JACOBS:  Your Honor, I asked him, did he

25  confiscate the document based on Mr. Banks' signature being on

1   it.

2              THE COURT:  Okay.  Just listen to the question.

3              MR. JACOBS:  That's a, yes, or, no, question.

4              THE COURT:  Listen to the question.  Repeat your

5   question again.

6   BY MR. JACOBS:

7   Q.     Did you confiscate the document based on Mr. Banks'

8   signature being on it?

9   A.     No.

10  Q.     Did you confiscate the document based on it being a

11  declaration?

12  A.     No.

13  Q.     And were you present for the testimony of

14  Defendant Giddens?

15  A.     Yes, I was.

16  Q.     Do you remember Defendant Giddens' testimony that his

17  name was in the documents?

18  A.     Do I remember saying that his name was in the

19  documents?

20  Q.     Do you remember him saying that.

21  A.     I don't remember.  Not really, no.

22  Q.     That was the reason you took the documents?

23  A.     No..

24  Q.     You didn't take the documents because you thought it

25  was contraband.

1   A.      No, I took them because they were contraband.

2   Q.      You took it because it was a declaration.  That was the

3   title of the page, a declaration, and that was the basis of

4   you taking it?

5   A.      Is that a question or a statement?

6   Q.      I'm asking you.

7   A.      No.  I had confiscated the items because it was

8   contraband.  I don't know who else's names was in it, I didn't

9   read it.

10  Q.      And in fact, any time you found a prisoner's

11  declaration within the LTSU, you confiscated it?  That was the

12  practices in LTSU, confiscating declarations?

13  A.      If that's a question, the answer is, no.

14  Q.      And that was because the declaration is -- do you know

15  what a declaration is?

16  A.      No, I don't.  I'm not a lawyer.  I don't know what a

17  declaration is.

18  Q.      But have you heard testimony as to what a declaration

19  is?

20  A.      As to what is declaration is?

21  Q.      Have you heard the testimony?

22  A.      As to what a declaration is?

23  Q.      Yes.

24  A.      I don't remember any testimony explaining what a

25  declaration is, no.

1  Q.      Okay.  So, it wouldn't matter to you whether or not a

2  declaration is a legal document, or a witness statement, if

3  another prisoner's name is on it, it is?

4  A.      What do you mean by that?  I mean, that's kind of a

5  wide statement.

6  Q.      So, if you find a declaration, being as though you

7  don't know what a declaration is, if another prisoner's name

8  is on it, that's basis enough for you to take it?

9  A.      Not, not -- never.  No, not just for having a person's

10 name on it.  But that paper clearly stated, Gary Banks versus

11 the Department of Corrections.

12 Q.      So, the only thing you're looking for is documents

13 indicating that prisoners are witnessing corruption taking

14 place in the LTSU?

15 A.      No, that is not what I'm looking for.

16 Q.      When you do these cell searches, you're reading these

17 documents in prisoners' cells.

18 A.      No, I don't read documents.

19 Q.      And you're searching for evidence to disprove the

20 claims of prisoners?

21 A.      No.

22 Q.      And after you take these documents, you did a

23 confiscation slip; right?

24 A.      Or taking what documents?

25          MR. BRADLEY:  Excuse me.

1   Q.      Out of the cell search.  You conduct the cell search.

2           MR. BRADLEY:  Excuse me, Your Honor, is he asking

3   generally, or is he asking about what happened

4   September 16th, 2003?

5           MR. JACOBS:  I'm asking the policy.

6           THE COURT:  Refer to the time frame for that

7   opinion.

8   BY MR. JACOBS:

9   Q.      I'm talking with the policy, how it's supposed to be

10  done.

11  A.      At that time, yes.

12  Q.      When you all take a document from a prisoner, or any

13  type of property that you label contraband, did you issue a

14  confiscation slip; correct?

15  A.      If I take property that is contraband, yes, I issue a

16  slip.

17  Q.      And then, you destroy the material?

18  A.      No, I don't destroy them go.

19  Q.      You destroy the material, so then, there's no way to

20  prove what the document was?

21          MR. BRADLEY:  Your Honor, I'm going to object,

22  because he was directing that question to this defendant.  He

23  was -- he used the term, "you all".  He was directing it to

24  any number of people.

25          THE COURT:  Refer to what -- if you wouldn't mind,

1    Mr. Jacobs, direct the question to this witness, about what

2    his conduct, or any other conduct that's pursuant to a policy.

3              MR. JACOBS:  I'm referring not just to him, but his

4    observation, too, concerning the practices.

5              THE COURT:  Yes.

6    BY MR. JACOBS:

7    Q.      When I say "you all", I mean you, Defendant Giddens

8    Defendant Chirico, and other LTSU officers.

9    A.      Okay.  Can you repeat the whole question, though?

10   Q.      When you confiscate this material, you destroy it.

11   A.      No, I don't.

12   Q.      And you destroy it, because then, there's no way to

13   prove what the documents were?

14   A.      No, that's not true at all.

15   Q.      When you issued this misconduct to me on

16   September 16th, 2003, you were aware of the consequences if

17   I was found guilty of the charges you alleged; correct?

18   A.      Was I aware of the consequences?

19   Q.      About my fate at the hearing examiner.

20             MR. BRADLEY:  Excuse me, Your Honor.  He's not being

21   able to finish the response.

22             MR. JACOBS:  He asked me to clarify.  I was

23   clarifying.

24             THE COURT:  Be careful to permit the time for the

25   response, before you go on.

1        MR. JACOBS:  Exactly.  He asked me to clarify the

2   question.  I was trying to clarify for him.

3        THE COURT:  Okay.  Then, clarify the question.

4   BY MR. JACOBS:

5   Q.     Do you know, when you issue a misconduct certain

6   charges carry certain penalties; correct?

7   A.     Yes.  The penalties are up to the hearing examiner.

8   But, yes, charges do carry a penalty; yes.

9   Q.     Each charge carries a penalty?

10  A.     Not always.

11  Q.     Each charge can carry a penalty if --

12  A.     They can, yes.

13  Q.     And each charge can yield up to 90 days per charge?

14  A.     I believe that's what it is.

15  Q.     That was the policy at the time in question?

16  A.     I don't recall exact policy at the time, but, yeah,

17  generally.

18  Q.     And a misconduct can be used as a basis for denial

19  parole?

20  A.     I have nothing to do with the parole system.

21  Q.     Okay.  But a misconduct does adversely affect a

22  prisoner?

23  A.     A misconduct affects a prisoner?  Yeah, it affects the

24  prisoner.

25  Q.     In a bad way?

1    A.      I wouldn't say in a bad way, but you impose sanctions

2    for disobeying the rules, which is why you get a misconduct.

3    Q.      So you're disciplined?

4    A.      You've given sanctionss.

5    Q.      Okay.  Now, for the purpose of this misconduct, you

6    issued the misconduct because you wanted me to be punished?

7    A.      No.  I issued a misconduct because I found contraband

8    in your cell.

9    Q.      And the process that you initiated under the DC-ADM 801

10   provides for sanctions to be imposed as a result of the

11   misconduct that you wrote; correct?

12   A.      Yes.  I believe it does, yes.

13   Q.      And this was your way of trying to punish me for having

14   a declaration against Defendant Giddens?

15   A.      No, sir.

16   Q.      And you use the misconduct system to erroneously label

17   legal documents "contraband"?

18   A.      No.

19   Q.      And you used the misconduct system to punish me for the

20   possession of legal documents that wasn't contraband?

21   A.      No, sir.

22   Q.      And you knew that a declaration wasn't contraband?

23   A.      I knew a declaration wasn't contraband.

24   Q.      You knew that at this time; didn't you?

25   A.      I already testified that I don't know what a

1    declaration is.  What I testified is the paperwork said, Gary

2    Banks versus the Department of Corrections.

3    Q.      Were you here for the testimony of Michael Edwards?

4    A.      For who?

5    Q.      Michael Edwards.

6    A.      Michael Edwards.  Yes, I was.

7    Q.      Do you know him?

8    A.      Not really, no.

9    Q.      Do you remember his testimony when I asked him, did he

10   remember someone named Lynch from being in the hole?

11   A.      I remember you asked him that question.

12   Q.      Do you remember what his answer was?

13   A.      He says he remembers a Lynch, but he doesn't remember

14   the first name, and there's more than one Lynch that works at

15   SCI Pittsburgh.

16   Q.      Do you remember his testimony that there was a Lynch

17   that worked on A-100 or A-200 in the year 2001 or 2002?

18   A.      I think he said in the year 2000.

19   Q.      Did you work in A-100 or A-200 in the year 2001 or

20   2002?

21   A.      No, I didn't.  I was working in A-300 in 2002.

22   Q.      What about 2001?

23   A.      From July of 2001, I wouldn't be permitted to work in

24   RHU, because I was still a trainee.

25   Q.      At no time did you work in RHU at SCI Pittsburgh?

1   A.      I'm sure a day or two here and there I probably did

2   work in A-1 or A-2, but I wasn't assigned to A-1 or A-2

3   permanently.

4   Q.      What time frame would that have been?

5   A.      I have no idea.

6   Q.      You don't remember?

7   A.      No, I don't.

8   Q.      You stated the documents you took on September 16th,

9   2003 were held in the armory?

10  A.      In a locker in the armory, yes.

11  Q.      On the LTSU unit?

12  A.      Yes.

13  Q.      And then, after the disposition of the misconduct

14  hearing, what happened to them?

15  A.      It would have been taken to the Security Office.

16  Q.      By who?

17  A.      Probably by the search team, or the security team.

18  Q.      So, someone not within the LTSU unit?

19  A.      It's possible, but I don't believe it was; no, sir.

20  Q.      But what there a policy or somebody responsible for

21  handling contraband?

22  A.      Who it is specifically, I don't know.

23  Q.      You don't know?  But it wouldn't be the person that

24  took it?

25  A.      The person that took the contraband from A-300 to the

1   Security Office?

2   Q.      The person that initially took the contraband.

3   A.      Well, that was me.  I took the contraband initially.

4   Q.      Okay.  So, it wouldn't be you?

5   A.      Once I write the confiscation slip and I place the

6   contraband in the locker and I secure it with a lock, then,

7   after that point, no, I have nothing else to do with it,

8   because then the hearing examiner takes it for his hearing,

9   and it should be placed back in the locker, and then, taken to

10  Security.

11  Q.      So, somebody else's responsibility?

12  A.      After that point in time, yes.

13  Q.      There are different types of searches; correct?

14  A.      Yes.

15  Q.      What types of searches do you have?

16  A.      There's three different types of searches.  There's a

17  general search, a random search, and an investigative search.

18          And we also have another thing known as fire and

19  security checks.

20  Q.      And what type of search was conducted on

21  September 16th, 2003?

22  A.      Specifically, I don't remember, but it would have been

23  either a random or a general.

24  Q.      But it wasn't investigative?

25  A.      No.

1   Q.      Showing you what's been marked as Plaintiff's Exhibit
2   No. 7-B.  You recognize that document; correct?
3   A.      Yeah.  That's the confiscated items receipt that I
4   wrote.
5   Q.      Do you see in the section where it identifies what type
6   of search what conducted?
7   A.      Says, LTSU cell search.
8   Q.      Over to the left.
9   A.      There's three blocks.  It says, random search, general
10  search, and investigative search.
11  Q.      And none of them are marked; are they?
12  A.      No, they are not.
13  Q.      Is that typical?
14  A.      Typical?
15  Q.      Yes.
16  A.      I don't know.
17  Q.      Is that box supposed to be filed in?
18  A.      It should be filed in, but it doesn't necessarily have
19  to be fill in, no.
20  Q.      But it's not filled in in this particular case?
21  A.      No, it's not filled in in this case.  And the reason I
22  didn't fill that in is because I indicated in the comments --
23              MR. JACOBS:  Your Honor --
24              THE COURT:  Just a second.
25              Just answer the question.  Your counsel will be able

1    to follow-up with you.

2    BY MR. JACOBS:

3    Q.      You stated on direct examination that no one directed

4    you to take these documents on September 16th, 2003.

5    A.      No one directed me to take the documents, no.

6    Q.      But Defendant Giddens did approve of you taking those

7    documents; didn't he?

8    A.      To my knowledge, I didn't need his approval to

9    confiscate the items.

10   Q.      Did you show the documents to Defendant Giddens?

11   A.      I may have, but I'm not 100 percent sure.

12   Q.      But you didn't need his approval; did you?

13   A.      No, I don't need his approval to confiscate contraband.

14   Q.      But you thought that it was important that he see what

15   was in those documents; didn't you?

16   A.      No, I didn't.

17   Q.      You didn't think it was important?

18   A.      No.

19   Q.      Were you present for Defendant Giddens' testimony?

20   A.      Yes, I was.

21   Q.      Do you remember his testimony that he showed you those

22   documents -- that you showed him the documents?

23   A.      Word for word, I don't remember his testimony.

24   Q.      Do you remember his testimony that when you showed him

25   the documents, he seen his name in those documents?

1  A.      Um, I don't recall that, no.

2  Q.      That was the reason you showed those documents to him;

3  isn't it?

4  A.      What was the reason?  You're making a statement.  If

5  you're going to ask me a question, I'll answer it, but you're

6  making a statement.

7  Q.      That was the reason you showed him the document; isn't

8  it?

