IN THE UNITED STATES DISTRICT COURT

OF WESTERN PENNSYLVANIA


ANDRE JACOBS,                          CIVIL   DIVISION
            Plaintiff,
                                       NO. 04-1366


        vs.


PENNSYLVANIA DEPARTMENT
OF CORRECTIONS, et al.,


            Defendants.


_____


        Transcript of JURY TRIAL on NOVEMBER 10, 2008
    United States District Court, Pittsburgh, Pennsylvania
        BEFORE:   JOY FLOWERS CONTI, DISTRICT JUDGE


APPEARANCES:

For the Plaintiff:          Andre Jacobs, Pro Se




For the Defendants:         Scott Bradley, Esq.
                            Robert Willig, Esq.




Court Reporter:             Karen M. Earley, RDR-CRR
                            6260 U.S. Courthouse
                            700 Grant Street
                            Pittsburgh, PA  15219
                            412-201-2660


Proceedings reported by mechanical stenography.
Transcript produced by computer-aided transcription.

I N D E X

|                        | DIRECT | CROSS | REDIRECT | RECROSS |
|------------------------|--------|-------|----------|---------|
| DEFENSE WITNESSES:     |        |       |          |         |
| Jeffrey Beard          | 3      | 15    | --       | --      |
| David McCoy            | 27     | 31    | 39       | --      |
| Kristin Reisinger      | 40     | 46    | 81       | 84      |
| Robert Bittner         | 87     | 90    | --       | --      |
| Gregory Giddins        | 103    | 153   | --       | --      |

```
 1                    P R O C E E D I N G S
 2    (November 10, 2008, morning session.  In open court, jury
 3    present.)
 4              THE COURT:  Good morning, everyone.  Please be
 5    seated.
 6              Members of the jury, our first witness today will
 7    be by video conferencing, and this is a witness being called
 8    by the defendants.
 9              Mr. Bradley.
10              MR. BRADLEY:  We are waiting for the call-in.
11              MR. JACOBS:  Who is the witness?
12              MR. BRADLEY:  Jeffrey Beard.
13              Good morning, sir.  Can you hear me?
14              THE WITNESS:  I can.
15              MR. BRADLEY:  Your Honor, the witness is ready.
16    For the record, the defendants call Jeffrey Beard.
17              THE COURT:  Okay.  If the witness could please
18    stand and be sworn.
19         JEFFREY BEARD, DEFENSE WITNESS, WAS SWORN.
20              THE COURT:  Please be seated.
21                     DIRECT EXAMINATION
22    BY MR. BRADLEY:
23    Q.  Good morning, sir.  My name is Scott Bradley.  I'll raise
24    my hand so you can see who is talking to you.
25              I, of course, represent you and the other
```

**Jeffrey Beard - Direct**

1    defendants in this matter.

2             Could you again state your name for the record.

3    A.   Jeffrey A. Beard.

4    Q.   And can you tell the jury what your current occupation is.

5    A.   I'm currently the Secretary of Pennsylvania Department of

6    Corrections.

7    Q.   And how did you become to be the Pennsylvania Department

8    of Corrections Secretary?

9    A.   Well, I started working for the Department some 36 and a

10   half years ago as a psychologist and then worked my way up in

11   the system, became a Deputy Superintendent, Superintendent,

12   Deputy Commissioner, and finally back in 2001, I was nominated

13   and approved as the Secretary of Corrections.

14   Q.   Can you explain to the jury just briefly what your role is

15   as the secretary and what your duties and obligations are?

16   A.   Yes.  My duties and obligations are essentially to oversee

17   the total operation of the Pennsylvania Department of

18   Corrections which consists of some 48,000 inmates, 16,000

19   employees, we have 27 correctional institutions and a boot

20   camp and a number of community correction centers for which

21   I'm also responsible.

22             THE COURT:  Is it possible for the mic to be

23   brought closer to the witness so he can be a little bit

24   louder.

25             THE WITNESS:  Is that better?

**Jeffrey Beard - Direct**

1   Q.  Can you increase the volume on your end?

2   A.  I think you can on yours.

3           THE COURT:  We have it increased all the way up

4   here.

5           THE WITNESS:  Is that better?

6   Q.  Can it go a little higher?

7   A.  Perhaps if I move over here.  Can you still see me okay?

8           THE COURT:  That's better.

9   A.  Is that better?

10  Q.  Yes.

11  A.  Okay.

12  Q.  Without identifying specifically anything you looked at,

13  did you prepare for your testimony here today?

14  A.  Yes.

15  Q.  Prior to the preparation for your testimony, did you have

16  any independent recollection of who the plaintiff in this

17  matter was, Andre Jacobs?

18  A.  No.

19  Q.  Following your preparation, did the materials you looked

20  at refresh your recollection as to whether you had any prior

21  knowledge of this plaintiff?

22  A.  Yes, it did.

23  Q.  Through that preparation, did that indicate whether you

24  had -- let me ask you this first.

25          Prior to your preparation, did you have any prior

**Jeffrey Beard - Direct**

1    knowledge of Mr. Jacobs filing grievances or lawsuits raising

2    issues regarding his conditions of confinement in the

3    Department of Corrections?

4    A.   Prior to my review?

5    Q.   Yes.

6    A.   No.  No, I did not.

7    Q.   One of the issues or perhaps the main focus of this

8    litigation is Mr. Jacobs claims that while in the LTSU at

9    SCI-Pittsburgh, it was a pattern, practice, or policy of the

10   Department of Corrections of retaliating against inmates who

11   filed grievances and lawsuits and doing this in particular

12   ways by either confiscating or destroying their legal

13   documents or falsifying grievances or misconducts.

14            As a general matter going back to the time period

15   of the time you were the secretary from 2001 to approximately

16   2004, were you aware of the existence of any such policy?

17   A.   I was not aware of an existence of any such policy, no.

18   Q.   Did you approve or direct the implementation of such a

19   policy?

20   A.   Absolutely not.

21   Q.   To your knowledge, did such a policy exist or does such a

22   policy exist?

23   A.   To my knowledge, such a policy does not exist and if I was

24   aware of any such policy, I would take action against those

25   people who were implementing that policy.

**Jeffrey Beard - Direct**

1  Q.  As the Secretary of Corrections, how do you when

2  complaints of this nature would come to you -- first off, what

3  complaints of this nature -- would complaints of this nature

4  come to you from time to time?

5  A.  Well, I would get letters from legislators, letters from

6  sometimes relatives, sometimes inmates write in.

7        Most of the correspondence I don't see because

8  there's a lot of correspondence.  As I said earlier, we have

9  some 48,000 inmates.  We get a lot of correspondence.

10       So there's a lot of things that come in from

11  inmates, from family members that go to other people to

12  respond to.

13       If it comes from a legislator or something like

14  that, I usually see those letters, and that's how I would

15  become aware of those complaints.

16  Q.  I guess in response to that and overall, what steps would

17  you take or what steps do you take to ensure that your

18  institution and your department is run essentially in a

19  constitutional manner?

20  A.  Well, I do a whole bunch of things.  I review a lot of

21  reports and information on a weekly and a monthly basis that's

22  generated by the institutions.

23       I have regional deputy secretaries who have teams

24  of individuals who go out to the institutions who at least on

25  a quarterly basis do in-depth investigations and reviews of

**Jeffrey Beard - Direct**

1   what is going on in institutions and they provide a report to

2   me each quarter of their findings.

3          I also personally go out and tour institutions.  I

4   try to get to most facilities twice a year.  I don't always

5   make every facility twice a year, but I try to get to most

6   twice a year and during those tours, I talk to staff, I talk

7   to inmates, I observe conditions.

8          Those are some of the ways that I monitor what is

9   going on in my facilities.

10          Also, any correspondence that I do receive, that is

11   making specific allegations of mistreatment or whatever,

12   generally, I would refer those documents to my Office of

13   Professional Responsibility and have them do an investigation

14   into the complaints.

15   Q.   In the course of that process, was it ever brought to your

16   attention that there was an issue in the LTSU State

17   Correctional Institution of Pittsburgh that there was a

18   pattern, practice, or policy of retaliating against inmates

19   that involve themselves in filing grievances and filing

20   lawsuits?

21   A.   I'm not aware of that specific allegation, no.

22   Q.   Again, had you been aware of such an allegation, what

23   steps would you have taken?

24   A.   Had I been aware of such an allegation, I would have

25   talked to the superintendent of the institution about the

1   allegation and see what he or she would tell me.

2            I would probably discuss the matter with the

3   regional deputy secretary and see if there was any findings or

4   anything they were seeing out there.

5            More likely than not, I would refer the particular

6   allegation again to my Office of Professional Responsibility

7   and I would have them investigate it.

8   Q.  And, again, to your knowledge, you never referred such an

9   investigation or inquiry with regard to the LTSU in Pittsburgh

10  in general or with regard to Mr. Jacobs in particular?

11  A.  Relative to retaliation for grievances and lawsuits?

12  Q.  Yes.

13  A.  That's correct, I never referred that issue to the Office

14  of Professional Responsibility for review.

15  Q.  Are you familiar with the American Correctional

16  Association?

17  A.  I am.

18  Q.  Can you explain to the jury briefly what that association

19  is?

20  A.  The American Correctional Association is a professional

21  organization.

22            THE COURT:  Excuse me.  Is there an objection?

23            MR. JACOBS:  Yes, Your Honor.

24            THE COURT:  Okay.  We'll excuse the jury for a

25  moment.  Please rise for the jury.

Jeffrey Beard - Direct

1          (Whereupon, the jury exited the courtroom.)

2    (In open court, jury not present.)

3          THE COURT:  Please be seated.

4          MR. JACOBS:  On Friday, they raised the matter of

5    possibly presenting this type of testimony today.  They gave

6    me this document, a brief summary of how ACA standards

7    operate, but this document does not include all factors, all

8    factors that was factored into reaching this determination

9    toward Mr. Beard.  This particular award related to how

10   prisons are run.

11          If this type of testimony is going to be permitted,

12   I think I would be able to at least present testimony as well

13   as documentation which undermined --

14          THE COURT:  That would be in rebuttal, yes.

15          MR. JACOBS:  Yes.  At this point, there's no

16   possible way for me to get the material that was factored into

17   making this determination unless the defendants turn it over.

18   It's the Department of Corrections' files.

19          MR. BRADLEY:  Your Honor, I wasn't going to get

20   into a whole lot of detail.  Just explain what the association

21   is, what the accreditation process is generally, and the fact

22   that SCI-Pittsburgh was accredited at the relevant time

23   period.

24          This, I believe, addresses the issue of deliberate

25   indifference on the part of the supervisors, particularly this

1    defendant.

2            And that it, I believe, he will testify, gives him

3    additional assurance in terms of the other things he already

4    testified he would do to insure the constitutionality of the

5    running of his prisons, that this was an external check, and

6    that they committed themselves to this process; and to the

7    extent any of this case is based on a claim of deliberate

8    indifference to what was going on at the LTSU and

9    SCI-Pittsburgh.

10           THE COURT:  You will tie it into the timeframe in

11   question?

12           MR. BRADLEY:  Yes.

13           THE COURT:  Mr. Jacobs, I will permit that for that

14   limited purpose.

15           You will have the right for rebuttal on this.

16           MR. JACOBS:  Also with respect to testimony that

17   the process of this accreditation is being undermined by the

18   Department of Corrections.

19           THE COURT:  I don't know what that means.

20           MR. JACOBS:  In other words, in order for them to

21   maintain a clear record, SCI-Pittsburgh, of good conditions,

22   and I know that to be otherwise and other prisoners know that

23   to be otherwise, I believe there were misrepresentations on

24   the part of the Department of Corrections as far as

25   undermining grievances, undermining misconducts and complaints

1   in general, that there's a policy or practice of undermining

2   these grievances in order to obtain this status of good

3   conditions out of a particular prison.

4          MR. BRADLEY:  He has already had witnesses testify

5   as to things that have gone on in the institution.  I think at

6   this point, he has to come up with something more than just

7   somebody's belief or opinions or conclusions about that.

8          THE COURT:  Because you are bringing this up so

9   late and he didn't have notice of this when he was presenting

10  his witnesses, he'll have a fair opportunity for rebuttal on

11  this, if it's permitted.  You have to make a choice.

12          Do you want to discuss it or then have the rebuttal

13  or do you want to move on?

14          MR. BRADLEY:  Could I have a moment, Your Honor.

15          (Pause in the proceedings.)

16          MR. BRADLEY:  We'll withdraw the proffer at this

17  time, Your Honor.

18          THE COURT:  Okay.  We will please bring back the

19  jury.

20          MR. JACOBS:  Is he going to have a problem seeing

21  documents?

22          THE COURT:  I think he can show them on the screen.

23  We did that with the other witnesses.

24          (Whereupon, the jury re-entered the courtroom.)

25          THE COURT:  Please be seated.

 1   (In open court, jury present.)

 2            THE COURT:   Members of the jury, that last question

 3   has been withdrawn.

 4   BY MR. BRADLEY:

 5   Q.  Secretary Beard, Mr. Jacobs' claims were based on a series

 6   of events that occurred in the LTSU in SCI-Pittsburgh in

 7   August or September of 2003.

 8            Within that timeframe, again, were you aware of any

 9   grievances or lawsuits that Mr. Jacobs had filed?

10   A.  Back at that time, no, I was not.

11   Q.  Are you familiar with the other defendants in this case?

12   A.  I'm not sure who the other defendants are.

13   Q.  If I could just read them off to you.   William Stickman?

14   A.  Yes, I know Bill Stickman.

15   Q.  Gregory Giddens?   He is a lieutenant.

16   A.  I may have met him.   I can't recollect, no.

17   Q.  Sergeant Allen Lynch?

18   A.  No.

19   Q.  Corrections Officer Frank Cherico?

20   A.  No.

21   Q.  Captain Tom McConnell?

22   A.  Again, I may have met him at some point.   I take regular

23   tours of the institutions and I meet a lot of people.   The

24   name I don't recollect, no.

25   Q.  Superintendent Assistant Carol Scire?

**Jeffrey Beard - Direct**

1   A.   Yes, I know Carol.

2   Q.   Hearing Examiner Michael Ferson?

3   A.   I don't believe I know him, no.

4   Q.   Current Unit Manager of SCI Fayette Shelly Mankey?

5   A.   No.

6   Q.   Captain Charles Simpson from SCI-Pittsburgh?

7   A.   No.

8   Q.   David McCoy, former counselor and drug and alcohol

9   supervisor at SCI-Pittsburgh?

10  A.   No.

11  Q.   Christine Reisinger?

12  A.   Yes.

13  Q.   And Robert Bittner?

14  A.   I know Bob Bittner, yes.

15  Q.   With those names in mind, did you ever direct -- again,

16  back in the timeframe of August and September of 2003 and

17  immediately thereafter, did you ever direct anyone, including

18  those individuals I just named, to take any retaliatory action

19  against Mr. Jacobs or any action that would deprive his access

20  to courts?

21  A.   No.

22  Q.   Did you enter any agreement, whether explicit or implicit,

23  with any of those other individuals to take any retaliatory

24  action against Mr. Jacobs or any action to deprive his access

25  to courts?

Jeffrey Beard - Cross

1   A.   No.

2                   MR. BRADLEY:   That's all the questions I have for

3   you, sir.

4                   Mr. Jacobs will have some questions, I'm sure.

5                        CROSS-EXAMINATION

6   BY MR. JACOBS:

7   Q.   Good morning, Mr. Beard.

8   A.   Good morning.

9   Q.   Are you familiar with the DC-801, discipline policy?

10  A.   Yes.

11  Q.   Did you author that policy?

12  A.   I do sign off on all of the policies of the Department of

13  Corrections, yes.

14  Q.   You read them, too, correct?

15  A.   Pardon?

16  Q.   Do you read them?

17  A.   Yes.

18  Q.   And they're based on state law?

19  A.   Some of the policies may be based on state law.  Some of

20  the policies may be based on best practice around the country

21  on -- depending what the issue is.

22  Q.   This policy in particular, 801?

23  A.   I'm not sure how much of that might be in regulation.

24  It's not really involved, but there are regulations that

25  govern the department and some of our policies do have certain

1  factors in those regulations; but sitting here, I couldn't

2  tell you what parts of that may be in regulation.

3  Q.  But it is required by the Department of Corrections

4  employees to comply with those policies, correct?

5  A.  Yes.

6  Q.  And the Department of Corrections Code of Ethics, are you

7  familiar with that?

8  A.  I am.

9  Q.  Isn't it also required for all Department of Corrections

10  employees to comply with the provisions of the Code of Ethics?

11  A.  That is correct.

12  Q.  At all times?

13  A.  That is correct.

14  Q.  Under all circumstances?

15  A.  Yes.

16  Q.  Under that policy, there's a reference to property of

17  another as far as the charges are concerned.  Are you familiar

18  with that section?

19  A.  Without actually having it here, I can't say what the

20  actual charge might be, but I am aware of in the Inmate

21  Handbook property of another inmate is considered to be

22  contraband in possession of an inmate.

23         So, there would be some charge, however it's worded

24  to that effect in Administrative Directive 801.

25  Q.  So you are generally familiar with that particular charge?

1   A.   Yes.

2   Q.   Okay.  Is that charge designed to prohibit prisoners from

3   giving each other affidavits or declarations?

4   A.   I'm not sure what you're asking.

5   Q.   I'm asking you if another prisoner gives me an affidavit

6   or declaration -- do you know what an affidavit is?

7   A.   That would be, I guess, something where they're saying

8   what happened in a particular event.

9   Q.   And a declaration would be the same thing, correct?

10  A.   Yes.

11  Q.   And if another prisoner gives me a declaration that he

12  witnessed misconduct of another prison official against me and

13  he gives me that declaration, is that contraband?

14  A.   I would not consider that contraband, no.

15  Q.   Is the policy designed to consider that contraband?

16  A.   No.  What the policy is designed for --

17  Q.   Give me a second.

18  A.   If you have possession of, say, a lawsuit from another

19  inmate.

20  Q.   Okay.  We're talking about declarations.  If a prisoner

21  gives me a declaration under the DC-801, is that contraband?

22  A.   I don't consider that to be contraband, no.

23  Q.   And you wrote the policy, correct?

24  A.   Yes -- I didn't write it.  I signed it.

25  Q.   Okay.  You authorized it and you put it into -- you

Jeffrey Beard - Cross

1  authorized the authority under the Department of Corrections'

2  practices, correct?

3  A.   That's correct.

4  Q.   Okay.  You stated that you do have a method of discovering

5  things that are going on within a particular institution, did

6  I hear that right?

7  A.   I said that I have a number of things that I look at to

8  help me monitor what is going on in the various institutions,

9  yes.

10  Q.   Would that include grievance complaints?

11  A.   I don't review all the grievances, no.

12  Q.   Do you review any grievances?

13  A.   Only those grievances that are remanded by the Office of

14  Grievances in the central office.

15  Q.   And the Office of Grievances, that's your office, correct?

16  A.   Yes.  They report directly to me.

17  Q.   And Ms. Reisinger is your staff, correct?  She is a member

18  of your staff?

19  A.   She was, yes.

20  Q.   Okay.  Is there a particular method for identifying

21  patterns of a particular complaint from prisoners?

22  A.   The office would monitor complaints that would come in and

23  if they saw a particular pattern of complaints, they would

24  probably bring that to my attention.

25  Q.   Whose responsibility is that?

1   A.  That would be the person who's the head of that office.

2   Q.  During the relevant timeframe, that would have been

3   Ms. Reisinger, correct?

4   A.  That's correct.

5   Q.  So --

6   A.  Yes.

7   Q.  So, if prisoners were sending complaints to her office

8   complaining about retaliation and denial of access to courts

9   and destruction of legal property, it would be required that

10  those complaints be documented, correct?

11  A.  Well, the paperwork is documented, yes.

12  Q.  Okay -- excuse me?

13  A.  I said the paperwork stands on its own.  The reports that

14  are sent in by the inmates, the grievance appeals, they exist.

15  Q.  Okay.  It would be her responsibility then to identify a

16  particular pattern of complaints?

17  A.  Yes.  If there was a pattern to the complaints that were

18  coming in, it would be her responsibility to identify that,

19  that's correct.

20  Q.  You said she would probably report that to you?

21  A.  If she identified a particular pattern of complaints, say,

22  from a particular institution or part of a particular

23  institution, she would more likely than not bring it to my

24  attention, yes.

25  Q.  But what happens if she ignored it?

1   A.   Well, then, assuming that exists, then she wouldn't be

2   doing her job.

3   Q.   Okay.  Are you familiar with the DCM-804?

4   A.   Which is?

5   Q.   In the grievance system.

6   A.   Yes.

7   Q.   Are you familiar with the section in particular where it

8   states that a grievance coordinator shall not assign a

9   grievance officer as the same person that's being complained

10  against?

11  A.   I am familiar with that, yes.

12  Q.   So if I filed a grievance against John Doe, would the

13  grievance coordinator be prohibited from assigning John Doe to

14  investigate that grievance?

15  A.   Yes.

16  Q.   Under that policy?

17  A.   Yes.

18  Q.   You would agree with me that the purpose of that

19  particular requirement is so that the person being complained

20  against is not investigating himself, correct?

21  A.   That's the purpose of it, yes.

22  Q.   Thank you.

23           You are familiar with the DCM-007?

24  A.   Yes.

25  Q.   That deals with legal aides, paralegal aides, access to

Jeffrey Beard - Cross

1  the law library, things of that nature?

2  A.  I'm familiar with access to legal services policy.

3  Q.  It is true that during the relevant timeframe in question,

4  that particular policy prohibited prisoners in the LTSU from

5  seeing a paralegal aide?

6  A.  I can't answer that question.  We do change policies

7  periodically, make up dates for whatever to them, and so it

8  would be very difficult for me to say what was in place at

9  that particular point in time.

