IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ANDRE JACOBS,                          )
                                       )
                  Plaintiff,           )
                                       )     Case No. 04-1366
            v.                         )
                                       )
PENNSYLVANIA DEPARTMENT OF             )
CORRECTIONS, JEFFERY A. BEARD,         )
et al.,                                )
                  Defendants.          )

## MEMORANDUM OPINION

## I.      Background

Plaintiff inmate Andre Jacobs ("Jacobs" or "plaintiff") brought this action pursuant to 42 U.S.C. § 1983 against the following defendants: Pennsylvania Department of Corrections ("DOC"), Thomas McConnell ("McConnell"), Carol Scire ("Scire"), Gregory Giddens ("Giddens"), Allen Lynch ("Lynch"), Robert Bittner ("Bittner"), Captain J. Simpson ("Simpson"), Kristin P. Ressing ("Ressing"), Michael Ferson ("Ferson"), Shelly Mankey ("Mankey"), William Stickman ("Stickman"), Frank Cherico ("Cherico"), David McCoy ("McCoy") and Jeffery Beard ("Beard") (each a "defendant" and collectively "defendants"). Jacobs asserted claims against each defendant alleging violations of his First Amendment right to access the courts ("access to courts claim"), conspiracy to violate his civil rights ("conspiracy claim"), and retaliation for attempting to exercise his constitutional rights ("retaliation claim").

Jacobs alleged that during his confinement at SCI-Pittsburgh, defendants engaged in a conspiracy to deny him access to courts by seizing his legal documents, and that defendants

retaliated against him for filing grievances and initiating litigation. Jacobs alleged that certain

defendants confiscated some of Jacobs' legal documents he needed for another case. As a result

of not having access to the confiscated documents, Jacobs alleged that he lost his right to file an

exception to the time bar under the Post Conviction Relief Act, 42 PA. CONS. STAT. §§ 9541-45

("PCRA"). Jacobs included a Pennsylvania common law claim of defamation against defendant

Giddens.

At the close of Jacobs' case in chief, the defense moved for judgment as a matter of law

pursuant to Federal Rule of Civil Procedure 50(a), with respect to plaintiff's claims. The court,

pursuant to Federal Rule of Civil Procedure 50(b), deferred ruling on the motion until after the

jury verdict was returned.

The jury returned a verdict in favor of Jacobs on the access to courts claim with respect to

Giddens and McConnell; on the conspiracy claim with respect to McConnell, Scire and Giddens;

on the retaliation claim with respect to McConnell, Scire and Giddens; and on the defamation

claim with respect to Giddens. (Trial Tr. Nov. 19 & 24, 2008 at 4-8.) The jury returned a verdict

in favor of all the other defendants in the claims asserted against them. (Id.)

Following the jury verdict, the defense renewed its motion for judgment as a matter of

law pursuant to Federal Rule of Civil Procedure 50(b) with respect to the defamation claim

against Giddens, the retaliation claims against Scire and McConnell, the conspiracy claims

against Scire and McConnell, and the access to courts claim against Scire, McConnell and

Giddens. For the reasons set forth below, defendants motion will be granted in part and denied

in part.

II.     **Standard of Review**

Defendants Giddens, McConnell and Scire move for judgment as a matter of law

pursuant to Federal Rule of Civil Procedure 50(b), which provides:

> If the court does not grant a motion for judgment as a matter
> of law made under Rule 50(a), the court is considered to have
> submitted the action to the jury subject to the court's later deciding
> the legal questions raised by the motion. No later than 10 days after
> the entry of judgment -- or if the motion addresses a jury issue not
> decided by a verdict, no later than 10 days after the jury was
> discharged -- the movant may file a renewed motion for judgment as
> a matter of law and may include an alternative or joint request for a
> new trial under Rule 59. In ruling on the renewed motion, the court
> may:
>
> (1) allow judgment on the verdict, if the jury returned a verdict;
>
> (2) order a new trial; or
>
> (3) direct the entry of judgment as a matter of law.

FED. R. CIV. P. 50(b).

Entry of judgment as a matter of law is a "sparingly" invoked remedy. CGB Occup.

Therapy, Inc. v. RHA Health Servs. Inc., 357 F.3d 375, 383 (3d Cir. 2004).  It should only be

granted if "viewing the evidence in the light most favorable to the nonmovant and giving it the

advantage of every fair and reasonable inference, there is insufficient evidence from which a jury

reasonably could find liability." Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1166 (3d Cir.

1993).  The court may not weigh evidence, determine the credibility of witnesses or substitute its

version of the facts for that of the jury.  The court may, however, grant the motion if upon review

of the record, it can be said as a matter of law that the verdict is not supported by legally

sufficient evidence.  Parkway Garage, Inc. v. City of Phila., 5 F.3d 685, 691-92 (3d Cir. 1993). A

mere scintilla of evidence presented by the plaintiff is not sufficient to deny a motion for judgment as a matter of law. Walter v. Holiday Inns, Inc., 985 F.2d 1232, 1238 (3d Cir. 1993). "'The question is not whether there is literally no evidence supporting the party against whom the motion is directed but whether there is evidence upon which the jury could properly find a verdict for that party.'"  Lightning Lube, 4 F.3d at 1166 (quoting Patzig v. O'Neil, 577 F.2d 841, 846 (3d Cir. 1978)).  In resolving this motion, the court should consider all the evidence available, excluding only evidence which the jury was not entitled to believe, and drawing all reasonable inferences in the light most favorable to the nonmoving party. Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 150 (2000).