9  A.      What was the reason?

10  Q.      Because his name was in them.

11  A.      No, it's not.

12  Q.      You stated that you were generally aware that I file

13  grievances within the LTSU?

14  A.      Yes.

15  Q.      And that would have been against the officers?

16  A.      I believe I testified I don't know who you filed them

17  against or what you file them for.  I'm just aware that you

18  filed grievances.

19  Q.      You also testified that you wouldn't be made aware of

20  whether the grievance was filed against you.  You remember

21  saying that?

22  A.      I don't remember saying that, no.

23  Q.      You said you have no way of knowing if a grievance was

24  filed against you in particular?

25  A.      Well, I mean, at the point in time when a grievance is

1    picked up from your cell or whatever, no.  I don't open them

2    up and look at them.  If a grievance is filed on me by you, or

3    any other inmate, and the lieutenant that's investigating the

4    grievance chooses to ask me a question about the grievance,

5    then, he can do that, and that's how I would know about it.

6    But just somebody coming to me and saying, oh, a grievance was

7    filed on you, no.

8    Q.      But you are advised if a grievance is filed against

9    you?

10   A.      No.  Not always, no.

11   Q.      Not always?

12   A.      Not always, no.

13   Q.      So, if a prisoner filed a grievance against you that

14   says that you did something wrong, are you saying that the

15   person investigating the grievance, the complaint, might not

16   never come and talk to you about it?

17   A.      They may or may not.  I mean, I'm not the person

18   investigating the grievances.  I don't know how they do their

19   investigation.

20          What I said is, if I'm a part of the grievance, then, I

21   would suppose, yes, they can ask me questions about the

22   grievance, and then, my involvement, or whatever the case may

23   be.  I don't know how they investigate grievances.  That's not

24   part of my job.

25   Q.      Has a prisoner ever filed a grievance against you

1    during the relevant time frame for seizing or destroying legal

2    property?

3    A.      The relevant time frame, you mean from the year --

4    Q.      The year 2003.

5    A.      To when; to now?

6    Q.      No later than the year 2003, and prior to that time.

7    A.      Prior to 2003?  Phew.  That's a long time ago.  I

8    really don't remember.

9    Q.      You don't remember.

10   A.      No.

11   Q.      You don't remember ever being involved in having to

12   take a prisoners' legal property?

13   A.      Take an inmate's legal property?

14   Q.      Yes.

15   A.      If it wasn't contraband, no.

16   Q.      If you labeled it "contraband."

17   A.      If something is contraband and I see it, then, I do

18   confiscate it.

19   Q.      You could label anything contraband, if you want; can't

20   you?

21   A.      No, I can't.

22   Q.      Anything in the cell you could label contraband, if you

23   want?

24   A.      No, I can't.

25   Q.      You can come in the cell, under DOC policy, and label a

1  Bible contraband, if you want; can't you?

2  A.     No, I can't.

3  Q.     Anything in that cell, if you write it's tampered, it's

4  tampered with, you -- can't you take that?

5  A.     If property in your possession is tampered with, then,

6  yes, it can be considered contraband.

7  Q.     Altered; right?

8  A.     Altered, tampered with, destroyed, broken, whatever.

9  Q.     Altered.  Altered.  What would be an altered book?

10  A.     Um, altered book could be, say you had a book and you

11  tore a bunch of pages, or tore the bindings and the covers off

12  of them.  That's altered.

13  Q.     And you would label that contraband?

14  A.     Yes, I would.

15  Q.     And you know, anything you label contraband is going to

16  be processed at contraband?

17  A.     Not necessarily, no.

18  Q.     If you write on the misconduct -- there's going to be a

19  misconduct hearing under the label of contraband; correct?

20  A.     Not necessarily, no.

21  Q.     Do you agree with me that this was a tactic that you

22  used in the LTSU to take prisoner's legal property?

23  A.     No, I do not agree.

24  Q.     Because you know that the that was the only way that

25  you could take a person's legal property?

1    A.      No, I do not agree with that.

2          Can I finish answering the question?  No, I do not

3    agree with that.

4          THE COURT:  You need to try not to talk over each

5    other, because the court reporter cannot get that down.  You

6    need to wait for the witness to finish the answer, and then,

7    you can continue with the next question.

8          MR. JACOBS:  No further questions.

9                    REDIRECT EXAMINATION

10   BY MR. BRADLEY:

11   Q.      Mr. Jacobs had asked you about going in in these cell

12   searches and specifically looking just for legal materials in

13   order to confiscate them, et cetera.

14          When you do these cell searches, what types of things

15   are you looking for?

16   A.      Um, there's numerous things that we're looking for.

17   Um, you're looking for, as Officer Chirico testified, you're

18   looking for weapons.  We look for, like in the shower, like

19   feces and urine in their cell in cups or whatever to try to

20   throw it on us.  You're looking for any of their like sheets,

21   blankets that we issue them, checking to see if they have

22   enough of the blankets, what they are issued, or if they have

23   too much, or if the sheets and blankets are torn.

24          We're searching the structure of the cell, the walls,

25   the lights, the doors, the sink, the toilet, everything, to

1  make sure everything is intact, make sure it's solid, make

2  sure it's working, make sure there's no tampering to it.

3        Contraband is a wide -- there's a wide variety of

4  contraband that can be found.  Looking for extra medication

5  that they hoard and keep in their cells.

6  Q.    So, even though the property of the LTSU inmates was

7  limited, there were still things beyond legal property you

8  would be looking for?

9  A.    Oh, yes.

10 Q.    I want to talk to you for a few minutes about the

11 process of issuing a misconduct.

12       Is your testimony that during the cell search you found

13 these two pieces of paper which you determined to be

14 contraband?

15 A.    Yes.

16 Q.    Again, to be clear, the only reason you determined

17 these to be contraband is because it appeared to be the

18 property of another inmate; is that correct?

19 A.    Yes.  It's stated on on it, Gary Banks versus

20 Department of Corrections.

21 Q.    That seizure had nothing to do with the fact it was

22 Andre Jacobs in the cell, or that he filed grievances, or that

23 he had file a lawsuit?

24 A.    No, sir.

25 Q.    Take us through the steps, from the time you picked up

1   those pieces of paper to the point where you actually wrote

2   down on paper the misconduct that has been previously

3   identified, and how that was subsequently given to Mr. Jacobs.

4   A.      Well, it's start at the cell.  I mean, we go to his

5   cell.  We order the inmate to strip search.  He takes off all

6   his clothes, hands us the clothes through the food aperture

7   that we open and give them their food trays and that, things

8   we give them.  Essentially, they are done through the food

9   aperture.  We do a search of the inmate's body, give him the

10  clothes back.  He gets dressed.

11  Q.      If I could just interrupt you there.  This strip

12  search, is it a physical search?

13  A.      No.  We do it like visibly, through the cell door.

14  Q.      So, is that -- the door is between you and the inmate,

15  so you don't physically have your hands on the inmate at this

16  point?

17  A.      No, sir.  No.

18  Q.      Continue, please.

19  A.      And once all that is done, he's handcuffed behind his

20  back.  We have the door open.  He's removed from the cell.

21  Usually one or two officers stays outside the cell with him

22  and stands next to him, make sure he doesn't go anywher, try

23  to assault anybody or anything like just, to make sure that

24  the inmate is secure where he is at.

25          As Lieutenant Giddens testified, yes, he usually was on

1   the pod when we do cell searches, just as the supervisor, to

2   watch over the whole situation, to make sure nothing did

3   happen.

4        Once that's done, then I know this particular time,

5   like I went in the cell.  I started searching the cell, and

6   sitting on Inmate Jacobs' desk in his cell there was a, a

7   white State envelope, State envelopes that they issue to them

8   to mail letters.  And I remember written on that envelope it

9   had, Gary Banks CT8731, and I picked up the envelope and I

10  asked Inmate Jacobs, I said, why do you have Gary Banks'

11  envelope in here?

12       And do you want me to say what he said?  Because there

13  was some vulgar comments.

14  Q.    You can say what you heard.

15  A.    When I asked him why he had Gary Banks' property in his

16  cell, basically response I got was, "Fuck you, pussy."  So,

17  okay.  I realize I'm not going to get nowhere discussing the

18  matter with him.  So, then, I open up the envelope, and there

19  was two sheets of paper in the envelope.  I opened them up,

20  and that's when I noticed on that first sheet of paper, real

21  big, in bold print, said, Gary Banks -- Garry Banks versus the

22  Department of Corrections.

23       I didn't read it any further, because like it's been

24  stated a couple times here, we're not allowed to read the

25  mail.  We just review it to see if anything stands out.  That

1   stood out to me, so I took the paperwork.

2         We continued with the cell search, obviously, checked

3   the physical layout of the cell, the walls, everything, like I

4   said.  Within his cell he also has one box of property, and in

5   that box of property contains his personal property and his

6   legal property.  We searched through that entire box.  We even

7   go as gar as to take the box apart, search through the box.

8   They like hiding things in the cracks of the boxes.  We search

9   pretty much everything in the cell.

10        And once the cell search was done, we put him back in

11  the cell, unhand -- well, secured the door, and then,

12  un-handcuff him.  That's when I went to the Sergeant's office.

13  I wrote the confiscation slip for the items.  I wrote the

14  misconduct.  I do believe that's when I turned the misconduct

15  and the confiscation slip in to the shift commander.  I do

16  believe that I had the items with me to show to the shift

17  commander, that it stated Gary Banks versus Department of

18  Corrections.

19        And then, afterward, I took it back up and I put it --

20  I secured it in the locker I talked about in the armory.  I

21  put it in the metal locker.  I put a lock on it.  That's what

22  I did with it.

23  Q.    So, you're -- and maybe to compare this for the jury's

24  experience, this isn't a situation like a police officer pulls

25  someone over and writes them a ticket.  You don't walk around

1  with the misconduct pad and write the misconducts and give

2  them to the inmates right then and there; do you?

3  A.     No, not at all.

4  Q.     In fact, even though you're the one that issued the

5  misconduct, you're not the one that actually delivers the

6  report to the inmate; is that correct?

7  A.     No.  If you're the writer of the misconduct, you're not

8  permitted to be the server.  It has to be somebody else to

9  sign on the -- where it says, signature of person serving

10  notice, it has to be someone other than the writer of the

11  misconduct to sign that, and actually physically take it to

12  the inmate's cell to serve it to him.

13  Q.     That's on the lower right-hand corner of what's been

14  marked as Plaintiff's Exhibit 7-A?

15  A.     Yes, sir.

16  Q.     Does that indicate who served the misconduct in this

17  case?

18  A.     Its says R. Collings, CO1.

19  Q.     So, would it be fair to say, from the time you leave

20  the cell, went to your office, write the confiscation slip and

21  wrote the misconduct report, you would have had enough time to

22  read through those two pages of legal documents?

23  A.     I would have had enough time to read through it.

24  Q.     You would have had enough time?

25  A.     I would have had enough time, yeah.

1   Q.      And your testimony istreet that you didn't read through

2   them?

3   A.      No.  We're not permitted to read through it.  So, no, I

4   didn't read it.

5   Q.      In fact, what you did do was create two written

6   documents regarding that seizure; is that correct?

7   A.      Yes, sir.

8   Q.      And both of those written documents were then provided

9   by somebody else to the inmate?

10  A.      Yes, sir.

11          MR. BRADLEY:  That's all the questions I have.

12          Thank you, Your Honor.

13                    RECROSS EXAMINATION

14  BY MR. JACOBS:

15  Q.      You stated when you conduct these cell searches, you're

16  looking for weapons.

17  A.      That's one of the items of contraband I'm looking for,

18  yes.

19  Q.      Feces?

20  A.      Yes.

21  Q.      Urine?

22  A.      Yes.

23  Q.      Torn blankets?

24  A.      Yep.

25  Q.      Make sure the toilet is working?

1    A.      Yes.

2    Q.      Sink, all that is working?

3    A.      Yes.

4    Q.      You need to read a person's legal documents to see if

5    it's a weapon in the cell?

6    A.      Do I need to read the legal documents?

7    Q.      Yes.

8    A.      No, I don't.

9    Q.      Do you need to review the legal documents to see if

10   there's a weapon in the cell?

11   A.      Actually, yes.

12   Q.      Do you need to review a legal document to see if

13   there's urine in this cell?

14   A.      In a way, actually, yes.

15   Q.      Do you need to review a legal document to see if feces

16   are in the cell?

17   A.      Yes.  It's been known for inmates to hide things within

18   their paperwork there, their property, books; yes.  I have to

19   review every piece of paper in that cell.

20   Q.      You have to read what was in the document to discover

21   these things; huh?

22   A.      No, I don't have to read what's in the document, no.

23   Q.      Okay.  And the misconduct that you issued to me on

24   September 16th, 2003, is that an accurate statement of what

25   you remember taking place?

```
 1   A.      The misconduct I wrote you?

 2   Q.      Yes.

 3   A.      Yes.

 4   Q.      Is that accurate?

 5   A.      That is what I wrote, yes.

 6   Q.      Is it accurate?

 7   A.      I just said, yes.

 8   Q.      Are the charges accurate?

 9   A.      Refusing an order, possession of contraband, borrowing

10   property.  Yes.

11   Q.      Now, you just testified that in the course of that cell

12   search, you asked me about those documents, and I said, "Fuck

13   you"?

14   A.      You said, "Fuck you, pussy"; yes.

15   Q.      Fuck you, pussy.  Nowhere in that document does it say

16   that; does it?

17   A.      No, it don't.

18   Q.      And under the DOC policy, wouldn't that be using

19   abusive language?

20   A.      Yes, it would.  But if can I explain, there's some

21   other circumstances with that, though.

22   Q.      And don't you think that you inquiring why I had these

23   documents would be important for ownership?

24   A.      No, it wouldn't, because they clearly stated that they

25   was Gary Banks'.
```

1    Q.      So, what's the point of asking me why did I have the

2    documents, if they were going to be contraband regardless?