10            THE COURT:  Is there an objection?

11            MR. BRADLEY:  Yes, Your Honor.

12            THE COURT:  We'll take a brief recess.  Please rise

13  for the jury.

14            (Whereupon, the jury exited the courtroom.)

15  (In open court, jury not present.)

16            THE COURT:  What is the objection?

17            MR. BRADLEY:  Your Honor, Mr. Jacobs has presented

18  a footnote in a non-precedential Third Circuit opinion in

19  another case of his where there is some conclusion made about

20  the 007 policy.

21            I don't believe this is the appropriate witness to

22  bring that evidence through.

23            He attempted to lay the foundation.  The witness

24  indicated that he wasn't sure if that was the policy or not.

25            I don't know that he can impeach him or contradict

**Jeffrey Beard - Cross**

1   him by what was written by the Third Circuit in a

2   non-precedential opinion.

3           MR. JACOBS:  I'm not trying to impeach him.  I'm

4   trying to refresh his recollection.  That wasn't a different

5   case.  That was this case.

6           THE COURT:  This would not be shown to the jury.

7           MR. JACOBS:  I just want to refresh his

8   recollection about the policy.

9           THE COURT:  To see if he is familiar with that and

10  see if that refreshes his recollection.

11          MR. BRADLEY:  I do apologize.  I was looking at the

12  Third Circuit number.  It may well be the same case.

13          THE COURT:  Are you okay with that to refresh his

14  recollection?

15          MR. BRADLEY:  Sure.

16          THE COURT:  Okay.  Please rise for the jury.

17          (Whereupon, the jury entered the courtroom.)

18  (In open court, jury present.)

19          THE COURT:  Please be seated.

20          Members of the jury, you'll see that your viewing

21  screens are dark.  That's because there is a document that is

22  going to be shown to the witness for the purpose of seeing if

23  it refreshes his recollection, but it is not evidence so it is

24  not being shown to you.

25          THE WITNESS:  May I approach the screen so I can

Jeffrey Beard - Cross

1   see the document a little clearer?

2        THE COURT:  Yes.

3   Q.  Can you see the document, Mr. Beard?

4   A.  Yes, I was able to see the document.  It refreshed my

5   memory that that was the policy at that time.

6        I mean that's what it seems to be indicated here,

7   but I -- that doesn't refresh my memory that that was, in

8   fact, the policy at that time.

9   Q.  Okay.  Well, are prisoners allowed to be assisted in legal

10  matters?

11       MR. BRADLEY:  Your Honor, I'm going to object to

12  the absence of a timeframe.  That seems to be a rather broad

13  question.

14       THE COURT:  Narrow the question to the relevant

15  timeframe.

16  Q.  At the relevant timeframe in the year 2003, were prisoners

17  allow to assist each other in legal matters?

18  A.  Yes, prisoners are allowed to assist each other in legal

19  matters with certain conditions.

20  Q.  Would that assistance include being able to draft motions,

21  legal motions?

22  A.  I don't -- you know, I think when the inmates are allowed

23  to help each other, particularly in units, they can go and sit

24  with each other in an area and work on a case and that

25  particular case, the inmate, one inmate could draft a motion

Jeffrey Beard - Cross

 1   and hand it to the other inmate, yes.

 2   Q.   Okay.   Well --

 3   A.   Or could help the inmate draft the motion.

 4   Q.   Okay.   So, in segregated units, you said that normally

 5   there's a section within a unit where they could sit by each

 6   other, where the prisoner could sit by each other and assist

 7   each other, correct?

 8   A.   Yes.

 9   Q.   Have you ever toured the LTSU?

10   A.   I toured the LTSU on a number of occasions, yes.

11   Q.   Did you tour the LTSU at SCI-Pittsburgh?

12   A.   Yes.

13   Q.   Did you ever tour the law library?

14   A.   I can't recollect what the law library set up there looked

15   like back in 2003-2004, no.

16   Q.   So would you agree with me, though, in order for a

17   prisoner -- in order for someone else to assist me with

18   drafting a motion pertaining to my case, I would have to give

19   him documents pertaining to that case?   Do you agree with me

20   on that?

21   A.   I don't know that you would have to give documents.   You

22   would certainly have to discuss the case, yes.

23   Q.   Well, do you agree with me that I would have to show him

24   some documentation pertaining to the case?

25   A.   Yes.

Jeffrey Beard - Cross

1  Q.  It is the policy of the DOC -- was it the policy of the

2  DOC at the time in question to discourage or interfere with

3  one prisoner of providing assistance to another prisoner?

4  A.  No.

5  Q.  Are you familiar with the policies pertaining to the

6  disposal of contraband?

7  A.  Generally, yes.

8  Q.  So, if the Department of Corrections' employees take

9  something from a prisoner, label it contraband, do you follow

10  me?

11  A.  Yes.

12  Q.  And those materials are sent to the security department,

13  okay?

14  A.  Okay.

15  Q.  At that point, aren't documents created to show who

16  received those documents?

17  A.  There's a form, confiscation form that's supposed to be

18  filled out any time contraband is taken from an inmate that

19  documents what that contraband was.

20  Q.  Okay.  After that, the person that the contraband is given

21  to also creates a document to show that this contraband was

22  given to him, correct, or her?

23  A.  I'm not sure if there's another level of documentation

24  there or not.

25  Q.  Okay.  Well, do you know if there's any type of process to

1    be followed prior to the contraband being destroyed?

2    A.  Well, I guess it would depend on what the contraband was,

3    depend on the nature of the contraband.

4    Q.  Well, as in this case, what was labeled contraband was my

5    legal documents.  What would happen then?

6    A.  Well, if they're your legal documents, they shouldn't have

7    been considered to be contraband.

8    Q.  Well, they were found in the possession of another

9    prisoner who was assisting me with my legal matters.

10   A.  Then they were contraband for that other inmate.

11   Q.  They were contraband for the inmate that was assisting me?

12   A.  Yes.

13   Q.  But they were not contraband for me?

14   A.  No.

15   Q.  Is it true that under the Department of Corrections'

16   policy, those documents could have been returned to me?

17   A.  Certainly, the documents could have been returned to you.

18   Q.  Especially if the staff knew that the documents belonged

19   to me?

20   A.  Yes, they could have been returned to you.

21           MR. JACOBS:  No further questions.

22           MR. BRADLEY:  Nothing further, sir.  Thank you very

23   much.

24           THE COURT:  The witness is excused.

25           Is there going to be any other witness through

David McCoy - Direct

```
 1    videoconferencing?

 2              MR. BRADLEY:  No, Your Honor.

 3              THE COURT:  Thank you.

 4              THE WITNESS:  Thank you.

 5              THE COURT:  We'll need to disconnect.

 6              Is there another witness?

 7              MR. BRADLEY:  Yes.  The defendants call David

 8    McCoy.

 9              THE COURT:  The witness will please come forward

10    and stand in front of the court reporter to be sworn.

11         DAVID MCCOY, DEFENSE WITNESS, WAS SWORN.

12              THE COURT:  Please take the witness stand.

13                        DIRECT EXAMINATION

14    BY MR. BRADLEY:

15    Q.  Would you state your name for the record.

16    A.  David McCoy.

17    Q.  What is your present occupation?

18    A.  Home unit manager of the State Correctional Institution of

19    Pittsburgh.

20    Q.  Are you employed by the Pennsylvania Department of

21    Corrections?

22    A.  Yes.

23    Q.  How long have you been employed by the Department of

24    Corrections?

25    A.  I have been employed by the Department of Corrections for
```

1    nine years.

2    Q.   What was your first position?

3    A.   My first position at SCI-Pittsburgh was contract drug and

4    alcohol treatment therapist.  I worked for Gateway Rehab.  I

5    have been in the institution for 11 years.

6              Gateway Rehabilitation Center had the contract for

7    drug and alcohol services at SCI-Pittsburgh.

8              I was hired as a counselor two years after I worked

9    as a drug and alcohol therapist.

10             Then I worked as a counselor on a long-term

11   segregation unit.  I went back to drug and alcohol treatment.

12   I was the acting drug and alcohol treatment supervisor at the

13   time in question.

14   Q.   Then were you subsequently promoted to unit manager?

15   A.   Yes.  When Pittsburgh closed, I relocated to SCI Forest,

16   and I was offered a unit manager position there.

17   Q.   Just to be clear then, what was your position in September

18   of 2003?

19   A.   I was the acting drug and alcohol treatment supervisor.

20   Q.   At that time, did you have any involvement with the LTSU

21   where Mr. Jacobs was located?

22   A.   No, sir.

23   Q.   Prior to September-October of 2003, did you know who

24   Mr. Jacobs was?

25   A.   No, sir.

1   Q.  Were you aware that Mr. Jacobs had filed any grievances or

2   lawsuits against the Department of Corrections at that time?

3   A.  No, I was not.

4   Q.  We've had some testimony in this case about the Program

5   Review Committee.  Are you familiar with that?

6   A.  Yes, I am.

7   Q.  Did you play a role in the Program Review Committee about

8   that time, fall of 2003?

9   A.  Yes, sir.

10  Q.  This document has been previously marked as Defendant's

11  Exhibit C.  Do you recognize that document?

12  A.  Yes, I do.

13  Q.  Can you tell the jury what that document is?

14  A.  That's an appeal form that we would -- the appeal

15  committee would rule on.

16  Q.  This relates specifically to a misconduct that was issued

17  to Andre Jacobs at A469026, correct?

18  A.  Yes.

19  Q.  Does your name and signature appear on this document?

20  A.  Yes.  My name is on the bottom.

21  Q.  Does that reflect your participation in the PRC that

22  reviewed this conduct?

23  A.  Yes, it does.

24  Q.  With regard to your action as reflected by this document,

25  Defendant's Exhibit C, did you take this action with respect

1   to Mr. Jacobs' misconduct appeal based on the fact Mr. Jacobs

2   had previously filed grievances against the Department of

3   Corrections?

4   A.  No, sir.

5   Q.  Did you take this action because Mr. Jacobs had previously

6   filed a lawsuit against the Department of Corrections?

7   A.  No.

8   Q.  Did anyone, including the other defendants in this case,

9   attempt to influence or influence your decision in that case?

10  A.  No, sir.

11  Q.  Did you make your decision in that case based solely on

12  what was presented to you in terms of misconduct?

13  A.  Yes.

14  Q.  Based on that information, would you have made the same

15  decision whether or not Mr. Jacobs was the inmate appealing?

16  A.  Yes, sir.

17  Q.  Did you enter into any agreements whether explicit or

18  implicit with any of the other defendants to take any

19  retaliatory action against Mr. Jacobs or any action to deprive

20  his access to records?

21  A.  No.

22  Q.  Did you direct anyone to take any retaliatory action

23  against Mr. Jacobs or any action to deprive his access to

24  courts?

25  A.  No, sir.

David McCoy - Cross

1      MR. BRADLEY:  Thank you, sir.  That's all I have.

2                    CROSS-EXAMINATION

3    BY MR. JACOBS:

4    Q.  Good morning, Mr. McCoy.

5    A.  Good morning, sir.

6    Q.  Are you familiar with the Department of Corrections Code

7    of Ethics?

8    A.  Yes, I am.

9    Q.  Are you required to abide by the provisions of the Code of

10   Ethics?

11   A.  Yes, sir.

12   Q.  At all times?

13   A.  Yes, sir.

14   Q.  In all circumstances?

15   A.  Yes, sir.

16   Q.  You said that you were a counselor at the LTSU at one

17   time?

18   A.  That's correct.

19   Q.  What time was that?

20   A.  I'm not sure of the dates.  I was there at the conception

21   of the LTSU.

22   Q.  What year?

23   A.  I can't say for sure.  I would believe it would be 2001,

24   maybe 2002.

25   Q.  Were you familiar with any of the defendants in this case?

1    A.  Yes, I am.

2    Q.  All of them?

3    A.  No, sir.

4    Q.  While you were a counselor in the LTSU, did you know

5    Defendant Giddens?

6    A.  Yes, I did.

7    Q.  Did you know Defendant Lynch?

8    A.  I don't remember Defendant Lynch from the LTSU.

9    Q.  Defendant Cherico?

10   A.  Yes, sir.

11   Q.  You had an office in the LTSU, correct?

12   A.  Yes, I did.

13   Q.  You worked around the office on a daily basis, correct?

14   A.  I worked on the unit.

15   Q.  Around them?

16   A.  Well, I don't remember Officer Cherico being there, and

17   Defendant Giddens was not there at the time.

18   Q.  You say you remember him from where?

19   A.  From the institution.  He wasn't on the LTSU though when I

20   was there.

21   Q.  At that time?

22   A.  No, he wasn't.

23   Q.  Were you at liberty at the time in question to apply any

24   DOC policy in any way other than how it should have been?

25   A.  No, I wasn't, sir.

**David McCoy - Cross**

1  Q.  So you were supposed to follow the policy as it is

2  written?

3  A.  I did follow the policy.

4  Q.  I'm asking you.

5  A.  Yes.

6  Q.  And you heard the testimony of Mr. Beard, correct?

7  A.  Yes, I did.

8  Q.  You heard him state that a prisoner being in possession of

9  a declaration is not contraband, did you hear that testimony?

10  A.  Yes, sir.

11  Q.  Yet, you signed this document affirming the conviction for

12  me being in possession of contraband, correct?

13  A.  It was ruled at the time by the chief hearing examiner

14  that that was contraband.  It's not my --

15  Q.  Okay.  So I'm asking you.  You affirmed that

16  conviction -- you made an independent decision, correct?

17  A.  Based on the facts I was given, yes.

18  Q.  You said the chief hearing examiner.  So this was outside

19  influence who encouraged you to believe this was contraband?

20          MR. BRADLEY:  Objection, Your Honor.  That's not

21  what he testified to.

22  Q.  You said based on the chief hearing examiner?

23  A.  That's testimony I heard in this courtroom, sir.

24  Q.  Well, I'm talking about your particular decision.  Was

25  that based on your independent decision or was that based on

1    what the chief hearing examiner said?

2    A.  My independent decision was based on the facts I had at

3    the time.

4    Q.  And the facts you had at the time was I was in possession

5    of declarations written by Inmate Gary Banks, correct?

6    A.  Could I see the form again, please.

7              THE COURT:  Which exhibit is this?

8              MR. BRADLEY:  Defendant's C.

9    Q.  What document are you referring to?

10   A.  The appeal form that was on the screen.

11             THE COURT:  Can you see it all right?

12   A.  Yes.  We ruled on the witness being denied is what we

13   ruled on here.  We ruled on the finding of guilt.

14   Q.  Okay.  As of the PRC, you also engaged in discussions with

15   others in the PRC, correct?

16   A.  At the time, yes.

17   Q.  Do you recall testimony of Defendant Mankey regarding the

18   declarations?

19   A.  In this courtroom or at the trial?

20   Q.  In this courtroom.

21   A.  Yes.

22   Q.  So you're aware of what the documents were that were being

23   labeled contraband?

24   A.  Yes, sir.

25   Q.  You interpreted those documents to be contraband?

David McCoy - Cross

1   A.  I went on the word of the hearing examiner, sir.

2   Q.  I thought you said you made an independent decision?

3   A.  With the facts I had, yes.

4   Q.  So you're saying the hearing examiner did influence your

5   decision?

6   A.  No, sir, that's not what I said.

7   Q.  What facts were presented by the hearing examiner?

8   A.  Our role at PRC is to rule on whether or not the

9   procedures were followed.

10  Q.  Okay.

11  A.  We don't retry the case.  We don't rehear the case at PRC.

12  Q.  So the procedures being followed, if I'm found guilty of

13  something -- if I'm found guilty of possession, possessing

14  contraband and this material is not contraband, you're saying

15  that it is not your role to correct that, yes or no?

16  A.  I'm saying it --

17  Q.  Yes or no?

18  A.  Can you rephrase the question.  I don't quite understand.

19  Q.  So even if a prisoner is found guilty under the DC-ADM

20  policy of violating a rule under that policy and, in fact, he

21  never violated that rule, it is your position to correct that?

22  A.  In the particular case that we ruled on, we ruled that it

23  was contraband.  We upheld the hearing officer's decision.

24  Q.  So you ruled it was contraband even though it was not

25  contraband?

**David McCoy - Cross**

1   A.  We upheld his decision.

2   Q.  For this particular case?

3   A.  Yes, sir.

4   Q.  Because it involved me?

5   A.  No, sir, not because it involved you.

6   Q.  You generally uphold erroneous convictions then is what

7   you're saying?

8   A.  No, that's not what I said.

9   Q.  But you knew that this wasn't contraband?

10  A.  I did not know that, sir.

11  Q.  But you know now it is not contraband?

12  A.  I'm not sure at this point it wasn't contraband.

13  Q.  So you question the authority of Mr. Beard who wrote the

14  policy?

15  A.  That's not what I'm doing.

16          MR. BRADLEY:  Objection, Your Honor.  Mr. Beard did

17  not write the policy.

18          THE COURT:  Rephrase the question.

19  Q.  So you question the authority of Mr. Beard?

20  A.  That's not what I'm doing, sir.

21  Q.  Is it your duty to carry out the policy as it is intended?

22  A.  Yes, sir.

23  Q.  And you stated that it was the chief hearing examiner

24  involved in your decision?

25  A.  That's information I learned in this courtroom.  At the

**David McCoy - Cross**

```
 1   time, I didn't know that.

 2   Q.  So he didn't talk to you?

 3   A.  No, sir.

 4   Q.  You testified on direct examination that you would have

 5   made the same decision in any other circumstance?

 6   A.  Yes, I did.

 7   Q.  So even if a prisoner was found guilty of something --

 8           MR. BRADLEY:  Your Honor, his testimony is he would

 9   have made the same decision regardless of the inmate involved

10   under the circumstances that were presented in that case.

11   Q.  Under the particular circumstances -- in the circumstances

12   in this case is that I was found guilty of possessing

13   contraband of something that isn't contraband.

14           I'm asking you would you make that same decision in

15   any other case, uphold the decision finding a prisoner guilty

16   of contraband when it wasn't contraband?

17   A.  I don't know that it wasn't contraband.

18           THE COURT:  Just a second.  Just a moment.  There's

19   an objection.

20           MR. BRADLEY:  Your Honor, he's making the

21   assumption that the witness agrees with his characterization

22   that it wasn't contraband.

23           He has indicated that his understanding it was

24   contraband was based on the hearing examiner's finding.

25           MR. JACOBS:  I'm giving him a scenario, Your Honor.
```

David McCoy - Cross

1          THE COURT:  Are you giving him a hypothetical?

2          MR. JACOBS:  In light of the evidence.

3          THE COURT:  Rephrase your hypothetical.

4    Q.  If a prisoner is found guilty at a misconduct hearing, all

5    right, you follow?

6    A.  I'm following.

7    Q.  Of committing a particular misconduct?

8    A.  Of his particular misconduct or a hypothetical?

9    Q.  A particular misconduct under this particular policy.

10   A.  A hypothetical policy?

11   Q.  No.  DC-ADM inmate discipline policy.  Is it your practice

12   to ignore whether or not he was actually guilty of committing

13   a violation?

14   A.  No, sir.

15   Q.  You're aware of what a declaration would be used for, are

16   you?

17   A.  This particular -- are we still hypothetical?

18   Q.  Any declaration.

19   A.  Yes, sir.

20   Q.  You're aware of what that is?

21   A.  Yes.

22   Q.  That is a witness statement, and were you aware at the

23   time in question?

24   A.  Of --

25   Q.  What a declaration is?

David McCoy - Redirect

1   A.  Yes, sir.

2              MR. JACOBS:  No further questions.

3              MR. BRADLEY:  Just a few follow-ups.

4                    REDIRECT EXAMINATION

5   BY MR. BRADLEY:

6   Q.  Mr. Jacobs asked you about the Code of Ethics.  Did you

7   believe at the time you participated in the PRC in this case

8   that you were acting in compliance with the Code of Ethics?

9   A.  Yes.

10  Q.  Did you believe at the time you were to the best of your

11  abilities carrying out the directives and policies of the

12  Department of Corrections specifically with regard to the 801?

13  A.  Yes, I did.

14  Q.  Just to clear it up, you did not have any conversations

15  with Mr. Ferson about how to resolve this grievance?

16  A.  No.

17  Q.  When you talk about how you relied on the hearing

18  examiner, are you referring to the written conclusions he made

19  in terms of the findings on the misconduct forms?

20  A.  Yes.  We didn't have a conversation.  It was the documents

21  that I was referring to.

22  Q.  So the hearing examiner did not try to influence or direct

23  your decision in this case, did he?

24  A.  At no time.

25              MR. BRADLEY:  That's all I have.

1          Thank you.

2                MR. JACOBS:  Nothing else.

3                THE COURT:  The witness is excused.

4          This will be a good time for our morning recess.

5    Please rise for the jury.

6                (Whereupon, a break was taken.)

7     (In open court, jury present.)

8                MR. BRADLEY:  Defendants call Kristin Reisinger.

9          **KRISTIN REISINGER, DEFENSE WITNESS, WAS SWORN.**

10               THE COURT:  Please take the witness stand.

11                         DIRECT EXAMINATION

12   BY MR. BRADLEY:

13   Q.  Would you state your name for the record and spell it,

14   please.

15   A.  Kristin Reisinger, R E I S I N G E R.  Kristin,

16   K R I S T I N.

17   Q.  Who is your current employer?

18   A.  Pennsylvania Department of Corrections.

19   Q.  What is your current position with the department?

20   A.  I'm the hearing examiner at SCI Camp Hill.

21   Q.  How long have you worked for the Department of

22   Corrections?

23   A.  I worked for the department for 12 years.

24   Q.  Can you explain to the jury the various positions you held

25   beginning with the first position you held?

1   A.  I was hired in 1996 and at that time, I was the paralegal

2   supervisor who oversaw the paralegals who traveled around to

3   the institutions to assist the inmates throughout the

4   department.  That was from 1996 to 2000.