Defendants Giddens, McConnell and Scire claim without citation to independent legal authority, that the court should consider only the evidence presented at the time defendants made the initial motion for judgment as a matter of law, i.e., only the evidence presented in plaintiff's case in chief.  Those defendants argue that Rule 50(a)(1) implies that the court should only consider the evidence of record at that time.  Rule 50(a)(1) provides:

> **(a) Judgment as a Matter of Law.**
>
> > **(1) *In General.*** If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may:
> >
> > > **(A)** resolve the issue against the party; and
> > >
> > > **(B)** grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

FED. R. CIV. P. 50(a)(1).  Defendants Giddens, McConnell and Scire argue that after plaintiff's

case in chief, plaintiff "has been fully heard on an issue," and the court should be precluded from considering subsequent evidence. This argument, however, does not consider Rule 50(b) which contemplates a court declining to rule on a motion before sending the issue to the jury – "If the court does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion." FED. R. CIV. P. 50(b).

In this case, the court did not rule on the Rule 50 motion when it was filed. Under these circumstances, the case law interpreting the reasoning behind Rule 50 supports the court considering all the evidence presented. In order for the court to consider a Rule 50(b) motion by a party after the jury verdict (traditionally referred to as judgment n. o. v.), that party must have previously moved for judgment as a matter of law pursuant to Rule 50(a) on that issue (traditionally referred to as a directed verdict). Mallick v. International Broth. of Elec. Workers, 644 F.2d 228, 233 (3d Cir. 1981). Rule 50(a)(2) requires that a Rule 50(a) motion must "specify the judgment sought and the law and facts that entitle the movant to the judgment." Courts have interpreted this provision to require enough specificity to put the opponent on notice so that he may cure any possible technical defects in his case. Acosta v. Honda Motor Co., 717 F.2d 828, 831-32 (3d Cir. 1983).

The United States Court of Appeals for the Third Circuit explained the reasoning behind enabling an opponent to cure defects in Acosta:

> Rule 50(b) is essentially a notice provision that, among other
> functions, protects the important seventh amendment right of trial
> by jury. A motion for a judgment n.o.v. must be preceded by a
> motion for a directed verdict sufficiently specific to afford the party
> against whom the motion is directed an opportunity "to cure

> possibly technical defects in proof which might otherwise make his case legally insufficient. A motion for judgment notwithstanding the verdict made after trial, in the absence of prior notice of the alleged defect, comes too late for possibly curative action, short of a completely new trial. Thus, whether or not the Constitution compels the rule forbidding a party to advance by judgment notwithstanding the verdict motion a ground not first advanced in a motion for directed verdict, the rule is certainly consistent with the general spirit animating the Federal Rules of Civil Procedure. That spirit suggests avoidance of surprises and tactical victories at the expense of substantive interests."

Id. (quoting Wall v. United States, 592 F.2d 154 (3d Cir. 1979)).

Even if a court errs in denying a Rule 50(a) motion, the error can be cured by evidence offered by the moving party. 9B CHARLES ALAN WRIGHT & ARTHUR R. MILLER , FEDERAL PRACTICE AND PROCEDURE § 2534, at 523-24 (3d ed. 2008). With respect to a motion for a directed verdict, which was the terminology used for a motion for judgment as a matter of law pursuant to Rule 50(a) prior to the 1991 revision to Rule 50,[1] the Court of Appeals for the Third Circuit held that:

> By proceeding to offer evidence in its own defense, a defendant waives the right to a directed verdict. If the motion for directed verdict is renewed at the close of all the evidence, the court will decide it according to the record as it then stands. Peterson v. Hager, 724 F.2d 851 (10th Cir. 1984); 9 J. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2534 (1971) (initial error by district court "is cured if subsequent testimony on behalf of the moving party repairs the defects of his opponent's case"); 5A J. MOORE & J. LUCAS, MOORE'S FEDERAL PRACTICE ¶ 50.05 [1] (2d ed. 1986) (same). Accordingly, any defects in [the plaintiff]'s case in chief were cured by evidence adduced during [the defendant]'s defense.

---

[1] See Wittekamp v. Gulf & Western, Inc., 991 F.2d 1137, 1141 n.2 (3d Cir. 1993). In Wittekamp, the Court of Appeals for the Third Circuit stated: "Our case law regarding the standard of review on appeals from orders granting directed verdicts is applicable to an order granting a judgment as a matter of law." Id. at 1142 n.3.

Trustees of Univ. of Pa. v. Lexingtons Ins. Co., 815 F.2d 890, 903 (3d Cir. 1987).

In this case, when the court declined to rule on the Rule 50(a) motion, and sent the case to the jury, Jacobs was given the opportunity to cure any defects he may have had in his case in chief.  The court will consider all the competent evidence presented, including the evidence that was presented after defendants' Rule 50(a) motion was filed.

## III.  Discussion

### A. Defamation Claim Against Giddens

Jacobs brought a state law defamation action against defendant Giddens, alleging that Giddens defamed him by making false statements that Jacobs fabricated the grievance in which he claimed that his legal documents were improperly confiscated. At trial, defendant Giddens raised the affirmative defense of sovereign immunity. The jury found for plaintiff on the defamation claim. (Trial Tr. Nov. 19 & 24, 2008 at 6.)

The jury returned a verdict in favor of Jacobs and against Giddens with respect to Jacobs' defamation claim based upon statements made by Giddens in connection with a misconduct report issued against Jacobs. Prior to submitting the claim to the jury, defendants argued that the defamation claim should be dismissed because Giddens was acting within the scope of his employment when he issued the misconduct report and was covered by sovereign immunity. This court determined that there were genuine issues of material fact with respect to whether Giddens was acting within the scope of his employment when he made the allegedly defamatory statements and submitted the issue to the jury. Giddens argues that the jury had insufficient evidence to conclude that he was not acting within the scope of his employment at the time of the

7

defamatory statements.