3    A.      Why not ask you?  I mean, you may tell me the truth and

4    say, well, yeah, it's his.

5            You always ask, any time you find contraband in the

6    inmate's cell, you ask what it is, why they have it, and where

7    they get it from.

8    Q.      The truth is, you never asked me why I had the

9    documents; correct?

10   A.      No, that's not the truth.

11   Q.      The truth is, I never said, "Fuck you, pussy"?

12   A.      No, that's not the truth.

13   Q.      Because if I said it, you would have it in the

14   misconduct; correct?

15   A.      Not necessarily, no.

16   Q.      Isn't that what the misconduct is for?

17   A.      Yes, it is.  That's exactly what it's for.

18   Q.      As a Department of Corrections employee, aren't you

19   required to report incidents accurately?

20   A.      Yes, I am, but if I wrote a misconduct every single

21   time an inmate used --

22            MR. JACOBS:  Your Honor.

23            THE COURT:  Just a second.  You know, just respond

24   to the question.

25            THE WITNESS:  Yes, ma'am.

1    BY MR. JACOBS:

2    Q.      You stated that the documents that you took on

3    September 16th were inside of an envelope?

4    A.      When I saw them on your desk, they was inside of an

5    envelope, yes.

6    Q.      Then, on the confiscation slip, you wrote, two pages of

7    legal statements?

8    A.      Yes, I did.

9    Q.      Belonging to Inmate Gary Banks?

10   A.      Yes, I did.

11   Q.      Did that include the envelope?

12   A.      No, it does not.

13   A.      You just made the envelope up just now; didn't you?

14   A.      No.

15          MR. JACOBS:  No further questions.

16                       REDIRECT EXAMINATION

17   BY MR.  BRADLEY:

18   Q.      Why didn't you charge Mr. Jacobs with the abusive

19   language charge on September 16th, 2003?

20   A.      Well, to be quite honest about it, on that unit, being

21   the nature of the inmates that was on the unit, um, be quite

22   honest, if I wrote up every inmate every time they used some

23   abusive language to me, I probably literally would have wrote

24   100 misconducts a day.

25          I mean, the truth of the matter is, sometimes, you

1   know, when you're doing the cell search, the important thing

2   is you found the contraband.  So, I document the contraband.

3   The fact he use some abusiv language, to me, I mean,

4   literally, if I wrote up everybody that used abusive language

5   to me on that unit, I would have wrote 100 misconducts a day,

6   too.

7           MR. BRADLEY:  Nothing further, Your Honor.  Thank

8   you.

9                       RECROSS EXAMINATION

10  BY MR. JACOBS:

11  Q.      But you took the time out to write, what was that,

12  three different charges?

13  A.      I believe I put three different charges on it, yes.

14  Q.      And you took the time out to write what you say took

15  place on September 16th, 2003; correct?

16  A.      Regarding the contraband, yes.

17          MR. JACOBS:  No further questions also.

18          MR. BRADLEY:  That's all, Your Honor.  Thank you.

19          THE COURT:  Okay.  The witness is excused.  This

20  will be a good time for our afternoon recess.

21          Would everyone please rise and excuse the jury.

22          (Whereupon, jury retires.)

23          THE COURT:  We'll be in recess.

24          (Whereupon, court recessed at 2:55 p.m.)

25                       *  *  *  *  *

```
 1              (Whereupon, court reconvened.)

 2              THE COURT:  Please be seated.

 3              Call your next witness.

 4              MR. BRADLEY:  Yes, Your Honor.  The defendants call

 5   Thomas McConnell to the stand.

 6              THE COURT:  The witness could please come forward,

 7   stand and be sworn.

 8              THE COURT:  Thank you.  Please take the witness

 9   stand.

10                         *  *  *  *  *

11              THOMAS EDWARD McCONNELL, a witness herein,

12   having been first duly sworn, testified as follows:

13                     DIRECT EXAMINATION

14   BY MR. BRADLEY:

15   Q.      Good afternoon, sir.  Would you state your name, and

16   spell your last name for the record, please.

17   A.      Good afternoon.  My name is Thomas Edward McConnell.

18   Last name is spelled, M, as in Mc, c-C-O-N-N-E-L-L.

19   Q.      Are you currently employed?

20   A.      No, sir.  I'm retired.

21   Q.      And where are you retired from?

22   A.      From the State Correctional Institution in Pittsburgh.

23   Q.      And were you an employee of the Department of

24   Corrections there?

25   A.      Yes, I was.
```

```
 1   Q.      How long had you worked for the Department of
 2   Corrections?
 3   A.      25 years.
 4   Q.      And what was your position when you retired?
 5   A.      At the time of my retirement, I was a CO4, Corrections
 6   Officer 4, or A captain.
 7   Q.      And What was your assignment at that time?
 8   A.      At the time of my retirement I was the night shift,
 9   10:00 p.m. to 6:00 a.m., shift commander.
10   Q.      And prior to holding that position, what position did
11   you hold?
12   A.      Beginning with my employment in December of 1979, I
13   started as a Corrections Officer 1.
14           In 1988, I was promoted to the rank of sergeant.
15           In 1991, I was promoted to the rank of lieutenant.
16           In 1996, I was promoted to the rank of captain.
17           From May of 1997 until October of 1999, I was the
18   security captain.
19           And then, again, from May of 2003 through October of
20   2004, I was the security captain.
21   Q.      And those positions as security captain were at
22   SCI Pittsburgh?
23   A.      Yes, sir.
24   Q.      And could you tell the jury just briefly what your
25   duties would be as the security captain?
```

1    A.      The security captain in a correctional institution has

2    a wide range of responsibilities.   They include conducting

3    inspections of all the security aspects of the facility,

4    including electronic equipment, security equipment, cameras,

5    et cetera.

6           They also conduct internal investigations of inmate

7    activity and/or staff activity.

8           They are the liaison officer between a number of law

9    enforcement agencies, such as the Pennsylvania State Police,

10   the FBI, the Secret Service, and after 2001, the joint

11   terrorism task force.

12   Q.      Do you know the plaintiff in this case, Andre Jacobs?

13   A.      Not very well.

14   Q.      Do you know when you had first became aware of

15   Mr. Jacobs, or learned of his existence?

16   A.      At this time, I would say my first recollection of

17   Mr. Jacobs was in September of 2003.

18   Q.      And is that related to the events that we're here in

19   court for?

20   A.      Yes, sir, it is.

21   Q.      At that time, did you have prior knowledge of

22   Mr. Jacobs' grievance activity?

23   A.      No, sir, I didn't.

24   Q.      Were you aware at that time that he had filed and was

25   engaged in litigation of a lawsuit against DOC personnel from

1    SCI Pine Grove?

2    A.      No, I didn't.

3    Q.      Could you please explain to the jury how you came to be

4    involved in this matter that we are here for?

5    A.      On or about September 17th, 2003, I received a

6    communication from Mr. Jacobs in the form of an Inmate Request

7    to Staff.  Basically was a handwritten note to me.  Actually

8    was addressed to security, not to me specifically.  But it was

9    addressed to security.

10          And in that document Mr. Jacobs stated that staff

11   members in the LTSU had stolen his legal work from

12   Inmate Lyons.  He then advised me I was in violation of the

13   law and I was -- and denying him access to Courts, and that he

14   wanted his documents back.

15   Q.      Putting up a document previously marked as Plaintiff's

16   Exhibit 3.  Is this the document you were just referencing?

17   A.      Yes, sir, it is.

18   Q.      And in a response to what Mr. Jacobs had written, did

19   you provide a response to him?

20   A.      Yes, sir I did.

21   Q.      And does that appear in the bottom portion of this

22   document?

23   A.      Yes, it does.

24   Q.      Is that your name and signature on the bottom of the

25   document?

1  A.      Yes, it is.

2  Q.      And could you read to the jury what you wrote?

3  A.      I wrote, Mr. Jacobs, nobody, certainly not

4  Lieutenant Giddens or myself, is trying to violate your rights

5  to access to the Courts.  The fact is, an officer found some

6  items belonging to someone other than Lyons in Lyons' cell, so

7  they confiscated them.  I will review the matter with

8  Lieutenant Giddens, and if appropriate, the items will be

9  returned to you.  I don't -- I don't think I need remind you

10  that this does technically constitute loaning or borrowing

11  property.

12       And then, I signed and dated it.

13  Q.      Do you have any recollection of doing anything after

14  September 17th, after you responded to the inmate request?

15  A.      No, sir, I don't.

16  Q.      Do you know if you ever talked to Lieutenant Giddens?

17  A.      I don't have any direct recollection of doing so.

18  However, I would have probably at least asked

19  Lieutenant Giddens what this was in reference to.  I think he

20  may have alluded to the fact that there were pending

21  misconducts.

22  Q.      Would you have recalled if Lieutenant Giddens had asked

23  you to do anything in violation of Department of Corrections

24  rules, policies or the Code of Ethics with regard to the

25  materials that were confiscated from Inmate Lyons?

1   A.      Yes, I would have.

2   Q.      And what would you have done?

3   A.      I would have advised him at this time that any such

4   request was inappropriate, and then, I would have documented

5   that to my supervisors.

6   Q.      And that didn't happen; did it?

7   A.      No, sir.

8   Q.      Again, just so I'm clear, following the providing the

9   written response to Mr. Jacobs, did you do anything; did you

10  have any involvement in the matters that we're here in court

11  for?

12  A.      I have no direct recollection of that, sir.

13  Q.      Do you know was happened to the materials?

14  A.      No, I do not.

15  Q.      Did you direct that anything be done with the

16  materials?

17  A.      No, I did not.

18  Q.      Do you know if you ever saw the materials?

19  A.      At this point in time, I don't recall having seen them.

20  Q.      Other than what you've identified with

21  Lieutenant Giddens, did you have any other conversations with

22  any of the other defendants in this matter regardMr. Jacobs,

23  regarding any plan or agreement to retaliate against

24  Mr. Jacobs for filing grievances and lawsuits?

25  A.      No, I did not.

1   Q.      Did you ever direct anyone, including defendants, or

2   including other members of the Department of Corrections, to

3   take any retaliatory action against Mr. Jacobs, or any action

4   to deprive his access to courts?

5   A.      No, I did not.

6   Q.      Did you enter into any agreement, whether explicit or

7   implicit, with the other defendants to take any retaliatory

8   action against Mr. Jacobs, or any action to deprive him of his

9   access to courts?

10  A.      No, I did not.

11          MR. BRADLEY:  No further questions.  Thank you.

12                     CROSS EXAMINATION

13  BY MR. JACOBS:

14  Q.      Good afternoon.

15  A.      Good afternoon.

16  Q.      As security captain, do you also review the complaints

17  of prisoners?

18  A.      On occasion, I did.

19  Q.      Do you recall any specific complaints coming from

20  persons in the LTSU?

21  A.      I don't recall specifics, although, I'm sure there were

22  some.

23  Q.      But you don't remember the nature of them?

24  A.      They probably varied, depending on the particular

25  individual who might have submitted them.

1    Q.      Do you recall any complaints about a policy or practice

2    of guards in the LTSU seizing and destroying legal property?

3    A.      No, I do not.

4    Q.      You recall any complaints of guards in the LTSU

5    retaliating against prisoners for exercising their First

6    Amendment rights?

7    A.      No, I do not.

8    Q.      But if those complaints were being made, are those the

9    type of complaints that would come across your desk?

10   A.      As I stated previously, they may have.

11   Q.      But you don't remember?

12   A.      I don't recall them.

13           MR. JACOBS:  No. 3.

14   BY MR. JACOBS:

15   Q.      Referring to Plaintiff's Exhibit No. 3, upon you

16   receiving that request, did you speak to anybody concerning

17   the documents?

18   A.      The only person I would have spoken to, in my

19   recollection, would have been Lieutenant Giddens, and that

20   would have been merely to ask what this was in reference to.

21   Q.      If I recall correctly, you stated that he may have said

22   that there were misconducts pending regarding the matter?

23   A.      I believe that's what I said.

24   Q.      Meaning more than one misconduct?

25   A.      I believe that's what I said.

1  Q.     Do you recall -- were you present for the testimony in
2  this case?

3  A.     Yes, I was.

4  Q.     Do you recall any testimony concerning a misconduct
5  being issued for the documents being referred to on this form?

6         MR. BRADLEY:  Your Honor, I'm not sure if he's
7  asking from the testimony, or did he know in 2003.

8         MR. JACOBS:  I just asked him from the testimony.

9         MR. BRADLEY:  Whether he knew from the testimony
10 isn't relevant to what he knew when he wrote this response.

11        THE COURT:  I think he can ask what his
12 understanding is from the testimony about that.

13 A.     Okay.  Could you repeat your question?

14 Q.     You were present for the testimony; correct?

15 A.     That's correct.

16 Q.     Do you recall whether there was any testimony that a
17 misconduct was issued for the documents that were taken on
18 September 15th, 2003?