5             In the year 2000, I was hired as the Assistant

6   Chief Grievance Coordinator.  I served in that position for

7   six years.  I later went on to become the Chief Grievance

8   Officer and then last year, I became the Hearing Examiner at

9   Camp Hill.

10  Q.  In September of 2003 then, what was your position and

11  where were you assigned?

12  A.  In September of 2003, I was the Assistant Chief Grievance

13  Coordinator and I was at the central office in Camp Hill.

14  Q.  Can you tell the jury what duties and responsibilities you

15  would have as the Assistant Chief Grievance Coordinator?

16  A.  As the Assistant Chief Grievance Coordinator, I answered

17  to the chief who answered to Secretary Beard.  Our duties were

18  to answer grievances to final appeal.

19            Inmates have a grievance procedure for which they

20  can file their complaints and they address their complaints at

21  the institution level.

22            They can then appeal their decision to the

23  superintendent of their institution and then it comes to final

24  review.

25            We oversee -- we oversaw in my old position 26

1  institutions, and we answered all grievances to final review.

2  Q.  Were you present in the courtroom for the testimony of

3  Secretary Beard?

4  A.  Yes, I was.

5  Q.  Do you recall him testifying in response to a question

6  from Mr. Jacobs that the relevant time period you were the

7  Chief Grievance Officer?

8  A.  I do remember him saying that.

9  Q.  Was that correct?

10  A.  No, that was not correct.

11  Q.  Who was the Chief Grievance Officer at that time?

12  A.  That was Sharon Burks.

13  Q.  That would have been your supervisor?

14  A.  Correct.

15  Q.  Back in September -- the late months of 2003, September,

16  October, November of 2003, did you know the plaintiff in this

17  case Andre Jacobs?

18  A.  Personally, no.  This is the first I have seen him, met

19  him.  He had paperwork that came across our desk, but I didn't

20  know him from any other inmate whose paperwork came across our

21  desk.

22  Q.  The document on the screen has been marked as Defendant's

23  Exhibit E.  Can you describe for the jury what this document

24  is.

25  A.  This is an appeal to final review.  It's our office's

1   response to the inmate's appeal to our office.

2   Q.  Is that your signature on there?

3   A.  Yes, it is.

4   Q.  However, it's not your name?

5   A.  Correct.  Ms. Burks was probably out of the office in

6   training and when she is out, I would fill in for her.

7   Q.  You do that by signing your name?

8   A.  Correct.

9   Q.  I believe there was prior testimony in the case indicating

10  that Grievance No. 63417 filed by Mr. Jacobs concerned the

11  seizure of 151 pages of his legal materials from another

12  inmate Eric Lyons.  Did you hear that testimony?

13  A.  Yes, I did.

14  Q.  Looking at Defense Exhibit E, do you have, as you sit here

15  today, do you have any independent recollection of signing off

16  on that grievance appeal?

17  A.  Not specifically.  I mean I did sign off on this.  I did

18  review the grievance, but this is back in 2003, but, yes, I

19  did sign it and review it in 2003.

20  Q.  As you sit here today, you have no real recollection of

21  the process you went through --

22  A.  Not specifically, no.

23  Q.  Obviously, because this was in response to a grievance,

24  you had an awareness that Mr. Jacobs had at least filed one

25  grievance, wouldn't that be true?

1  A.  Yes.

2  Q.  Was your decision in denying this appeal -- perhaps we

3  should -- excuse me.

4          Can you indicate for the jury what the consequence

5  of Defense Exhibit E was at the time, what the decision was

6  made as reflected in the document?

7  A.  Well, we upheld the fact that he was in possession of

8  another inmate's legal materials and they had been properly

9  confiscated as inmates are not permitted to have property of

10  other inmates.  He was appealing that to final review.

11          We upheld the fact that he was in possession of

12  another inmate's legal material and he was not permitted to

13  have them.

14  Q.  Now, at the time that decision was made, was that

15  basically on the fact that Mr. Jacobs had filed previous

16  grievances against the Department of Corrections?

17  A.  No.

18  Q.  Did you have any knowledge of that time that Mr. Jacobs

19  had filed a lawsuit against other employees of the Department

20  of Corrections?

21  A.  No, I did not.

22  Q.  Did anyone, including the other defendants in this case,

23  attempt to influence or influence your decision that you made

24  in this case?

25  A.  No.

Kristin Reisinger - Direct

1   Q.  You had indicated that one of your first positions with

2   the Department of Corrections was as the paralegal supervisor,

3   is that correct?

4   A.  Yes, it is.

5   Q.  In that role, did you become familiar with the

6   department's policy on the provisions of legal services to

7   inmates?

8   A.  Yes, I was very familiar with it.

9   Q.  I believe there had been testimony previously offered in

10  this case that inmates in the -- strike that.

11         Pursuant to the policy, if an inmate is requesting

12  legal assistance, what steps does he have to take and what

13  does he have to show?

14  A.  Well, there's two groups of inmates for the policy.  We're

15  talking about Departmental Policy 007.

16         In that policy, inmates in general population may

17  request legal assistance from a legal reference aide and these

18  legal reference aides are employed in the law library.  It's

19  the main law library that inmates in general population may

20  have access to.

21         In this case, the plaintiff was not in general

22  population.  He was in an L5 unit and specifically our L5

23  units, which I don't think has been determined yet to this

24  point, is for disciplinary custody inmates who have received

25  disciplinary custody time through misconducts.  They are in

Kristin Reisinger - Direct

1   what we call an L5 unit.

2              Specifically, Mr. Jacobs was in the LTSU, and in

3   order to receive legal assistance in the LTSU, inmates in the

4   LTSU may request assistance from a staff paralegal.  In order

5   to qualify to be seen by our staff paralegal, the inmate must

6   be legitimately illiterate.

7              There's a mini law library the inmates have access

8   to and there's all kind of self-help books in there and all

9   the legal materials that have been determined that need to be

10  in that law library and the inmates do have access to that.

11             However, to be seen by a staff paralegal, as I

12  said, an inmate must be determined to be legitimately

13  illiterate.

14             MR. BRADLEY:  Thank you.

15             That's all the questions I have.

16                       CROSS-EXAMINATION

17  BY MR. JACOBS:

18  Q.  Good morning.

19  A.  Good morning.

20  Q.  You said you were very familiar with the DC-ADM 007?

21  A.  Correct.

22  Q.  Do you know why that policy was created?

23  A.  Yes.  To provide legal access to inmates.

24  Q.  Are you aware that that policy was created as part of the

25  settlement agreement?

1   A.  Yes.

2   Q.  And are you aware what settlement agreement that was?

3   A.  Yes.  The Austin settlement.

4           MR. BRADLEY:  Your Honor, I'm going to have an

5   objection.

6           THE COURT:  All right.  Please excuse the jury.

7   Please rise.

8           (Whereupon, the jury exited the courtroom.)

9   (In open court, jury not present.)

10          THE COURT:  Please state your objection.

11          MR. BRADLEY:  Initially, Your Honor, my

12  understanding of an access to claims -- access to court's

13  claim under the First Amendment following Lewis versus Casey

14  requires an inmate to show actual injury as a predicate to its

15  claim and that there's no freestanding right regarding access

16  to services, provision of law library, provision of legal

17  assistance.

18          So I think where Mr. Jacobs is headed to begin with

19  I believe is not relevant to his First Amendment claim.

20          THE COURT:  He has to show that something was taken

21  from him or some action was taken that interfered with that

22  and the second prong of that is whether or not the materials

23  taken caused him to suffer an actual injury.  So there's two

24  parts to that.

25          MR. BRADLEY:  Apart from that, what he's proposing

1    to offer is looks to be five or six pages of at least a

2    24-page opinion in the Eastern District which apparently

3    approved the settlement regarding a wide variety of things

4    regarding --

5              THE COURT:  Just let me ask you, Mr. Jacobs, what

6    is the purpose of what you want to show to the witness?

7              MR. JACOBS:  Your Honor, it's my position as it

8    relates to the complaint that the defendants were carrying out

9    a practice of discouraging a prisoner's right of access to

10   courts as well as interfering with that right.

11             Ms. Reisinger testified to the purpose and intent

12   of this particular policy with regard to legal assistance and

13   law library, and it is my position that I was excluded from

14   that, receiving assistance under that policy and punished for

15   receiving legal assistance --

16             THE COURT:  What does this proposed exhibit have to

17   do with it?

18             MR. JACOBS:  It has to do with the intent, the

19   purpose of the settlement.

20             The purpose of the settlement was for prisoners in

21   segregation to receive access to the law library.  She

22   testified prisoners in LTSU segregation could not receive

23   paralegal assistance.

24             I believe this goes directly --

25             THE COURT:  What is the date of the settlement

1    agreement?

2              MR. JACOBS:  1995.

3              MR. BRADLEY:  I think her testimony was that the

4    same standard of illiteracy prevailed whether it was in the

5    general population or in the restricted housing units.

6              THE COURT:  So what does this has to do with the

7    illiteracy issue?

8              MR. JACOBS:  It has nothing to do with the

9    illiteracy.  It is the purpose of the settlement.  They made a

10   settlement, which brought about the policy for access to

11   paralegal assistance and prisoner receiving paralegal

12   assistance and legal assistance in general.

13             In this case, I was punished for --

14             THE COURT:  Does the policy require that to receive

15   that type of assistance, the prisoner has to be illiterate?

16   Am I hearing that correctly?

17             MR. BRADLEY:  That's my understanding.

18             THE WITNESS:  Yes.

19             MR. JACOBS:  That's what she said, but the thing is

20   the agreement they made with the Court was that this

21   particular paralegal assistance system was for prisoners in

22   segregation.  She testified it is not for prisoners in

23   segregation.

24             It is my position that the defendants were carrying

25   out a practice deliberately designed to hinder prisoners'

1    access to courts.

2              THE COURT:  Can I see the proposed exhibit.

3              What is the argument now, Mr. Jacobs?

4              MR. JACOBS:  That the defendants were carrying out

5    a policy or practice of discouraging legal assistance amongst

6    prisoners that want access to courts.

7              THE COURT:  The policy does talk about eligible

8    inmates being able to receive the paralegal services and to be

9    eligible you have to be illiterate.

10             MR. JACOBS:  I understand that, but the policy

11   itself is evidence that it is being carried out in a way

12   contrary to the agreement and is being carried out in a way

13   designed to hinder access to the courts by prisoners that need

14   assistance drafting legal documents.

15             THE COURT:  I have the quote from the judge's

16   opinion.  I don't know what the actual agreement was.  You're

17   saying there was a consent agreement entered into?

18             MR. JACOBS:  No, it wasn't a consent agreement.

19   The thing is the agreement -- the considerations that were

20   made were specifically targeted to prisoners in segregation.

21             A strong feature of the settlement agreement was

22   for prisoners in segregation, not whether or not they were

23   illiterate or not.

24             THE COURT:  I don't have the settlement agreement.

25   That's what I'm saying.  It appears to have been a settlement

Kristin Reisinger - Cross

1    agreement.

2          MR. JACOBS:  Yes, there was.  She stated she is

3    familiar with it.

4          THE COURT:  Okay.  Do you have a copy of the

5    settlement agreement?

6          MR. JACOBS:  No, I don't, but I should still be

7    able to question her about it being as though she said she was

8    familiar with it.

9          THE COURT:  You can ask her about the settlement

10   agreement, but I don't know that the decision from Austin

11   versus Pennsylvania Department of Corrections would be

12   relevant except perhaps maybe to refresh her recollection, if

13   she needed it.

14         MR. JACOBS:  I would like to draw her attention to

15   those particular sections I have outlined in there.

16         THE COURT:  For what purpose?

17         MR. JACOBS:  To refresh her recollection.

18         THE COURT:  You can ask her if that refreshes her

19   recollection.

20         MR. JACOBS:  While we're on this particular

21   defendant, Your Honor, I have a document I want to enter under

22   Federal Rule of Civil Procedure, Federal Rule of Evidence 608

23   wherein Ms. Reisinger perjured herself.

24         MR. BRADLEY:  Your Honor, this is a declaration

25   from Ms. Reisinger in another case involving another inmate.

1          She indicates that going through a review of the

2   inmate's records, he has never filed a grievance regarding

3   staff at SCI-Fayette labeling him a snitch.

4          He also has a grievance from this inmate which

5   indicates he has made the complaint that he filed, a grievance

6   claiming he was labeled as a snitch.

7          I think it's such a collateral issue to begin with,

8   but if she indicates from her review of the records he has

9   never filed a grievance and he has never filed a grievance and

10  she identifies some other grievances but she doesn't identify

11  this one, so it's not clear whether she would have seen this

12  one.

13         I object to the admission of the exhibits.

14         THE COURT:  Mr. Jacobs.

15         MR. JACOBS:  It goes to the character for

16  truthfulness and untruthfulness and in the Court's discretion.

17  I will limit it to that statement specifically --

18         THE COURT:  You know, these form exhibits would be

19  called extrinsic evidence, so if the Court permits you to

20  question, you can question her on it, but you have to -- you

21  would then be bound by the answer in the sense you can't then

22  put this into evidence.

23         MR. JACOBS:  It is in the Court's discretion.

24         THE COURT:  You can inquire into it on

25  cross-examination, but it's not evidence in and of itself.

1          So if she says she didn't do this or whatever

2   you're questioning her about, then you can't put the evidence

3   in to contradict her.  It can't be shown by extrinsic

4   evidence.  That's what the rule means.

5          I'll permit you to ask her about it, but it doesn't

6   come into evidence and it doesn't get shown to the jury.

7          MR. JACOBS:  Okay.

8          THE COURT:  Please rise for the jury.

9          (Whereupon, the jury entered the courtroom.)

10  (In open court, jury present.)

11  BY MR. JACOBS:

12  Q.  In regards to the Austin settlement, you stated you were

13  familiar with the provision of that settlement, correct?

14  A.  Generally, yes.

15  Q.  Are you familiar with the claim raised in that complaint

16  regarding prisoners' access to the courts?

17  A.  I'm assuming that the inmates were making the claim of

18  denial of access to the courts.

19  Q.  You stated as a result of the agreement made in that case,

20  the Policy DC-ADM 007 was created?

21  A.  Correct.

22  Q.  And do you know why it was agreed upon that prisoners in

23  segregation in particular needed assistance?

24  A.  Not specifically, no.

25          THE COURT:  Mr. Jacobs, do you wish to show

1   something to the witness to see if it refreshes her

2   recollection?

3                   MR. JACOBS:   Yes.

4                   THE COURT:   This is another one of those instances

5   where the document is not shown to the jury.

6   Q.   Do you see the highlighted portion on the document?

7   A.   Yes, I do.

8   Q.   Does that refresh your recollection as to the reasons for

9   the paralegal system?

10  A.   Yes.

11  Q.   And you'll agree with me that one of the reasons for the

12  paralegal system was that it was difficult for prisoners in

13  segregation to exercise their right of access to the courts?

14  A.   No, I don't agree with you on that.

15  Q.   Well, do you agree with that settlement agreement that the

16  purpose of that policy was so that prisoners who are in

17  segregation could access the courts?

18  A.   Yes, of course.

19  Q.   Through --

20  A.   Everybody is entitled to access to the courts.

21  Q.   Through this particular policy DC-ADM 007?

22  A.   Through this policy what?

23  Q.   That was why the policy was created?   That was one of the

24  reasons why the policy was created?

25  A.   One of the reasons.

Kristin Reisinger - Cross

1   Q.   Okay, for prisoners in segregation.

2   A.   Well, the mini law library was created --

3   Q.   Excuse me.  Answer the question.  For prisoners in

4   segregation?

5   A.   Not specifically, no.

6   Q.   One of the reasons?

7   A.   One of the reasons, yes.

8   Q.   For prisoners --

9   A.   For all prisoners, Mr. Jacobs.

10  Q.   I'm not talking about all prisoners.  I'm talking about

11  segregation.

12  A.   Segregation is part of prisoners.

13           THE COURT:  Listen to the question first, then you

14  can ask for an explanation.

15  Q.   The policy DC-ADM 007, one of the reasons why that policy

16  was created was for prisoners in segregation?

17  A.   Yes.

18  Q.   Thank you.

19           You stated on direct examination that your review

20  of -- what document was that, the exhibit that was shown to

21  you, the final --

22  A.   The final level of appeal.

23  Q.   That you filled in for Ms. Burkes at that time?

24  A.   Yes.

25  Q.   You weren't insinuating that was just a one-time thing,

1  were you?

2  A.  No.  I was the assistant chief and when she was not

3  available, I filled in.

4  Q.  There were many times you responded to a prisoner's final

5  level of appeal, correct?

6  A.  Many?  What do you mean by many?

7  Q.  On how many occasions did you respond to a prisoner's

8  final level of grievance appeals?

9  A.  I would sign for Ms. Burkes whenever she was not present.

10  Q.  You would review the grievances, too, correct?

11  A.  Absolutely.

12  Q.  So how many times did you actually review a prisoner's

13  appeal?

14  A.  Every working day for seven years.

15  Q.  So her name is typed in there but yours is signed in

16  there?

17  A.  Correct.  In this case, yes.

18  Q.  In many other cases you described every working day for

19  approximately seven years?

20  A.  Yes.  That's what I did.  That was part of my job.

21  Q.  By way of these appeals to prisoners' grievances, you

22  became aware of complaints made by prisoners at SCI-Pittsburgh

23  in the year 2003, correct?

24  A.  If they would have appealed to final review, yes.

25  Q.  Through the grievance process?

1  A.  Through the grievance process.

2  Q.  And you would have been made aware of those grievances as

3  well as what those grievances allege?

4  A.  If the inmates would have appealed to final review, I

5  would have been aware.

6  Q.  If you received -- if you happened to notice a pattern of

7  a particular type of complaint, what would you do at that

8  time?

9  A.  What do you mean by pattern?

10  Q.  Something that happens more frequently than others.

11  A.  I would have been aware of all the grievance appeals from

12  Pittsburgh that would have come to final review.

13  Q.  Okay.  So suppose certain complaints stood out more than

14  other complaints?

15  A.  Well, that's just it.  They would have to stand out.

16  Q.  What would you do if they stood out?

17  A.  If they stood out, I would have called the institution at

18  SCI-Pittsburgh to see what was going on.

19  Q.  At what point, what could you do if they -- if you found

20  out that something was going on?  What could you do?  Would

21  you report it to somebody?  Would you write a report?

22  A.  It would depend on what you mean by what's going on.

23  Q.  Well, that's what you said, what's going on.

24  A.  There's a lot -- all grievances from SCI-Pittsburgh that

25  come to final review, I would review them.

**Kristin Reisinger - Cross**

1        If there was anything significant, a red flag would

2   have gone up.  If several inmates were grieving about the same

3   thing, I would have called the superintendent at

4   SCI-Pittsburgh to find out what was going on at Pittsburgh.

5   Q.  Okay.

6   A.  Regarding that specific complaint, but I would have to

7   receive several complaints from several inmates.

8   Q.  By several you mean what?

9   A.  Six, seven, five, six, seven.

10  Q.  You were present for the testimony of Michael Alberts,

11  correct?

12  A.  Yes.

13  Q.  You were present for the testimony of Gary Banks, correct?

14  A.  Yes.

15  Q.  Do you recall Mr. Banks' testimony he filed over 300

16  grievances?

17  A.  Yes, I recall that testimony.

18  Q.  Do you recall the testimony of Mr. Alberts that he

19  filed -- I don't remember the exact term he used, but he said

20  he filed a lot of complaints?

21  A.  Yes.

22  Q.  Concerning access to the courts, retaliation and other

23  claims raised in this case?

24  A.  Well, that's what he stated.

25  Q.  Okay.  But do you recall the testimony?

1  A.  Yes.

2  Q.  Do you recall at any time inquiring into any of these

3  claims?

4  A.  Not specifically.

5  Q.  In fact --

6  A.  I recognize their names but specifically --

7  Q.  In fact, do you recall me making complaints about

8  destruction of property taking place in the LTSU prior to

9  events in question?

10 A.  Not specifically, no.

11         MR. BRADLEY:  Your Honor, I have an objection to

12 one of the documents and maybe to the other as well.

13         THE COURT:  Okay.  We'll excuse the jury.  Please

14 rise for the jury.

15         (Whereupon, the jury exited the courtroom.)

16 (In open court, jury not present.)

17         THE COURT:  Please be seated.

18         MR. BRADLEY:  He presented two handwritten

19 documents, both are addressed to a Shauna Kyler, who is also

20 with the Camp Hill central office.

21         One regards the misconduct appeal and there's been

22 no testimony presented that at the time this witness would

23 have been involved --

24         THE COURT:  Whose misconduct?

25         MR. BRADLEY:  Mr. Jacobs' misconduct.  I believe

1    the one -- it's not a complete number but 506 number that has

2    been referred to in this case.

3              THE COURT:  Okay.

4              MR. BRADLEY:  The other one I do believe relates to

5    the appeal that this witness signed off on, but, again, it's

6    not addressed to her and it -- although it references the

7    appeal, it doesn't appear to be something that was filed in

8    the normal administrative process, so I don't know if she has

9    ever seen this document.

10             MR. JACOBS:  Her response was right here.  It was

11   addressed --

12             THE COURT:  This is the witness that responded to

13   it?  Do you want to show the response letter to Mr. Bradley.

14             MR. BRADLEY:  I believe this is the document we

15   admitted into evidence as Exhibit E that she signed --

16             MR. JACOBS:  That's a different number.

17             MR. BRADLEY:  Okay.  I apologize for that.  I got

18   confused on the numbers.  Nevertheless -- okay.  If I

19   understand this to be then the final request for appeal, then

20   he can ask her if she ever saw this.  I have no objection to

21   that.

22             The other one, again, it's regarding a misconduct

23   appeal and there's been no testimony -- if there is a document

24   that she signed --

25             THE COURT:  It's so confusing for the record.  What

Kristin Reisinger - Cross

1   are you referring to?  Which letter do you not have any

2   objection to?