Under 1 PA. CONS. STAT. § 2310, the Commonwealth and its employees enjoy the protection of sovereign immunity so long as the employees are acting within the scope of their employment, subject to certain exceptions[2] which are not relevant to the matter at hand. La Frankie v. Miklich, 618 A.2d 1145, 1148 (Pa. Commw. Ct. 1992). This protection means that employees of the Commonwealth, and in particular corrections officers at State Corrections Institutions such as SCI-Pittsburgh, are protected from intentional tort claims like defamation, to the extent that they are acting within the scope of their employment at the time of the tort. Williams v. Stickman, 917 A.2d 915, 917 (Pa. Commw. Ct. 2007).

Pennsylvania has adopted the Restatement (Second) of Agency § 228 with respect to the issue of scope of employment. Brumfield v. Sanders, 232 F.3d 376, 380 (3d Cir. 2000). An employee is acting within the scope of his employment if the conduct at issue: 1) is the kind the employee is employed to perform; 2) occurs substantially within the authorized time and space limits; and 3) is actuated, at least in part, by a purpose to serve the master. Id. (citing RESTATEMENT (SECOND) OF AGENCY § 228 (1957)). The question whether an employee was acting within the scope of his employment is generally a matter for the jury. Chuy v. Phila. Eagles Football Club, 595 F.2d 1265, 1276 (3d Cir. 1979).

"[T]he mere existence of a personal motivation is insufficient" to bring an employee's

---

[2] The nine statutory exceptions to sovereign immunity set forth in 42 PA. CONS. STAT. § 8522, are: operation of a motor vehicle, acts of health care employees, personal property in the custody of Commonwealth employees, dangerous condition of Commonwealth real estate, dangerous condition of highways under Commonwealth jurisdiction, animals in custody of the Commonwealth, sale of liquor at Commonwealth distributors, acts of a member of Pennsylvania armed forces, and administration of any toxoid or vaccine. See, e.g., Yakowicz v. McDermott, 548 A.2d 1330, 1333 (Pa. Commw. Ct. 1988).

actions outside the scope of his employment where the conduct was within the scope of employment generally. Brumfield, 232 F.3d at 380.  Pennsylvania courts have also held that the definition contained in section 228 of the Restatement (Second) of Agency applies even when the employee's actions are "intentional or criminal."  Butler v. Flo-Ron Vending Co., 557 A.2d 730, 736 (Pa. Super. Ct. 1989).  While it is not necessary that the action be expressly authorized by the employer, the action must be "clearly incidental" to the employer's business. See Shuman Estate v. Weber, 419 A.2d 169, 173 (Pa. Super. Ct. 1980) (actions of employee were outside scope of employment when employee, hired to drive employer's car from repair shop to destination, embarked on personal errands far from the authorized time and space limits of the employment).

The jury was instructed that if they found that Giddens was acting within the scope of his employment at the time he made the defamatory statements, then they were to return a verdict in favor of Giddens. (Trial Tr. Nov. 18, 2008 at 98.)

At trial, Jacobs introduced evidence that Giddens' fabricated a misconduct report against him, falsely accusing Jacobs of lying when he claimed that corrections officers had improperly confiscated his legal materials. (Trial Tr. Nov. 5, 2008 at 45.)  On cross examination, Giddens admitted that his misconduct accusing Jacobs of fabricating the grievance was incorrect, although he testified it was a good faith mistake. (Trial Tr. Nov. 13, 2008 at 38.)  Jacobs testified that Giddens had a bias against Jacobs, and that Giddens' actions were motivated by a personal animus against Jacobs, rather than by a desire to execute his duties as a corrections officer. Jacobs testified that he filed a previous grievance against Giddens one month earlier.  (Tr. Tr. Nov. 5, 2008 at 50.)

Jacobs presented evidence through the testimony of inmate Eric Lyons ("Lyons"), which,

9

if believed by the jury, supported Jacobs' theory that Giddens defamed Jacobs in an attempt to discredit Jacobs and quash Jacobs' attempts to name Giddens in a lawsuit.  Lyons testified that Giddens was named in the documents that were confiscated as a possible defendant in the suit Jacobs was preparing.  (Id. at 97.)  Lyons testified that Giddens came to his cell after the documents were confiscated.  (Id. at 100.) Lyons told Giddens about the confiscation and Giddens said he would look into it.  (Id.)  The next day Giddens returned to Lyons' cell and had the following conversation with Lyons:

> Q. [By Jacobs] And what was the extent of the conversation?
>
> A. [By Lyons] When he came in, he approached my door and, um, you know, he had a real jovial look on his face, you know, like a smile, you know. And I asked him, I said, you know, what's up with the legal material I talked to you about yesterday? And he explained to me that, that he had sent the legal material up to security. And I was like, why did you send it to security? And he explained to me, he said, well, I would have been a fool to give that back to you or to Mr. Jacobs. I said, because that was your material. And he said, I would have been a fool to give it back to him, because my name is all on it. And he was laughing in the course of telling me this, you know. I was like, what that got to do with anything? I said, that's his legal material. And he said, well, I sent it up to security.
>
> Q. After Defendant Giddens told you that he would have been a fool to return all the legal documents, did he tell you how they would be dealt with after they were sent to security?
>
> A. He said that it was not likely that you'll get it back and it would probably be destroyed, according to someone – information that someone told him. He said he decided it with someone. He didn't mention any names, but he said he discussed the matter with somebody. He said it would be not likely that you'll get it back, you know.  I just told him to forget about it.
>
> Q. You said he discussed it with someone, but you do not remember the person that he discussed it with?