19 A.     I believe there was testimony referencing a misconduct
20 issued to Inmate Lyons.

21 Q.     Okay.  And based on this document right here, you
22 indicated that technically that would be loaning and
23 borrowing, Mr. Lyons being in possession of my legal
24 documents; correct?

25 A.     That's what I said.

1    Q.      Are you trying to say that prisoners are not allowed to

2    assist each other with legal work?

3    A.      No, that's not what I'm saying .

4    Q.      Wasn't your position in the year 2003 that a prisoner

5    could not assist another prisoner with legal work?

6    A.      No, that was not my position.

7    Q.      And by your response in this document right here, you

8    were aware that Mr. Lyons was in possession of my legal

9    property; right?

10   A.      Yes, based on the misconduct.

11   Q.      And based on your response right here; right?

12   A.      Can you repeat the question?

13   Q.      Based on your response in this document right here,

14   Exhibit No. 3, you already knew that Mr. Lyons was in

15   possession of my legal property?

16   A.      Based on your statement, yes.

17   Q.      And based on you talking to Mr. Giddens; correct?

18   A.      No, based on your statement.

19   Q.      Based on my admission that Mr. Lyons had my legal

20   brief?

21   A.      Yes, based on your statement that Mr. Lyons had your

22   legal property.

23   Q.      Yet, you still stated in that document that you would

24   consider returning those documents?

25   A.      I did state that.

1    Q.    So, just because documents were taken that belonged to

2    me from Mr. Lyons, doesn't necessarily mean that the documents

3    not be returned; correct?

4    A.    If they were determined to be contraband, they wouldn't

5    be returned.

6    Q.    But you already knew when you wrote this document right

7    here, based on my own statement, that Mr. Lyons had those

8    documents, and that those documents belonged to me; right?

9    A.    Yes.

10    Q.    And you still said that you would consider returning

11    those documents.

12    A.    What I said was, I will review the matter, and if

13    appropriate, the items will be returned.

14    Q.    To me?

15    A.    You.

16    Q.    Correct?

17    A.    To you.

18    Q.    Okay.  Despite the fact that the documents in

19    Mr. Lyons' possession was interpreted as being contraband?

20    A.    Is that a question?

21    Q.    I'm asking you that, you still made that consideration,

22    you still made the consideration of returning those legal

23    documents, despite the fact that they were labeled contraband

24    in the hands of Mr. Lyons?

25    A.    I considered that possibility, yes.

1    Q.      Is that also consistent with, with any policy or

2    procedure of the Department of Corrections?

3    A.      That's a very broad question.  Can you narrow the

4    question?

5    Q.      Were you present for the testimony of Mr. Bared?

6    A.      Yes, I was.

7    Q.      Do you know who Mr. Beard is?

8    A.      Yes, I do.

9    Q.      Do you recall in Mr. Beard's testify that those

10   documents, although those documents may have been labeled

11   contraband in the hands of Mr. Lyons, if they were returned to

12   me, they were not considered contraband.

13           Do you remember that testimony?

14   A.      I recall something to that effect, yes.

15   Q.      Is there a policy or procedure that addresses whether

16   or not documents, or any type of item that's labeled

17   contraband, can be returned to a prisoner?

18   A.      I can't cite specific policy language that states that.

19   A.      Do you recall any?

20   A.      No.

21   Q.      I'm not sure if I heard you correctly on direct

22   examination.  Did you -- you don't recall whether or not you

23   actually received these documents?

24   A.      I don't believe I said anything incorrect about that.

25   Q.      Did you receive the document?

1   A.      I don't recall.

2   Q.      You don't remember?

3   A.      No.  I don't remember.

4   Q.      Had you received these documents, what would be the

5   procedure for the handling of them?

6   A.      Had I received the documents, and they were marked as

7   contraband, with the attached DC 154A and related misconduct,

8   they would have been secured either by myself or another

9   member of my staff in the Security Office until the outcome of

10  the misconduct hearing.

11  Q.      Suppose there was no misconduct hearing.

12  A.      I don't know if there was or there wasn't.

13  Q.      But I'm saying, suppose they weren't -- suppose there

14  wasn't a misconduct hearing, and those documents were still

15  being held in the unit.

16  A.      In the unit?

17  Q.      Yeah, before they got sent to the Security Department.

18  A.      I wouldn't have anything to do with them until they

19  were sent to the Security Department.

20  Q.      So, do the documents get sent to the Security

21  Department before or after the misconduct hearing?

22  A.      In this particular instance, or in general?

23  Q.      Pursuant to the policy.

24  A.      In general terms, misconducts were issued to the

25  inmate.  If items were confiscated as contraband, they were

1  turned in to the Security Office.

2  Q.      And do you have any recollection as to how those

3  documents were handled in this particular case?

4  A.      No, I do not.

5  Q.      But generally, you're saying that as soon as they are

6  confiscated, they are sent to the Security Department?

7  A.      In general, that's the case.  There are cases as well

8  in restricted housing units where they are secured on the

9  unit, because that's where the misconduct hearing will be

10 held.

11 Q.      You stated that prior to the events in question, you

12 did not know whether or not I had pending litigation in the

13 courts?

14 A.      That's what I said.

15 Q.      But you did become aware of that at some time; correct?

16 A.      Based on this statement that you sent me on the

17 DC-135A.  If I may, you specifically stated, you specifically

18 stated that the items were in reference to your active case,

19 and that there were motions filed on, quote, defendants.

20 Q.      File by defendants.

21 A.      All right.  Okay, fine.  That's what it says.

22 Q.      So, you did become aware, based on this statement.  And

23 you did become aware that I was trying to access -- exercise

24 my right to access to the courts?

25 A.      Yes.

1    Q.      And you stated that you were not trying to interfere

2    with that right of access to the courts?

3    A.      That's what I stated.

4    Q.      And that you would review the matter with

5    Lieutenant Giddens concerning those documents?

6    A.      That's correct.

7    Q.      And would you have, would you have gotten his input on

8    whether or not to return those documents?

9    A.      I'm not sure I understand your question.

10   Q.      Well, the purpose of you talking to Defendant Giddens

11   was to get his position on the matter; correct?

12   A.      No, that's not why I talked to Lieutenant Giddens.

13           My purpose for contacting the Lieutenant was simply to

14   establish why you wrote the statement and what documents were

15   being referenced.

16   Q.      I told you on the statement why I wrote the document --

17   why I wrote the statement; correct?

18   A.      That's true.

19   Q.      And you stated that you had no recollection whether or

20   not the documents were ever sent to you; right?

21   A.      That's correct.

22   Q.      Showing you what's been marked as Plaintiff's

23   Exhibit No. 29.

24           Do you recognize that document?

25   A.      Yes, I do.

```
 1   Q.      Would that be your name?

 2   A.      Yes, that's my name.

 3   Q.      You see No. 1?

 4   A.      Yes, I do.

 5   Q.      Did you read it?

 6   A.      Did I read it?

 7   Q.      Yeah.

 8   A.      Yes.

 9   Q.      Do you see a response?

10   A.      Yes, I do.

11   Q.      So, you're denying that those documents were ever sent

12   to you?

13   A.      No.  I'm denying that I recall ever receiving them.

14   Q.      You didn't say that you didn't recall, you said that

15   you denied that; correct?

16   A.      Correct.

17   Q.      And now you're saying, you don't remember?

18   A.      That's correct.

19   Q.      But those documents were sent to you.  There would be

20   documentation that they were sent to you; wouldn't it?

21   A.      Yes, there would.

22   Q.      And those documents would be accessible by the

23   Department of Corrections; correct?

24   A.      That's correct.

25   Q.      And you would be able to determine whether or not the
```

1  documents were actually sent to you or they weren't sent to

2  you; wouldn't you?

3  A.     If I had access to those records, yes.

4  Q.     You're the one that creates the records in the Security

5  Department; aren't you?

6  A.     Yes, sir.

7  Q.     And there's a specific form that a person within -- a

8  Security Department person fills out when they receive

9  contraband from within the prison; isn't it?

10 A.     What form are you referencing, sir?

11 Q.     Is there any form?

12 A.     We kept a log book, a register, if you will, of items

13 received.

14 Q.     So, it would be documented?

15 A.     Yes.

16 Q.     But if you didn't fill out this form, and you didn't

17 secure this documentation, it wouldn't be documented?

18 A.     It's documented on the 154A.

19 Q.     I mean, further documentation after it's sent to the

20 Security Department.

21         Isn't there further documentation after the 154A?

22 A.     As I just stated, there was a log book.

23 Q.     And was also acknowledgement that those documents are,

24 or any type of contraband was received by the Security

25 Department?

1    A.    That was the purpose of the log book, yes.

2    Q.    Showing you what's been marked as Plaintiff's

3    Exhibit No. 30.

4          Do you recognize this document?

5    A.    I can't say for certain that I do.  I can't recall it,

6    other than what's on the screen right now.

7    Q.    Can you see who that document is addressed to?

8    A.    Yes.  It's addressed to, Security Department.  My name

9    is written underneath it.

10   Q.    And you see the date?

11   A.    October 7th, 2003.

12   Q.    And that would have been after you responded to my

13   initial questions concerning the documents taken from

14   Mr. Lyons; correct?

15   A.    That is correct.

16   Q.    Do you have any recollection of receiving any type of

17   letter, if you will, of this type?

18   A.    From you?  No, I don't.

19   Q.    Do you see my allegation in that document that --

20         MR. BRADLEY:  Your Honor, I'm going to object.  He's

21   indicated that he doesn't have any recollection of seeing

22   this.  Perhaps if he wants to show it to him first, to refresh

23   his recollection.

24         THE COURT:  Give him an opportunity to read it and

25   see if it refreshes his recollection.

1          MR. JACOBS:  Okay.

2    BY MR. JACOBS:

3    A.    I've read it.

4    Q.    Okay.  Do you see my allegation in the body of this

5    letter that --

6          MR. BRADLEY:  Your Honor, in the absence of him

7    having -- well, he didn't ask the question.

8          THE COURT:  You need to ask if it has refreshed his

9    recollection.

10   BY MR. JACOBS:

11   Q.    I'm going to show his attention to that specific

12   section.

13         THE COURT:  You need to ask if his recollection is

14   refreshed after reviewing it.

15         MR. JACOBS:  He said he don't remember receiving it.

16         THE COURT:  That's why you asked him to read it.

17   BY MR. JACOBS:

18   Q.    Does that refresh your recollection?

19   A.    No, it doesn't.

20         MR. BRADLEY:  Based on that, Your Honor, I would

21   object to any further questioning on this exhibit to this

22   witness.

23         THE COURT:  The objection is sustained.

24   BY MR. JACOBS:

25   Q.    As a member of the Security Department, you're

1  responsible for the accountability of all contraband sent to

2  the Security Department; correct?

3  A.      That is correct.

4  Q.      And you're responsible for maintaining the chain of

5  custody that -- of that contraband; correct?

6  A.      Yes.

7  Q.      When does your responsibility with regards to that

8  contraband begin?

9  A.      It begins the time it comes into my office.

10 Q.      And when does it end?

11 A.      The final disposition of the property.

12 Q.      And that would be when?

13 A.      That would vary on a case-to-case basis.

14 Q.      And it would be based on a grievance proceeding?

15 A.      No.

16 Q.      Are you familiar with the policy that if a prisoner

17 files a grievance about property taken from him, that no

18 disposition is supposed to be taken until after all levels of

19 appeal are exhausted?

20 A.      Can you repeat the question?

21 Q.      If a prisoner files a grievance about property being

22 taken from him, nothing is supposed to be done with that

23 property until all levels of appeal are exhausted; correct?

24 Isn't that the policy?

25 A.      Yes, that's correct.

1   A.      Wasn't that the policy at the time in question?

2   A.      I believe it was.

3   Q.      So, nothing was supposed to be done with that property

4   that was taken on September 17th, 2003 until after the final

5   level of appeal was exhausted; correct?

6   A.      That would be correct.

7   Q.      I'm showing you what's marked as Defendant's Exhibit

8   No. E, or Exhibit E.  Do you recognize that exhibit?

9   A.      I recognize what it is.

10  Q.      Okay.  Do you see the date?

11  A.      Yes, I do.

12  Q.      So, and do you agree with me that this is the final

13  disposition of the grievance that I filed regarding the

14  documents taken from Mr. Lyons on September 15th, 2003?

15  A.      Can you repeat that, please?  I was reading the

16  document.

17          MR. BRADLEY:  Your Honor, we'll stipulate that this

18  is the letter indicating the final review of this grievance.

19          THE COURT:  Is that stipulation accepted,

20  Mr. Jacobs?

21  BY MR. JACOBS:

22  Q.      Do you agree with me, based on this document and the

23  date of this document, November 4th, 2003, that the documents

24  taken from Mr. Lyons on September 15th, 2003 should not have

25  been destroyed any time prior to that day, under the DOC

1    policy?

2    A.     I'm not sure I understand your question in reference to

3    this document.

4    Q.     In reference to the preservation of the item being

5    challenged through the grievance process.  You stated when a

6    prisoner files a grievance challenging the seizure of any of

7    his property, that nothing is supposed to be done with that

8    property until all levels of appeal are exhausted.

9           You remember that?

10   A.     Yes.

11   Q.     And this would be a level of appeal; correct?

12   A.     Yes.

13   Q.     So, at least until November 4th, 2003, those documents

14   should not have been destroyed?