3           MR. BRADLEY:  I don't object to her being asked

4   about Grievance No. 58710.

5           THE COURT:  Okay.  We'll need an exhibit number for

6   that.

7           MR. BRADLEY:  With regard to the other one that is

8   identified as regarding Misconduct No. A69506 --

9           MR. JACOBS:  This is a grievance that pertains to

10  that.

11          THE COURT:  What is it being marked?

12          THE CLERK:  20.

13          THE COURT:  What is the next one?

14          MR. BRADLEY:  It refers to Misconduct

15   No. A69506 -- I think that should be A694506.

16          My objection to this is there's been no indication

17  that she handled misconduct appeals.

18          MR. JACOBS:  That was a mistake.

19          MR. BRADLEY:  You are only offering one document?

20          MR. JACOBS:  Yes.

21          MR. BRADLEY:  Okay.

22          THE COURT:  Are we ready then for the jury?  Is

23  there anything else?

24          MR. BRADLEY:  No.

25          THE COURT:  Please rise for the jury.

```
 1              (Whereupon, the jury entered the courtroom.)
 2    (In open court, jury present.)
 3              THE COURT:  The objection is overruled as to the
 4    one document.  You may continue.
 5    BY MR. JACOBS:
 6    Q.  Ms. Reisinger, I'm showing you what has been marked as
 7    Plaintiff's Exhibit 21.
 8              Do you recognize this document?
 9    A.  No, I do not.
10    Q.  Are you familiar with -- is it generally the form of how
11    prisoners make their final grievance appeal?
12    A.  Yes.
13    Q.  Would this be a document that you would review if you were
14    a reviewing staff member?
15    A.  Yes.
16    Q.  Can you read the highlighted section of that document?
17    A.  It is strongly my position that the claim of the missing
18    documents was used as an avenue --
19    Q.  Only.
20    A.  -- only to search my cell and steal my legal documents.
21    Q.  Can you read the first highlighted section.
22    A.  And the materials which are pertinent to my current civil
23    action, criminal appeal, and grievances were never returned.
24    Q.  Read the next.
25    A.  LTSU officers are engaging in unlawful conduct which is
```

1   infringing on those rights.

2   Q.  Read the next section.

3   A.  That the materials be immediately returned; that Officer

4   Cherico and Lieutenant Giddens be disciplined and ordered to

5   refrain from similar conduct in the future.

6   Q.  Okay.

7           I'm referring to what is marked as Plaintiff's

8   Exhibit No. 20.  Can you identify that form?

9   A.  Yes.  It's our final review answer to you.

10  Q.  Do you see the grievance number?

11  A.  Yes, I do.

12  Q.  You would agree with me this grievance number does not

13  pertain to the events in question?

14  A.  What do you mean that it does not pertain?

15  Q.  That's not the same grievance.

16          MR. BRADLEY:  Your Honor, we'll stipulate it's a

17  different grievance than she testified to earlier.

18          THE COURT:  Okay.

19  Q.  This particular grievance was filed before the events in

20  question?

21  A.  That, I don't know.

22  Q.  I'm showing you what was marked as Plaintiff's Exhibit

23  No. 8.  Do you see the date of that grievance?

24  A.  Yes.  August 4 of '03.

25  Q.  So in reference to my appeal Exhibit No. 21, which was

1   just shown to you, you were put on notice at least one time

2   that officers in the LTSU were engaging in illegal practices?

3           MR. BRADLEY:  Your Honor, I'm going to object to

4   that.  She was put on notice Mr. Jacobs had made a complaint

5   about that.

6   Q.  That's what I was saying.  At least one time?

7           THE COURT:  Rephrase your question in terms of you

8   filed a complaint.

9   Q.  You were aware I filed a complaint?

10  A.  Yes, according to this grievance here.

11  Q.  And did you take any action in regards to my complaint

12  such as contacting the prison?

13  A.  Did you appeal this to final review?

14  Q.  I just showed you your response.

15  A.  Well, then I would have answered it.

16  Q.  Would you have called the superintendent being that as I

17  was complaining about a practice?

18  A.  No, I would not have.

19  Q.  If I recall your testimony correctly, you stated on direct

20  examination you upheld a grievance because I was in possession

21  of another inmate's legal property?

22  A.  Yes.

23  Q.  Is that how you remember it?

24  A.  What do you mean is that how I remember it?  Refreshing

25  myself with the document, here is how I remember it.

**Kristin Reisinger - Cross**

1   Q.   Not this particular document, but the document you were

2   testifying about on direct examination.   They showed you the

3   other final grievance appeal.

4            Do you remember being shown that document?

5   A.   Yes.

6   Q.   You stated that you upheld the responses of staff after

7   review of the record?

8   A.   Correct.

9   Q.   And the basis of you upholding that was that I was in

10  possession of another inmate's legal property?

11  A.   Yes.

12  Q.   I'm showing you what is marked as Plaintiff's Exhibit

13  No. 2.   If you can take a moment to review that.

14  A.   Yes.

15  Q.   Do you see anywhere in that document where it states I was

16  in possession of another inmate's legal property?

17  A.   Mr. Lyons was in possession of your property, which is a

18  violation of DC-ADM 801.   That's for this grievance.

19            I believe there was another misconduct that has

20  been presented in the course of testimony here that you were

21  in possession of two of Mr. Banks' --

22  Q.   That wasn't a grievance, that was a misconduct, correct?

23  A.   Yes.

24  Q.   A misconduct doesn't go before you, does it?

25  A.   No.

Kristin Reisinger - Cross

1  Q.  Only grievances?

2  A.  Correct.

3  Q.  You would agree with me then that it was Mr. Lyons who was

4  in possession of what I want to call contraband, correct?

5  A.  Yes.

6  Q.  Those documents were not contraband with respect to me?

7  A.  They were contraband with respect to Mr. Lyons.

8  Q.  But they were not contraband with respect to me?

9  A.  Correct.

10  Q.  Under DOC policy, I would have been allowed to have legal

11  documents, correct?

12  A.  You would have been allowed to have your legal documents

13  in your possession.

14  Q.  Okay.  You were present for the testimony of Mr. Beard,

15  were you not?

16  A.  Yes, I was.

17  Q.  Do you recall Mr. Beard's testimony that the particular

18  documents in question would not have been contraband had they

19  been returned to me?

20  A.  That's based on his testimony.

21       MR. BRADLEY:  Your Honor, first, I don't believe

22  that was his testimony.

23       THE COURT:  Rephrase your question.

24  Q.  Do you recall Mr. Beard's testimony?

25  A.  I do.

**Kristin Reisinger - Cross**

1   Q.  And are you required to follow the policies of the

2   Department of Corrections?

3   A.  Absolutely.

4   Q.  Are you also required to interpret the policy in a way

5   that your interpretation would not abridge the rights of the

6   person involved?

7   A.  Yes.

8   Q.  Were you aware by my complaint that those documents were

9   legal documents?

10  A.  So you claim.

11  Q.  Well, there's been testimony by -- there's been evidence

12  introduced in this case even a correction officer would know

13  these were legal documents.  Do you remember that?

14          It wasn't my label.  It was the correction

15  officer's label.

16          Do you credit that?

17          MR. BRADLEY:  It is not up to her to credit the

18  testimony or not.  He needs to ask her a question.

19          THE COURT:  Move on.

20  Q.  You never took time out to review the documents and see

21  whether, in fact, they were legal or not, did you?

22  A.  No.

23  Q.  Did it matter to you whether or not they were legal or

24  not?

25  A.  Yes, on the basis of your claim.

1   Q.   Did it matter to you whether or not I needed those

2   documents to pursue the legal claims?

3   A.   Will you please rephrase that, re-ask that.

4   Q.   Did it matter to you whether or not I needed those

5   documents to pursue legal claims?

6            MR. BRADLEY:   In her role as responding to the

7   grievance or just in general?   I'm not sure where he's going

8   with this.

9            THE COURT:   Just ask it if it's in general or with

10  respect to your particular case.

11  Q.   When you review this final level grievance appeal, okay?

12  A.   Yes.

13  Q.   Did you factor into your decision whether or not I needed

14  these legal documents to pursue a legal claim?

15  A.   No, because the issue at hand here, the bottom line is

16  that Mr. Lyons was in possession of your legal material, which

17  is against department policy.   You're not allowed to be in

18  possession of other inmate's property.

19  Q.   I understand that.   In my grievance appeal and in my

20  appeal to you, I requested the documents be returned.   Do you

21  remember that?

22  A.   Yes.

23  Q.   And you refused to return those legal documents, correct?

24  A.   Me specifically?

25  Q.   Yes.   You reviewed them.   You reviewed the appeal, didn't

Kristin Reisinger - Cross

1   you?

2   A.  Yes.

3   Q.  You denied my request that the documents be returned,

4   correct?

5   A.  Correct.  They were considered contraband.

6   Q.  In the hands of Mr. Lyons?

7   A.  Correct.

8           THE COURT:  This might be a good time for our lunch

9   recess.  Do you have many more questions for her?

10          MR. JACOBS:  Yes.

11          THE COURT:  Members of the jury, we're going to

12  take a lunch recess.  I have another matter that is not

13  related to this proceeding scheduled over the lunch hour that

14  I will be hearing.

15          I'm going to ask you to return at 1:30, but we may

16  not be able to begin exactly at 1:30.

17          With that, we'll please excuse the jury.

18          Please rise.  We'll be in recess for the lunch

19  hour.

20          (Whereupon, a luncheon recess was taken.)

21         (Afternoon session.  In open court, jury present.)

22          THE COURT:  If the witness could retake the witness

23  stand.

24          Mr. Jacobs, are you ready?

25          Can everyone see that?  It's a little hard to see.

1    BY MR. JACOBS:

2    Q.  Would you take a minute and review that document.

3    A.  Yes, I've done that.

4    Q.  You did?

5    A.  Yes.

6    Q.  Do you see the reference in that complaint that Defendant

7    Giddens refused to return the legal documents because his name

8    was mentioned in a planned Civil Action against him?

9    A.  Yes, I see that.

10   Q.  Do you see in this complaint that Mr. Lyons was assisting

11   me with legal matters?

12   A.  Yes, I see that.

13   Q.  Do you also see a reference in that complaint that

14   Defendant Jericho and Giddens had unlawfully seized and

15   destroyed my legal material on another occasion?

16   A.  Yes, I see your claim to that.

17   Q.  Okay.  If you remember Exhibit No. 21, the grievance

18   appeal that was addressed to Ms. Burkes that you responded to?

19   A.  Yes.

20   Q.  You remember the highlighted portions that you read?

21   A.  Yes.

22   Q.  Wherein the allegation that there was a practice of LTSU

23   officers taking legal documents?

24   A.  Your claim, yes.

25   Q.  So you were aware by the grievance itself and by a

1    previous complaint that I sent to you that I did file a

2    grievance complaint?

3    A.   Yes.

4    Q.   And that I did make attempts to access the courts?

5    A.   Yes.

6    Q.   And that some of those claims were against prison

7    officials?

8    A.   Yes.

9    Q.   So you didn't need anybody to tell you these things, did

10   you, because they are in the documents?

11   A.   Your grievance, yes.

12   Q.   Okay.  You stated that you review -- in regards to this

13   particular case, this particular grievance, you review all

14   grievance-related documents?

15   A.   Yes.

16   Q.   And would that include my grievance, the grievance

17   response, my appeal, and the superintendent's response and my

18   appeal to central office, correct?

19   A.   Correct.

20   Q.   Any other documents outside of that?

21   A.   No.

22   Q.   The grievance I'm showing you marked as Plaintiff's

23   Exhibit No. 2 --

24   A.   Can I see what number that is?  Slide it down a little.

25   Okay.

**Kristin Reisinger - Cross**

1   Q.   This would have been one of the documents you reviewed as

2   part of your appeal, correct?

3   A.   Yes.

4   Q.   Defendant Giddens makes reference to a misconduct hearing

5   being held on 9-24-03, do you see that?

6   A.   Yes.

7   Q.   And that the documents in question were revoked by the

8   hearing examiner?

9   A.   Yes.

10   Q.   Is that one of the reasons you decided not to return my

11   legal property?

12   A.   Right.

13   Q.   Well, did you consider that those documents never were

14   revoked by the hearing examiner?

15   A.   I'm going by the response here they were revoked.

16   Q.   Okay.  Did you consider that they never were revoked?

17   A.   Well, if they were contraband, why would they have not

18   been revoked.

19   Q.   Did you consider that they were never revoked?

20   A.   They've established it was contraband and contraband is

21   revoked.

22   Q.   Did you consider that they never were revoked?

23   A.   I'm going by --

24   Q.   Yes or no?

25   A.   Did I consider that they were never revoked?

1    Q.   Yes.

2    A.   No.

3    Q.   Because the guard said that they were revoked, so you

4    credited that?

5    A.   Yes.

6    Q.   But you did not investigate whether or not that allegation

7    was true or not?

8    A.   No.  I'm going by the officer's testimony and his

9    response.

10   Q.   And that's all you need?

11   A.   In this case, yes.

12   Q.   This particular case?

13   A.   Yes.

14   Q.   Do you ever credit the allegations of a prisoner's

15   complaint?

16   A.   Absolutely.

17   Q.   Did you credit my allegation that Defendant Giddens was

18   attempting to conceal the initial seizure that took place on

19   September 15th, 2003?

20   A.   I took into credit the claim that you make in this

21   grievance and the responses that were provided by the staff

22   and your appeals.

23   Q.   So you're saying that when a corrections officer makes

24   reference to other alleged facts involved in a grievance

25   appeal, you never check whether or not the facts are true?

**Kristin Reisinger - Cross**

1  A.  Yes, I do.

2  Q.  But you never checked whether or not the hearing examiner

3  revoked the legal materials in question?

4  A.  There was not any need for me to do that.

5  Q.  There was not a need for you to do that?

6  A.  I do not believe so, no, based on the responses provided.

7  Q.  Because the officer said that it was true?

8  A.  Yes.

9  Q.  I'm showing you what's been marked as Defendant's Exhibit

10  D.  Do you know what that document is?

11  A.  That's a hearing examiner report.

12  Q.  Okay.  Does that misconduct match with the number?

13  A.  Yes, it does.

14  Q.  Do you see what that misconduct is about?

15  A.  Yes.  It's about refusing to obey an order, possession of

16  contraband and borrowing and lending property.

17  Q.  Do you see that deals with documents found in my

18  possession on September 16, 2003?

19  A.  Correct.

20  Q.  And that those documents allegedly belong to Mr. Gary

21  Banks?

22  A.  Yes.

23  Q.  And that Mr. Lyons was no way involved in that misconduct?

24  A.  Yes.

25  Q.  Do you see that disposition was taken as to that

**Kristin Reisinger - Cross**

1  particular misconduct?

2  A.  Yes.

3  Q.  If you recall the testimony of Mr. Ferson, those two

4  documents were revoked by the hearing examiner on this day?

5  A.  I was not here for Mr. Ferson's testimony, but I see his

6  sanction here, 30 days disciplinary custody time to be served

7  consecutively and he revoked the contraband and dismissed

8  without prejudice charge No. 35, refusing to obey an order.

9  Q.  That was on 9-24-03?

10  A.  Yes, at 9:10 a.m.

11  Q.  And this was the date reference and Defendant Giddens'

12  response, correct?  That's the same date, isn't it?

13  A.  You have a grievance date of 9-30-03.  I can't see the

14  bottom for when Lieutenant Giddens signed off.

15  Q.  No.  I mean the date of when he said the documents were

16  revoked.

17  A.  On 9-24-03, the hearing examiner revoked this item.

18  Q.  But that wasn't the 151 pages, was not the item that

19  Mr. Ferson revoked, was it?

20  A.  No.  There must have been some confusion.

21  Q.  Confusion?

22  A.  That's what it appears to be.

23  Q.  So you're familiar with the grievance tracking system?

24  A.  Yes, sir.

25  Q.  And is it possible to pull up a grievance number so if I

1   punch in a grievance number, what's going to come up?  If I

2   punch in this particular grievance number, what is going to

3   pop up on the screen?

4   A.   On our grievance tracking system?

5   Q.   Yes.

6   A.   Everything is by inmate number.  So, grievances that you

7   would have filed under the grievances you would have filed,

8   what would be in the tracking system would be the response at

9   the initial level and the response at the superintendent

10  level.  That's what I would see, that final review.

11  Q.   But if you pull it up, a grievance number, a misconduct

12  would come up, wouldn't it?

13  A.   No.

14  Q.   If you review a misconduct, you would punch in a

15  misconduct number, a grievance wouldn't come up?

16  A.   No.  Two separate appeal processes.

17  Q.   They are specific to that specific number?

18  A.   Right.

19  Q.   So it is impossible to punch in a grievance number and

20  come up with a misconduct?

21  A.   In the tracking system, yes.  They're two tracking

22  systems.

23  Q.   So would you agree with me that two separate incidents

24  were mixed into one and got a response?

25            MR. BRADLEY:  I'm going to object to the extent she

**Kristin Reisinger - Cross**

1   can read what it says but based on the question --

2   A.  I don't have access to the tracking system right now.

3   Sorry.

4            MR. BRADLEY:  Based on the question, it sounds like

5   he is asking her what was in Lieutenant Giddens' mind when he

6   wrote this document.

7            THE COURT:  Who signed off on the document?

8            MR. BRADLEY:  Lieutenant Giddens.

9            THE COURT:  Okay.

10           MR. JACOBS:  I'm asking her in her understanding of

11  the tracking system, would it appear that being as though one

12  incident happened on one day and one incident happened on

13  another day, one incident involved a grievance and one

14  involved a misconduct, that these facts from these separate

15  incidents were put into one specific document.

16           MR. BRADLEY:  I think he asked her that and she

17  answered and he then asked her another question --

18           THE COURT:  You can ask her this is a grievance but

19  is it also referring to a misconduct and would that be

20  typical.

21           MR. JACOBS:  Okay.

22           THE COURT:  Do you want to ask the question?

23  Q.  Did you credit the statement by Defendant Giddens that my

24  claim that 151 pages of legal documents were taken was an

25  outright fabrication?

1   Did you factor that into your determination that my

2   grievance was without merit?

3   A.  Somewhat, yes, I factored the whole thing into

4   consideration.

5   Q.  That particular statement, did you factor --

6   A.  Yes.

7   Q.  But you didn't do anything to assert whether or not that

8   allegation that 151 pages of legal documents were taken was

9   true or not?

10  A.  I'm assuming it was true because they were, in fact,

11  confiscated because they did not belong to you.  I mean we've

12  been through this.

13  Q.  Listen to the question.  You said that you factored that

14  into your determination that my grievance was without merit,

15  correct?

16  A.  That your grievance was without merit -- you haven't asked

17  me that.

18  Q.  You determined that I was not entitled to any relief?

19  A.  Yes, I did determine that.

20  Q.  And you factored into that determination Defendant

21  Giddens' statement right here in this document that my claim

22  that 151 pages of legal documents was taken was an outright

23  fabrication?

24  A.  Yes, I did.

25  Q.  So by that statement, you had an impression that I

1  submitted a false grievance, correct?

2  A.  A false grievance, no.

3  Q.  Well, at least with respect to the documents that were

4  taken, the 151 documents that were taken?

5  A.  Your grievance did not have merit based on Lieutenant

6  Giddens' response.

7  Q.  Okay.  Did you understand your position to not go along

8  with Defendant Giddens' determination that the grievance was

9  fabricated or that I was not supposed to have my legal

10  documents returned?

11  A.  What do you mean go along with?

12  Q.  In other words, you didn't have to say that these

13  documents were not to be returned.  You could have took

14  another course of action, couldn't you?

15  A.  My job was to review the documents that were presented to

16  me at final review, which is what I did.

17  Q.  Okay.  Do you have any type of authority to send a

18  grievance back?

19  A.  Yes.

20  Q.  Do you have any type of authority to grant a return of my

21  legal property?

22  A.  Yes.

23  Q.  That was something you could have done?

24  A.  Yes.

25  Q.  That was something that you didn't want to do?

Kristin Reisinger - Cross

1  A.  No.  Want to do?  You're trying to put words in my mouth.

2  That is something I chose not to do because it was considered

3  contraband.

4  Q.  You chose not to do it because it was considered

5  contraband in the hands of Mr. Lyons?

6  A.  Correct.

7  Q.  But not considered contraband in my hands?

8  A.  That's just it.  It wasn't in your hands, it was in

9  Mr. Lyons' hands.

10  Q.  But if it would have been returned to me, it would not

11  have been contraband in my hands.

12  A.  If you had possession of it, no, it would not have been

13  contraband.

14  Q.  If you would have allowed those documents to be returned

15  to me, it would not have been contraband, correct?

16  A.  You're doing a lot of ifs here, a lot of hypotheticals.

17        If you would have had your own legal material, it

18  would not have been contraband.  You did not have your own

19  legal material.  Other inmates were in possession of your

20  legal material.

21  Q.  So if you had returned those legal documents to me, it

22  would not have been contraband at that time, would it?

23  A.  No.

24  Q.  The reason you didn't return them those legal documents is

25  because you didn't want me to have legal documents?

Kristin Reisinger - Redirect

1    A.   That's not correct.

2    Q.   You gathered from these complaints that I made, the

3    grievance documents, the grievance appeal, as well as the

4    previous complaint I sent to you that Defendant Giddens did

5    not want me to have those legal documents?

6    A.   I disagree.

7    Q.   You solidified this conspiracy to deprive me of my legal

8    property, correct?

9    A.   No.

10              MR. JACOBS:   No further questions.

11                    REDIRECT EXAMINATION

12   BY MR. BRADLEY:

13   Q.   Whether it was two pages or 151 pages, would that have

14   made a difference in the result?

15   A.   No.

16   Q.   Why not?

17   A.   Because the bottom line is the inmates are responsible for

18   their own property and should be in possession of their own

19   property.

20              When they share, borrow, lend, or if they have

21   property that belongs to another inmate, it is considered

22   contraband whether it is legal material or not.