> A. No. He did not mention the individual's name that he discussed
> it with, the material itself, but he said it was not likely that you'll
> get it back.

(Id. at 101-02.)  Lyons was issued a misconduct for having Jacobs' materials that day.  (Id. at 102.)

Later that evening, on Giddens' shift, the corrections officers conducted a block search of all the cells on the LTSU including Lyons' cell and Jacobs' cell.  (Id. at 108-09.)  During the cell search of Lyons' cell, the officers asked for the misconduct that had been issued to Lyons that day.  Lyons did not have it.  (Id.)  Giddens and another officer searched Jacobs' cell and confiscated several documents.  (Id. at 109.)   Two weeks later Giddens called Lyons to his office for a conversation.  (Id. at 112.)

> Q. [By Jacobs] And what was the extent of that conversation?
>
> A. [By Lyons] In the afternoon, it was about two weeks later.
>
> Q. Two weeks after the misconduct?
>
> A. No, two weeks -- oh, excuse me. Yes, two weeks after
> the incident, after the confiscation of the material and the
> misconduct, yeah. It was two weeks after that, the officers came
> into the unit, and they told me that Lieutenant Giddens wanted to
> see me in his office. I asked him, why. They said they didn't know,
> he just wanted to see me, and we went through the procedures of
> strip search and all that again, and they put the handcuffs on me.
> Well, I turned around. I had the handcuffs on me. They told me, no,
> put them on the front, and they put the handcuffs on me in front. I
> thought that was a little bit unorthodox.
>
> Q. Why did you think that was unorthodox?
>
> A. Excuse me?
>
> Q. Why was that unorthodox?

11

A. They don't do that in LTSU. You're always cuffed behind the back, for security purposes.

Q. Okay.

A. So when they put the handcuffs on me in the front, I thought it was quite unusual. I wasn't going to make a phone call or anything like that. So, when they took me down Lieutenant's office, they had a tether on the front of it, and the Lieutenant told them to remove the tether. And he had a chair sitting in front of his desk. He told me to have a seat, which I did.

After I sat down, he asked me if I wanted a cup of coffee. He had a coffee machine up in his office. He asked me if I wanted a cup of coffee, and I accepted, because that's a rarity. I accepted the coffee. He offered me a cigarette.  I accepted that, because that definitely was a rarity.

And once everything -- once the atmosphere was a little bit comfortable, he leaned back in his chair and he goes, discussing you --

Q. -- what stop right there. You say that he offered you a cigarette?

A. Yeah.

Q. Are cigarettes permitted in the unit that we were in?

A. No.

Q. That's, that's something that we're not allowed to have?

A. No. There's no smoking in the L-5 unit around the whole State.

Q. At all?

A. At all.

Q. So, that would have been contraband under the DOC policy?

12

A. Most definitely.

Q. And what happened after this?

A. Well, as I said, he leaned back in his chair and he began discussing you. The topic of the conversation was the legal material that was confiscated, and because --

Q. The legal material that was confiscated from you?

A. Yes.

Q. Okay.

A. And because I was, I was raising cane about not getting the material back. I felt responsible for the material, and I was upset because the material was confiscated from me when I was assisting you with your legal work. Well, okay. You're going to take the material from me; give it back to you. And I was a bit on edge about not, them not giving it back to you, and them telling me that they are not going to give it back to you.

So, I was in the course of filing a grievance on the matter, which you said you will handle. You said, no, don't do that. I'll handle that. So, I didn't. But I was still inquiring about it. And the fact that I did not get a hearing on the misconduct was a bit like what's going on here, because I didn't get anything on that.

So, once we got in there and he was discussing this material that was taken from you, he told me basically to mind my business, because, you know, I wanted -- if I wanted to get out of the program, he was explaining to me the best way to get out of it, that I did not know you, you know, because I just came into the facility, which I wasn't very familiar with you, other than the fact you was next-door to me.

So, he said, you don't know this guy, you know. Why get involved with something that you have no concern about? And he said, if you want to make this an easy transition in or getting out of, of this program, then, you know, mind your business, and you know, that way you won't get our -- you'll wind up getting brutalized down the road. He put a whole bunch of twists and turns into the conversation, but you know, I, I thought it was kind of, kind of

13

odd that, you know, he was approaching me like this.

Q. How did you take this meeting?

A. Well, like I said, the whole thing was quite unorthodox; the coffee, the cigarettes, you know, him calling me down there, the topic of the discussion being you and your legal material. He could have came to my cell and done that.

Um, I took this as being sort of like a warning, a threatening warning to me. I mean, being in the Institution, having an individual, especially a white hat, approach you like that, I thought -- I felt threatened by him doing that to me.

(Id. at 112-15.)

Lyons never received a misconduct hearing for the misconduct issued to him that day. (Id. at 111.)  Lyons testified that not receiving a hearing was very unusual and against DOC policy.  This was the only time he was issued a misconduct without a hearing afterward.  (Id. at 121.)  In an effort to explain why Lyons never had a misconduct hearing, defendants produced an informal resolution form for the misconduct.  (Id. at 133.)  Lyons testified he never saw the form and did not attend an informal resolution hearing for this misconduct.  (Id.)  Lyons testified that it was most unusual to have the resolution – no action taken.  In his experience, an informal resolution would usually result in a warning or reprimand.  (Id.)  The informal resolution form was signed by the unit manager, but not Lyons.  (Id. at 134.)