15   A.     That's correct.

16   Q.     And even if they had been destroyed, or anything was

17   intended to be done with them, I was supposed to be notified;

18   wasn't I?

19   A.     Correct.

20   Q.     And I was supposed to be given an opportunity to shred

21   them or destroy those documents?

22   A.     Technically, the items were taken from Mr. Lyons.  They

23   weren't taken from you.

24   Q.     I understand that.

25   A.     And the issue at hand was that they were contraband

1   from Mr. Lyons.

2   Q.      But I filed the grievance.

3   A.      I understand that.  The documents were evidence of

4   Mr. Lyons' misconduct.

5   Q.      But I was the known owner; correct?

6   A.      No.

7   Q.      No?

8   A.      The mere fact you said they were yours, did not

9   establish ownership.

10  A.      Well, the guards said that they were mine, too.  You

11  remember that testimony?

12  A.      No.

13  Q.      You don't remember that?

14  A.      No.

15  Q.      I'm showing you what's been marked as Plaintiff's

16  Exhibit No. 6.

17          Do you see the highlighted portion of that document?

18  A.      Yes, I do.

19  Q.      Does that refresh your recollection as to who these

20  documents belong to?

21          MR. BRADLEY:  I'm going to object.  He testified

22  he's never seen the document.  So, he can only speculate as to

23  whether he knows what they are saying, and also, who they

24  belonged to.

25          THE COURT:  Please lay a foundation about his

1  understanding with respect to this document, Mr. Jacobs.

2  BY MR. JACOBS:

3  Q.     Are you suggesting that I was not the known owner of

4  those documents?

5  A.     No, I'm not suggesting anything.

6  Q.     So, you don't dispute I was the known owner of those

7  documents?

8  A.     I didn't have any facts at the time as to who owned

9  them.

10  Q.     Well, I tell you in the initial litter that I sent to

11  the Security Department that they belonged to me; correct?

12  A.     Yes, you did.

13  Q.     Did you do any investigation as to whether or not that

14  representation was true or false --

15  A.     No, I didn't.

16  Q.     -- or to the circumstances of the seizure of those

17  documents?

18  A.     No, I did not.  Once I established that misconducts

19  were pending, I waited for the outcome of the misconducts, and

20  I was not in the process of investigating that matter in any

21  way.

22  Q.     You stated that these documents were contraband in the

23  hands of Mr. Lyons; correct?

24  A.     Yes.

25  Q.     If they belonged to me, were they also contraband in my

1   hands?

2   A.      They were no longer yours.  You had surrendered control

3   of those documents to Mr. Lyons.  They now became contraband

4   for Mr. Lyons, and you had no more control over them.

5   Q.      Under the policy at the time in question, those

6   documents were returned to me, and I was identified as the

7   owner of those documents, would they still be contraband?

8   A.      Yes, because they were no longer your documents.

9   Q.      They would still be contraband, even if they were

10  returned to me?

11  A.      They wouldn't be returned to you, because they were

12  contraband.  They were found in the possession of another

13  inmate.

14  Q.      So, because -- so, you're saying that because they were

15  found in the possession of Mr. Lyons, and they were labeled

16  contraband based on him being found in possession of those

17  documents, that's the end of the story?

18  A.      Yes.  For me, that was the end of the story.  They were

19  found in possession of another individual.  You had

20  surrendered control of those documents.  Therefore, they were

21  contraband.

22  Q.      Yet, in your response to the request slip, you stated

23  that you were still considering returning those documents?

24  A.      No.  In my initial response to you in September, the

25  first communication from you, I said that would I take it

1  under advisement and consider it.  That was the very first and

2  only contact I had with you on that.

3  Q.     And you knew at that very first and only contact that

4  Mr. Lyons was in possession of my legal documents?

5  A.     I knew that Mr. Lyons was in possession of contraband;

6  i.e., the property of another individual.  I don't know if

7  they were legal documents or they were blank papers.

8  Q.     Well, you knew they weren't blank papers, because they

9  were identified as belonging to someone else; correct?

10 A.     No, that's incorrect.  I hadn't seen the documents.  I

11 don't know what they were.

12 Q.     So, is it a policy of the Department of Corrections to

13 destroy the legal property of a prisoner because it was found

14 in the hands of another prisoner; is that the policy?

15 A.     It is not the policy of the Department of Corrections

16 to destroy any property --

17 Q.     And --

18 A.     -- that rightfully belongs to an individual.  If it is

19 found in the possession of another person, it's contraband.

20        MR. JACOBS:  Your Honor -- Your Honor, I asked him a

21 simple, yes, or, no, question about the DOC policy.

22        THE COURT:  Just answer the questions, yes, or, no.

23        THE WITNESS:  Yes, Your Honor.

24        THE COURT:  Thank you.

25 BY MR. JACOBS:

1   Q.      Is it the policy of the Department of Corrections to

2   destroy legal property of a prisoner because it is found in

3   the hands of another prisoner?

4   A.      No.

5   Q.      Yet, my legal property was destroyed?

6           MR. BRADLEY:  Your Honor, there's no foundation for

7   that statement.

8           MR. JACOBS:  Well.

9           THE COURT:  You have to lay a foundation whether he

10  knows whether your property was destroyed.

11  BY MR. JACOBS:

12  Q.      Do you know what happened to the documents?

13  A.      No, I do not.

14  Q.      And under normal circumstances, they would have been

15  sent to you?

16  A.      Yes.

17  Q.      But in this particular case, you don't recall ever

18  receiving them?

19  A.      That's correct.

20  Q.      And if they were sent to you, you would know whether or

21  not they were sent to you; wouldn't you?

22  A.      I'm not sure I follow your question.

23  Q.      In other words, there would be documentation that these

24  documents were received by the Security Department?

25  A.      As I previously testified, if I received the documents,

1   I would have logged them into our log book.

2   Q.      But if you did not want to document that you were, in

3   fact, in receipt of these documents, you would just not fill

4   out the form acknowledging that you received the documents;

5   correct?

6   A.      No; that's incorrect, sir.

7   Q.      How is that incorrect?

8   A.      Because I wouldn't do that.

9   Q.      I mean, is it possible?

10  A.      No.

11  Q.      Isn't it true that if you don't follow the procedure

12  for documenting this contraband, and these materials

13  specifically, no record is contradicted that you ever received

14  the documents?

15  A.      As previously stated, the DC 154A specifically says

16  they were turned in to Security.

17          My testimony is, I don't recall receiving the

18  documents, and absent anything there in the record, the log

19  books, to show they were received, I don't know that I did.

20  Q.      Again, would you agree with me, that if the proper

21  procedures as far as documenting the contraband that was

22  received in the Security Department were not followed, there

23  would be no documentation as part of the Security Department

24  that these documents were ever received?

25  A.      No.  I would disagree with you.

1    Q.      So, if no one fills out the documentation, the

2    documents will never be created; right?

3    A.      The fact that the DC 154A was filled out and

4    specifically said they were turned in to Security, documents

5    that they were --

6    Q.      I'm not talking about the, before the Security

7    Department, I'm taking about after the Security Department,

8    after they are received in the Security Department; okay?

9    A.      Okay.

10   Q.      If you don't fill out that documentation saying, yes, I

11   received these documents, this is where we put them, this is

12   what we did with them, so forth and so on, there would be no

13   record in that Security Department that these documents were

14   receive or what was done with them; correct?

15   A.      Correct.

16   Q.      Are you familiar with the procedures for how

17   documentary evidence is supposed to be handled by the Security

18   Department?

19   A.      Am I familiar with what?

20   Q.      If you receive evidence in the Security Department,

21   written evidence in the Security Department that's labeled

22   "contraband", or as being used -- any type of evidence,

23   there's specific procedures for how that's supposed to be

24   handled?

25   A.      Yes, I'm familiar with those procedures.

1    Q.      Isn't it true that if you received this type of

2    evidence and it tends to prove or disprove any action, there

3    are specific procedures for how it's supposed to be handled?

4    A.      There are procedures in place for how evidence is to be

5    handled.

6    Q.      Specifically, written evidence?

7    A.      Written evidence to what?

8    Q.      Anything.

9    A.      I'm not sure I can follow your line of questioning.

10   Q.      Showing you what's been marked as Plaintiff's

11   Exhibit No. 31 --

12          MR. BRADLEY:  Excuse me, Your Honor.  Before he asks

13   any specific questions about this, could the witness be

14   permitted to examine the entire document?

15          THE COURT:  Yes, he may.

16          If you'll take a second to familiarize yourself with

17   the document.

18   BY MR. JACOBS:

19   A.      Yes, I did.

20   Q.      Does that refresh your recollection as to procedures in

21   place concerning the handling of evidence?

22   A.      It's identifying the procedures in place.  I can't say

23   for certain that that was in place at the time of this issue.

24          MR. BRADLEY:  Your Honor, we'll stipulate that was

25   the policy that was in place at the time, 2003.

1          THE COURT:  Thank you.  The stipulation is accepted.

2          THE WITNESS:  Yes, ma'am.

3   BY MR. JACOBS:

4   Q.      You see No. 3, evidence accountability?

5   A.      Yes, I do.

6   Q.      Can you take minute to look through that?

7   A.      Okay.

8   Q.      Concerning the documents in question, had those

9   documents been sent to you -- had those documents been sent to

10  you, you would have been the person accountable for them;

11  correct?

12  A.      That is correct.

13  Q.      And the reason you're saying now you have no

14  recollection as to whether you received them or not is so you

15  can avoid that accountability; correct?

16  A.      No, that is incorrect.

17  Q.      Do you see No. 3, Section 1, each individual who has

18  custody, who had custody of evidence is identified on a

19  receipt of property.

20  A.      Yes, I do.

21  Q.      And that form would have been created after the

22  evidence in question was sent to the Security Department;

23  correct?

24  A.      Yes.

25  Q.      Are you familiar with that form, DC 436, receipt for

1    property form?

2    A.      At this point in time, I don't recall these forms.

3    Q.      You done know what that form is?

4    A.      I don't recall those forms.

5    Q.      At all?

6    A.      At all.

7    Q.      How long did you say you worked in the Security

8    Department?

9    A.      I worked there 25 years.  I've been retired for five.

10   Q.      You worked in the Security Department for 25 years?

11   A.      No.  I worked in the institution for 25 years.  I

12   worked in the Security Department for approximately three and

13   a half years.

14   Q.      Three and a half years?

15   A.      Yes.

16   Q.      And upon -- in your time working in the Security

17   Department, when you received evidence, did you ever fill out

18   that form?

19   A.      I filed out a number of chain of evidence forms, yes,

20   chain of custody.

21   Q.      That specific form, DC 436?

22   A.      I don't know that that's the specific number.

23   Q.      Do you recall ever filling out a form acknowledging

24   that you received evidence?

25   A.      Yes.

1  Q.      And any transaction of that evidence is supposed to be

2  recorded; isn't it?

3  A.      The document in question, the form you referenced was

4  used whenever we collected evidence, such as narcotics,

5  weapons, implements of escape.  Those would most likely be

6  used for prosecution.  That was the chain of evidence; from

7  your hand, to mine, to the State Police.

8  Q.      I'm asking you that once you receive evidence in the

9  Security Department, anything that's done with that evidence

10 is recorded; isn't it?

11 A.      Yes, in the log book that the policy statement

12 references.

13 Q.      Okay.  It states right here under 4-b -- you see that?

14 A.      Yes, I do.

15 Q.      If you received the documents in question, those are

16 the procedures you would have had to follow; right?

17 A.      Yes.  That's the procedure I would have followed.

18 Q.      If you would have received the documents?

19 A.      Correct.

20 Q.      Do you see the part where it says, "documentary

21 evidence".

22 A.      Yes, I do.

23 Q.      And that documentary evidence, which in itself tends to

24 prove or disprove the allegation against the subject, must be

25 collected and processed in the same manner as other types of

1    evidence.

2         You see that?

3    A.    Yes.

4    Q.    So, if I make an allegation that a prison guard is

5    attempting to destroy my legal property because his name is

6    mentioned in them, would that tend to -- would the review of

7    those documents tend to prove or disprove my allegation?

8    A.    I'm not sure I follow your question.

9    Q.    Well, if documents were taken; okay?

10   A.    Um-hum.

11   Q.    And I challenged those documents being taken, and I

12   state that the reason those documents were taken were for

13   improper motivations; okay?

14   A.    Yes.

15   Q.    And that the evidence itself is evidence that the

16   taking of those documents was improperly motivated, would you

17   want to review those documents?

18   A.    In all probability, I would.

19   Q.    But if those documents are destroyed, there would be no

20   way for you to determine the validity of the claim; correct?

21   A.    Correct.

22   Q.    Do you see No. 7, "disposition of evidence"?

23   A.    Yes, I do.

24   Q.    Do you see No. 2?

25   A.    Yes.

1  Q.      You stated when you talked to Defendant Giddens, he

2  stated there was pending misconducts?

3  A.      Yes.

4  Q.      Was that true at my -- the hearing, is that an

5  administrative hearing, a misconduct?

6  A.      It probably would.

7  Q.      You see No. 4; articles which are not contraband may be

8  returned to the apparent owner?

9  A.      Yes.

10 Q.      Okay.  So, you were present for the testimony of

11 Defendant Giddens; correct?

12 A.      Yes.

13 Q.      And Defendant Chirico?

14 A.      Yes.

15 Q.      And do you recall their testimony that the documents

16 taken from Mr. Lyons on September 15th, 2003 were sent to

17 the Security Department?