23   Q.   That was the basis of your decision?

24   A.   Absolutely.

25   Q.   This is the grievance response you previously identified

1  and again, does this reflect your decision?

2  A.  Yes, it does.

3  Q.  And if you could just read in the third paragraph down.

4  A.  Upon completion of this review, it is the decision of this

5  office to uphold the responses provided by staff at the

6  institutional level.

7         Your legal materials were in the possession of

8  another inmate, which is a violation of policy.  The officers

9  properly confiscated the items.

10  Q.  So you actually gave Mr. Jacobs an explanation as to why

11  you ruled the way you did, is that correct?

12  A.  Yes.  I always do.

13  Q.  You didn't just write denied or no merit or anything of

14  that nature?

15  A.  No.  We review each grievance personally on its merits and

16  personally address every grievance.

17  Q.  With regard to the other grievance final review response

18  that Mr. Jacobs showed you --

19         THE COURT:  Could you identify these by exhibit

20  numbers.

21         MR. BRADLEY:  Sure.

22  Q.  That was Defendant's Exhibit E that I just showed you.

23         I'm now showing you Plaintiff's Exhibit 20.

24  A.  Upon completion of this review, it is the decision of this

25  office to uphold the responses provided by staff at the

1  institutional level.  There is no evidence to support your

2  allegation of harassment and retaliation.

3         Your cell was searched because they were looking

4  for legal materials that were missing from the mini law

5  library after you were in there.

6  Q.  So based on that response, you determined that his claims

7  were unfounded?

8  A.  Yes.

9  Q.  Based on the fact that these claims were unfounded, would

10  that give you any reason to go investigate further with either

11  the institution or with the central office in terms of

12  responding to a pattern of responses or grievance issues that

13  you would see?

14  A.  No.

15  Q.  Was there ever a time that you saw grievances that caused

16  you to report to someone at the institution or to central

17  office that there was an issue with regard to the way inmates

18  were being treated with respect to access to courts and

19  retaliation for filing grievances and lawsuits in the LTSU at

20  SCI-Pittsburgh?

21  A.  No.

22  Q.  If you had seen a pattern of founded events from the LTSU

23  at SCI-Pittsburgh regarding interference with inmates access

24  to courts and retaliation for lawsuits and grievances, what

25  would you have done?

Kristin Reisinger - Recross

1  A.  I would have -- the first thing I probably would have done

2  would have been to call the superintendent at that

3  institution.

4       I also would have reported it to supervisor Sharon

5  Burkes who would have gone to Secretary Beard.

6  Q.  When you issued the decisions in either of these -- either

7  Plaintiff's Exhibit 20 or Defendant's Exhibit E, did you talk

8  to Lieutenant Giddens personally and ask him how he wanted you

9  to find in these grievances?

10  A.  No.

11  Q.  Did you talk to anyone?

12  A.  No.

13       MR. BRADLEY:  That's all I have.  Thank you.

14              RECROSS-EXAMINATION

15  BY MR. JACOBS:

16  Q.  You stated it wouldn't matter whether or not it was two

17  pages or 151 pages, correct?

18  A.  Yes, I did.

19  Q.  Would it matter if the response was fabricated?

20  A.  How am I to determine if the response was fabricated?

21  Q.  I'm asking you not how you determine it.  I'm asking you

22  would it matter to you.

23  A.  It would matter to me if the response was fabricated, but

24  we haven't determined that.

25  Q.  Okay.  You stated in your response to Exhibit what has

1   been marked as Defendant's Exhibit D -- E, you stated that the

2   officers probably confiscated the material?

3   A.   Yes.

4   Q.   Would that be based on a policy of disallowing prisoners

5   to assist each others in legal matters?

6   A.   No.

7   Q.   Well, Mr. Lyons was assisting me in legal matters in this

8   particular case and that assistance was interfered with.

9           MR. BRADLEY:  Your Honor, that sounds like

10  testimony rather than a question.

11          THE COURT:  Let him finish the question.  Can you

12  finish your question.

13  Q.   This case involved Mr. Lyons assisting me with legal

14  matters and because he was assisting me with legal matters,

15  those documents were taken from him.

16          So, I ask you would your interpretation that those

17  documents were properly confiscated a statement on a policy

18  disallowing prisoners to assist each other?

19  A.   In accordance with DC-ADM 007, inmates in L5 units are not

20  permitted to assist each other.

21  Q.   So there is a policy and the policy was interpreted to

22  mean that prisoners were not allowed to assist each other with

23  legal matter s in the L5 unit?

24  A.   Correct.

25  Q.   At the time in question?

1   A.   Yes.

2   Q.   That's why Mr. Lyons' assistance was interfered with?

3   A.   I cannot make that determination.

4   Q.   Well, you said this policy was in place?

5   A.   Yes, it was in place.

6   Q.   And your understanding of this policy is what led you to

7   this conclusion that they were properly confiscated?

8   A.   Yes.   They were in Mr. Lyons' possession, which is a

9   violation of policy.

10   Q.   And Mr. Lyons is not allowed to assist -- well, anyone in

11   L5 units is not allowed to assist anyone in legal matters?

12   A.   Yes.

13   Q.   That policy was designed to hinder and obstruct prisoners'

14   access to courts, isn't it?

15   A.   No, it is not.   It is designed to give access to the legal

16   courts.

17   Q.   In this response you stated that the officer properly

18   confiscated the items, correct?

19   A.   Yes.

20   Q.   But your response doesn't address whether or not it was

21   proper or improper for him not to return them at that time?

22   A.   No, it does not say that.

23          MR. JACOBS:   No further questions.

24          MR. BRADLEY:   Nothing further, Your Honor.

25          THE COURT:   The witness is excused.

1        MR. BRADLEY:  Defendants call Robert Bittner.

2        THE COURT:  The witness will please come forward

3   and stand to be sworn.

4   **ROBERT STEVEN BITTNER, DEFENSE WITNESS, WAS SWORN.**

5        THE COURT:  Please take the witness stand.

6                 DIRECT EXAMINATION

7   BY MR. BRADLEY:

8   Q.  Can you state your name for the record and spell it.

9   A.  Yes, sir.  Robert Steven Bittner, B I T T N E R.

10  Q.  What is your present occupation?

11  A.  I am retired, sir.

12  Q.  What are you retired from?

13  A.  Pennsylvania Department of Corrections.  I was at the time

14  as the matter being litigated the Chief Hearing Examiner for

15  the Department of Corrections.

16  Q.  Is that the position you retired from?

17  A.  Yes, sir.

18  Q.  How many years did you work for the Department of

19  Corrections?

20  A.  Thirty-four and a half.

21  Q.  What was your first position?

22  A.  Corrections Counselor One at the Camp Hill Institution.

23  Q.  When did you become the Chief Hearing Examiner?

24  A.  I became Chief Hearing Examiner in 1986.

25  Q.  What did you do prior to that, just prior to that?

1   A.   I was a Hearing Examiner.

2   Q.   How long had you been a hearing examiner?

3   A.   I was a Hearing Examiner from 1983 to 1986.

4   Q.   Can you explain to the jury what duties and

5   responsibilities you would have had as the Chief Hearing

6   Examiner?

7   A.   Yes, sir.  My responsibilities were the immediate

8   supervision of all of the Department of Corrections' hearing

9   examiners located throughout the state and to complete final

10  review of inmate misconduct appeals to the final level.

11  Q.   In the course of your duties and responsibilities, would

12  you have occasion to talk with hearing examiners about

13  specific issues in misconduct hearings they were conducting?

14  A.   Daily.

15  Q.   There was testimony in this case that the hearing examiner

16  hearing Mr. Jacobs' misconduct hearing back in September of

17  2003 called you to ask you a question about whether a certain

18  item was contraband or legal document.

19          Do you have any recollection of that conversation?

20  A.   No, sir.

21  Q.   Do you doubt that conversation would have occurred?

22  A.   No, sir, absolutely not.  If Mr. Ferson says he called me,

23  he called me.  I just receive so many calls from so many

24  hearing examiners about so many different issues that it's

25  difficult to recall specific inquiries.

**Robert Bittner - Direct**

1   Q.   When Mr. Ferson would call you, would he generally

2   identify the inmate or would he just simply address the issue?

3   A.   Address the issue.

4   Q.   Do you know the plaintiff in this case Andre Jacobs?

5   A.   No, sir.

6   Q.   Have you ever to your knowledge had any dealings with

7   Mr. Jacobs?

8   A.   That I can recall, no, which is not to say that I never

9   answered a misconduct appeal to final review for Mr. Jacobs.

10  I may have, I may not have, but I don't have any recollection

11  of him, no.

12  Q.   And, specifically, with regard to the events that

13  are concerned in this trial, are you aware of any action

14  you took as Chief Hearing Examiner with regard to

15  Mr. Jacobs?

16  A.   No, sir.  In fact, I pointed out in one of these

17  interrogatories that I did not perform final review of this

18  misconduct.

19        I was, in fact, on medical leave from hip

20  replacement surgery and this misconduct was reviewed at the

21  final level and responded to by Mr. John Androtti for me and

22  you'll see on the document the signature says that.

23        MR. BRADLEY:  That's all the questions I have of

24  this witness.

25        Thank you.

Robert Bittner - Cross

1              CROSS-EXAMINATION

2    BY MR. JACOBS:

3    Q.  Good afternoon.

4    A.  Good afternoon.

5    Q.  Are you insinuating that you had no participation in this

6    particular misconduct?

7    A.  No, sir.  I'm stating that, other than Mr. Ferson calling

8    me for guidance, which he probably did, I just don't remember

9    that.

10             As far as final review, no, I wasn't even working

11   at that time.

12   Q.  You mean -- when you say "at that time," you mean anywhere

13   around that time?

14   A.  Yes, sir.

15   Q.  Or on that specific day?

16   A.  No.  Anywhere around that time.  I don't recall the exact

17   date of surgery, but it was about mid November and I returned

18   to duty the first working day after Christmas, whenever that

19   was.

20   Q.  Mid November?

21   A.  Yeah.

22   Q.  I'm showing you what's marked as Plaintiff's Exhibit

23   No. 22.  Do you see that?

24   A.  Yes.

25   Q.  Do you recognize that document?

1  A.  Yeah.

2  Q.  Do you recognize the name?

3  A.  Andre Jacobs, is that you -- that's the name you are

4  talking about.

5  Q.  Do you recognize who it is from?

6  A.  Can I see the rest of the document, please?  That is a

7  form response.  You will notice --

8  Q.  You need to answer the questions first.  Can you pull that

9  down?

10  A.  That's what I'm trying to do, Mr. Jacobs.

11  Q.  You never answered my question.  Do you see who that is

12  from?

13  A.  Yes.

14  Q.  That's you, correct?

15  A.  That's correct.

16  Q.  Do you see the date?

17  A.  Yes.

18  Q.  October 24, 2003?

19  A.  Yes.

20  Q.  You stated that you would have been on medical leave mid

21  November?

22  A.  Yes.

23  Q.  That would have been after this document?

24  A.  That's correct.

25  Q.  This would have been after the documents in regards to

**Robert Bittner - Cross**

```
 1    this appeal were sent to your office?

 2    A.   No, sir.

 3    Q.   This is before mid November?

 4    A.   This is a form letter notifying you --

 5    Q.   Just follow me --

 6    A.   Well, I'm trying to answer your question, Mr. Jacobs.

 7    Q.   You said mid November?

 8    A.   Yeah.

 9    Q.   I'm asking you --

10    A.   No.  You're telling me when we received documents, and I'm

11    trying to tell you when we received them.

12              THE COURT:  Just a second.  Listen to the

13    questions.  If you can answer them yes or no, you can do that.

14              If you need follow-up, your counsel can follow-up

15    and you can give a full explanation.

16              THE WITNESS:  Yes, ma'am.

17    Q.   This document predates your roundabout day of surgery,

18    does it not?

19    A.   To the best of my recollection, yes.

20    Q.   You see down here where it says additional comments?

21    A.   Yes.

22    Q.   Sent for witness form?

23    A.   Yes.

24    Q.   Does that mean that -- what does that mean?

25              THE WITNESS:  Now, Your Honor, can I answer that?
```

1    THE COURT:  Yes.  You asked the question,

2    Mr. Jacobs.

3    Q.  Sent for witness form --

4    A.  Objection.

5    THE COURT:  Sir, your counsel will file an

6    objection.  The witness cannot say objection.

7    Q.  Sent for witness form.

8    A.  What does that mean?

9    Q.  What does that mean sent for witness form?

10   A.  Now, can I answer that without you interrupting me since

11   you asked what it means.

12   THE COURT:  Sir, you're out of order.  You can

13   explain your answer.  You can explain what it means.

14   A.  Yes, ma'am.  Okay.  This is a form letter that is sent to

15   every inmate from whom we receive an appeal.

16   It is to notify you that we received your appeal

17   and we're not answering it right away because you didn't

18   include a copy of the witness form with your appeal.

19   Therefore, instead of rejecting your appeal, which

20   we could have, in accordance with the 801, we sent for the

21   witness form for you and there would be a delay.

22   This letter is a form letter.  It was sent by my

23   secretary and you will see that it is not signed by me.

24   Q.  How do you remember that it was sent by your secretary and

25   not you?

1   A.   Because I don't send letters.

2   Q.   You don't send letters?

3   A.   No.  I don't do the mail.  My secretary does.

4   Q.   You don't participate in the appeal process?

5   A.   Certainly, and when I do, it's signed by me.  This is not

6   signed by me.  It's a routine notice to you that we got your

7   appeal.  We'll answer it, but we need more information before

8   we do.

9   Q.   When you say "we," who do you mean?

10   A.   My office, me, under normal circumstances.  Obviously if

11   I'm in the hospital, that's different.

12   Q.   Okay.  So would it be you or your secretary to identify

13   what documents were received or not received?

14   A.   My secretary often identifies that.

15   Q.   Do you ever do it?

16   A.   Yes.

17   Q.   So in other words, do you have any recollection as to

18   whether or not you received these documents pertaining to this

19   appeal at the time in question?

20   A.   No.

21   Q.   You don't have any recollection?

22   A.   No.

23   Q.   But you did?

24   A.   I did what?

25   Q.   Receive those documents.

Robert Bittner - Cross

1   A.   I did or my office did.

2   Q.   Your office?

3   A.   Yes.

4   Q.   Your office is you?

5   A.   I would assume from this note that we received everything

6   from you.  You can probably remember a lot better than I did.

7          You know that you're supposed to send the record of

8   the misconduct with your appeal, and I would assume that you

9   did; but your record that you sent in support of your appeal

10  did not include the witness request form.  That's why we sent

11  for that.

12  Q.   Were you present for Mr. Ferson's testimony?

13  A.   No.

14  Q.   Are you aware of Mr. Ferson's statement that he contacted

15  you in regards to this particular misconduct?

16  A.   Yes.

17  Q.   And that he asked you whether or not he was to interpret

18  declarations as contraband?

19  A.   Am I aware he said that, yes.

20  Q.   Are you aware of what he said your response was?

21  A.   Not clearly.  Obviously, if I understand right, because I

22  wasn't here, my response was that this would categorize

23  contraband.

24  Q.   So he came to you asking for your guidance on a particular

25  issue?

1   A.   Yes.

2   Q.   And did he explain the circumstances of the particular

3   issue?

4   A.   I don't recall.  I don't recall the conversation.

5   Q.   Would it be typical for him to give a scenario in order

6   for you to understand the circumstances?

7   A.   Yes.

8   Q.   But he wouldn't mention a name?

9   A.   He rarely if ever did.

10  Q.   So is that how you interpret a declaration as contraband?

11  A.   I don't recall that I did.

12  Q.   Well, I mean at the time of the question in the relevant

13  timeframe, is that how you would classify a declaration as

14  contraband?

15  A.   If it was in the hands of an inmate that it didn't belong

16  to, yes.

17  Q.   Well, do you know what a declaration is?

18  A.   Yes.

19  Q.   What is a declaration?

20  A.   A declaration is part of your legal package, if you will,

21  in which an inmate makes a statement and signs it.

22  Q.   Isn't it also true that a declaration could be used for a

23  person witnessing an event that takes place?

24  A.   I believe I was saying that.

25  Q.   Okay.  So, in other words, I, John Doe, witness this or

1   that taking place?

2   A.   Okay.

3   Q.   Okay.   So the document is not written for the person that

4   wrote the document, would you agree with me on that?

5   A.   I don't follow you on that.

6   Q.   What I'm saying is that if this person is making a

7   statement, a written statement about something he witnessed,

8   that document goes to the events which he witnessed, do you

9   follow me on that?

10  A.   I'm trying.

11         MR. BRADLEY:   Your Honor, I don't know that this is

12  the right witness to be laying a foundation for what a legal

13  declaration is.

14         MR. JACOBS:   He said he knows what it is.

15         THE COURT:   He can respond if he knows what it is.

16         MR. BRADLEY:   Your Honor, I have an objection --

17         MR. JACOBS:   Don't worry about it.

18  Q.   Is it the policy under the Department of Corrections to

19  prohibit prisoners from giving each other declarations?

20  A.   From giving each other?

21  Q.   Correct.

22  A.   There's a policy in the Department of Corrections that

23  you're not allowed to possess the property of other inmates,

24  including legal materials.

25  Q.   I understand that.

**Robert Bittner - Cross**

1   A.   So we classify -- your question, sir, is there a policy

2   against -- can you ask the question again.

3   Q.   If a prisoner writes a declaration and says that he

4   witnessed misconduct by a correctional officer against me, you

5   follow me?

6   A.   Yes.

7   Q.   He gives me that witness statement for my legal records?

8   A.   Okay.

9   Q.   Am I in possession of contraband?

10  A.   In that instance, I would say no, but I'm not sure we've

11  established that instance in this matter.

12  Q.   Okay.

13          MR. BRADLEY:   Your Honor, I have a procedural

14  objection, I guess, to the next document that has been

15  offered.

16          THE COURT:   Okay.   We'll excuse the jury.   Please

17  rise for the jury.

18              (Whereupon, the jury exited the courtroom.)

19  (In open court, jury not present.)

20          THE COURT:   Please be seated.

21          MR. BRADLEY:   Your Honor, the plaintiff has offered

22  two documents, the first being plaintiff's interrogatories and

23  request for production of documents that appear to be undated

24  and unsigned and the defendant's responses.

25              The issue I'm having is that the way these were set

1   up, this was a request -- this was sort of a group request to

2   defendants Ferson, McCoy, Lynch, Bittner, and Mankey, so there

3   was no delineation in the request for answers.

4          There was no delineation in the responses given and

5   the responses are given under my signature, so he can present

6   these in rebuttal, in his own case as interrogatories that

7   were responded to by the defendants; but to the extent he is

8   seeking to contradict or impeach this witness or introduce

9   these documents through this witness as somehow a statement by

10  this witness, I don't think that's appropriate.

11         MR. JACOBS:  Your Honor, these are facts in the

12  case.  These are facts they admitted to in their own

13  interrogatories.  He questioned the facts in the case.

14         I'm putting that evidence in as to what is the

15  actual fact in this case.  The fact of this case is they were

16  unsworn declarations.

17         He cast doubt on that fact.

18         MR. BRADLEY:  If he wants to bring them in through

19  rebuttal, that is fine.

20         THE COURT:  Can you show this to this witness and

21  ask him if he agrees or disagrees.  If he wishes to change

22  what he said before, made a mistake, he can say that.

23         MR. BRADLEY:  That's not my point.  I don't know if

24  he said that or not.  We don't know who answered these.  They

25  were directed to a group of people and a group response was

Robert Bittner - Cross

1   given.

2           THE COURT:  He can still see if he knows that and

3   if it's proper evidence.  If he answers, it's proper evidence.

4           MR. BRADLEY:  I understand, but they would be

5   proper in rebuttal not as an admission of this.

6           THE COURT:  The question included this witness'

7   name, is that not correct?

8           MR. BRADLEY:  I don't believe it did.

9           THE COURT:  The interrogatory.

10          MR. JACOBS:  The document itself is directed to

11  Defendant Bittner.

12          MR. BRADLEY:  And six other defendants including

13  Mr. Ferson who may have given the response.

14          THE COURT:  If it's ambiguous as to who responded,

15  he can ask him if he saw this and if he agrees or disagrees

16  with that.

17          Please rise for the jury.

18          (Whereupon, the jury entered the courtroom.)

19  (In open court, jury present.)

20          THE COURT:  Please be seated.

21          The objection is overruled.

22          You may continue, Mr. Jacobs.

23  BY MR. JACOBS:

24  Q.  I would like to draw your attention to No. 7 referring to

25  what has been marked as Plaintiff's Exhibit 24.

**Robert Bittner - Cross**

1   A.   Okay.

2   Q.   Did you read that?

3   A.   No. 7.   Identify by title the two pages of legal papers

4   seized from plaintiff on September 16, 2003.   If the documents

5   still exist, produce the documents.

6   Q.   Okay.

7   A.   Okay.

8   Q.   Do you see the answer?

9   A.   Yes.   The two documents confiscated by Mr. Jacobs were,

10  quote, unsworn declarations, unquote.   It is not known to the

11  responding defendants if these documents still exist as they

12  were sent to the security office at SCI-Pittsburgh, which is

13  now closed.

14          They were found to be contraband, property of

15  another and were revoked.

16  Q.   So do you still question whether or not these documents

17  were, in fact, unsworn declarations?

18          MR. BRADLEY:   Your Honor, I'm going to object to

19  that because he has never seen these documents.

20          THE COURT:   You need to lay a foundation as to

21  whether he has seen the documents.

22  Q.   Have you ever seen the documents?

23  A.   No.

24  Q.   Were these documents declarations, unsworn declarations of

25  another prisoner who witnessed misconduct taking place against

**Robert Bittner - Cross**

1   me?  He gave me those documents.