During cross examination, Giddens testified that he was familiar with the code of ethics of the Department of Corrections, and specifically with the provision which stated that it was a violation of the code for corrections officers to enter false or inaccurate information on official documents. (Trial Tr. Nov. 13, 2008 at 4.)  From this evidence, the jury could have found that Giddens' actions were not "clearly incidental" to the business of the DOC or to his duties as a

14

corrections officer, since Giddens was not acting in the interests of his employer, but rather was working in his own interest to discredit Jacobs and cover up Jacobs' grievances against him.

Because there was evidence introduced at trial sufficient to support the jury's verdict, Giddens' motion on this issue is DENIED.

### B.  Jacobs' retaliation claims against Scire and McConnell

Jacobs brought a retaliation claim against Scire and McConnell, alleging that they retaliated against him for exercising his constitutional right to access the court system in violation of 42 U.S.C. § 1983.

In order to prove a retaliation claim, a prisoner must show: 1) the conduct in which he was engaged was constitutionally protected; 2) he suffered adverse action at the hands of prison officials sufficient to deter a person of ordinary firmness from exercising his constitutional rights; and 3) his constitutionally protected conduct was a substantial or motivating factor in the decision to discipline him.  Carter v. McGrady, 292 F.3d 152, 158 (3d Cir. 2002) (citing Mount Healthy Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977)).  Courts have held that when an inmate alleges that he was falsely charged with misconduct in retaliation for filing complaints against corrections officers, this retaliation implicates conduct protected by the First Amendment.  Mitchell v. Horn, 318 F.3d 523, 530 (3d Cir. 2003).  Similarly, the Court of Appeals for the Third Circuit has held that the prosecution of false misconduct reports qualifies as action "sufficient to deter a person of ordinary firmness from exercising his constitutional rights."  Smith v. Mensinger, 293 F.3d 641, 653 (3d Cir. 2002).  To satisfy the final element of the § 1983 claim, the plaintiff must produce evidence showing "a chronology of events from

which retaliation plausibly may be inferred." <u>Woods v. Abrams</u>, No. 06-757, 2007 WL 2852525, at *9 (W.D. Pa. Sept. 27, 2007) (citing <u>Tighe v. Wall</u>, 100 F.3d 41, 42 (5th Cir. 1996); <u>Goff v. Burton</u>, 91 F.3d 1188 (8th Cir. 1996))**.** A prisoner must at least produce evidence showing that the alleged retaliation occurred after the defendants had knowledge of the prisoner's constitutionally protected activity. <u>See</u> <u>Booth v. King</u>, 228 F. App'x 167, 172 (3d Cir. 2007).  Once a prisoner has made his prima facie case, the burden shifts to the defendant to prove by a preponderance of the evidence that it "would have made the same decision absent the protected conduct for reasons reasonably related to penological interest." <u>Turner v. Safley</u>, 482 U.S. 78, 89 (1987)).

    With respect to McConnell, McConnell does not challenge the first two elements of the retaliation claim, and did not offer proof that the decisions were made for a legitimate penological interest.  McConnell argues that Jacobs failed to prove his claim because he did not introduce evidence[3] showing that McConnell had knowledge of Jacobs' constitutionally protected activity at the time he was accused of retaliating against Jacobs.  The record, however, reflects otherwise.

    Jacobs' theory of liability on the retaliation claim with respect to McConnell was that McConnell, who as security officer was in charge of securing confiscated documents, retaliated against Jacobs for filing grievances and lawsuits against corrections officers by destroying 151 pages of Jacobs' confiscated documents.

    During Jacobs' cross examination of McConnell, Jacobs presented evidence which, if

---

[3] Defendants argued that plaintiff did not introduce such evidence in his "case in chief."  The court, however, for reasons stated above, is not limited to considering the evidence introduced in plaintiff's case in chief.

believed by the jury, established that upon his receipt of the documents, McConnell became

aware that Jacobs was exercising his First Amendment right of access to courts:

> Q. So, you did become aware, based on this statement. And you
> did become aware that I was trying to access -- exercise my right
> to access to the courts?
>
> A. Yes.

(Trial Tr. Nov. 13, 2008 at 157.)  Contrary to McConnell's argument, Jacobs presented

competent evidence upon which the jury could rely to establish that McConnell was aware of

Jacob's protected activity.  Jacobs produced evidence that McConnell was in charge of securing

confiscated items, and that McConnell received the confiscated items in this case.  (Id. at 159-

63.)  It was against DOC policy to destroy the documents in question.  (Id. at 170.)  The

confiscated items were never recovered and defendants never offered an explanation about why

they could not be produced.  This evidence taken as a whole was sufficient for a jury to infer

that Jacobs' protected activity was a substantial motivating factor in McConnell's actions.

    With respect to Scire, Scire assert that Jacobs did not produce any competent evidence

against Scire relating specifically to Jacobs' retaliation claim.  Jacobs' theory of liability with

respect to his retaliation claim against Scire was that she was upset with Jacobs for filing

grievances, and in retaliation she obstructed Jacobs' access to courts and in pursuing the

grievance process through her position as grievance coordinator.

    Although Scire limited her argument to the evidence presented in plaintiff's case in

chief, and limited the argument with respect to the retaliation claim against Scire to the assertion

that Scire did not have prior notice of plaintiff's protected activity, the court finds it worth

noting the evidence presented in support of an adverse action in this claim.  With respect to his

17

retaliation claim against Scire, Jacobs' theory is that Scire retaliated against him for exercising his rights by obstructing the grievance procedure through assigning the subject of the grievance to investigate the grievance, and subsequently denied plaintiff's grievance as unfounded.  In order to determine whether this constituted an adverse action, the jury needed to decide whether the action was "sufficient to deter a person of ordinary firmness from exercising his constitutional rights."  Carter, 292 F.3d at 158.  It is debatable in this case whether assigning the subject of a grievance to investigate the grievance contrary to DOC policy would dissuade a person of ordinary firmness from filing further grievances.  There was sufficient evidence presented, however, that the jury could rely on to make this determination, and the court will not disturb the jury's role as fact-finder with respect to this issue.