18 A.      Yes.

19 Q.      And you saw the documentation indicating that the

20 documents were sent to the Security Department; correct?

21 A.      I saw that referenced on DC 154A, yes.

22     MR. BRADLEY:  Your Honor, can we get a time frame?

23 I'm not sure if he's saying what he saw in this trial or what

24 he knew back in 2003.

25     THE COURT:  Why don't you clarify that with the

1   witness, Mr. Jacobs.

2   BY MR. JACOBS:

3   Q.     You saw all the documentation that was showed to you,

4   that the documents were sent to the Security Department;

5   correct?

6          MR. BRADLEY:  Again, Your Honor, he hasn't provided

7   a time frame.

8          THE COURT:  Which time frame do you want this to

9   address, Mr. Jacobs?

10  BY MR. JACOBS:

11  Q.     I'm showing you what's marked as Plaintiff's Exhibit

12  No. 6.  Do you see what is says under "disposition"?

13  A.     Yes, I do.

14  Q.     What does it say?

15  A.     It says, sent to security.

16  Q.     Okay.  As far as we know, you're the only one in the

17  Security Department that had any knowledge about the events in

18  question?

19  A.     I don't know.

20  Q.     I mean, as far as your knowledge?

21  A.     When I was in the Security Office, I oversaw two

22  lieutenants and seven corrections officers.  I don't know at

23  this point in time if any of them had that knowledge.

24  Q.     We do know that you were involved with these documents.

25          MR. BRADLEY:  Your Honor, he's testified that he got

1    an inmate request slip from Mr. Jacobs.

2            He's also testified that he's never seen the

3    documents, or does not recall seeing the documents.

4            And with respect to the document that's on the

5    screen, there's been no evidence that he saw this document

6    back in 2003.

7            THE COURT:  You have to ask if there's -- lay a

8    foundation to see if the witness is familiar with this

9    document.

10           MR. JACOBS:  I'm not talking about -- I'm done with

11   the document, Your Honor.

12           THE COURT:  Okay.

13   BY MR. JACOBS:

14   Q.    I'm asking you who, other than you, in the Security

15   Department were involved in any way with the documents that

16   were taken from Mr. Lyons on September 15th, 2003?

17   A.    I don't know.

18   Q.    You don't know of anyone?

19   A.    No, I don't know who, if anyone, did.

20   Q.    Okay.  You represented to me at the time in question,

21   in your response to my request, that you would review the

22   matter with Defendant Giddens; correct?

23   A.    Yes, I did.

24   Q.    Was that a true representation?

25   A.    A true representation of what?

```
 1   Q.      That that's what you intended to do.
 2   A.      If that's what I said I would do, that's what I would
 3   do.
 4   Q.      And in fact, that's what you did; isn't it?
 5   A.      Yes.  I asked Lieutenant Giddens for information on the
 6   issue.
 7   Q.      You reviewed the matter with Lieutenant Giddens?
 8   A.      Yeah, I reviewed the matter with Lieutenant Giddens.
 9   Q.      And Lieutenant Giddens explained to you that I was
10   trying to sue him?
11   A.      That's incorrect.
12   Q.      And at that point you and Defendant Giddens came up
13   with a plan on how you could destroy the documents; correct?
14   A.      That also is incorrect.
15   Q.      And all of the procedures that were supposed to be
16   followed with respect to preserving this evidence and document
17   this evidence were not followed?
18   A.      Is that a question?
19   Q.      Correct.
20   A.      That, too, is incorrect.
21   Q.      You were the one held responsible for maintaining the
22   chain of custody of those documents?
23            MR. BRADLEY:  Objection; lack of foundation, Your
24   Honor.
25   BY MR. JACOBS:
```

1    Q.      Had those documents been seen to you?

2            THE COURT:  Sustained.

3    Q.      Had those documents been sent to you, as Security

4    Department staff, you would have been the one responsible for

5    maintaining chain of custody; correct?

6            MR. BRADLEY:  Asked and answered, Your Honor.

7    Q.      Based on the policies and procedures?

8            MR. BRADLEY:  Asked and answered.  We've covered

9    this.

10           THE COURT:  Answer this one last time, and then,

11   we'll need to move on, Mr. Jacobs.

12   BY MR. JACOBS:

13   A.      Your question?

14   Q.      Had these documents been sent to you, you would have

15   been responsible for maintaining the chain of custody of those

16   documents?

17   A.      Yes.

18   Q.      And those documents were sent to you?

19   A.      I don't know.

20   Q.      You don't remember?

21   A.      I don't recall.

22   Q.      Okay.  In fact, the only reason you're saying that you

23   don't remember is so that you can avoid responsibility for the

24   destruction of my legal property?

25   A.      As I previously stated last time you asked me this,

1   that's incorrect.

2          MR. JACOBS:   No further questions.

3                  REDIRECT EXAMINATION

4   BY MR. BRADLEY:

5   Q.      Did you knowingly and intentionally fail to document

6   the receipt of these 151 pages of materials taken from Eric

7   Lyons?

8   A.      No, I did not.

9   Q.      Mr. Jacobs had asked you a question about No. 1 on

10  what's been previously marked as Plaintiff's Exhibit No. 29,

11  and what you were being asked to do is admit, or, then,

12  whether you received 151 pages of legal documents belonging to

13  me Andre Jacobs on or about September 15th of 2003.

14          Is that correct?

15  A.      Yes, sir.

16  Q.      And what were the two choices for you to respond?

17  A.      The two choiceses were either to admit or deny the

18  particular question.

19  Q.      And did you receive 151 pages of legal documents

20  belonging to Andre Jacobs on or about September 15th, 2003?

21  A.      I do not recall.

22  Q.      So, therefore, you could not admit that?

23  A.      That's correct.

24  Q.      And therefore, you denied that?

25  A.      Yes, sir.

1    Q.    Mr. Jacobs had asked you earlier about whether in this

2    document he made any mention of his pending legal case.

3          Do you recall that?

4    A.    Yes.

5    Q.    And he referred you to the highlighted portion.

6    A.    Yes.

7    Q.    Could you read that again?

8    A.    The legal materials which you are currently withholding

9    pertains to my active case, and you are interfering with my

10   responding to a motion recently filed by defendants.

11   Q.    Is there anywhere in that that it mentions a pending

12   lawsuit was in these materials that named Lieutenant Giddens?

13   A.    No, sir, there's not.  And if I may say, in my

14   experience with these kind of things, most inmates when they

15   refer to their active case, they are referring to the current

16   case on which they are incarcerated on.

17              MR. BRADLEY:  Nothing further.  Thank you.

18                    RECROSS EXAMINATION

19   BY MR. JACOBS:

20   Q.    Mr. Bradley just asked you, did you knowingly fail to

21   not document the receipt of documents that were taken from

22   Mr. Lyons.

23          Remember that question?

24   A.    Yes.

25   Q.    And what was your answer?

1    A.      I believe I said, no.

2    Q.      But you said, you don't remember receiving them at all.

3    A.      And the question was, did I knowingly do something.

4    And I said, no.

5    Q.      No.  He said, did you knowingly fail to document the

6    receipt of the materials taken from Mr. Lyons, and you said,

7    no.

8    A.      That's correct.

9    Q.      But you said you didn't remember whether they were sent

10   to you at all.

11   A.      Correct.

12   Q.      Want to draw your attention to, I'm referring to you

13   what's been marked as Plaintiff's Exhibit No. 29.   And draw

14   your attention to No. 7.

15   A.      Okay.

16   Q.      And what does that particular sentence actually do?

17   A.      Excuse me?

18   Q.      That asks you to admit or deny that statement; correct?

19   A.      Yes.

20   Q.      Do you see the response?

21   A.      Yes, I do.

22   Q.      Do you agree with me that you did more than admit or

23   deny the statement?

24   A.      Yes.

25           MR. JACOBS:  No further questions.

1            MR. BRADLEY:  Just briefly.

2                    REDIRECT EXAMINATION

3    BY MR. BRADLEY:

4    Q.     If you had failed to document the receipt of these

5    items to the Security Department, would that have been in

6    violation of your obligations as a Department of Corrections'

7    employee?

8    A.     Yes, it would.

9    Q.     Would you have remembered that?

10   A.     Yes, I would.

11   Q.     Did you do that?

12   A.     No, did I not.

13   Q.     Thank you.

14           MR. BRADLEY:  No further questions.

15                    RECROSS EXAMINATION

16   BY MR. JACOBS:

17   Q.     So, so you're saying you didn't document the receipt of

18   these documents?

19   A.     No, that's not what I'm saying.

20   Q.     Saying you don't recall documenting receipt of these

21   documents?

22   A.     I'm saying I don't recall receiving or documenting

23   them, yes.

24   Q.     And you just stated that if you did violate the

25   procedures of the Department of Corrections, you would have

1  remembered it?

2  A.    Yes.

3  Q.    And Defendant Chirico and Defendant Giddens said that

4  they sent them to you, to the Security Department.

5        MR. BRADLEY:  I'm going to object.  There's been no

6  testimony on that.  The exhibit speaks for itself.

7        MR. JACOBS:  No, they testified that they sent them

8  to the Security Department the same day.

9        MR. BRADLEY:  Well, he said something --

10        THE COURT:  Ask him if he recalls that testimony.

11 BY MR. JACOBS:

12 Q.    Do you recall that testimony?

13 A.    Yes.

14 Q.    You recall the testimony that Defendant Giddens and

15 Chirico stated that they did send that material, taken from

16 Mr. Lyons on September 15th, to the Security Department on

17 that day?

18 A.    Yes.

19 Q.    But you don't recall receiving it?

20 A.    That's correct.

21        MR. JACOBS:  No further questions.

22        THE COURT:  Okay.  This would be a good time for us

23 to recess.

24        Members of the jury, thank you for your patience,

25 since the trial has gone longer that we initially anticipated.

1   As I indicated, we expect to have some further testimony next
2   Monday, perhaps Tuesday, but I think the evidence phase of the
3   trial will be over either Monday, or Tuesday in the morning.
4   　　　　　So, with that, I'm going to ask you to have a very
5   nice weekend, and to remember the instructions, and to comply
6   with them, that I've been giving you.
7   　　　　　You cannot talk about the case, you cannot among
8   yourselves, or at home, or with anyone else.
9   　　　　　You cannot do any investigation or research
10  whatsoever, of any kind.  You still need to keep an open mind.
11  　　　　　So with that, please rise for the jury.
12  　　　　　(Whereupon, jury retired at 4:30 p.m.)
13  　　　　　THE COURT:  Just be seated, and we'll wait for the
14  jury to leave.  And we have two items to take care of.
15  　　　　　(Whereupon, a conference was held in case
16  No. 04-1941, Andre Jacobs v. Department of Corrections, et al)
17  　　　　　THE COURT:  This is Judge Conti calling.  We have a
18  conference call.
19  　　　　　MISS ATEN:  Hi.  This is Rebecca Aten.
20  　　　　　THE COURT:  Good afternoon.  This is Judge Conti.
21  　　　　　We are here in Court.  I have -- Mr. Jacobs is here,
22  as well as Mr. Bradley, representing the defendants, along
23  with Mr. Willig.
24  　　　　　This is a conference in the civil action Jacobs
25  versus Durco, 04-1941.  This Court was scheduled for trial on

1   Monday, November 17th, and the Court had understood that there

2   was one witness who had some scheduling issues and could only

3   be available on the 18th of November.

4          The first -- there are three cases originally

5   involving Mr. Jacobs that the Court had scheduled.  The first

6   case is the case that the Court is presently hearing, and that

7   is Jacobs versus Pennsylvania Department of Corrections,

8   04-1366.  That case has gone longer than anticipated, and in

9   fact, we still have at least another perhaps day to day and a

10  half of testimony, plus argument, and that will take that

11  first case into next week.  And so, we're not going to be able

12  to start either the second or third case for Mr. Jacobs as we

13  had originally anticipated and scheduled.

14         So, I want to check your availability for trial to

15  begin on January 20th, and to go the rest of that week.  So

16  we would have at least four days, and we could go to the next

17  week, if we needed to.

18         MR. SAMPSON:  Your Honor -- this is Michael Sampson.

19  And I, along with Miss Aten and Michelle Mantini, represent

20  Mr. Jacobs in the Jacobs versus Durco action.

21         Just to clarify, are you saying both cases will be

22  tried that week, or the next case?

23         THE COURT:  Well, the next case I can try on

24  March the 2nd.  Mr. Bradley has a problem doing it on

25  March the 2nd, so I was hopeful that you would be able to have

1   your trial on the 20th of January.

2           MR. SAMPSON:  Well, Your Honor, I think that will

3   work.  In all candor, Your Honor, you had indicated at the

4   last conference that you intend to have this completed by

5   November, so we actually checked with our expert and our

6   witnesses through the month of December.  We have not yet had

7   a chance to, you know, check on their availability at the end

8   of January.  We can certainly do that as soon as we're done

9   here.

10          THE COURT:  Okay.  If you could do that, and let me

11  know as soon as possible.

12          MR. SAMPSON:  That's fine.

13          THE COURT:  Okay.

14          THE COURT:  Mike.

15          MR. SAMPSON:  So we're clear, that under no

16  circumstances this trial would commence before January 20th.