2              MR. BRADLEY:  Same objection, Your Honor.  He

3   hasn't laid a foundation whether he has seen the documents.

4              THE COURT:  He is laying a hypothetical on the

5   issues.

6   Q.  Based on your testimony about your understanding of a

7   declaration.

8   A.  Okay.

9   Q.  If a prisoner gives me a declaration about something he

10  witnessed that took place against me and I'm attempting to use

11  these declarations as evidence in my case, am I in possession

12  of contraband?  Is that how you interpret the policy?

13  A.  I don't understand your question.  You asked me earlier in

14  the same set of circumstances, would that constitute

15  contraband --

16  Q.  I'll rephrase the question.  You said you didn't

17  understand the question.  I'll rephrase the question.

18              Are prisoners allowed to give each other

19  declarations?

20  A.  I'm not aware of where policy specifically addresses

21  declarations.  I'd have to answer I don't know.

22  Q.  Do you interpret the policy --

23  A.  Do I interpret policy?  On occasion.

24  Q.  Do you interpret the policy to mean that property of

25  another prohibits prisoners from giving each other

**Robert Bittner - Cross**

1   declarations?  Is that how you interpret the policy?

2   A.  No.  If that issue were raised to me at final review, I

3   would bounce that off my immediate supervisor, the deputy

4   chief counsel.

5   Q.  But you said the documents.  The appeal in question was

6   never given to you, correct?

7   A.  That's correct.

8   Q.  It was given to someone else who is not even involved in

9   this case, correct?

10  A.  My assistant Mr. John Androtti who is the hearing examiner

11  supervisor under me.

12  Q.  Somebody else?

13  A.  I'm sorry?

14  Q.  Someone else that is not in this case?

15  A.  That's correct.

16          MR. JACOBS:  No further questions.

17          MR. BRADLEY:  Nothing further, Your Honor.

18          THE COURT:  Okay.  The witness is excused.

19          MR. BRADLEY:  Defendants call Gregory Giddens.

20          THE COURT:  If the witness could please come

21  forward, stand and be sworn.

22      **GREGORY GIDDINS, DEFENSE WITNESS, WAS SWORN.**

23              <u>DIRECT EXAMINATION</u>

24  <u>BY MR. BRADLEY:</u>

25  Q.  Would you please state your name and spell it for the

**Gregory Giddins - Direct**

1    record.

2    A.   Gregory S. Giddins, G I D D I N S.

3    Q.   What is your presents occupation?

4    A.   Lieutenant.

5    Q.   Who is your employer?

6    A.   The Pennsylvania Department of Corrections SCI-Mercer.

7    Q.   How long have you been employed by the Department of

8    Corrections?

9    A.   A little over 18 years.

10   Q.   What was your position when you first started?

11   A.   Correctional officer trainee.

12   Q.   How long were you a trainee?

13   A.   For a period of one year.

14   Q.   What did you do as a trainee, if you can relate to the

15   jury your training and experience as a correctional officer

16   trainee?

17   A.   As a correctional officer trainee there are four phases

18   you go through in your training year.

19           Initial phase, Phase 1 is orientation and it's

20   basically an inventory of what happens in a correctional

21   environment.

22           It also includes a period of training at the

23   central office area what is now called Elizabethtown.  When I

24   first started, there was no Elizabethtown.  It was four weeks.

25   Now it's campus and five weeks of training.

**Gregory Giddins - Direct**

1       Once you completed that training and done

2   observation of all three major shifts, six to ten, two to ten,

3   and two to six, you go into your Phase 2 training.

4       Phase 2 allows you to work for a period of 13 weeks

5   on each major shift, six to ten, two to ten, and two to six in

6   large groups, groups where you can be directly supervised or

7   governed by another officer or higher authority.

8       You complete that and go onto Phase 3.  That's

9   another period of 26 weeks or so.  That allows you to work

10  more individual posts where you're making independent

11  decisions but you're still within close proximity of other

12  staff but you can make some independent decisions based upon

13  the experience that you've had.

14      The final phase is Phase 4.  Phase 4 allows you to

15  work very security oriented posts, posts such as the officers

16  who escorted the inmate to the court today, the control booth,

17  points of egress and out of the institution.

18      Once you completed that period of training, you are

19  promoted to the rank of corrections officer one.

20  Q.  When you were corrections officer trainee, what

21  institution were you assigned to?

22  A.  SCI-Pittsburgh.

23  Q.  Upon you becoming corrections officer one, did you remain

24  at SCI-Pittsburgh?

25  A.  I did.

**Gregory Giddins - Direct**

1   Q.  How long did you remain corrections officer one?

2   A.  Approximately six and a half, seven years.

3   Q.  At that time were you promoted?

4   A.  Yes, sir.

5   Q.  Was that a merit appointment or serving a number of years?

6   A.  Combination of experience, testing, promotional

7  examination through the supervisor staff who make the decision

8  as to whom to promote.

9   Q.  What was your promotion to?

10  A.  Correctional officer two or the rank of sergeant.

11  Q.  Did you remain at SCI-Pittsburgh while you were a

12  sergeant?

13  A.  I did.

14  Q.  You were eventually promoted to lieutenant?

15  A.  That is correct.

16  Q.  Would that also be a corrections officer three position?

17  A.  Yes.

18  Q.  How long ago did that occur?

19  A.  August of 2001.

20  Q.  So you have been a lieutenant with the Department of

21  Corrections since August of 2001?

22  A.  That is correct.

23  Q.  And in August of 2001, where were you assigned?

24  A.  SCI-Pittsburgh.

25  Q.  What particular unit or responsibilities were you

**Gregory Giddins - Direct**

1  assigned?

2  A.   At the time of promotion, I was on the six to two shift.

3  So at the time of promotion, I remained on the six to two

4  shift for a short period, short time thereafter, approximately

5  two or three months.

6            I was assigned to the two to ten shift where I was

7  a shift lieutenant and handled day-to-day shift operations for

8  the shifts and I remained as a shift lieutenant -- I can't

9  give you an exact date but sometime until late 2002 or early

10  2003, I was asked by my major, which was the senior uniform

11  officer, if I would accept an assignment to work in the

12  long-term segregation unit, remaining on the afternoon shift.

13            I believe that appointment was based upon the fact

14  that as a sergeant, I had worked in the RHU, which is the

15  normal L5 units, for a period of about four years prior to

16  promotion as lieutenant both on the six to two and two to ten

17  shifts.

18  Q.   So you had some experience prior to your promotion to

19  working in the restrictive housing unit?

20  A.   Yes, sir.

21  Q.   And just for the jury's edification, I know there has been

22  a lot of testimony about L5 and RHU and segregated units.

23            Can you give the jury some background on the

24  Department of Corrections' policies regarding those types of

25  units.

**Gregory Giddins - Direct**

1   A.   There are multiple areas within a correctional environment

2   particularly in Pittsburgh where we were basically a reception

3   unit.

4           Initially, we were what they call a classification

5   center.  Then a few years ago, we lost our classification

6   status, however, we still accepted new commitments from county

7   facilities into the state system.

8           So those are Level 4 inmates, but they were

9   isolated based upon their testing and medical needs based upon

10  if they cleared.

11          You have general population inmates, those are the

12  inmates you usually see on TV or in a movie environment moving

13  around the yard, then you have segregated units such as the

14  RHU or restrictive housing units.  Those are units where

15  short-term lock-up inmates are maintained when they violate

16  rules of the institution or there are some other issue that

17  mandates that we staff secure them until such time there can

18  be a disposition on their continued existence in the

19  institution, the LTSU.

20          There is also a unit called the SMU or the special

21  modification unit, these were specialized L5 or restrictive

22  housing units for inmates that showed a long-term propensity

23  to violate, an institutional propensity --

24          MR. JACOBS:  I object, Your Honor.

25          THE COURT:  We'll take a brief recess.  Please

**Gregory Giddins - Direct**

1    rise.

2                    (Whereupon, the jury exited the courtroom.)

3    (In open court, jury not present.)

4                    THE COURT:  Please be seated.

5                    MR. JACOBS:  Counsel is eliciting testimony on the

6    characters in past misconduct hearings of prisons in the LTSU

7    segregation unit.

8                    Your Honor has addressed this issue previously and

9    I believe it is highly prejudicial to me and other witnesses

10   that testify in this case and the background -- my background

11   as well as any of the witness' background has no bearing on

12   documents being taken in the LTSU.

13                   THE COURT:  Did you see the written proffer on what

14   the long-term housing unit is?

15                   MR. JACOBS:  Every time they come, they take me

16   right out.  I never had time to read the document.

17                   THE COURT:  Why don't you take time to read it

18   limited to what the witness is going to be testifying to.

19                   The Court indicated at the end of the last hearing

20   day that the door had been opened to a certain extent with

21   respect to having the jurors understand what the LTSU is and I

22   asked for a proffer and this is the proffer which is fairly

23   limited in scope.

24                   Do you have a copy of that, Mr. Jacobs?  It is one

25   paragraph.

**Gregory Giddins - Direct**

1          MR. BRADLEY:  Your Honor, do you mind providing the

2     witness with a copy of that so he can limit his --

3          THE COURT:  I would hear from Mr. Jacobs first.

4          MR. JACOBS:  We never discussed a proffer in this

5     case.  As I recall, Mr. Willig had made a proffer in regards

6     to the 04-5290 case that happened --

7          THE COURT:  No.  Last Thursday we had argument, and

8     Mr. Bradley had indicated that he wished to present some

9     evidence about what the LTSU is since there has been a lot of

10    testimony about that and hear witnesses testifying about the

11    way they were treated in that unit.

12          I told him I would consider that.  I believe the

13    door had been opened somewhat and asked for a proffer, if that

14    testimony comes in, what they would say about it.

15          MR. JACOBS:  I do recall that.  With respect to

16    Mr. Bradley, you stated that you wanted me to put something in

17    writing in regards to that.

18          THE COURT:  I wanted him to do that and that is

19    what he has done.

20          MR. JACOBS:  I also put something in writing with

21    regard to that particular issue.  Mr. Bradley incorrectly

22    stated that Mr. Edwards testified about what happened in the

23    LTSU and his conditions in the LTSU when Mr. Edwards was never

24    in the LTSU.

25          The only one who was in the LTSU that testified was

**Gregory Giddins - Direct**

1  Mr. Lyons and Mr. Banks and Mr. Lyons' testimony didn't really

2  go into practices.  Mr. Banks' testimony was more on that

3  issue.

4           I can't see how the misconduct histories are --

5           THE COURT:  Just read the description of the LTSU

6  they have given and see -- this doesn't go into the nature of

7  the misconducts.

8           MR. JACOBS:  But Mr. Giddens testified --

9           THE COURT:  He has gone beyond the proffer and so

10 what would be appropriate is if you have problems with the

11 proffer, we'll take that out.

12          If you don't, then we'll show the proffer to the

13 witness and say can't go beyond that.

14          MR. JACOBS:  Okay.

15          THE COURT:  I'll strike his last testimony.

16          MR. JACOBS:  This is going to be the case.  This is

17 basically the purpose, they're identifying what they believe

18 is the purpose of the LTSU.

19          I believe this opens the door for me to testify as

20 to what I believe the purpose of the LTSU is.

21          THE COURT:  If you wanted to give some rebuttal on

22 that, you can do that.

23          I have a problem with describing it as a prison

24 within a prison.  You can just say the LTSU like the RHU is

25 for inmate serving disciplinary custody.

**Gregory Giddins - Direct**

1          MR. WILLIG:  Okay, Your Honor, it's more than that.

2          THE COURT:  It goes -- you can do everything else.

3    Calling it a prison within a prison has a connotation that

4    goes beyond what you need to do to describe it.  It's the

5    reference to a prison within a prison.

6          Mr. Jacobs, have you had a chance to review it?

7          MR. JACOBS:  Yes.

8          THE COURT:  Any statements?

9          MR. JACOBS:  The RHU as our place in the LTSU, this

10   basically references, insinuates past misconduct and actually

11   information that's not actually accurate as to whether or

12   not --

13         THE COURT:  We can strike that sentence.

14         MR. BRADLEY:  This was a very clean response to

15   testimony we heard about denial of mill trades, about being

16   placed in cells next to inmates that threw urine and feces.

17         I wasn't going to get into all that.  That goes to

18   the character of some of the witnesses.

19         He opened that door and we're entitled to have some

20   response to that.

21         MR. WILLIG:  Your Honor, I would add that is what

22   differentiates the LTSU from the RHU.

23         There are DC inmates who didn't hack it in the RHU

24   and they had to be placed in the LTSU because they

25   continue --

**Gregory Giddins - Direct**

1        THE COURT:  Is that after a hearing?

2        MR. WILLIG:  Misconduct hearing, sure.

3        MR. BRADLEY:  There's a process which they go

4   through which goes beyond a hearing.

5        There's psychological evaluations, there's reviews,

6   and it goes up to the highest levels of the department.

7        MR. JACOBS:  That information is incorrect, Your

8   Honor.  There has been a ruling by the Middle District of

9   Pennsylvania in Braunson versus Horne where the Court made a

10  very, very direct ruling that the prisoners being held at the

11  LTSU were not there with due process.

12       We did not receive due process in our placement in

13  the LTSU; but in any event, I fail to see why the background

14  of the prisoner is relevant to whether these documents were

15  taken, whether defendant engages in practices of destroying

16  legal property, whether defendant engages in practices of

17  retaliating against prisoners, what is the background of the

18  prisoner from not being in the RHU.

19       THE COURT:  The problem is you elicited testimony

20  from your witnesses about the suicide and other things that

21  were going on to indicate there were, that there were issues

22  and things going on there and it's only fair for the other

23  side to explain what the LTSU is.

24       MR. JACOBS:  I understand that.  They want to

25  basically try to clean the image of the defendants up with

**Gregory Giddins - Direct**

1    respect to the actual practices.

2              If they want to elicit testimony on rebuttal --

3              THE COURT:   You elicited that testimony.

4              MR. JACOBS:   I understand that, but they want to

5    elicit rebuttal testimony as to the actual practices or the

6    policies or the retaliation or the conspiracy or whatever.

7    There's no objection to that; but now they're going into the

8    legality and the validity of the LTSU.

9              I have strong issues concerning the actual

10   legality.

11             I have strayed away from that issue myself, the

12   legality of the existence of the LTSU.   Now, they're going

13   into the purpose and the background.   They're going to get

14   into that.

15             THE COURT:   There is no background description in

16   here.

17             MR. JACOBS:   But they are describing the prisoners.

18             THE COURT:   There is just a reference to

19   individuals who cannot function in lesser forms of DC

20   restrictions.

21             MR. JACOBS:   So they're characterizing -- that's

22   basically an indirect character.

23             MR. WILLIG:   In response to Mr. Jacobs' highly

24   inflammatory testimony from his witnesses about horrible

25   things that happened in the LTSU, we have come back and want

**Gregory Giddins - Direct**

1    to respond in a measured, calm way and just describe in the

2    most general terms this is what the LTSU is and because this

3    is what the LTSU is, it puts the correctional officers'

4    actions in the proper perspective.

5            We think as the defense position it is a measured,

6    well-reasoned response.

7            THE COURT:  I already said you can't refer to it as

8    a prison within a prison.

9            Now, we are looking at the inmates who for whatever

10   reason cannot function in lesser DC restriction and are placed

11   in the LTSU.

12           Can this be rephrased so that it is not -- so there

13   is some reference that the Department of Corrections will

14   place inmates in the LTSU whom the Department of Corrections

15   considers to be unable to satisfactorily reside in the RHU?

16           There's review procedures, isn't there, every 90

17   days for individuals that are in the LTSU?

18           MR. WILLIG:  Yes.

19           MR. BRADLEY:  Yes.

20           THE COURT:  What language could you use for that?

21   This is sort of like a finding of fact here.  I think the

22   question is this is where the inmates that the Department of

23   Corrections consider to be unable to function at other levels.

24   Are you satisfied with that?

25           MR. BRADLEY:  Yes.

**Gregory Giddins - Direct**

1     THE COURT:  With that modification, let me share

2  this with the witness.  The witness can be instructed as the

3  Court has modified this statement this will be the scope of

4  what you can say about the LTSU.

5          THE WITNESS:  Just on this front page, Your Honor?

6          THE COURT:  Just that one full paragraph, there.

7          Is that okay if I leave that with him --

8          MR. JACOBS:  What?

9          THE COURT:  The Court has handed to the witness the

10  proffer and I have instructed the witness he is not to exceed

11  the scope of that proffer as modified pursuant to the Court's

12  limitations here in court.

13          I'm going to leave that with him during his

14  testimony so he doesn't make a mistake.

15          MR. JACOBS:  Okay.

16          MR. BRADLEY:  One of the areas I want to explore

17  with him, one of the issues Mr. Jacobs has brought up is the

18  cell search.

19          I did want to ask would cells on this unit be

20  searched more frequently as a matter of course than on other

21  units.

22          THE COURT:  Mr. Jacobs?

23          MR. JACOBS:  There's no way for me to assert

24  whether or not any testimony he can give would be true or not.

25  There is no way for me to rebut that.

**Gregory Giddins - Direct**

1          THE COURT:  He can ask it.  You can rebut it from

2    your personal knowledge, if you know.

3          MR. JACOBS:  I mean there's no way I can have that

4    knowledge whether or not searches are conducted at this prison

5    or that prison or this unit or this unit more than the LTSU.

6          How does someone make that determination?

7          THE COURT:  I think you can probe him to see if he

8    observes cell searches in other units and see whether or not

9    that's true.

10          You can do that through cross-examination.  You

11    have your own witnesses who may be in various locations on

12    rebuttal.  You can ask what they have experienced.

13          MR. JACOBS:  On rebuttal?

14          THE COURT:  Yes.  Please rise for the jury.

15          (Whereupon, the jury entered the courtroom.)

16    (In open court, jury present.)

17          THE COURT:  Please be seated.

18          Members of the jury, the objection is sustained and

19    the last statement -- the last answer of this witness is

20    stricken.

21          Mr. Bradley, do you want to rephrase your question?

22    BY MR. BRADLEY:

23    Q.  Lieutenant Giddins, can you just explain to the jury very

24    briefly and broadly what the LTSU is?

25    A.  The LTSU is a more restrictive form of the L5 or RHU that

1   I previously spoke of.  It houses maximum custody inmates who

2   are serving disciplinary time for violation of institutional

3   rules and regulations.  It's the highest level of security

4   that we offer within the department or was at the time.

5               Inmates who for whatever reason have been unable to

6   function both in eligible population and regular housing

7   restrictive housing unit are submitted and placed in the LTSU.

8               The population in the LTSU is limited to 40 inmates

9   and that's 40 inmates of the 44,000 that the Department of

10  Corrections had incarcerated.

11  Q.   You've indicated that you were assigned to the LTSU as a

12  lieutenant, is that correct?

13  A.   That is correct.

14  Q.   Had you been assigned to the LTSU previously?

15  A.   I was not.

16  Q.   What were your duties and responsibilities as the LTSU

17  lieutenant?

18  A.   My primary function was to supervise both the care,

19  custody, and control of inmates assigned in the unit and the

20  day-to-day duties of the officers and sergeant assigned to the

21  unit.

22              I can't remember the total number of officers I had

23  assigned.  I believe it was something like four, six officers

24  plus a sergeant that were assigned to the unit.

25              When I arrived -- I arrive at one p.m., which would

**Gregory Giddins - Direct**

1  cross over the daylight function.  We had a yard exercise,

2  crew of eight to four officers.  I would supervise them for a

3  very short portion of their workday.  Then I would supervise

4  the officers working either one to nine or two to ten until

5  the end of that shift or until final lock-up.

6          That included mail distribution, that included the

7  delivery of meals on the unit for the dinner meal, that

8  included law library, that included any movement that occurred

9  and anything that dealt with the inmates or the staff on that

10  unit.

11  Q.  Just so we're clear, the inmates in these units, are they

12  generally confined to their cells for the distribution of the

13  day?

14  A.  In general.  You could say that there were some inmates

15  that spent more time than others out of their cell, those

16  inmates that have a propensity to request the law library more

17  often than others, those inmates that had medical issues more

18  prevalent than others, breathing treatment, things of that

19  nature.

20          All of those things would add to the time the

21  inmate spent outside of the cell.  If the inmate was so

22  inclined, certainly the inmate could spend 24 hours in the

23  cell.

24          In general, they all got out for yard, quite a

25  large portion got out for law library, and a portion got out

**Gregory Giddins - Direct**

1   for medical or whatever other institutional business they had

2   to deal with.

3          It might be to notarize legal documents, things of

4   that nature.

5   Q.  You mentioned a couple of times the term "yard."  Can you

6   explain to the jury what that means and what that process is?

7   A.  Yard is an exercise area.  By policy, I believe by law,

8   all inmates must receive at least one hour of exercise.

9          In this particular unit, it was limited to five

10  days a week as opposed to seven days a week, one hour of

11  exercise period.

12         So an inmate would sign up with the daylight shift

13  to participate in yard and based upon the schedule that was

14  put in place, the inmate would participate in a one-hour

15  period of exercise in a recreational area.

16         It was a secured area.  It wasn't a wide open area.

17  It was a secured area but the inmate would have opportunity

18  for fresh air, limited action with other inmates and exercise

19  in an open air situation.

20  Q.  Prior to becoming the LTSU lieutenant in I believe you

21  said 2002, 2003, did you know the plaintiff in this case Andre

22  Jacobs?

23  A.  I did not.

24  Q.  When did you first become or first meet Mr. Jacobs?

25  A.  I really can't speak to that time.  At some point during

**Gregory Giddins - Direct**

1    my time in the LTSU, I believe Mr. Jacobs was assigned to the

2    unit, but when that was, I can't speak to.

3           I can't even recall if he was there before or

4    after.  I think it was after, but I'm not certain of that.

5    Q.  Prior to September of 2003, do you recall any specific

6    incidents or involvement with Mr. Jacobs other than the

7    day-to-day things you had just described, such as yard, law

8    library, meals, that type of thing?