Scire did not testify in this case.  Jacobs presented evidence in support of his claim that Scire retaliated against him personally in the form of two exhibits with Scire's signature.  (Pl.'s Trial Ex. 1; Pl.'s Trial Ex. 45.)  One exhibit showed that Scire was aware of Jacobs asserting previous grievances, because she signed off as having reviewed a previous grievance.  The other exhibit is the grievance concerning the incident in question in this case.  This exhibit shows, as exhibited by her signature and as argued by plaintiff, that Scire reviewed the grievance and assigned Giddens to investigate the grievance.  Jacobs established through the testimony of Giddens that assigning the investigation of a grievance to the subject of the grievance was unusual and not DOC's ordinary procedure.  During Jacobs' testimony, Jacobs presented evidence that Scire was aware of Jacobs exercising his constitutional rights and some antagonism by Scire which could indicate motivation to retaliate.  Jacobs' testified at trial on November 18, 2008:

> On 7/15/2003, while in the Sergeant's office for notary service,
> Miss Scire told me she would arrange for me to copy and review
> my legal documents -- legal discovery material, quote, whenever
> she feels like getting around to it, unquote.
>
> Could you show the bottom of that?
>
> If you see the name, print name and title, grievance officer on the
> bottom left-hand corner, you see Carol Scire, Grievance
> Coordinator. And this grievance was specifically filed against
> Carol Scire, and she appointed herself to investigate herself.

(Trial Tr. Nov. 18, 2008 at 70.)[4]  Jacobs presented sufficient evidence for the jury to infer that

Scire was aware of Jacobs' attempts to exercise his constitutional rights, Jacobs suffered adverse

action at the hands of Scire sufficient to deter a person of ordinary firmness from exercising his

constitutional rights,[5] and Jacobs' constitutionally protected conduct was a substantial or

motivating factor in Scire's actions.  This court cannot, even if it would have found differently,

disturb the jury's verdict.


### C.  Conspiracy claims against McConnell and Scire

Jacobs alleged that McConnell, Scire and others conspired to deny Jacobs his First

Amendment right of access to courts by confiscating his legal documents and using the prison

administrative, misconduct and grievance systems to prevent Jacobs from claiming the

---

[4] Jacobs presented additional evidence concerning Scire that the court did not consider for
purposes of deciding this motion because the jury was not permitted to consider it in support of
this claim.  Specifically, Jacobs presented evidence of possible retaliation by Scire against other
inmates for filing grievances.  Two of Jacobs' witnesses testified about interactions that each had
with Scire concerning his particular grievance.  This evidence, however, was not relevant to
Jacobs' claim of retaliation against Scire, and was only entered into evidence for the limited
purpose of establishing knowledge on the part of supervisory personnel in support of Jacob's
supervisor liability claim.

documents. The jury returned a verdict in favor of plaintiff with respect to McConnell, Scire and Giddens, and in favor of defendants with respect to all other defendants. (Trial Tr. Nov. 19 & 24, 2008 at 5.)

To establish a § 1983 conspiracy claim, a plaintiff must prove: 1) the existence of a conspiracy involving state action; and 2) a deprivation of civil rights in furtherance of the conspiracy by a party to the conspiracy. See Panayotides v. Rabenold, 35 F. Supp. 2d 411, 419 (E.D. Pa. 1999), aff'd, 210 F.3d 358 (3d Cir. 2000).  A conspiracy is an agreement between "two or more persons to do an unlawful act, or to do a lawful act by unlawful means, or to accomplish an unlawful purpose." Franklin Music Co. v. American Broadcasting Cos., 616 F.2d 528, 534 (3d Cir. 1979).  "To prevail on a conspiracy claim, the plaintiff must present evidence of an agreement – 'the *sine qua non* of a conspiracy,' as it is 'not enough that the end result of the parties' independent conduct caused plaintiff harm or even that the alleged perpetrators of the harm acted in conscious parallelism.'"  Eichelman v. Lancaster County, 510 F. Supp. 2d 377, 393 (E.D. Pa. 2007) (quoting Spencer v. Steinman, 968 F. Supp. 1011, 1020 (E.D. Pa. 1997)). An agreement may be proved by circumstantial evidence.   Scully v. US WATS, Inc., 238 F.3d 497, 516 (3d Cir. 2001). The circumstantial evidence, however, "must be full, clear and satisfactory.  Mere suspicion or the possibility of guilty connection is not sufficient, nor proof of acts which are equally consistent with innocence."  Id. (citations omitted).

McConnell and Scire argue that there was insufficient evidence presented against McConnell and Scire to establish that an agreement existed to deprive Jacobs of his constitutional rights.

### 1.  Evidence of conspiracy with respect to McConnell

Jacobs presented no direct evidence that an agreement existed between McConnell and any other person to deprive Jacobs of his constitutional rights.  Jacobs points to circumstantial evidence from which, he argues, the jury could infer that an agreement existed between McConnell and Giddens.  Specifically, Jacobs points to the testimony of Lyons referenced above, when, if Lyons' testimony is credited, Giddens told Lyons that the material would most likely be destroyed.  Lyons testified:

> Q. After Defendant Giddens told you that he would have been a fool to return all the legal documents, did he tell you how they would be dealt with after they were sent to security?
>
> A. He said that it was not likely that you'll get it back and it would probably be destroyed, according to someone -- information that someone told him. He said he decided it with someone. He didn't mention any names, but he said he discussed the matter with somebody. He said it would be not likely that you'll get it back, you know.
>
> I just told him to forget about it.
>
> Q. You said he discussed it with someone, but you do not remember the person that he discussed it with?
>
> A. No. He did not mention the individual's name that he discussed it with, the material itself, but he said it was not likely that you'll get it back.