17          THE COURT:  That's correct.  I have another trial

18  that's supposed to begin on January the 5th.  So, this will be

19  the 20th.

20          MISS ATEN:  Okay, Your Honor.

21          MR. SAMPSON:  We will do that, and I think we can

22  get back to you by tomorrow, Your Honor, to confirm that week.

23          THE COURT:  That would be appreciated.

24          MR. SAMPSON:  No problem.

25          THE COURT:  Okay.  Thank you.

1          What the Court will do is we'll tentatively set the
2     04-1941 for January the 20th, and then, the 04-1592 case for
3     trial on March 2nd.
4          MR. SAMPSON:  That's fine, Your Honor.  We should be
5     able to let you know, again, by tomorrow.  We'll confer with
6     all of our witnesses' schedules and let you know if that poses
7     a problem.  Optimistically, it will not.
8          THE COURT:  Do you understand all that, Mr. Jacobs?
9          MR. JACOBS:  Yes.
10         THE COURT:  That way we'll have enough time to have
11    this case concluded this month.
12         MR. SAMPSON:  No problem, Your Honor.
13         THE COURT:  I'm sorry?
14         MR. SAMPSON:  I said, no problem.
15         THE COURT:  I think we'll need to direct the
16    marshals to return those individuals who had been writted in.
17         MR.WILLIG:  Yes, Your Honor.
18         THE COURT:  Okay.  Thank you.
19         Do you need any of those for rebuttal witnesses in
20    this case?
21         MR. JACOBS:  No.  I was wondering if you was going
22    to address my other motion?
23         THE COURT:  I am.  I'm going to take that up now.
24         MR. JACOBS:  In the event that maybe this, the other
25    witness might not be able to be secure, I might be able to use

1    Mr. Brown as a rebuttal witness, because he was there around

2    the same time frame, if that's more convenient.

3              MR.WILLIG:  Well, we need --

4              THE COURT:  You need to tell us whether you may be

5    calling -- you're advising the Court now you may be calling

6    Mr. Brown as a rebuttal witness.

7              MR. JACOBS:  Right.

8              THE COURT:  Okay.  Why don't we keep him.

9              MR.WILLIG:  Okay.

10             THE COURT:  Okay.  Then, we won't have any problems.

11             Are there other -- there were a couple other

12   witnesses, though, and those will be returned.

13             MR.WILLIG:  Two others, Your Honor.

14             THE COURT:  And two others will be returned.

15             MR. JACOBS:  I got some motions --

16             THE COURT:  Yes.

17             MR. JACOBS:  -- that I was unable --

18             THE COURT:  Okay, I'm sorry.

19             MR. JACOBS:  -- that I was unable to get copies of.

20   These are just originals that had some handwritten motions.

21             THE COURT:  Oh, all right.  Are these ones I haven't

22   seen yet?

23             MR. JACOBS:  Right.

24             THE COURT:  Okay.  Okay.

25             MR. SAMPSON:  Your Honor, this is Mike Sampson.  I

1   apologize for interrupting.

2            THE COURT:  We don't need you any further.

3            Does anyone need the counsel from Reed Smith?

4            MR. SAMPSON:  That is why I wanted to check.  We

5   will get back to you tomorrow.

6            THE COURT:  Thank you very much.

7            MR. SAMPSON:  Thank you, Your Honor.

8            MR. JACOBS:  I just wanted to ask you also about the

9   Rule 608; had attempted to put in some evidence, extrinsic

10  evidence.

11           THE COURT:  Under Rule 608, the extrinsic evidence

12  doesn't come in unless it's a prior conviction.

13           MR. JACOBS:  I believe the rule had said something

14  about specific instances of conduct.

15           THE COURT:  You can inquire into that on cross

16  examination, but extrinsic, it says, 608(b), specific

17  instances of the conduct of a witness for the purpose of

18  attacking or supporting the witness' character for

19  truthfulness, other than conviction of crime, as provided in

20  Rule 609, may not be proved by extrinsic evidence.

21           They may, however, in the discretion of the Court,

22  if probative of truthfulness or untruthfulness, be inquired

23  into on cross examination of the witness.

24           So, they can't -- the evidence can't come in

25  independently.  And the Court's recollection is that you were

 1   permitted to probe into those issues of misconduct on cross

 2   examination.  So, I did permit you to do that.

 3              MR. JACOBS:  Okay.

 4              THE COURT:  Mr. Bradley, did you wish to be heard on

 5   that?

 6              MR. BRADLEY:  That's my recollection of what

 7   happened, although -- I'll leave it at that.

 8              THE COURT:  Okay.  All right.

 9        The Court has received the plaintiff's reply to

10   defendants' brief on Eighth and Fourteenth Amendment in State

11   tort law claims.

12        The Court has received the plaintiff's request to

13   confer with and secure rebuttal witnesses.

14        The Court has also received the plaintiff's motion

15   for, I think you meant to say, various immediate relief,

16   compel remaining portions of 6.3.1 procedures, and a reply to

17   defendants' claim that he opened the door for testimony on

18   LTSU.

19        Mr. Bradley, have you received copies of all of

20   those?

21              MR. BRADLEY:  Your Honor, I received the request to

22   confer with and secure rebuttal.  The reply that he opened the

23   door to the LTSU --

24              THE COURT:  I believe that's moot now.

25              MR. JACOBS:  Yeah.  I had it wrote down before.  So,

1    that motion is moot.   That reply is moot.

2         MR. BRADLEY:   Yes, I received all of those, Your

3    Honor.

4         THE COURT:   And there's some new motions now?

5         MR. JACOBS:   Yes.   This is, is with regards to the

6    instructions to the jury; jury instructions.

7         THE COURT:   Well, this is on the final charge.

8         MR. JACOBS:   Yes.

9         THE COURT:   Okay.   Okay.   I'm hoping to take up the

10   final charge issues next week after the defendants' case is is

11   completed, so that we can have a full final charge conference,

12   and we'll know everything there is to know about the evidence

13   in the case at that time.

14        So, Mr. Bradley just received now two new motions by

15   the plaintiff; motion to strike defendants' affirmative

16   defense, and plaintiff's objections to Court's jury

17   instructions.

18        I haven't had a chance to review these, either.   So

19   if you could file your response by Monday at 9:00 a.m., that

20   would be appreciated.   Okay.

21        How about the plaintiff's -- let take up the

22   plaintiff's request to confer with and secure rebuttal

23   witnesses.

24        Have you filed these, have you filed any of these

25   motions yet?

1      MR. JACOBS:  Through the mail?

2      THE COURT:  Yes.

3      MR. JACOBS:  No.

4      THE COURT:  Okay.  Okay.  So, we'll need the

5   originals to file these; okay?  You can have the copies back.

6      THE COURT:  Is the Courtroom Deputy making copies of

7   the request to confer with rebuttal witnesses?

8      MATTHEW FERGUS, Law Clerk:  That's what she is doing

9   now.

10      THE COURT:  Are we ready?  Okay.

11      The plaintiff is requesting a rebuttal witness be

12   made available, Mr. Bronson, and also wants to have a letter

13   forwarded to Mr. Bronson, describing the nature of the

14   testimony he would be eliciting.

15      MR. BRADLEY:  Initially, Your Honor, I think he's

16   actually asking for two witnesses.  I think the first

17   paragraph describes another witness.  But based on the

18   description, or absence of a description, I have no idea what

19   he's referring to.

20      THE COURT:  Okay.  Says, just relating to

21   Mr. Bronson, this motion.

22      MR. JACOBS:  Yes, yes.

23      THE COURT:  Just Mr. Bronson.

24      MR. BRADLEY:  Okay.  So, can I ignore Paragraph 1?

25      THE COURT:  Yes.  We may have to discuss Mr. Brown

1  as well -- he came up -- later today.

2       MR. BRADLEY:  With regard to Mr. Bronson, first, I

3  would note that this witness was listed on the pretrial

4  statement as an intended witness in this case.  So, Mr. Jacobs

5  has known about his existence, and had the opportunity to have

6  him brought in and provide testimony in his case in chief.

7       THE COURT:  Maybe I should ask Mr. Jacobs.  What

8  would he be called to rebut?

9       MR. JACOBS:  Evidence elicited by the defendants

10  that practices concerning the practices of destruction of

11  property, the amount -- the amount of time that these

12  incidents were placed, and documents, these incidents taking

13  place, prisoners' documenting seizure and destruction of legal

14  property, retaliation, things of that nature.  The specific

15  incidents documented.

16       THE COURT:  Mr. Bradley.

17       MR. BRADLEY:  Initially, that's the exact same type

18  of testimony he q from the other witnesses.  It seems like

19  what he's doing is just calling this rebuttal testimony, and

20  sort of having the last word on the issue.  It appears his

21  Mr. Bronson's testimony would be cumulative of the testimony

22  that's already been presented.  And again, it puts us in the

23  position of having to, on very short notice, try to come up

24  with surrebuttal.

25       He has known of this witness.  He has known

1  particularly of that type of evidence.  He could have had

2  Mr. Bronson made available in his case in chief, and I just

3  think at this point it would be inappropriate to have him

4  called as a rebuttal witness.

5        MR. JACOBS:  Well, due to the -- as I indicated in

6  the motion, due to the late ruling on the issue of Mr. Brett

7  Grote, I was under the impression that Mr. Brett Grote's

8  testimony would be allowed, and had that testimony been

9  allowed, I would not have needed Mr. Bronson's testimony.  And

10 Mr. Bronson does have direct knowledge with respect to time

11 frames and events which Mr. Grote did not have, and which I

12 was under the impression Mr. Grote would be able to testify to

13 having.

14       THE COURT:  What you're saying is you really need to

15 call him in your case in chief.

16       MR. JACOBS:  Well, I was going to that was why I had

17 listed him as an initial witness in the pretrial narrative

18 statement.  But then, I was placed under the impression that

19 Mr. Grote had that same type of information and would be

20 easily produced at the trial.  Then it came that up

21 Mr. Grote's testimony would not be permitted concerning the

22 wide-spread practice within the LTSU at the relevant time

23 frame of the claims within the case.

24       MR. BRADLEY:  He could have brought that up at the

25 time we were getting the witnesses together.  I mean, and

1    again, this is stuff in his case in chief.  This is not

2    rebuttal.

3              THE COURT:  In Emrick versus Suzuki Motor, 750 F.2d,

4    19, Third Circuit, 1984 -- I'll repeat that for you.   750

5    F.2d, 19, Third Circuit, 1984, the Court of Appeals for the

6    Third Circuit on Page 22 stated, it is well settled that

7    evidence which properly belongs in the case in chief, but is

8    first introduced in rebuttal, may be rejected, so as to avoid

9    prejudice to the defendant and to assure, ensure the orderly

10   presentation of proof.

11             And in United States versus Chrzanowski, 502 F.2d,

12   573, Third Circuit, 1974, the Court of Appeals for the Third

13   Circuit, on Page 576, noted that the proper function and

14   purpose of rebuttal testimony is to explain, repel, counteract

15   or disprove the evidence of the adverse party.

16             In Upshur versus Shepherd, 538 F.Supp. 1176, Eastern

17   District of Pennsylvania, 1982, affirmed at 707 F.2d, 1396,

18   Third Circuit, 1983, the District Court noted that the trial

19   Court has discretion to limit the scope of rebuttal evidence

20   to that which is precisely directed to rebutting new matter or

21   new theories presented by the defendant's case in chief.

22             So you know, I just was curious as to why you didn't

23   bring this up when the Court said Mr. Grote would not be able

24   to testify, when I made that ruling.

25             MR. JACOBS:  Well, for one, I didn't have none of my

1   files at that time.  I only had limited files concerning this

2   particular case.  And as the testimony developed, and the

3   defendants elicited testimony concerning particularly notice

4   of the -- of claims and the documented instances of these, of

5   seizure and destruction of property, it became apparent to me

6   that that was going to weigh strongly on the issue of

7   supervisory liability.  And I do want to disprove the

8   testimony of defendants in this case that there were not many

9   instances of the seizure and destruction of property, and

10  claims by LTSU prisoners at the relevant time frame.

11          THE COURT:  Okay.  The Court does have some

12  discretion here.  I'll permit his testimony, but limited to

13  his personal knowledge.  He can't testify about what happened

14  with other prisoners; only about his personal involvement, and

15  the claims he's filed during the relevant time frame.  It has

16  to be fairly limited, because we're already way beyond the

17  time frames here, and it has to be specifically directed to

18  the particular defendants.  And then, of course, the

19  defendants will have an opportunity for surrebuttal.  Okay.

20          MR. JACOBS:  Okay.

21          THE COURT:  Now, the other individual --

22          MR. JACOBS:  The paragraph within, where I was asked

23  to confer with my witness, is a witness that has been coming

24  and had been here throughout the trial, and this witness --

25          THE COURT:  I think do you have a problem with him

1  sending the letter.

2          MR. BRADLEY:  He -- I specifically asked about

3  Paragraph 1.  I indicated that Paragraph 1 did not refer to an

4  independent witness.

5          THE COURT:  He wants to send Mr. Bronson the letter.

6          MR. BRADLEY:  That's fine.

7          THE COURT:  Okay.  You'll get that to him?

8          MR. BRADLEY:  Yes.

9          THE COURT:  Mr. Bronson.

10          MR.  BRADLEY:  Yes.

11          THE COURT:  Okay.

12          MR. JACOBS:  Okay.  The witness I was asking to

13  confer with is not -- is a civilian.