9    A.  Nothing specific.  Nothing in particular other than the

10   things that we've discussed during these proceedings.

11   Q.  Do you recall an incident on September 15 of 2003

12   involving an inmate named Eric Lyons at the LTSU?

13   A.  Vaguely, other than the review of the documents.  Vaguely.

14   Q.  To the best of your recollection, can you tell the jury

15   what you remember about that incident and maybe specifically

16   in terms of what role you would have had as the LTSU

17   lieutenant in the transfer of inmate to the law library and

18   back?

19   A.  As I recall, Inmate Lyons was being escorted from our law

20   library area.

21          Upon the return from the law library, it was

22   discovered that he was in possession of property which had the

23   appearance of belonging to another inmate.

24          The property was taken from the inmate.  The inmate

25   was escorted back to his cell and secured.  Then that officer

**Gregory Giddins - Direct**

 1   then brought that information to my attention.

 2          Legal property is not something we're authorized to

 3   read unless we have the authorization of the superintendent

 4   and there has to be a whole lot of other issues involved.

 5          So, there was a cursory review of the documents in

 6   question and a misconduct was written by the officer, and a

 7   confiscation slip was issued by the officer; and the documents

 8   were sent to security for review and to be held until a

 9   disposition was issued on the misconduct that was issued to

10   the inmate.

11   Q.   Do you know or do you recall if you were physically

12   present when Inmate Lyons was searched?

13   A.   I was not, as I recall, physically present when he was

14   searched.

15   Q.   So the first you would have been aware of this incident is

16   when the corrections officer brought you the materials that

17   were taken from Mr. Lyons?

18   A.   That is correct.

19   Q.   There was some testimony that Mr. Lyons was searched going

20   into the library as well as coming out of the library.

21          Can you explain why he would be searched both

22   coming in and going out?

23   A.   All inmates in L5 and both LTSU are searched both exiting

24   their cell and entering the law library and exiting the law

25   library prior to going back into the cell.

**Gregory Giddins - Direct**

1      Security was our first priority.  Any time you

2  remove an inmate from the cell, that inmate, as well as the

3  staff, are at risk for injury, particularly in a unit like the

4  LTSU.

5      So, to minimize, if not eliminate, the opportunity

6  for anyone to be injured, the inmate was searched coming out

7  of his cell and going anywhere, not just the law library but

8  anywhere within the facility or within the unit.

9      The inmate is, again, searched prior to placement

10  back in.  To add to it, in the law library we started to lose

11  pages of the law library books.  There's some very expensive

12  books that the Department of Corrections purchased so that the

13  inmates would have access to any type of law they needed to

14  effectively litigate a case or file an appeal or whatever the

15  case may be.

16      Unfortunately, inmates felt that they could go into

17  those books and remove pages for their own personal need and,

18  therefore, those pages were unavailable for other inmates when

19  they went into the law library.

20      So, what we had to do was go through their personal

21  papers to identify they were, in fact, their own personal

22  papers and not the property of the Department of Corrections.

23      Additionally, inmates would also use it as a point

24  of transfer for contraband.  One inmate would go into the law

25  library and do his legal work or whatever and upon exiting, he

**Gregory Giddins - Direct**

1   would leave what we call kites or notes for another inmate so

2   that when that inmate entered the law library, he would then

3   retrieve that kite, place it into his legal paperwork, which

4   he knows we can't read, so he feels very safe that legal work

5   now, that contraband is now safe from staff.

6           He would simply take that material back to his cell

7   and he is now in possession of some unauthorized material.

8           So, all of the tenets of searching coming and going

9   were put in place to minimize the impact of losing material

10  and the passing or exchange of contraband within the unit by

11  doing those searches.

12  Q.  You indicated a corrections officer.  Do you recall who

13  the officer was that searched Mr. Lyons?

14  A.  Officer Cherico.

15  Q.  Did Officer Cherico describe in detail what he discovered,

16  what he found?

17  A.  I would guess that he probably did in some detail and that

18  together we went through and tried to identify exactly what it

19  is, but I don't have direct recall so I can't say exactly what

20  the documents were or what they looked like.

21          The 151 -- I didn't count the pages so I can't say

22  that was an accurate number.

23          If he counted them and said it was that number of

24  pages, then that's what I accepted.

25  Q.  Do you recall from your review whether there were any just

**Gregory Giddins - Direct**

1  blank pages within that materials?

2  A.  I cannot recall what any of those pages looked like.

3  Q.  Did you see your name on any of the papers in the

4  materials?

5  A.  Not that I recall.

6  Q.  Did you look for your name in any of the materials?

7  A.  I did not, but it would be irrelevant if my name were in

8  those materials.

9  Q.  Why do you say that?

10  A.  It has no impact on me.  Part of the hazard of working not

11  only in the correctional environment but working in a lock-up

12  unit or specialized unit is that inmates are going to differ

13  with the position of the policies that you're charged to

14  enforce.

15      Therefore, you end up either being sued or end up

16  in a court of law such as we are here today.  It's just a part

17  of working in that type of environment and it's what you

18  accept when you work in those types of areas.

19  Q.  Do you accept?

20  A.  I accept that fully and wholly.

21  Q.  Is that also true in terms of just regular administrative

22  grievances within the Department of Corrections?

23  A.  Anywhere within the correctional environment.

24  Q.  Did you see names of other DOC employees at SCI-Pittsburgh

25  including Stickman, Cherico, on any of these papers?

**Gregory Giddins - Direct**

1  A.  Not that I recall.  I didn't read the documents.  I simply

2  glanced at them to identify what we would identify them as.

3  Q.  What were they identified as?

4  A.  They were identified as legal papers.

5  Q.  Again, belonging to another inmate?

6  A.  Belonging to another inmate.

7  Q.  With respect to that search of Inmate Lyons on September

8  15th and confiscation of those papers, in addition to what you

9  have already told the jury, is there anything else you can

10  tell the jury with regard to your participation in that event?

11  A.  As a unit supervisor, my participation is minimal.  I

12  either concur with the staff or differ with them and give them

13  direction other than which is the course taken.

14          In this situation, I concurred he was in possession

15  of property of another.  Misconduct was written, and at that

16  point that information is sent directly to the shift

17  commander, a person, as you heard Captain Simpson testified,

18  that would handle those type of responsibilities.

19          It is that shift commander's authority or

20  responsibility to identify if he concurs with that misconduct,

21  if he or she is going to sign off on that misconduct and issue

22  it to the inmate.

23          My authority ceases at that level.

24  Q.  Moving to the next events claimed by Mr. Jacobs.  He

25  indicates that his cell had been searched the following day

1    September 16th, 2003.

2              Do you have a recollection of that event?

3    A.  I have a slight recollection of that event, yes, sir.

4    Q.  Initially was the search of Mr. Jacobs' cell on September

5    16th, 2003 in any way connected with the confiscation of

6    materials from Mr. Lyons on September 15th, 2003?

7    A.  To the best of my knowledge and recollection, it was not.

8    Q.  Is it unusual that an inmate's cell in the LTSU would be

9    searched?

10   A.  No.  There was a requirement, I believe, by our policy

11   that required each inmate's cell is searched a minimum of

12   twice per month.

13             We split that between the shifts, search each cell

14   once on the one shift and the two to ten shift would search

15   each cell at least one time.  That was a minimum, the limited

16   number of times it could be searched but a minimum of those

17   twice per month searches.

18   Q.  You had indicated on September 15th that Officer Cherico

19   had issued a misconduct to Inmate Lyons regarding the

20   possession of property of another?

21   A.  I believe so.

22   Q.  Could we have the exhibit.  This has been previously

23   marked as Plaintiff's Exhibit 6.  Do you recognize this as a

24   misconduct document?

25   A.  Yes, sir.

**Gregory Giddins - Direct**

1  Q.  And this is the form the Department of Corrections uses to

2  issue misconducts?

3  A.  That is correct.  DC 14, Part 1.

4  Q.  This is what Officer Cherico issued to Eric Lyons on

5  September 15th, 2003, following the search coming from the law

6  library, is that correct?

7  A.  Yes.

8  Q.  I believe you had just provided testimony on this.

9  Perhaps for the jury's understanding, can you just go through

10  some of the signatures on the bottom of the misconduct form?

11  A.  The reporting staff member's signature and title is that

12  of the staff member that is charging the inmate with the

13  violation of institutional rules.  That is CO IFP Jericho.

14        The action reviewed and approved by ranking CO

15  signature and title, that is Captain Claiborne at the time.

16  He was the shift commander for the two to ten shift obviously

17  by his signature on duty on the date in question.

18        The next area is the date and service time of the

19  misconduct, and as you notice, the service time was 2140

20  hours.  That is basically 9:40 p.m., which would have been

21  after I had left my shift, which was from one p.m. to nine

22  p.m. and the signature of the person serving, this was

23  Sergeant Lynch.

24        Just above that is the justification.  There's a

25  requirement under policy that the shift commander justifies

**Gregory Giddins - Direct**

1   rationale for each misconduct and in this case, the

2   justification under immediate action taken and reason was that

3   the captain decided that it was not a severe circumstance and

4   he wanted it processed for informal resolution, an informal

5   resolution that would be sent to the housing unit manager as

6   opposed to the hearing examiner for disposition.

7          It is not input into the computer.  What is input,

8   it is input as a formal resolution.  It is not tracked in the

9   same manner as a formal resolution which those misconducts go

10  to hearings.

11  Q.  The day after this misconduct was issued, did you ever go

12  to Eric Lyons' cell and attempt to retrieve this misconduct

13  form that had been issued to him?

14  A.  I did not.

15  Q.  Did you direct anybody to go get the misconduct form from

16  Eric Lyons?

17  A.  I did not.  Why would I want to take the misconduct back.

18  It makes no sense.

19  Q.  Did anybody direct you to take the misconduct back?

20  A.  No one directed me to take the misconduct back.

21  Q.  As I indicated, Mr. Jacobs has indicated that his cell was

22  searched on September 16th.

23         Did you search his cell looking for the misconduct

24  issued to Eric Lyons on September 15th?

25  A.  As a common practice, not a requirement, as a practice for

**Gregory Giddins - Direct**

1    myself as a supervisor and based upon various allegations from

2    inmates, I would be out and available and on the pod for the

3    searches of inmate's cells.

4            The particular case where Mr. Jacobs' cell was

5    searched, I believe I was out and on the pod in the event

6    there were any issues, concerns, because most of the inmates

7    on the unit for whatever reason had issues with their cells

8    being searched.

9            They had issues with their persons being searched

10   even though they knew and everyone knew it was a requirement

11   of the unit.  When we went to search their cells or person,

12   they took issue with it more times than not.

13           So to eliminate the idea that there was some

14   impropriety or issues, I would make myself available as best I

15   could during those searches.  I wasn't there 100 percent of

16   the time but at least 50, 60 percent of the time I was out on

17   the unit, on the pod available while the cell searches

18   occurred.

19   Q.  To the best of your knowledge and recollection, the search

20   of Mr. Jacobs' cell on September 16th was just a routine cell

21   search in this unit?

22   A.  I can't say that.  I don't know.  I don't have a

23   recollection as to what would be the rationale for his cell

24   search.

25   Q.  Was his cell being searched for the purpose of harassing

1   Mr. Jacobs?

2   A.   No.

3   Q.   Was it being searched in order to find the misconduct that

4   had been issued to Mr. Lyons the day before?

5   A.   Why would I expect Mr. Lyons' misconduct to be in

6   Mr. Jacobs' cell?

7   Q.   Was it done for the purpose of disrupting his legal

8   activities?

9   A.   No.

10  Q.   Was it searched for the purpose of taking and confiscating

11  and destroying Mr. Jacobs' legal property?

12  A.   No, sir.

13  Q.   Did it come to your attention during the search of

14  Mr. Jacobs' cell that what was purported as contraband was

15  discovered?

16  A.   Yes.

17  Q.   Can you tell the jury what your recollection of that

18  process and event was?

19  A.   As I recall, Sergeant Lynch showed me two pages of

20  documents that appeared to be legal -- they appeared as if

21  they were legal documents but both documents had the name of

22  another inmate on them.

23          Once, again, I'm not an attorney, I'm a corrections

24  officer.  Even though I can look at a document and identify at

25  this time it kind of looks like legal work, certainly I know

**Gregory Giddins - Direct**

1    if it has someone else's name on it, it should belong to that

2    other individual.  Reasonable assumption from a reasonable

3    person's perspective.

4            So based upon that information, a misconduct was

5    issued.  The documents were confiscated.  What we call a

6    DC-154A was issued to the inmate and the documents were

7    confiscated and again sent through the chain of command and

8    into security for review and maintenance until disposition was

9    levied on those documents.

10   Q.  Again, just to be clear, given the allegations in this

11   case, did you search or did you cause Mr. Jacobs' cell to be

12   searched because he had previously filed grievances against

13   you or other DOC members?

14   A.  Mr. Jacobs was one of at the time 40 inmates maintained in

15   the LTSU.  I had no personal issue than I did with any other

16   inmates.  They were inmates charged in my care and I provide

17   the care, custody, and control that I was required to both by

18   my administrative staff and by the policies of the Department

19   of Corrections for the Commonwealth of Pennsylvania.

20   Q.  Again, that would address your answer to the question

21   whether what you did on that day was because Mr. Jacobs had

22   filed litigation against other DOC members.

23   A.  It would just be another litigation, part of what happens

24   in the correctional environment that I'm experiencing and that

25   most of us in this courtroom that work for the Department of

1  Corrections have experienced.  Nothing different than any

2  other circumstance.

3  Q.  You had indicated that as part of -- when the

4  documentation was taken from Mr. Lyons and when the

5  documentation was taken from Mr. Jacobs, that a confiscation

6  slip was issued?

7  A.  Yes, sir.

8  Q.  I would just ask if you can identify for the record I

9  believe you referred to it as a DC-154A?

10  A.  Yes, sir.

11  Q.  That appears in the left-hand corner of the document?

12  A.  It does.

13  Q.  Perhaps with specific reference to this document but for

14  the jury's understanding, could you explain the purpose of the

15  DC-154A?

16  A.  Any time that property is taken from an inmate, most

17  inmates want to have a receipt of that property whether it's

18  theirs or others, they want some type of document that shows

19  it was taken from them by staff.

20      The confiscation slip provides them with that slip

21  so they have a record they did at some point have this

22  property, whatever it was, and it was taken by a specific or

23  particular staff member and what that staff member did with

24  that property.

25      It also provides a record for the institution to

1   know what staff member in the event there's an appeal for a

2   grievance or misconduct what staff member was responsible for

3   that property and what that staff member actually did with

4   that property.

5   Q.   As part of Exhibit 6 we see the confiscated items that

6   were issued to Eric Lyons on September 15th, is that correct?

7   A.   That is correct.

8   Q.   Again, we're putting up what has been previously marked

9   7B.   That's another DC-154A.   Does this represent the

10  confiscated items receipt to Mr. Jacobs on September 16th,

11  2003?

12  A.   Yes.

13  Q.   Does this appear to be the misconduct that was issued to

14  Mr. Jacobs on September 16?

15  A.   Yes.

16  Q.   And can you indicate to the jury who issued this

17  misconduct?

18  A.   Again, in the lower left quadrant, reporting staff member

19  signature and title Sergeant A. Lynch.   That is the issuing

20  staff member, the staff member that is charging the inmate

21  with the violation of the rules.

22  Q.   Both the misconduct and the confiscation slip at 7A and 7B

23  reflect that the property taken from Mr. Jacobs' cell belonged

24  to Inmate Gary Banks.   Do you know Inmate Gary Banks?

25  A.   I do.

**Gregory Giddins - Direct**

1   Q.   Did you know him at that time in September of 2003?

2   A.   Yes.

3   Q.   Did you hear Mr. Banks testify on September 16th you went

4   to his cell and essentially threatened him with the fact that

5   he was providing assistance to Mr. Jacobs?

6   A.   I did.

7   Q.   Is that testimony correct?

8   A.   Nothing could be further from the truth.

9   Q.   On September 16th, 2003, did you go to Gary Banks' cell?

10   A.   I don't recall going to Gary Banks' cell.

11   Q.   Did you go to his cell and threaten him?

12   A.   Gary Banks is a difficult person to communicate with as he

13   made a regular and ongoing attack on my person.  I was called

14   everything but a child of God in Gary Banks' presence.

15          He appeared to have issue with my ethnicity on the

16   unit, supervising the units.  I was a house nigger.  I was an

17   Uncle Tom, and he felt he had the right to call me all of

18   those things on a regular basis because that was his First

19   Amendment right.

20          I would say that I seldom interacted directly with

21   Gary Banks.

22   Q.   Would the fact that Gary Banks was providing or attempting

23   to provide legal assistance to Mr. Jacobs or any other inmate

24   on the unit cause you to make threats against that individual?

25   A.   No, sir.  I don't threaten inmates.  It's not who I am.

**Gregory Giddins - Direct**

1  It's not what I do.

2  Q.   There's been testimony presented by Eric Lyons to the

3  effect several weeks after these events, you called Mr. Lyons

4  into your office, offered him a coffee, offered him a

5  cigarette and proceeded to discuss Mr. Jacobs and the fact

6  that Mr. Lyons was providing legal assistance to Mr. Jacobs.

7            Did those events take place?

8  A.   I know for a fact that I never invited any inmate into my

9  office and offered him a cigarette.

10           I have on occasion had inmates in my office

11  sometimes at my request, sometimes at their request to discuss

12  whatever issue it is.

13           I have no direct recall of Mr. Lyons being there,

14  but I can't say he was or was not.  I have no recollection,

15  but it was sometime prior to this to discuss issues with

16  inmates in my office.

17           It removed them from the bantering that would

18  happen on the unit from time to time.

19  Q.   If you had called Mr. Lyons into your office or if he had

20  come there at his request, would you have had any discussions

21  regarding your concerns about him providing legal assistance

22  to Mr. Jacobs?

23  A.   If legal assistance would have come up, Mr. Lyons would

24  have been reminded that there's no such process for our unit.

25           In the event that an inmate would like to have

**Gregory Giddins - Direct**

1   legal assistance from another, although it was not a part of

2   the policy, there were no provisions that allowed for that to

3   happen.   Certainly, if the request was valid, it would have

4   been sent up the chain of command for decision.

5           I was just part of that chain of command.   I did

6   not have that final authorization to allow one inmate to help

7   another.   It was not a policy or practice within the unit.

8           But certainly if the inmate had a wish or request

9   to receive some type of assistance on a specific issue,

10  certainly, that request could have been made known and the

11  proper people probably, ultimately the superintendent would

12  certainly -- at a minimum, the deputy would have made a

13  decision as to whether or not that was a proper request and

14  would have made a determination and answered the inmate's

15  request.

16  Q.   If such a request had been made to you generally, would

17  you have intercepted that request, quashed that request,

18  rejected that request on its face?

19  A.   I would have responded as I just did, that I do not have

20  the authority to authorize that, but I can send this up the

21  chain and someone who does have the authority can then make

22  the determination.

23  Q.   Again, I guess I'm looking for more of a general response

24  at this point, but did you ever threaten or attempt to exact

25  some kind of revenge against either Gary Banks or Eric Lyons

**Gregory Giddins - Direct**

1   for their -- whatever extent they were attempting to provide

2   or providing Mr. Jacobs with legal assistance?

3   A.   Once, again, I don't threaten inmates.  It's not who I am

4   and not what I do.

5            I am charged and given authority by the Department

6   of Corrections with my presence.  Certainly, I have

7   supervisory staff that gives me an additional degree of

8   authority.  I don't need to threaten an inmate to impose that

9   authority.  Just my presence presents that authority.  They

10  can accept it or decline to accept it.

11           That's their right or choice, but I have that

12  authority.  It's been given to me by the Department of

13  Corrections.  I don't need to further that authority -- what

14  could I get out of threatening?  I'm already in charge.  I'm

15  already in charge of that inmate.  Why do I need to threaten

16  him to show him my authority?

17  Q.   There was some testimony from Mr. Jacobs, from Mr. Lyons,

18  also from Mr. Banks, as well as an inmate named Michael

19  Edwards.

20           You were present for that testimony?

21  A.   I was.

22  Q.   Did you know all of those inmates that testified?

23  A.   All with the exception of a David Smith.  I never

24  interacted with him at all.

25  Q.   I don't believe, for the record, that David Smith did

**Gregory Giddins - Direct**

1    testify.

2    A.   Okay.

3    Q.   As far as Mr. Banks, Mr. Lyons, Mr. Edwards and

4    Mr. Jacobs, you heard their testimony?

5    A.   I did.

6    Q.   Did you hear their testimony regarding the treatment of

7    inmates in the LTSU who filed grievances and lawsuits?

8    A.   I did.

9    Q.   Do you credit that testimony?

10   A.   I do not.

11   Q.   Have you taken any inappropriate action for the record on

12   any inmate in the LTSU because they had filed grievances or

13   lawsuits?

14   A.   I have not.   There have been many, many grievances filed

15   in my 18 plus years with the Department of Corrections.

16              I probably wouldn't have time to do my actual

17   duties if I took the time to lash out towards each and every

18   inmate that has filed a grievance directed toward me or

19   included me.

20   Q.   Did you witness any of your subordinates taking any

21   inappropriate, unprofessional, unethical, or unlawful actions

22   towards inmates because they filed grievances or lawsuits?

23   A.   I did not.

24   Q.   If you had seen that, what would you have done?

25   A.   I would have had responsibility to act, to take

1   disciplinary action against that particular staff member,

2   assuming that staff member was less than insubordinate to me.

3   Q.  Mr. Banks also testified that some time in 2002, that you

4   had taken his legal property away from him in retaliation for

5   filing grievances and misconducts.

6           Is that true?

7   A.  I was not wholly aware that Mr. Jacobs was a grievance

8   filing type of inmate, so, no, that is not true.