(Trial Tr. Nov. 5, 2008 at 101-02.)  Jacobs argues that given this testimony, and McConnell's testimony acknowledging that he spoke to Giddens about the incident afterwards, the jury could infer that there was an agreement between the two to violate Jacobs' constitutional rights.  This evidence, however, is insufficient to infer a conspiracy with respect to McConnell.  It is not clear who Giddens spoke to in the security department and would be speculation for the jury to

conclude that Giddens was talking about McConnell.  Even if the jury could infer from the circumstances that the person in security that Giddens talked to was McConnell, the testimony is insufficient to establish an agreement or conspiracy.  Lyons testified that Giddens told him the documents would most likely be destroyed "according to someone -- information that someone told him." (Id. at 101.)  Lyons later stated that Giddens told him that "[h]e said that he decided it with someone."  (Id.) Given the totality of the circumstances, Jacobs did not show by a preponderence of the evidence that it was more likely than not that Giddens and McConnell had an agreement and conspired to violate Jacobs' constitutional rights.  The court will grant the motion for judgment as a matter of law in favor of McConnell with respect to plaintiff's conspiracy claim against him.

### 2.  Evidence of conspiracy claim with respect to Scire

Plaintiff's theory of his conspiracy claim with respect to Scire is that Scire conspired with Giddens by assigning him to investigate Jacobs' grievance against him.  Jacobs argues that the practice of assigning grievances to the subject of the grievance is so wide spread that the act of assigning someone to investigate a grievance is an unwritten agreement between the parties to violate the prisoner's constitutional rights. There, however, was no evidence presented that shows directly or indirectly, that Scire had any communications or made any agreement with any other person to deprive Jacobs of his constitutional rights.  The jury would have to speculate that Scire conspired with Giddens.  The court will grant the motion as a matter of law in favor of Scire with respect to plaintiff's conspiracy claim against her.

**D. Jacobs' § 1983  Access to Courts Claim**

Jacobs alleged that defendants interfered with his First Amendment right to access the courts by confiscating his legal materials, resulting in the loss of his attempt to prove his exception to the PCRA time bar in a separate case. The jury returned a verdict in favor of plaintiff on this claim with respect to McConnell and Giddens, and in favor of all other defendants against plaintiff. (Trial Tr. Nov. 19 & 24, 2008 at 5.)

When a prisoner asserts that a defendant's actions have inhibited his or her opportunity to present a past legal claim, the prisoner must show "(1) that they suffered an actual injury – that they lost a chance to pursue a nonfrivolous or arguable underlying claim; and (2) that they have no other remedy that may be awarded as recompense for the lost claim other than in the present denial of access suit."  Monroe v. Beard, 536 F.3d 198, 205-06 (3d Cir. 2008).  A prisoner has a constitutional right to access the court system free from unnecessary government interference. Bounds v. Smith, 430 U.S. 817, 828 (1977).  This right is not absolute, but includes "a right to bring to court a grievance that the inmate wished to present."  Lewis v. Casey, 518 U.S. 343, 354 (1996).  The constitutional doctrine of standing requires prisoners who are alleging an interference with this right to demonstrate "actual injury" such as the loss or rejection of a legal claim. Oliver v. Fauver, 118 F.3d 175, 177 (3d  Cir. 1997) (citing Lewis, 518 U.S. at 350 (1996)).

The Supreme Court described the rationale behind the "actual injury" requirement in Lewis:

> It is the role of courts to provide relief to claimants, in individual
> or class actions, who have suffered, or will imminently suffer,
> actual harm; it is not the role of courts, but that of the political

> branches, to shape the institutions of government in such fashion
> as to comply with the laws and the Constitution. In the context of
> the present case: It is for the courts to remedy past or imminent
> official interference with individual inmates' presentation of
> claims to the courts; it is for the political branches of the State and
> Federal Governments to manage prisons in such fashion that
> official interference with the presentation of claims will not occur.

Lewis, 518 U.S. at 349-50.  The claim alleged to have been lost must have been "arguably actionable" and must challenge either the validity of  Jacobs' sentence, or the conditions of his confinement in a civil rights action.  Id. at 353.  A prisoner does not have a right to bring a frivolous claim.  Id.  Commenting on the difference between a frivolous claim, and an arguable claim which would qualify as an actual injury, the Supreme Court noted:

> Not everyone who can point to some "concrete" act and is
> "adverse" can call in the courts to examine the propriety of
> executive action, but only someone who has been *actually
> injured.* Depriving someone of an arguable (though not yet
> established) claim inflicts actual injury because it deprives him of
> something of value-arguable claims are settled, bought, and sold.
> Depriving someone of a frivolous claim, on the other hand,
> deprives him of nothing at all, except perhaps the punishment of
> Rule 11 sanctions.

Id. at 353 n.3.  Not all losing claims are frivolous: "If all procedurally defaulted claims were frivolous, Rule 11 business would be brisk indeed."  Id. at 353 n.2.