14          THE COURT:  I'm sorry?

15          MR. JACOBS:  This witness on Paragraph 1 is a

16  civilian.  This is a witness that has been in the courtroom

17  throughout the course of the trial.

18          MR. BRADLEY:  Your Honor, he just said there was no

19  other witness than Purcell Bronson.

20          THE COURT:  Who is the other witness?

21          MR. JACOBS:  He asked me did this paragraph pertain

22  to Mr. Bronson.  No, it doesn't pertain to Mr. Bronson.

23          THE COURT:  The Court understood it that you, that

24  the only witness that you were referring to in this motion was

25  Mr. Bronson.  Who is this other person?

1             MR. JACOBS:  This is a person that is a civilian.

2             THE COURT:  Who is that person?

3             MR. JACOBS:  This is a witness who has documented

4    and put the defendants in the case -- Jeffrey Beard

5    specifically -- on notice of claims concerning things that

6    were happening at SCI Pittsburgh in the --

7             THE COURT:  When I mean, I have no idea who the

8    person is.  I'll permit Mr. Bronson, but I have no idea who

9    this other person is and why he would have any evidence.

10            MR. BRADLEY:  Again, that seems to be going to his

11   case in chief.

12            MR. JACOBS:  No, I'm not -- Your Honor, I'm not

13   asking you to permit his testimony.  I'm asking you to allow

14   my to confer with him, to understand the extent and whether

15   he's even needed here or not.  He's been coming to this trial

16   under the impression that he may be needed as a rebuttal

17   witness.

18            THE COURT:  Is there any reason why that person

19   can't communicate with the defendant?  Is there any limitation

20   on somebody sending him information?

21            MR. BRADLEY:  I mean, whatever.  The normal rules

22   would apply.  He can correspond with whoever he wants to

23   correspond with.

24            THE COURT:  You can correspond.  I mean, I don't

25   know how to help you here, Mr. Jacobs.  If this person has

1   been coming here, and you can correspond with the person,

2   what -- there's nothing the Court can do.  Now, under the

3   circumstances, you can send him a letter and ask what he has,

4   and he can get back to you.

5           MR. JACOBS:  Well, the first issue is that I came

6   here and I didn't have -- only property I had was legal

7   property here, and I was never issued any envelopes.

8   Envelopes are issued on a monthly basis, and by the time I

9   came to this prison, envelopes had already been issued.  So, I

10  was not issued envelopes.  So, I don't have any.  That's why I

11  haven't been sending any documents to the Court.  I've just

12  been bringing them, instead of sending them.

13          THE COURT:  Will you make sure Mr. Jacobs gets

14  envelopes?  I don't know what envelopes, what the nature of

15  those envelopes are.

16          How many do you need?

17          MR. JACOBS:  Well at least one to write to him.

18          THE COURT:  Okay.  Why don't you get him three

19  envelopes.  Then, just in case there's any other motion you

20  want to file, you'll have it available.  Okay?

21          MR. JACOBS:  Okay.

22          THE COURT:  All right.  Okay.  So, the Court is

23  going to deny the request to confer and secure, in light of

24  our discussion, but is asking and requesting the Department of

25  Corrections to provide you with the envelopes, so that you can

1   send whatever correspondence you would like to that individual

2   who is unnamed.

3         And then, Mr. Bronson will be able to appear as a

4   rebuttal witness, but just for the very limited purpose that

5   has been set forth by the Court on the record.

6         MR. BRADLEY:  Your Honor, just for clarification,

7   that's the only rebuttal witness, not Alton Brown.

8         THE COURT:  We have Mr. Bronson.  You don't need

9   Alton Brown?

10         MR.WILLIG:  So, we can send Mr. Bronson back?

11         THE COURT:  So, he'll be going back to the jail that

12   he's regularly incarcerated at.  Okay.  So, that takes care of

13   that motion.

14         Now, there's the motion for immediate relief in the

15   remaining portion of 6.3.1.  You want to just tell the Court

16   exactly what it is you need to see?

17         MR. JACOBS:  There's been testimony about how

18   confiscated material is supposed to be handled.

19         THE COURT:  Yes.  They said it was to be sent to the

20   Security.

21         MR. JACOBS:  Well, there's some gray areas about the

22   procedures for how this stuff is supposed to be handled.  At

23   one point Mr. Lynch said that the documents are supposed to be

24   sent to Security, but then, he said that sometimes they hold

25   them on the unit and put them in a box in a secure area.

1          In this case, the defendants are implying that they

2     sent these materials to Security, but Security is saying that

3     these documents were never received.  So, there's a gray area

4     in between as to what is exactly supposed to be done with

5     confiscated material.

6          THE COURT:  What I heard from the defense witnesses

7     was that there's supposed to be a record kept, and that there

8     was no record here.

9          MR. JACOBS:  Once the documents are received in the

10    Security Department.

11         THE COURT:  Right, right, which would let the, the

12    jury infer, if it wanted to, that they were never sent.

13         But what else do you need?  I mean, they have

14    already testified about, if they were received they would have

15    been documented.

16         MR. JACOBS:  For example, Your Honor, suppose

17    there's a procedure as to the specific handling of these

18    documents.  For example, once these documents are confiscated,

19    what are they supposed to do with them?  Are they supposed to

20    hand deliver them, or is there any type procedure for the

21    handling?  There is a procedure for the handling of

22    confiscated material.  And I mean, I think that's really

23    important to cross examination, because they are saying they

24    did it one way, when the procedures might dictate that they

25    are supposed to handle them another way.  And they are trying

1  to use that as a scapegoat, to say that those documents never

2  made it to the Security Department.

3        THE COURT:  I'm sorry, I'm not recalling any real

4  specific rule that you would be trying to refer to.

5        MR. JACOBS:  The handling of -- the handling of

6  contraband before it's received by the Security Department.

7        MR. JACOBS:  I understand the procedures once he

8  received it and what is supposed to be done after he receives

9  it.  But how are the defendants supposed to handle it once

10 they confiscate it and label it "contraband"?

11       I'll look through them again, but did I not see

12 anything in there related to that issue.  They said they have

13 a policy on it.

14       THE COURT:  One moment.  The section that you

15 referred the Court to doesn't really have anything that

16 specifically deals with what you're -- what information you're

17 seeking.

18       I think you've already received all this evidence

19 control.  I'm not aware of any other provision, so that I can

20 review.  That dealt with the level of detail.

21       MR. BRADLEY:  I know we provided the documents for

22 the Court's review.

23       THE COURT:  And I ordered these to be turned over,

24 and this is Exhibit 31.

25       MR. JACOBS:  I received evidence control.

 1           THE COURT:  Yes.  But there's nothing else that

 2    deals with confiscated property, that I'm aware of.  In the

 3    other, in the --

 4           MR. JACOBS:  Section 20.

 5           THE COURT:  Section 20, it just deals with inmate

 6    property; what happens when your property is received, when

 7    you're transferred.  Legal property, excess property, excess

 8    legal property, temporary absence, furlough, but nothing to

 9    deal with confiscated property.

10       I'm not aware of anything else in there that would be

11    relevant to this, to your inquiry, having reviewed in camera

12    that policy, Section 20.

13       There's nothing that deals with what you're seeking,

14    Mr. Jacobs.

15       And then, there was something here about Mr. Edwards

16    not being able to put in evidence, his own records about his

17    appeal, about his grievances?

18           MR. JACOBS:  Against the defendants in the case, as

19    well as --

20           THE COURT:  Yes.

21           MR. JACOBS:  -- as well as notice of the practices

22    involved in this case.

23           THE COURT:  And I did permit him to testify about

24    all of that, but I don't know how that would be direct

25    evidence in this case.

1          MR. BRADLEY:  I agree, Your Honor.  And he was given

2     considerable latitude in questioning Mr. Edwards, and he

3     elicited testimony on a wide variety of topics, and if we're

4     going to get all of those, I assume, grievances, misconducts,

5     or whatever, then, we're going to have to go through and

6     determine whether they were founded or unfounded, or whether

7     they were legitimate collateral issues.

8          THE COURT:  Whatever probative value they would have

9     would be outweighed by the possible confusion for the jury,

10    the need to deal with his other his claims that he was raising

11    there, the resolution of those claims, which are not germane.

12    I think the importance of his testimony to your case was that

13    he had been filing grievances against these defendants.

14          MR. JACOBS:  And also that --

15          THE COURT:  And nobody refuted that, as I heard it.

16          MR. JACOBS:  And also, that he put, that he

17    exhausted -- he also testified that he exhausted all appeals

18    to Central Office, and he filed -- he put Defendant Beard on

19    notice of the type of claims that are in this case.

20          THE COURT:  Right.  And he testified to that.  So,

21    you'll be able to review that with the jury in your closing.

22          Was there anything else in that motion?

23          MR. BRADLEY:  I believe that was it.

24          THE COURT:  Okay.  Now, is there anything else

25    outstanding, other than the matters relating to the final

1   charge?

2         MR. BRADLEY:  I believe that's all that's left, as

3   long as you're including the 8, 14, and as well as the

4   Rule 50.

5         THE COURT:  Yes, that's the final charge.

6         MR. BRADLEY:  Right.  To my understanding, those

7   are the other issues remaining.

8         THE COURT:  Okay.  Okay, Mr. Jacobs.  And then,

9   you'll take care of, Mr. Bradley, of getting the letter that

10   was attached to the one motion to Mr. Bronson?

11         MR. BRADLEY:  Yes.

12         THE COURT:  And you'll have him available.  We can

13   take -- I don't know when you, if you want to specially

14   schedule him.  How much longer do you think your case will

15   take?

16         MR. BRADLEY:  I don't think it will take -- my

17   direct won't take much longer.  William Stickman will probably

18   be the longest witness, but it will depend on cross of the

19   other -- well, actually, other than Mr. Jacobs, Miss Scire is

20   the only other witness.

21         THE COURT:  Should we plan to have Mr. Bronson,

22   then, Tuesday morning; is that safe?

23         MR. BRADLEY:  I was thinking Monday afternoon.

24         THE COURT:  I'll leave that you.

25         Somebody needs to advise him that the letter that

1    Mr. Jacobs is sending refers to Friday, but he should be

2    advised that it will be probably no earlier than Monday

3    afternoon, and possibly on Tuesday.  Okay?  Somebody will

4    advise him of that.

5             Are you okay with that, Mr. Jacobs?

6             MR. JACOBS:  Yes.

7             THE COURT:  Okay.  Then, that's what we'll do.  And

8    then, I would like, I would like to review the final

9    instructions, hopefully Monday afternoon when the witnesses

10   are concluded.  And then.  We can give the final charge to the

11   jury.  And I have a draft of the verdict slip, and that will

12   depend on which claims are in or out.  And we'll have that for

13   you -- you already gave it to them?  Okay.  So that, I think,

14   is reflective of just the claims that are in the final charge

15   presently/but it's the format that I need you to consider, in

16   terms of whether I've addressed the elements of damages.

17   Okay?

18            MR. BRADLEY:  Yes, Your Honor.

19            THE COURT:  Anything else?

20            MR. BRADLEY:  Not from the defendants.

21            THE COURT:  Okay.

22            MR. JACOBS:  In consideration of plaintiff's reply

23   to defendant's brief on a Fourteenth Amendment State law

24   claim.

25            MR.  BRADLEY:  Yes.

```
 1              MR. JACOBS:  I think I had made reference to a
 2   ruling this Court had made in regards to sovereign immunity.
 3              THE COURT:  Yes.
 4              MR. JACOBS:  I think I made reference to it, but I
 5   didn't have the actual document at the time.
 6              THE COURT:  Do you have it now?
 7              MR. JACOBS:  I do have it, but it's the only one I
 8   got.
 9              THE COURT:  Okay.  We'll make a copy of it.  Could
10   we make a copy of that?
11              Okay.  You'll be able to get it off the docket.
12   What number is it?
13              MR. JACOBS:  It's from 04-1941, Document 48.
14              MR. BRADLEY:  I don't need a copy, Your Honor.
15              THE COURT:  Okay.  We'll write down the number and
16   we'll make it available to him.
17              Do you have the number, Mr. Fergus?
18              MATTHEW FERGUS, Law Clerk:  Yes.
19              THE COURT:  Okay.  Thank you all.  This hearing is
20   adjourned.
21              We'll see you Monday morning.
22              (Whereupon, court adjourned at 5:20 p.m.)
23                        *  *  *  *  *
24
25
```

1                          I N D E X

2    DEFENDANT WITNESSES          DIRECT  CROSS  REDIRECT  RECROSS

3    Gregory Giddens

4        By Mr. Bradley                            31
                                                   42
5        By Mr. Jacobs (cross continues)    2                36
                                                             43
6    Frank Chirico

7        By Mr. Bradley            46               75
                                                    90
8        By Mr. Jacobs                     56                80

9    Allen Lynch

10       By Mr. Bradley            95              132
                                                   142
11       By Mr. Jacobs                    107               138
                                                            143
12   Thomas E. McConnell

13       By Mr. Bradley           144              183
                                                   186
14       By Mr. Jacobs                    150               184
                                                            186
15

16                        * * * * *

17            I certify by my original signature herein

18   that the forgoing is a correct transcript from the record of

19   proceedings in the above-entitled matter.

20

21                         s/Virginia S. Pease
                            Official Court Reporter
22

23

24

25