9           I can count maybe on one hand the number of

10  grievances that I can recall, even have any knowledge of in

11  the two years or so I interacted with Mr. Jacobs, that I

12  recall.

13  Q.  Just to be clear.  Mr. Banks had testified that back in

14  2002, that you and I believe Officer Cherico had taken away

15  all of his legal property.

16          Do you recall that?

17  A.  I do not specifically recall, but I can recall a period

18  where Mr. Banks was put in a restrictive status based upon his

19  behavior.

20          So there may have come a time in a restrictive

21  status that he lost property for a specific period of time.

22  Q.  Would that loss of property had been based on the fact he

23  had filed a grievance or filed lawsuits or, as indicated, some

24  conduct on Mr. Banks' part?

25  A.  It would have been directly related to his behavior on the

1  unit.

2           THE COURT:  Do you have many more questions of this

3  witness?

4           MR. BRADLEY:  I do, Your Honor.

5           THE COURT:  Let's take a very brief recess.

6           Please rise for the jury.

7              (Whereupon, a recess was taken.)

8  (In open court, jury not present.)

9           THE COURT:  We need to talk about how much longer

10  the case is going on.  I have two other cases involving

11  Mr. Jacobs where he is the plaintiff that he scheduled and

12  given where we are today, I'm not -- I just don't envision we

13  are going to be able to try the three cases within the

14  timeframes allotted and we -- there were other witnesses from

15  some of those other cases that may be pertinent.

16           What is your schedule?

17           How many more witnesses, how long do you think

18  you'll take, Mr. Bradley?

19           MR. BRADLEY:  I have some more ground to cover with

20  Lieutenant Giddens.

21           Also, the two other officers, Sergeant Lynch and

22  Officer Cherico that were directly involved in the predicate

23  incidents.

24           Then I have Defendant McConnell who is a security

25  officer.  I don't have a lot of questions for him.  Then I

1   have Superintendent Stickman who has not a whole lot of

2   involvement in the predicate incidents but as a superintendent

3   has some other testimony to offer.

4            I believe that would be the extent of my witnesses.

5            THE COURT:  So another full day?

6            MR. BRADLEY:  I do need to call Mr. Jacobs on a

7   number of matters regarding his other legal actions.

8            THE COURT:  Two days?

9            MR. BRADLEY:  Two days would be more than enough to

10  get my testimony in.  It would, of course, depend on the

11  cross-examination.

12           THE COURT:  At least a day and a half.

13           MR. BRADLEY:  I imagine Mr. Jacobs'

14  cross-examination would be extensive with regard to Lynch,

15  Cherico, and Giddens.

16           THE COURT:  Do you agree with that, Mr. Jacobs?

17           MR. JACOBS:  I have a lot of cross-examination for

18  this particular witness, as well as Mr. McConnell,

19  Mr. Cherico, not so much on Lynch, not so much on Stickman,

20  but I also have a rebuttal witness and rebuttal testimony

21  myself.

22           THE COURT:  So at least a minimum of two days?

23           MR. BRADLEY:  I would think.

24           THE COURT:  We have another jury we selected in the

25  other case.  We will have trial here on Thursday -- I would

```
 1    like to be able to advise this jury what we will do.  We will
 2    not meet on Friday.  Then we'll be here on Monday of the
 3    following week and perhaps by that time, we will be concluding
 4    perhaps.
 5              MR. JACOBS:  Thursday, Friday, and Monday?
 6              THE COURT:  Just Thursday and Monday, not on
 7    Friday.  I have some other matters on Friday I have to deal
 8    with.  This Thursday and Monday.
 9              Then we have to have the final charge and the
10    closing arguments, so that may go into Tuesday.
11              The next case doesn't have as many defendants or
12    witnesses.
13              MR. WILLIG:  Four defendants.  I will call those
14    four defendants and one, two, and maybe three other witnesses.
15              THE COURT:  So still seven witnesses perhaps.
16              Mr. Jacobs, how many witnesses do you have for that
17    next case?
18              MR. JACOBS:  Three.
19              THE COURT:  Ten witnesses, so, at least a couple
20    days.  We'll plan to go Monday, Tuesday, and Wednesday of this
21    week, hopefully concluding some time on Wednesday, being
22    complete.
23              The Court will not be in session here on Thursday.
24    So the following Friday.
25              Can we try this case in three days?
```

1        MR. WILLIG:  Yes, Your Honor.  My case, the 1592

2    isn't as complicated as this.  We have very distinct issues,

3    two assaults, one access to court.  I think we can.  I

4    definitely can.

5        THE COURT:  Mr. Jacobs.

6        MR. JACOBS:  Three days.

7        THE COURT:  The 21st, 24th, and 25th?

8        MR. JACOBS:  I don't know.  I don't think so.

9        THE COURT:  Because then the Court is not going to

10   be available until December 15th.  So it's a problem -- I don't

11   want to start the next trial and take up the jurors' time if

12   we're not going to be able to conclude the case within a

13   timeframe that is suitable.

14        This case has just gone on for way longer than

15   originally anticipated or projected.

16        MR. WILLIG:  Your Honor, again, I can most

17   definitely, I can put my case on in one day but depending on

18   the cross-examination --

19        MR. JACOBS:  I'm not really concerned too much with

20   the cross-examination but a lot of delays that I have no

21   control over, transporting witnesses back and forth and

22   everything in general.  I don't think we'll make it.

23        MR. WILLIG:  I've done writs for those three

24   witnesses.

25        THE COURT:  They'll be here and available to us

1    whenever we need them, the 21st, the 24th, or the 25th?

2         MR. WILLIG:  That's the plan, Your Honor.  On

3    Friday I dealt with Sharon and did the writs and did the

4    orders to get them here to court so we won't have a

5    videoconferencing problem.

6         THE COURT:  We need to make a decision on this

7    about what we're able to do and whether we should attempt to

8    try the case in three days.

9         MR. WILLIG:  From defense, Your Honor, absolutely.

10   Yes, we should try this case in three days.

11        MR. JACOBS:  I think the end result would be to

12   rush my witnesses' testimony.  If there happens to be some

13   rebuttal, if my witnesses testify and the defendants testify

14   and other issues are raised with respect to my witnesses, I

15   think I would be put at a disadvantage position of three days.

16        I got to testify, three of my witnesses got to

17   testify.  Two of my witnesses --

18        THE COURT:  Ten witnesses for the defense or seven

19   witnesses for defense?

20        MR. WILLIG:  Actually, one of those witnesses -- if

21   Mr. Jacobs will, and I think he will, stipulate to the use of

22   force video, the seventh witness is just a foundation witness.

23        I took the video.  I reviewed it.  If he is willing

24   to stipulate to the admissibility of the use of force video,

25   you can cut that witness out all together.

1            Another witness will be the RN.  He will be up

2     there literally 15 minutes, and the other four witnesses are

3     defendants and maybe another CO.

4            That's it, Your Honor.  They won't be up there

5     long.  I won't have them up there long.

6            Lieutenant Giddens is going to be my main witness,

7     and I'm not going to have him up there that long.

8            THE COURT:  We have to read the preliminary charge,

9     we have to have the two openings.  That is at least a good

10    part of a morning.  We could do that on a Friday.

11           So then you would have basically a few hours on

12    Friday and whatever the remainder of the morning is and the

13    afternoon.

14           Well, let's think about this.  I'm troubled about

15    that because the Court is just not going to be available until

16    December the 15th.

17           MR. WILLIG:  Of course, we'll try it whenever the

18    Court wants to try it.  The only thing I'm saying is if you

19    want to try it on the 21st, I'm more than ready to go.

20           THE COURT:  I don't want to bring the jury in and

21    not be able to finish the case and have them come back weeks

22    later.  That is not something that would be appropriate.

23           Mr. Jacobs, I'm going to get in touch with the

24    counsel on your third case.  I think whatever we decide, that

25    case has got to be rescheduled.  I'm going to try to

1    reschedule it for early January.  So we'll have a conference

2    call set up to talk about scheduling for that case with the

3    other counsel.

4            MR. WILLIG:  What I'll do, I'll have the defendants

5    and witnesses coming in for this Friday.  I'll call them off.

6            THE COURT:  It is not feasible.  I would have done

7    something on Friday, but it doesn't look like this case is

8    going to be done.  I have other matters that I will be pushing

9    and I have to deal with those.

10           MR. JACOBS:  As I recall, that other case that you

11   referenced only involves approximately five witnesses I think,

12   including myself.  I think that case could be tried within

13   three days.

14           THE COURT:  The problem with that is the one

15   witness they want to have is only available the 17th and 18th

16   and that doctor was going out of town and we don't have a jury

17   picked yet for that case.  We have to pick the jury.

18           I thought we would pick that jury on the 17th and

19   then have the openings on the 18th and then have the other

20   witness on the 18th.  I don't see where there's going to be

21   enough time to do that.  Then that witness is not available.

22   That's the expert witness.  That expert witness is then not

23   available until after the 24th.

24           We'll think about this to see if there's a

25   different way we can do this.

1          Does anyone need to use the restroom facilities?

2              (Whereupon, a break was taken.)

3   (In open court, jury present.)

4          THE COURT:  Please be seated.  Mr. Bradley.

5          MR. BRADLEY:  Thank you, Your Honor.

6   BY MR. BRADLEY:

7   Q.  Lieutenant Giddens, as part of your responsibilities as a

8   supervisor in the LTSU, did you have any role in the grievance

9   process?

10  A.  I did.

11  Q.  What was that role?

12  A.  Primarily if a grievance was filed on staff that were

13  assigned to the six to two shift within the LTSU, that

14  grievance would be assigned to me.

15  Q.  Was there a particular reason you would be assigned to

16  address a grievance on the six to two shift?

17  A.  Because I was not a party to the grievance and because it

18  would minimize or eliminate as best we could, I guess, the

19  idea of impropriety.

20  Q.  Was that in relation to the DOC policy which indicated

21  that individuals involved in a grievance should not be

22  responding?

23  A.  That's correct.

24  Q.  Did there come occasions when you would respond to

25  grievances filed against the two to ten shift?

**Lieutenant Giddens - Direct**

1  A.   That is correct.

2  Q.   Just to be clear, you were on the two to ten shift?

3  A.   I was.

4  Q.   As a lieutenant, you were a supervisor on the two to ten

5  shift?

6  A.   I was.

7  Q.   In what circumstances would you respond to grievances

8  filed against staff members on the two to ten shift?

9  A.   Generally, there is a timeliness requirement for

10  grievances and if my counterpart from the six to two shift for

11  whatever reason was unavailable and we were facing a

12  timeliness issue, I would pick up the slack as he would for me

13  to insure we responded to a grievance within that time limit

14  requirement.

15  Q.   This has been previously marked as Plaintiff's Exhibit 1.

16  Do you recognize this document?

17  A.   I don't recall it, but I recognize it as a grievance, yes.

18  Q.   It has been given Grievance No. 63417.

19  A.   Yes.

20  Q.   Placing before you Defendant's Exhibit No. 2.   Start with

21  the bottom.

22         Is that your name and signature that appears on

23  Exhibit 2?

24  A.   Yes.

25  Q.   The date on that is October 3, 2003?

**Lieutenant Giddens - Direct**

1  A.  That's correct.

2  Q.  Do you recognize this particular document or do you have a

3  specific recollection of it today?

4  A.  I do.

5  Q.  Explain to the jury what this document is and what role

6  you took in preparing it?

7  A.  It's a DC-804 Part 2, the official response to an inmate's

8  grievance.

9  Q.  This is the response you made to the grievance Mr. Jacobs

10  filed at No. 63417?

11  A.  That's correct.

12  Q.  As you sit here today, do you agree with the response that

13  was given --

14  A.  I do not.  I erred in my response on that document.

15  Q.  Can you explain to the jury the nature of that error.

16  A.  In hindsight, as I have gone through it in my mind, I can

17  only guess.  At the time that I received the inmate's

18  grievance, I went through records searching for misconducts

19  related to Inmate Jacobs and the seizure of property.

20          During that research, I was able to come up with

21  one misconduct which related to two pages of legal material

22  that was seized from Inmate Jacobs and belonged to Inmate

23  Banks.

24          So at the point, I could not find any other

25  misconducts that related to or confiscation slips that related

1   to Mr. Jacobs or seizure of alleged illegal property, I

2   responded to his grievance in kind with the information I was

3   able to gather during my investigation which related to the

4   misconduct we previously reviewed, wherein Sergeant Lynch

5   issued a misconduct for two pages of legal material that was

6   in his possession that appeared to belong to Inmate Banks that

7   had his name on it.

8           Based upon that investigation, the information I

9   was able to find, to me he was fabricating the 151 pages.  I

10  had no recollection of the 151 pages as previously on the

11  misconduct.  I didn't see it.  I just didn't recall it.  I

12  can't answer as to why.  I just didn't.

13          So I responded in kind to his grievance and sent

14  that response forward.  I take DOC documents seriously and any

15  time an inmate lies on a document, I want to make sure I bring

16  that to his attention that this is a fabrication and as such,

17  you can receive a misconduct under the Administrative

18  Directive 801.

19          I would never have put that statement that has been

20  highlighted on this document had I not fully and wholly

21  believed in my response on the document because it's an

22  official document for me as well.

23          So lying for me subjects me to disciplinary action

24  as well as the inmate.

25  Q.  When you wrote this response, did you purposely ignore or

**Lieutenant Giddens - Direct**

1  forget the prior incident involving Eric Lyons?

2  A.  I had no recollection of that incident purposely or

3  otherwise.  I just had no recollection.

4  Q.  So, again, when you responded, you responded to the best

5  of your ability with the information and knowledge that you

6  had at the time and which you could gather through your own

7  investigation?

8  A.  That is correct.  If I recall the timeframe specific to

9  this response, I can actually recall maybe asking a couple of

10  folks within a unit what 151 pages.  Where are these 151

11  pages.

12      I had no recollection of the seizure.  I guess my

13  response came some two weeks after that.  I had no

14  recollection.

15  Q.  Was this response done to conceal the seizure

16  from -- conceal the fact that documents were taken from

17  Mr. Lyons back on September 15, 2003?

18  A.  They had already been documented.  There was no way to

19  conceal something.  It was already a documented incident.

20  Q.  Just to conclude your testimony and just so the jury is

21  clear, did you take any action while the lieutenant on the two

22  to ten shift or at any time as a member of the Department of

23  Corrections with respect to Mr. Jacobs based on the fact that

24  Mr. Jacobs had filed grievances against either you or other

25  members of the Department of Corrections?

**Lieutenant Giddens - Direct**

1    A.  I did not.

2    Q.  Did you ever take any action with respect to Mr. Jacobs

3    based on the fact that Mr. Jacobs had filed a lawsuit against

4    other DOC personnel?

5    A.  I was not aware he even filed a lawsuit until now.

6    Q.  Did you take any action with respect to Mr. Jacobs based

7    on the fact that he was contemplating filing a lawsuit against

8    you?

9    A.  No, I did not.

10   Q.  Did you direct anyone, including the defendants, to take

11   any retaliatory action against Mr. Jacobs or any action that

12   would deprive him of access to the courts?

13   A.  Absolutely not.

14   Q.  Did you enter into any agreements whether explicit or

15   implicit with the other defendants in this case to take any

16   retaliatory action against Mr. Jacobs or any action to deprive

17   him of access to the courts?

18   A.  Absolutely not.

19            MR. BRADLEY:  No further questions, Your Honor.

20                     CROSS-EXAMINATION

21   BY MR. JACOBS:

22   Q.  You stated that you can recall some of the grievances that

23   I filed during the time in question?

24   A.  I don't recall the grievances.  I just recall I had a

25   file.

1          My grievance response is typed.  I had a

2    computerized file of grievances and each grievance file was

3    labeled with the inmate to which filed the grievance.

4          I may remember, I don't know, four or five that I

5    had in that file for you.

6    Q.  Do you remember any of the grievances that I may have

7    filed against you?

8    A.  I do not.

9    Q.  Prior to the events in question?

10   A.  I do not.  I have no recollection of any grievances other

11   than these at the end of the day that you filed against me,

12   that I recall anyway.

13   Q.  You mean the one that was on the screen or ones beside

14   that?

15   A.  The one that was on the screen.

16   Q.  But none prior to that?

17   A.  Some of the others we have discussed during these

18   proceedings.  There may have been one or two I saw my name on

19   that I recall.

20   Q.  Showing you what has been marked as Plaintiff's Exhibit

21   No. 8, do you recognize that document?

22   A.  I have some recollection, yes.

23   Q.  Does that refresh your recollection as to whether or not I

24   made a complaint against you prior to events in question?

25   A.  I believe that's one I had seen previously.

**Lieutenant Giddens - Cross**

1   Q.   Considering the timeframe this grievance was filed on

2   8-4-2003.   Do you see that?

3   A.   I see that.

4   Q.   Would you have remembered that grievance at the time frame

5   September 15th, 2003?

6   A.   I can't speak to that.  I don't know.  I possibly could

7   have.  I don't know.

8   Q.   Do you agree this particular grievance involved you and

9   Defendant Cherico?

10  A.   I believe that's part of your allegation, yes.

11  Q.   That's in this grievance?

12  A.   Yes.

13  Q.   You stated you generally don't respond to a grievance if

14  it's against you?

15  A.   That's policy, correct.

16  Q.   You are expected to abide by that policy, correct?

17  A.   I would expect so, yes.

18  Q.   Would you respond to a grievance of this nature, a direct

19  complaint against you?

20  A.   I believe I did respond to this one.  So obviously, yes.

21  Q.   You also stated that in the event that you did respond to

22  a grievance, it would have had to have been issued of

23  timeliness or the unavailability of another person to respond?

24  A.   That would be my recollection, yes.

25  Q.   So it is your testimony that had to be the case in this

**Lieutenant Giddens - Cross**

1   particular --

2   A.  That is not my testimony.

3   Q.  I'm asking you.

4   A.  I don't know.  I don't know why I responded.  Generally,

5   that was the rationale for responding to a grievance that I

6   was involved in.  Specifically to this grievance, I can't

7   answer that.  I don't know why.

8   Q.  Do you agree you're basically investigating yourself?

9   A.  I would agree.

10  Q.  Have you ever on other occasions investigated yourself?

11  A.  I can't speak to that.  I may have.  I'm sure I have

12  answered other grievances that I was involved in, yes.

13  Q.  Have you ever found yourself guilty of the allegation?

14  A.  I don't know.

15  Q.  So it is your recollection you don't recall?

16  A.  I have no idea.

17  Q.  You don't recall finding yourself guilty?

18  A.  I don't know about guilty.

19  Q.  Responsible?

20  A.  I may have found I committed an error and tried to correct

21  the error.

22  Q.  You don't remember whether or not you actually did?

23  A.  I can't confirm or give you a negative.

24          THE COURT:  Given the time -- unless there is an

25  objection, this will be the last question for the day.

**Lieutenant Giddens - Cross**

1   Q.   Do you see No. 11, Mr. Giddens?

2   A.   I see it.

3   Q.   I'm referring to what has been marked as Plaintiff's

4   Exhibit 24.   Take a moment and go over that specific number,

5   11.

6   A.   I have.

7   Q.   Plaintiff's Exhibit No. 25, not 24.

8          THE COURT:   Is there something you need to do?   Do

9   you see the answer?

10   A.   This statement is denied.

11   Q.   That's your answer?

12   A.   That was my answer to your interrogatory, yes.

13   Q.   But that's not your answer today, is it?

14   A.   To what?   Do you want to state Question 11 because without

15   it on the screen, I can't effectively respond to that.

16          THE COURT:   Put Question 11 back on the screen.

17          THE WITNESS:   Can you put them both on the screen

18   at the same time.   Is that possible?

19          THE COURT:   Do them consecutively one after the

20   other.   Don't pull them apart.

21          THE WITNESS:   If you can put 11 up, that's fine.

22   A.   Okay.   That's my answer, yes.

23   Q.   That was your answer at that time?

24   A.   Correct.

25   Q.   Is that your answer today?

**Lieutenant Giddens - Cross**

1    A.   That is my answer.   I had no recollection of that -- you

2    didn't give me an opportunity to recall.   It was either

3    admitted or not.

4              I had no recollection of events in question that I

5    had filed -- that you had filed several grievances against me

6    prior to September 15, 2003.   That's not something that stayed

7    in my mind.

8    Q.   Does this case refresh your recollection?

9    A.   To the extent that I know there were grievances out there,

10   yes.

11   Q.   Against you?

12   A.   I have no specific recollection of any grievance against

13   me other than the ones you have shown, yes.

14             THE COURT:   Okay.   This would be a good time to

15   stop for the day.

16             Members of the jury, your participation in the

17   trial, as I told you several times, is critical to the

18   interest of justice, and the case has gone on longer than

19   originally anticipated.

20             You remember we said it would be approximately one

21   week.   I want to give you a sense of what is going to be

22   expected.

23             We will not be in session here Tuesday or Wednesday

24   of this week.   We will be back on Thursday.   We will not be

25   here on Friday.

1          We expect we probably need at least another two

2     days of testimony so that would be Thursday of this week, back

3     here the following Monday and I would ask you to reserve your

4     calendars through that Wednesday.

5          I would anticipate we'll be finished with the

6     evidence either some time on Monday, that would be Monday the

7     17th or Tuesday the 18th and that sometime probably on the 18th

8     we'll have the final charge and closings and you'll begin your

9     deliberations.

10         If you can make your arrangements to be here, that

11    would be greatly appreciated.

12         So just this Thursday and then next Monday,

13    Tuesday, and possibly Wednesday.

14         Everyone, please rise for the jury.  Thank you and

15    we'll see you on Thursday.

16         (Whereupon, court was recessed for the day.)

17                              - - -

18

19         I hereby certify by my original signature herein,

20    that the foregoing is a correct transcript, to the best of my

21    ability, from the record of proceedings in the above-entitled

22    matter.

23              S/_Karen M. Earley

24                 Karen M. Earley

25                 Certified Realtime Reporter