Jacobs claims that some of his confiscated legal papers were preparation materials concerning a pending civil rights suit, i.e., Jacobs v. Heck, Civ. No. 02-1703 (W.D. Pa. filed Oct. 7, 2002).  Jacobs argues that some of the confiscated documents were confidential investigation excerpts showing the personal involvement of supervisor defendant Sasway attempting to conceal Heck's alleged assault on plaintiff.  Plaintiff claims that without these documents, he was unable to defend against Sasway's motion to dismiss filed at about the same

24

time the documents were confiscated in this case.  Plaintiff claims that Sasway was dismissed because plaintiff could not produce the evidence that was allegedly confiscated by defendants. Plaintiff's theory is legally insufficient.  According to the docket of that case – admitted as an exhibit in this case – Sasway was dismissed on a motion to dismiss, and not at summary judgment.  Plaintiff's failure with respect to Sasway was a failure of pleading facts, not a failure of evidence.  The confiscation of his legal materials did not prevent Jacobs from responding to the motion to dismiss or amending his complaint to add the allegations concerning the confidential investigation excerpts contained in his legal materials.  When it came time to present evidence at trial, plaintiff admitted that he had these materials at that time, and was not prevented from presenting them. (Trial Tr. Nov. 17, 2008 at 7-16.)  Plaintiff failed to show that he lost a nonfrivolous legal claim with respect to that claim.

Jacobs also asserts that the loss of his legal documents hindered his ability to file for an exception to the PCRA time bar, 42 PA. CONS. STAT. § 9545.  The PCRA allows a convict to petition for relief only within one year of the date a judgment becomes final. Commonwealth v. Fahy, 737 A.2d 214, 218 (Pa. 1999). There are three exceptions to this time bar: first, if the failure to raise the claim previously was the result of interference by government officials in violation of the laws of the Commonwealth; second, if the facts upon which the claim is predicated were unknown to petitioner or could not be reasonable ascertained; and third, if the right asserted is recognized as a constitutional right by either the United States Supreme Court or the Supreme Court of Pennsylvania. Id. Any petition invoking these exceptions must be filed within sixty days of the date the claim could have been presented. Id.

At trial, Jacobs testified on his own behalf and presented evidence that he filed a PCRA

claim because his counsel failed to assert his appeal rights. Jacobs' PCRA petition was dismissed due to the PCRA time bar, and Jacobs claimed to have been compiling evidence of his counsel's obstruction in order to qualify for the time-bar exception. This evidence was allegedly among the evidence lost when his documents were confiscated.  (Trial Tr. Nov. 5, 2008 at 57-59.)

Defendants argue that even if the jury found all plaintiff's evidence credible, Jacobs' petition for the exception to the time bar was itself time barred.  Jacobs claims that the confiscated evidence was to be used in support of the government obstruction exception to the PCRA.  Because Jacobs claims he was gathering evidence in the form of affidavits in support of his petition, he was aware of the claim and had sixty days to file it.  Defendants assert, and Jacobs does not dispute, that he never filed his petition for the exception to the PCRA time bar. Defendants assert that since Jacobs' underlying claim was time barred, Jacobs' claim is frivolous and he can not show an actual injury.  Jacobs argues that he only needs to have an arguable claim, and a time-barred claim is not frivolous.

The standard a court should use to determine whether a prisoner's underlying claim in the context of an access to courts claim is frivolous is well settled.  In the context of the in forma pauperis statute, 28 U.S.C. § 1915, a claim is frivolous "where it lacks an arguable basis either in law or in fact."  Neitzke v. Williams, 490 U.S. 319, 325 (1989).  In the context of Rule 11 – alluded to by the Supreme Court in Lewis – the frivolousness of a pleading is determined by the attorney signing the pleading and the court applies a "reasonableness under the circumstances" test.  Napier v. Thirty or More Unidentified Federal Agents, Employees or Officers, 855 F.2d 1080, 1091 (3d Cir. 1988).  In neither context is there a hard and fast rule that

26

a time-barred claim is a frivolous claim.

In this case, the court concludes that Jacobs failed to present sufficient evidence for a reasonable jury to conclude that he suffered an actual injury by the loss of a nonfrivolous claim as a result of the actions taken by Scire, McConnell and Giddens.  Jacobs established that he had pending litigation, and that 150 pages worth of documents that Jacobs was using in preparation for his various pending cases were confiscated and lost or destroyed.  Jacobs failed to present sufficient evidence to show how the destruction of the documents prevented him from successfully presenting his claims.  Jacobs' PCRA petition was dismissed because it was time barred.  Jacobs, however, failed to present any evidence showing that destruction of his legal documents delayed his petition and caused him to miss the applicable filing period.  Jacobs was already time barred from filing a PCRA petition at the time of the interference with his legal materials on September 15 and 16, 2003.  Any petition to invoke the government interference exception to the time bar must have been filed within sixty days, or by November 15-16, 2003.  Jacobs did not file his second PCRA petition until July 7, 2004.  Jacobs does not allege that any defendant's action interfered with his timely filing of his claim, but rather that the destruction of his legal materials caused him to lose substantive evidence in support of his PCRA petition.  Any substantive evidence which was lost through the destruction of his legal materials was of no value to Jacobs, because he did not comply with the statute of limitations and therefore did not have a viable claim.

## V. Conclusion

For the reasons stated above, defendants' motion for judgment as a matter of law is

denied with respect to the defamation claim against Giddens, denied with respect to the

retaliation claims against McConnell and Scire, granted with respect to the conspiracy claims

against Scire and McConnell, and granted with respect to the access to courts claim against

Scire, McConnell and Giddens.


     By the court:

/s/ JOY FLOWERS CONTI
Joy Flowers Conti
United States District Judge

Dated: September 21, 2009